08 CIV 6259

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

AMNESTY INTERNATIONAL USA; GLOBAL
FUND FOR WOMEN; GLOBAL RIGHTS;
HUMAN RIGHTS WATCH; INTERNATIONAL
CRIMINAL DEFENCE ATTORNEYS
ASSOCIATION; THE NATION MAGAZINE;
PEN AMERICAN CENTER; SERVICE
EMPLOYEES INTERNATIONAL UNION;
WASHINGTON OFFICE ON LATIN AMERICA;
DANIEL N. ARSHACK; DAVID NEVIN; SCOTT
MCKAY; and SYLVIA ROYCE,

        Plaintiffs,

        v.

JOHN M. McCONNELL, in his official capacity as
Director of National Intelligence; LT. GEN. KEITH
B. ALEXANDER, in his official capacity as
Director of the National Security Agency and Chief
of the Central Security Service; and MICHAEL B.
MUKASEY, in his official capacity as Attorney
General of the Unites States,

        Defendants.

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

JUL 10 2008

U.S.D.C. S.D. N.Y.
CASHIERS

Hon.

**ECF CASE**

JAMEEL JAFFER (JJ-4653)
MELISSA GOODMAN (MG-7844)
L. DANIELLE TULLY (DT-0509)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by
CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

July 10, 2008

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This is a challenge to the constitutionality of the Foreign Intelligence

Surveillance Act, 50 U.S.C. § 1801, *et seq*. ("FISA"), as amended by H.R. 6304, the

FISA Amendments Act of 2008 ("FISA Amendments Act," "FAA," or "Act"), which the

President signed into law on July 10, 2008. As amended, FISA allows the executive

branch sweeping and virtually unregulated authority to monitor the international

communications – and in some cases the purely domestic communications – of law-

abiding U.S. citizens and residents.  The amended law (the "challenged law") eviscerates

the "[c]lear legal standards and effective oversight and controls" that the Senate Church

Committee concluded in 1978 were necessary to ensure that government surveillance did

"not itself undermine the democratic system it [was] intended to protect."

2.      Plaintiffs are attorneys and human rights, labor, legal, and media

organizations whose work requires them to engage in sensitive and sometimes privileged

telephone and email communications with colleagues, clients, journalistic sources,

witnesses, experts, foreign government officials, and victims of human rights abuses

located outside the United States.  Because of the nature of their communications and the

identities and geographic location of the individuals with whom they communicate,

plaintiffs reasonably believe that their communications will be monitored under the

challenged law.  The challenged law compromises plaintiffs' ability to gather

information, represent their clients, and engage in domestic and international advocacy.

It requires plaintiffs to take costly and burdensome measures to protect the confidentiality

of sensitive and privileged communications, and it undermines plaintiffs' ability to

engage in communications that are relevant and necessary to their work.

3.      Plaintiffs recognize that the government has a legitimate interest in monitoring the communications of individuals who are reasonably thought to pose a threat to the United States. Where government surveillance implicates the rights of U.S. citizens and residents, however, it must be conducted in a manner that comports with the Constitution. The law challenged here supplies none of the safeguards that the Constitution demands. It permits the government to monitor the communications of U.S. citizens and residents without identifying the people to be surveilled; without specifying the facilities, places, premises, or property to be monitored; without observing meaningful limitations on the retention, analysis, and dissemination of acquired information; without obtaining individualized warrants based on criminal or foreign intelligence probable cause; and, indeed, without even making prior *administrative* determinations that the targets of surveillance are foreign agents or connected in any way, however tenuously, to terrorism. In effect, the challenged law allows the mass acquisition of U.S. citizens' and residents' international communications. In some circumstances, it allows the warrantless acquisition of purely domestic communications as well. Plaintiffs respectfully seek (i) a declaration that the challenged law violates the First and Fourth Amendments to the U.S. Constitution, Article III, and the principle of separation of powers; and (ii) a permanent injunction against the law's use.

## JURISDICTION AND VENUE

4.      Jurisdiction is properly vested in this Court pursuant to 28 U.S.C. § 1331 over causes of action arising under the U.S. Constitution. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

5.    Venue is proper in this district under 28 U.S.C. § 1391(e).

**PLAINTIFFS**

6.    Amnesty International USA ("AIUSA"), a section of Amnesty International, is a grassroots activist organization based in New York City. It undertakes research and action to prevent and end grave abuses of all human rights – civil, political, social, cultural and economic. AIUSA sues on its own behalf and on behalf of its staff.

7.    Global Fund for Women ("GFW") is a non-profit grantmaking foundation based in San Francisco, CA. GFW advances women's human rights worldwide by providing funds to women-led organizations that promote the economic security, health, safety, education, and leadership of women and girls. GFW sues on its own behalf and on behalf of its staff.

8.    Global Rights is a human rights organization based in Washington, D.C. With offices around the world, Global Rights partners with local activists to challenge injustice and amplify new voices within the global discourse. Global Rights sues on its own behalf and on behalf of its staff.

9.    Human Rights Watch ("HRW") is a non-profit, non-governmental human rights organization based in New York City. HRW researchers conduct fact-finding investigations into human rights abuses in all regions of the world and publish their findings in hundreds of reports and other documents every year. HRW sues on its own behalf and on behalf of its staff.

10.    The International Criminal Defence Attorneys Association ("ICDAA") is a non-profit organization incorporated in the United States and Canada that seeks to

4

create the foundations for a full, fair, and well-organized defense in proceedings before international tribunals. The ICDAA sues on its own behalf and on behalf of its members.

11.     The Nation Magazine ("The Nation"), which is published by The Nation Company, L.P., and based in New York City, is America's oldest weekly magazine of opinion, news, and culture. Its editorial mission is to bring a critical, independent, and progressive spirit to the reporting and analysis of politics, social issues, culture, and the arts. In recent years, The Nation's journalists have won national and international awards for their investigative reporting about issues relating to national security, terrorism, human rights, and the wars in Iraq and Afghanistan. The Nation sues on behalf of itself, its staff, and certain of its contributing journalists.

12.     PEN American Center ("PEN") is a human rights and literary association based in New York City. Committed to the advancement of literature and the unimpeded flow of ideas and information, PEN fights for freedom of expression; advocates on behalf of writers harassed, imprisoned, and sometimes killed for their views; and fosters international exchanges, dialogues, discussions, and debates. PEN sues on its own behalf and on behalf of its staff and members.

13.     Service Employee International Union ("SEIU") is the fastest growing labor organization in the Americas, representing 2 million members located across the United States, Canada, and Puerto Rico. With headquarters in Washington, D.C., SEIU is dedicated to improving the lives of workers and their families and creating a more just and humane society. SEIU works with counterpart unions abroad and with international global union federations to advance workers rights at home and abroad. SEIU sues on its own behalf and on behalf of its staff.

5

14.    The Washington Office on Latin American ("WOLA") is a non-profit, non-governmental organization based in Washington, D.C. that conducts research, advocacy, and education designed to promote human rights, democracy, and social justice in Latin America. WOLA sues on its own behalf and on behalf of its staff.

15.    Daniel N. Arshack is a founding partner of the law firm Arshack, Hajek and Lehrman, PLLC, located in New York City. His practice includes the representation of defendants and witnesses in domestic criminal proceedings and international criminal tribunals. Mr. Arshack sues on his own behalf.

16.    David Nevin is a founding partner of the law firm Nevin, Benjamin, McKay & Bartlett LLP located in Boise, ID. His practice includes the representation of criminal defendants and civil litigants in cases relating to terrorism and national security. Mr. Nevin sues on his own behalf.

17.    Scott McKay is a partner with the law firm of Nevin, Benjamin, McKay & Bartlett LLP located in Boise, ID. His practice includes the representation of criminal defendants and civil litigants in cases relating to terrorism and national security. Mr. McKay sues on his own behalf.

18.    Sylvia Royce is a former Assistant U.S. Attorney for the District of Columbia and the former Chief of International Prisoner Transfer at the U.S. Department of Justice. Her practice, based in Washington, D.C., includes representation of individuals detained at Guantánamo Bay as well as individuals imprisoned in the United States seeking transfer to their home countries. Ms. Royce sues on her own behalf.

## DEFENDANTS

19.     Defendant John M. McConnell is the Director of National Intelligence ("DNI"). DNI McConnell has ultimate authority over the activities of the U.S. intelligence community. Under the challenged law, the DNI and the Attorney General have joint authority to authorize the mass acquisition of U.S. citizens' and residents' international communications.

20.     Defendant Lieutenant General Keith B. Alexander is the Director of the National Security Agency ("NSA") and Chief of the Central Security Service. Lt. Gen. Alexander has ultimate authority for supervising and implementing all operations and functions of the NSA, the agency that conducts the surveillance authorized by the challenged law.

21.     Defendant Michael B. Mukasey is Attorney General of the United States. Attorney General Mukasey has ultimate authority over the Department of Justice. Under the challenged law, the Attorney General and the DNI have joint authority to authorize the mass acquisition of U.S. citizens' and residents' international communications.

## BACKGROUND

### The Foreign Intelligence Surveillance Act

22.     In 1978, Congress enacted the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.*, ("FISA"), to regulate government surveillance conducted for foreign intelligence purposes. The statute created the Foreign Intelligence Surveillance Court ("FISC") and empowered the court to grant or deny government applications for surveillance orders in foreign intelligence investigations. *See* 50 U.S.C. § 1803(a).

23. Congress enacted FISA after the U.S. Supreme Court held, in *United States v. United States District Court for the Eastern District of Michigan*, 407 U.S. 297 (1972), that the Fourth Amendment does not permit warrantless surveillance in intelligence investigations of domestic security threats. FISA was a response to that decision and to years of in-depth congressional investigation, which revealed that the executive branch had engaged in widespread warrantless surveillance of U.S. citizens – including journalists, activists, and members of Congress – "who engaged in no criminal activity and who posed no genuine threat to the national security."

24. Congress has amended FISA multiple times. In its current form, the statute regulates, among other things, "electronic surveillance," which is defined to mean:

(1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes;

(2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States . . .;

(3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; and

(4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

8

50 U.S.C. § 1801(f).

    25.    Before passage of the FISA Amendments Act of 2008, FISA generally

foreclosed the government from engaging in "electronic surveillance" without first

obtaining an individualized and particularized order from the FISC. To obtain an order,

the government was required to submit an application that identified or described the

target of the surveillance; explained the government's basis for believing that "the target

of the electronic surveillance [was] a foreign power or an agent of a foreign power";

explained the government's basis for believing that "each of the facilities or places at

which the electronic surveillance [was] directed [was] being used, or [was] about to be

used, by a foreign power or an agent of a foreign power"; described the procedures the

government would use to "minimiz[e]" the acquisition, retention, and dissemination of

non-publicly available information concerning U.S. persons; described the nature of the

foreign intelligence information sought and the type of communications that would be

subject to surveillance; and certified that a "significant purpose" of the surveillance was

to obtain "foreign intelligence information." 50 U.S.C. § 1804(a) (2006). "Foreign

intelligence information" was defined broadly (and is still defined broadly) to include,

among other things, information concerning terrorism, national security, and foreign

affairs.

    26.    Before the passage of the FISA Amendments Act, the FISC was

empowered to grant surveillance orders if it determined that a government surveillance

application met the statutory requirements; that there was "probable cause to believe that

the target of the electronic surveillance [was] a foreign power or an agent of a foreign

power"; that "each of the facilities or places at which the electronic surveillance [was]

9

directed [was] being used, or [was] about to be used, by a foreign power or an agent of a foreign power"; and that the government's proposed minimization procedures met the statutory minimization requirements. 50 U.S.C. § 1805 (2006).

27. Congress intended FISA (together with Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, which governs electronic surveillance conducted for law enforcement purposes) to supply the "exclusive means" by which the executive branch could lawfully engage in electronic surveillance within the country's borders. 18 U.S.C. § 2511(2)(f). In enacting FISA, Congress expressly prohibited electronic surveillance "except as authorized by statute," 50 U.S.C. § 1809(a)(1), and it specified civil and criminal penalties for electronic surveillance undertaken without statutory authority, 50 U.S.C. §§ 1809 & 1810.

<u>The President's Warrantless Surveillance Program</u>

28. In the fall of 2001, President Bush secretly authorized the National Security Agency ("NSA") to inaugurate a program of warrantless electronic surveillance inside the United States (the "Program"). President Bush publicly acknowledged the Program after *The New York Times* reported its existence in December 2005. The President reauthorized the Program repeatedly between 2001 and 2007.

29. According to public statements made by senior government officials, the Program involved the interception of emails and telephone calls that originated or terminated inside the United States. The interceptions were not predicated on judicial warrants or any other form of judicial authorization; nor were they predicated on any determination of criminal or foreign-intelligence probable cause. Instead, according to then-Attorney General Alberto Gonzales and then-NSA Director General Michael

Hayden, NSA "shift supervisors" initiated surveillance when in their judgment there was a "reasonable basis to conclude that one party to the communication [was] a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda."

30.    On January 17, 2007, then-Attorney General Alberto Gonzales publicly announced that a judge of the FISC had "issued orders authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization." The Attorney General further stated that "[a]s a result of these orders, any electronic surveillance that was occurring as part of the [Program] will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court."

31.    The FISC orders issued in January 2007 were modified in the spring of that same year. The modifications reportedly narrowed the authority that the FISC had extended to the executive branch in January. Following the FISC's modification of its January 2007 orders, DNI McConnell appealed to Congress to amend FISA.

### The Protect America Act

32.    Congress enacted the Protect America Act in August 2007. The Act expanded the executive's surveillance authority and provided legislative sanction for surveillance that the President had previously been conducting under the Program. Although the law eviscerated a regulatory framework that had been in place for almost thirty years, Congress enacted the law without holding a single hearing and after only four days of debate.

33.    Because of a "sunset" provision, the amendments made by the Protect

America Act ceased to have effect on Feb. 17, 2008. Surveillance orders that had been

issued during the Protect America Act's life, however, will continue in effect for up to

one year from the date they were issued.

The FISA Amendments Act of 2008

34.    In anticipation of the Protect America Act's expiration, the

administration lobbied Congress for permanent changes to FISA. President Bush signed

the FISA Amendments Act into law on July 10, 2008. Like the Protect America Act, the

FISA Amendments Act provides legislative sanction for the warrantless surveillance of

U.S. citizens' and residents' communications. It also provides immunity to

telecommunications corporations that facilitated the Program.

35.    The Act allows the mass acquisition of U.S. citizens' and residents'

international telephone and email communications. Under section 702(a) of the Act, the

Attorney General and the DNI can "authorize jointly, for a period of up to 1 year from the

effective date of the authorization, the targeting of persons reasonably believed to be

located outside the United States to acquire foreign intelligence information." An

acquisition under section 702(a) may not "intentionally target any person known at the

time of the acquisition to be located in the United States"; "intentionally target a person

reasonably believed to be outside the United States if the purpose of such acquisition is to

target a particular, known person reasonably believed to be in the United States";

"intentionally target a United States person reasonably believed to be located outside the

United States"; or "intentionally acquire any communication as to which the sender and

all intended recipients are known at the time of the acquisition to be located in the United

12

States." FAA § 702(b).

36.    Critically, however, an acquisition authorized under section 702(a) may encompass the international communications of U.S. citizens and residents. Indeed, the Attorney General and the DNI may authorize a mass acquisition under section 702(a) even if *all* of the communications to be acquired originate or terminate inside the United States. Moreover, the Attorney General and the DNI may acquire purely domestic communications as long as there is uncertainly about the location of one party to the communications.

37.    Before authorizing surveillance under section 702(a), the Attorney General and the DNI must either obtain an order from the FISC (a "mass acquisition order") or make an "exigent circumstances" determination that "intelligence important to the national security of the United States may be lost or not timely acquired and time does not permit the issuance of an order . . . prior to the implementation of such authorization." FAA § 702(a) & (c)(2). If the Attorney General and the DNI authorize surveillance under section 702(a) without first obtaining a mass acquisition order from the FISC, they must seek such an order from the FISC "as soon as practicable but in no event later than 7 days after such determination [of exigent circumstances] is made." FAA § 702(g)(1)(B).

38.    To obtain a mass acquisition order from the FISC, the Attorney General and the DNI must provide to the FISC "a written certification and supporting affidavit" attesting that the FISC has approved, or that the government has submitted to the FISC for approval, procedures ("targeting procedures") reasonably designed to (i) ensure that the acquisition is "limited to targeting persons reasonably believed to be located outside

13

the United States" and (ii) "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known at the time of the acquisition to be located in the United States." FAA § 702(g)(2)(A)(i). The certification and supporting affidavit must attest that the FISC has approved, or that the government has submitted to the FISC for approval, procedures ("minimization procedures") that meet the definition of "minimization procedures" under 50 U.S.C. §§ 1801(h) or 1821(4). The certification and supporting affidavit must also attest that the Attorney General has adopted "guidelines" to ensure compliance with the limitations set out in section 702(b); that the targeting procedures, minimization procedures, and guidelines are consistent with the Fourth Amendment; that "a significant purpose of the acquisition is to obtain foreign intelligence information"; that "the acquisition involves obtaining foreign intelligence information from or with the assistance of an electronic communication service provider"; and that "the acquisition complies with the limitations in subsection [702(b)]." FAA § 702(g)(2)(A)(iii)-(vii).

     39.    The Act does not require the government to demonstrate to the FISC that its surveillance targets are foreign agents, engaged in criminal activity, or connected even remotely with terrorism. Indeed, the statute does not require the government to identify its surveillance targets at all. Moreover, the statute expressly provides that the government's certification is not required to identify the facilities, telephone lines, email addresses, places, premises, or property at which its surveillance will be directed. FAA § 702(g)(4). Thus, the government may obtain a mass acquisition order without identifying the people (or even the group of people) to be surveilled; without specifying the facilities, places, premises, or property to be monitored; without obtaining individualized warrants

based on criminal or foreign intelligence probable cause; and without making even a prior administrative determination that the acquisition *relates to* a particular foreign agent or foreign power.

40.     The Act does not place meaningful limits on the government's retention, analysis, and dissemination of U.S. communications and information that relates to U.S. citizens and residents. While the Act requires the government to adopt "minimization" procedures that are "reasonably designed . . . to minimize the acquisition and retention, and prohibit the dissemination of nonpublicly available information concerning unconsenting United States persons," the statute does not prescribe specific minimization procedures, does not give the FISA court any authority to oversee the implementation of the procedures, and specifically allows the government to retain and disseminate information – including information relating to U.S. citizens and residents – if the government concludes that it is "foreign intelligence information." Nothing in the Act forecloses the government from compiling databases of such "foreign intelligence information" and searching those databases for information about specific U.S. citizens and residents.

41.     The FISC is required to issue a mass acquisition order if it finds that the government's certification "contains all the required elements" and that the "targeting and minimization procedures" are consistent with the requirements of the statute and the Fourth Amendment. FAA § 702(i)(3)(A).

42.     With respect to any acquisition authorized under section 702(a), the Attorney General and DNI may direct any electronic communication service provider immediately to "provide the Government with all information, facilities, and assistance

15

necessary to accomplish the acquisition." FAA § 702(h)(1)(A). "Electronic

communication service provider," a term that is defined more narrowly in other contexts,

*see, e.g.*, 18 U.S.C. § 2510(15), is defined broadly to include, *inter alia*,

telecommunications carriers, providers of remote computing service, and "any other

communication service provider who has access to wire or electronic communications

either as such communications are transmitted or as such communications are stored."

FAA § 701(b)(4).

43.    The role of the FISC in authorizing and supervising surveillance

conducted under the FISA Amendments Act is narrowly circumscribed. While the FISC

reviews the government's certifications, targeting procedures, and minimization

procedures, it does not consider individualized and particularized surveillance

applications, it does not make individualized probable cause determinations, and it does

not supervise the *implementation* of the government's targeting or minimization

procedures. As noted above, the FISC is authorized to reject an application for a mass

acquisition order if it finds that the government's certification or procedures are deficient.

Even if the FISC rejects the government's certification or procedures, however, the

government "may continue" its surveillance activities during the pendency of any appeal

or further court proceedings. FAA § 702(i)(4)(B). In other words, the statute permits the

government to continue its surveillance activities even if the FISC has concluded that

those activities are inconsistent with the statute or are unconstitutional.

## PLAINTIFFS' ALLEGATIONS

44.    Plaintiffs are attorneys and human rights, labor, legal, and media

organizations whose work requires them to engage in sensitive and sometimes privileged

communications, both domestic and international, with clients, journalistic sources, witnesses, experts, foreign government officials, and victims of human rights abuses.

45.    Because of the scope of the challenged law, the nature of their communications, and the location and identities of the individuals with whom they communicate, plaintiffs reasonably believe that their communications will be acquired, retained, analyzed, and disseminated under the challenged law.

46.    Some of the plaintiffs, in connection with their legitimate professional activities, communicate with people whom the U.S. government is likely to target when conducting foreign intelligence surveillance of persons abroad, including foreign government officials, political activists, and individuals alleged to be engaged in terrorism or associated with terrorist organizations.

47.    Some of the plaintiffs, in connection with their legitimate professional activities, communicate with people in countries and geographic regions that the U.S. government is likely to target when conducting foreign intelligence surveillance of persons abroad, including regions that are the specific focus of the U.S. government's counterterrorism or diplomatic activities.

48.    Some of the information that plaintiffs exchange by telephone and email is "foreign intelligence information" within the meaning of the challenged law.

49.    Because of the challenged law, plaintiffs will have to take burdensome and costly measures to minimize the chance that the confidentiality of their sensitive information will be compromised. The challenged law will require plaintiffs to develop new protocols for dealing with sensitive information, to travel long distances to collect

17

information that could otherwise have been gathered by telephone or email, and in some circumstances to forgo particularly sensitive communications altogether.

50.     Because of the challenged law, plaintiffs will be less able to gather information, represent their clients, and engage in domestic and international advocacy. The challenged law reduces the likelihood that clients, journalistic sources, witnesses, experts, foreign government officials, and victims of human rights abuses will share sensitive information with the plaintiffs.

51.     The challenged law is inhibiting, and unless enjoined will continue to inhibit, the legitimate and constitutionally protected communications of plaintiffs and others not before the Court.

### Amnesty International USA

52.     Amnesty International is the world's oldest and largest grassroots human rights organization. Amnesty International USA is Amnesty International's largest national section, comprising more than 330,000 members and 1,850 student and local groups. Through its campaigns, AIUSA seeks to expose and stop human rights abuses – for example, to force repressive governments to release prisoners of conscience (individuals detained solely for the peaceful expression of their beliefs); prevent torture and illegal detention; alert the world to the horrors of human trafficking; confront violence against women; and control the spread of small arms, which contribute to abuses in armed conflict.

53.     AIUSA conducts research and advocacy about a wide range of human rights violations in the United States and internationally. Over the last six years, AIUSA has participated in extensive research and advocacy about topics including the detention

of individuals in secret locations in Yemen and Afghanistan; the illegal transfer of detainees to countries like Syria, Egypt, and Jordan; the uninvestigated murders of women in Guatemala; and human rights abuses in Nepal and Indonesia.

54.    Because of the nature of its advocacy work and the global nature of Amnesty International's network, members of AIUSA's staff and volunteer experts routinely exchange sensitive information by telephone and email with individuals located outside the United States. Some of this information constitutes "foreign intelligence information" as that term is defined in the challenged law. For example, AIUSA staff communicate with Amnesty International researchers based in London who investigate human rights abuses relating to terrorism and counterterrorism, the wars in Afghanistan and Iraq, the CIA's extraordinary rendition program, secret prisons, prison conditions, and international complicity in human rights abuses. Staff exchange sensitive information through their communications, including facts provided by confidential sources, news regarding investigations into European and U.S. complicity in human rights abuses around the world, and plans for specific advocacy strategies.

55.    Because of the nature of its staff members' communications and the identity and location of those with whom they communicate, AIUSA reasonably believes that its staff members' communications will be monitored under the challenged law.

56.    The challenged law undermines the ability of AIUSA and its staff to gather information that is relevant and necessary to their work. The law will require AIUSA's staff to travel to collect information that otherwise could have been gathered by telephone or email, and in some circumstances to forgo particularly sensitive communications altogether. The challenged law also reduces the likelihood that sources,

19

witnesses, experts, foreign government officials, and victims of human rights abuses will share sensitive information with AIUSA's staff. Many of the individuals with whom AIUSA's staff communicate are vulnerable to persecution and retaliation by their own governments and by non-governmental actors. These individuals will be less willing or unwilling to share information with AIUSA if they believe that the information cannot be kept confidential.

### Global Fund for Women

57.    Global Fund for Women is a 501(c)(3) grantmaking foundation that advances women's human rights worldwide. The organization raises funds from a variety of sources and makes grants to women-led organizations that promote the economic security, health, safety, education, and leadership of women and girls. Since 1987, GFW has awarded more than $62 million to more than 3,500 women's organizations in 169 countries, with typical grants ranging from $1,000 to $20,000.

58.    While GFW is based in the United States, its relationships and operations are global. For guidance in grantmaking decisions, GFW draws on the resources of approximately 120 expert advisors who provide critical information to GFW about its grantees. GFW is governed by a sixteen-member Board of Directors and approximately half of the Board members are located outside of the United States. GFW employs approximately forty-five staff members, about half of whom interact directly with the international community.

59.    Because of the nature of its grantmaking work, GFW's staff routinely exchange sensitive information by telephone and email with individuals located abroad. Some of this information is "foreign intelligence information" within the meaning of the

20

challenged law. For example, GFW's staff communicate with prospective, current, and former grantees, as well as with GFW's world-wide network of advisors, in conflict zones such as Iraq, Pakistan, Indonesia, Colombia, Palestine, Afghanistan, and Turkey. Some of these communications are related to security concerns, political developments, and the domestic human rights situation in these countries. Members of GFW's staff also communicate with individuals abroad about U.S. foreign policy and about the policies and programs of foreign government agencies.

60.    Because of the nature of its staff members' communications and the identity and location of those with whom they communicate, GFW reasonably believes that its staff members' communications will be monitored under the challenged law.

61.    The challenged law undermines GFW's ability to gather the information it needs to make grantmaking decisions and to support its grantees. For example, the challenged law will impede GFW's ability to expand its grantmaking in the Middle East and North Africa – two regions to which GFW is particularly committed – because prospective grantees in these areas will likely be less willing to communicate with GFW if they believe that the privacy of their communications cannot be ensured. The challenged law impairs GFW's ability to engage in international communications that are necessary to carry out its work.

### Global Rights

62.    Global Rights is a human rights advocacy group that partners with local activists to challenge injustice and amplify new voices within the global discourse. Global Rights has nearly 100 employees, approximately twenty-five of whom are located in the United States; the remaining employees are located in field offices throughout the

world. Global Rights works directly with local activists and organizations to create more

rights-respecting societies. Global Rights and its partners often promote equality in

hostile environments. As a result, Global Rights has developed an understanding of the

day-to-day realities facing civil society in post-conflict situations, during prolonged

transitions to democratic rule, and in cultural environments that resist the promotion and

protection of the human rights of women.

      63.     In furtherance of its human rights advocacy, Global Rights staff

members routinely communicate by telephone and email with individuals located abroad.

The majority of these communications are between Global Rights staff in its Washington,

D.C. office and Global Rights field offices or staff in Afghanistan, Bosnia and

Herzegovina, Burundi, Colombia, the Democratic Republic of Congo, Liberia, Algeria,

Tunisia, Morocco, Nepal, and Nigeria. Both U.S. citizens and foreign nationals staff the

field offices.

      64.     Some of the information that Global Rights staff exchange by telephone

and email constitutes "foreign intelligence information" as that term is defined in the

challenged law. For example, Global Rights D.C.-based staff members communicate

with Global Rights staff in Afghanistan about issues such as justice system reform,

political participation, women's rights, and the specific Global Rights projects designed

to promote these goals. These projects include Young Lawyers in Training, which

provides law students at several universities with practical training on Afghan criminal

and civil law, and the Access to Justice Program, which builds the capacity of legal

service providers – particularly with respect to women's rights and family rights under

Afghan law and Sharia. In connection with their work in Afghanistan, Global Rights

staff communicate with Afghan judges, prosecutors, investigators from the Attorney General's office, and other members of the Afghan government.

65.    Global Rights also works in the Democratic Republic of Congo, through local offices in Kinshasa and Bukavu, to promote access to justice and combat impunity for grave violations of human rights, to encourage political participation, and to secure legislation critical to ensuring human rights protection. This work requires Global Rights staff to identify and discuss the operations of local human rights groups that document and expose atrocities committed against civilians, and to discuss strategies for holding human rights abusers accountable before national courts and international bodies such as the International Criminal Court. Some of Global Rights' communications relate to the foreign affairs of the United States.

66.    Because of the nature of its staff members' communications and the identity and location of those with whom they communicate, Global Rights reasonably believes that its staff members' communications will be monitored under the challenged law.

67.    The challenged law undermines Global Rights' ability to gather information and engage in advocacy. Global Rights' effectiveness depends entirely upon the strength of its relationships with local civil society actors, human rights organizations, and women's rights groups. Those relationships often demand strict confidentiality. The likelihood that Global Rights' international communications will be monitored by the U.S. government will make its partners abroad reluctant to communicate with Global Rights staff. This in turn will deprive Global Rights' staff of information that is relevant and in some cases necessary to their work. Global Rights' inability to communicate

23

confidentially with members, experts, and leaders of government and industry will seriously impede Global Rights' efforts to help its local partners become more effective advocates for political change, human rights, and respect for the rule of law.

## Human Rights Watch

68.     Human Rights Watch is a non-profit, non-governmental human rights organization based in New York City.  It employs over 246 staff members located across offices in Brussels, Geneva, London, Moscow, Paris, Hong Kong, Johannesburg, Los Angeles, New York City, San Francisco, Tashkent, Toronto, and Washington, D.C. Formed in 1978, HRW is dedicated to protecting the human rights of people around the world.  The hallmark of HRW's work is its commitment to even-handed, accurate reporting on human rights abuses throughout the globe.

69.     HRW researchers conduct fact-finding investigations into human rights abuses by governments and non-state actors in all regions of the world.  Its researchers are currently investigating topics ranging from brutal government-sponsored repression in Zimbabwe to the state of the justice system in Iraq.  HRW's investigations usually lead to reports and other materials for publication, which generate extensive coverage in local and international media.  HRW also works to create a dialogue with offending governments to encourage them to change abusive laws and policies, and, through its advocacy, it enlists the support of other influential actors such as the United Nations, the European Union, international financial institutions, the U.S. government, as well as civil society organizations, to achieve this end.

70.     HRW's reporting and advocacy work requires HRW's U.S.-based staff to communicate by telephone and email with individuals located abroad.  Some of the

information exchanged during these communications constitutes "foreign intelligence information" as that term is defined in the challenged law.  For example, Iain Levine, HRW's Program Director, who is based in New York City, often communicates with HRW staff abroad about HRW's work concerning conflict, political crises, refugees, HIV/AIDS, the Middle East, North Africa, and Sub-Saharan Africa.   He regularly needs speaks with HRW staff in countries with delicate security situations, such as Zimbabwe, Chad, Iraq, and Afghanistan.   Joanne Mariner, Terrorism and Counterterrorism Program Director at HRW, who is also based in New York City, communicates regularly via telephone and email with individuals abroad about individuals detained by the CIA, the CIA's "rendition" program, the intelligence services of foreign countries, and U.S. counterterrorism measures.  These communications are necessary to her research about U.S. human rights abuses and the complicity of Middle Eastern and Asian governments in these abuses.

71.    Because of the nature of its staff members' communications and the identity and location of those with whom they communicate, HRW reasonably believes that its staff members' communications will be monitored under the challenged law.

72.    The challenged law undermines the ability of HRW and its staff to develop and conduct research missions necessary for their advocacy and reporting work. The law will require HRW staff to take costly and burdensome measures to protect the confidentiality of their communications.  In some cases, it will require HRW to send staff abroad to gather or verify information that could otherwise have been gathered or verified via telephone or email.  For example, Joanne Mariner anticipates traveling to Jordan, Egypt, and countries in Europe to interview victims of and witnesses to human rights

abuses whom she would otherwise have interviewed by telephone. Overseas trips of this kind are time-consuming and costly.

73.    The challenged law will also discourage witnesses, experts, victims, foreign government officials, and human rights defenders from sharing information with HRW staff. Those who speak to HRW researchers often do so on condition of confidentiality, because they fear repercussions from their own governments, from the U.S. government, or from non-governmental entities. Some of the people whom HRW depends upon for information will decline to share information with HRW if they believe that the confidentiality of their identities and information cannot be ensured. This means that HRW will be deprived of information that is relevant and in some cases critical to its work.

### International Criminal Defence Attorneys Association

74.    The International Criminal Defence Attorneys Association is a non-profit organization incorporated in the United States and Canada that seeks to create the foundations for a full, fair, and well-organized defense in proceedings before international tribunals, such as the International Criminal Tribunal for Rwanda based in Arusha, Tanzania; the International Criminal Tribunal for the former Yugoslavia; and the recently established International Criminal Court (ICC), both based in The Hague, the Netherlands. The ICDAA works to organize a full, thorough, and structured defense with the aim of bolstering the legitimacy of the judicial process established by the international community to prosecute war crimes and crimes against humanity; bring together in a professional association the defense attorneys who are responsible for preparing and pleading cases to be tried by various international tribunals; share with the

international community experience and knowledge derived from the adversarial system of justice; encourage communication among lawyers specializing in criminal law from countries around the world; and assist in the development of international criminal law and in particular of international institutions such as the ICC.   ICDAA membership is comprised of organizations and criminal defense lawyers from around the world, including from the United States.

75.     ICDAA's members, including its members inside the United States, routinely engage in sensitive and privileged international communications relating to their representation of criminal defendants.  For example, members of the ICDAA who represent individuals before the ICC communicate with clients and witnesses located in the Sudan and the Democratic Republic of Congo.  ICDAA's members' communications with clients, clients' families, witnesses, journalists, human rights organizations, experts, investigators, and foreign government officials are vital to their effective representation of their clients.

76.     Because of the content of its members' communications, the identity of those with whom they communicate, and the geographic location of individuals with whom they communicate, ICDAA reasonably believes that its members' communications will be monitored under the challenged law.

77.     ICDAA's members have an ethical obligation to protect the confidentiality of their clients' information, including information covered by the attorney-client privilege.  However, the challenged law makes it nearly impossible to ensure that their international email and telephone communications are secure.  The law requires the attorneys to take burdensome and costly steps to gather information

necessary for the effective representation of their clients in a manner that ensures those communications remain confidential. In some cases, attorneys will have to gather information in person that they would otherwise have been able to gather by telephone or email. In email and telephone communications, attorneys will be forced to weigh the utility of asking for additional information against the risk that the communication will be acquired by the U.S. government.

### The Nation Magazine

78.    The Nation Magazine, an independent weekly journal published by The Nation Company, L.P. in New York City, is a critical, independent voice in American journalism. It publishes writing by regular contributors based in Europe, the Middle East, Latin America, Asia, and Africa. Its journalists report on a wide range of issues relating to international affairs, including the wars in Iraq and Afghanistan, the Israel-Palestine conflict, protest activities in China, and civil wars and other conflicts in Africa and Latin America.

79.    Because of the nature of their work, The Nation's editors, columnists, and contributors often engage in telephone and email communications with individuals outside the United States. These communications are vital to providing up-to-date, accurate information about emerging news stories and informing longer-range analytic articles on international topics. Some of the information exchanged by The Nation's editors, columnists, and contributors through these communications constitutes "foreign intelligence information" as defined by the challenged law. For example, the Nation's staff members and contributing journalists communicate by telephone or email with political dissidents in other countries, foreign journalists in conflict zones, representatives

of foreign governments, and individuals with connections to disfavored political and social groups. Some of these communications relate to the involvement or alleged involvement of the U.S. government or its allies abroad, or of the U.S. military and its contractors, in repression and human rights abuses. Some of these communications relate to the subjects of terrorism, counterterrorism, or the foreign affairs of the United States.

80.     Nation contributor Christopher Hedges has written extensively about violent conflicts and terrorism. In developing his articles, Mr. Hedges communicates with sources in countries such as Palestine, Iran, Syria, and Sudan. These communications, which include the exchange of information about terrorism, counterterrorism, and U.S. foreign affairs, are critical to his work. Nation contributor Naomi Klein has written extensively about the extension of radical free-market capitalism and the resurgence of imperial militarism following the September 11 attacks. In developing her articles, Ms. Klein routinely communicates with sources in Iraq, Argentina, Chile, Mexico and Colombia. She has communicated with journalists, political activists, human rights campaigners, members of indigenous resistance movements, and foreign government officials who have been targeted by the U.S. government or its allies. These communications, which include the exchange of information about state repression, resistance strategies, and the foreign affairs of the United States, are critical to her work.

81.     Because of the nature of its contributors' communications and the identity and location of those with whom they communicate, The Nation reasonably believes that its contributors' communications will be monitored under the challenged law.

82.　　The challenged law undermines the ability of The Nation's editors, writers, contributors, and staff to gather information that is critical to their work. The ability to communicate confidentially with sources is essential to journalists' work. Many of the people with whom The Nation's staff and contributors communicate will not share information if they believe that their identities cannot be kept confidential. Some of them fear retribution by their own governments; others fear retribution by the U.S. government; still others fear persecution at the hands of terrorist groups. The risk that their identities will be revealed will lead some sources who otherwise would have shared information to decline to do so.

83.　　The challenged law will force The Nation's writers and contributors to gather information in person that could otherwise have been gathered by telephone or email. This means that The Nation's journalists will obtain some information later than they would otherwise have obtained it, which will affect their ability to report news in a timely fashion. It also means that they will not have access to some information that they might otherwise have been able to access. The costs associated with gathering information in person are also significant. Overseas travel is expensive and time-consuming. The additional costs will compromise the ability of The Nation's writers and contributors to gather information in a timely fashion and to convey critical information to The Nation's readership.

### PEN

84.　　PEN American Center is an association based in New York City of approximately 3,300 authors, editors, and translators committed to the advancement of literature and the unimpeded flow of ideas and information. It is the largest of the 145

centers of International PEN.  PEN fulfills its mission and supports its members through conferences, readings, public forums, advocacy campaigns, and direct support to endangered writers around the world.  PEN is also a member of the International Freedom of Expression Exchange, a global network of non-governmental organizations that monitors free expression violations and defends journalists, writers, human rights activists, and Internet users who are persecuted for exercising their right to freedom of expression.

85.    One of PEN's core projects is to ensure that writers across the world are free to write and to express their ideas.  In 2006 alone, PEN followed the cases of 1,010 writers in ninety-eight countries who were imprisoned, censored, or threatened for their work.  In support of these efforts, PEN staff members based in New York regularly engage in email and telephone communications with writers, advocates, and other PEN partners in countries such as Cuba, Mexico, Tunisia, Democratic Republic of Congo, Turkey, Uzbekistan, Syria, and China.  Some of these communications include "foreign intelligence information" as defined by the challenged law.  For example, in the course of gathering information about a particular person or case, PEN staff members communicate with individuals abroad about political context, security concerns, and advocacy options.  Similarly, in the course of its efforts to support writers facing persecution in countries where anti-terrorism and national security laws are used to target political dissidents and suppress freedom of expression, PEN staff and volunteer members communicate with targeted writers, their families, and human rights activists to coordinate advocacy efforts and provide humanitarian assistance.

86.    As the U.S. center for an international organization that advocates for free expression, PEN relies on international email and telephone communications to keep abreast of developing issues, communicate strategy responses, and coordinate emergency support for individuals who have been imprisoned.

87.    PEN relies on confidential international email and telephone communications to carry out its human rights and free-expression advocacy around the world. Many of the individuals PEN seeks to assist have been monitored, imprisoned, or persecuted in their own countries. It takes months to establish the trust and rapport necessary for these individuals to communicate with PEN staff or volunteers about their own cases and the country context in which they work and live. Some of these individuals are living and working in countries where a history of cooperation between their governments and U.S. intelligence services has left a legacy of fear and distrust of the United States. The threat that these communications will be monitored by the U.S. government under the challenged law will result in fewer individuals reaching out to PEN.

88.    As the largest center of International PEN, a federation of 145 PEN Centers in 105 countries, PEN plays a prominent role in efforts to develop and expand International PEN's presence and impact around the globe. PEN advises and mentors other PEN centers in Africa, Latin American, and Asia, helps PEN centers in the developing world create and implement projects, and assists in raising funds to support this work. PEN relies on international email and telephone communications to communicate with its international counterparts and coordinate its center development efforts. The ability of PEN to conduct its center development program credibly and

safely depends on maintaining the trust of participating centers that it is operating independent of the U.S. government and free from U.S. government scrutiny. The threat that PEN's communications with its international partners will be monitored by the U.S. government under the challenged law will undermine the trust necessary to cultivate successful partnerships and will deter some of PEN's international partners from participating in the center development program.

89.    As an organization dedicated to promoting a free exchange of information and ideas around the world, PEN also convenes discussions, dialogues, and debates featuring writers and intellectuals from around the world. For example, PEN stages an annual World Voices Literary Festival in New York City, during which between fifty and one hundred international writers participate in more than sixty public programs with their American counterparts. Among those PEN recruits to participate in these events are writers and intellectuals who hold controversial and challenging views, dissident writers, and even writers the U.S. government has attempted to exclude from the country for ideological reasons. PEN extends invitations and negotiates the participation of international writers and intellectuals at PEN events through email and telephone communications. The threat that these communications might be monitored under the challenged law will inhibit writers whose views might be deemed controversial in the United States or by the U.S. government from discussing their participation and ultimately discourage their attendance at PEN events.

### Service Employees International Union

90.    The Service Employees International Union is the fastest-growing labor organization in the Americas, representing two million members in a variety of

33

occupations and industries covering three sectors: property services, public services, and health care. SEIU is the nation's largest health care union, the largest property services union, and the second-largest public employees union. While SEIU members are located throughout the United States, Puerto Rico, and Canada, SEIU works together with labor unions and human rights organizations around the world to improve the standard of living for working people on a global scale.

91.    To complement its U.S.-based work, SEIU employs full-time staff in Switzerland, the Netherlands, United Kingdom, Australia, Uruguay, and Brazil. It also partners with organizations in more than forty other countries. In addition to places where it has staff, SEIU focuses considerable international activity in Poland, China, and several countries in Southern Africa including Malawi. With its partners, SEIU crafts global alliances to address worker and human rights issues at global employers and to help workers in both the United States and abroad to attain workplace justice and to pursue mutual interests. To achieve these ends, SEIU staff routinely communicate by email and telephone with individuals, including labor union activists, outside the United States. Some of these communications include "foreign intelligence information" as defined by the challenged law. For example, SEIU staff communicate with academics, non-governmental organizations, and labor union officials in Colombia, China, and Russia regarding workers' right to organize and fair labor standards. Some of these communications relate to the foreign affairs of the United States.

92.    Because of the nature and content of its staff members' communications, the identity of those with whom they communicate, and the geographic

34

location of individuals with whom they communicate, SEIU reasonably believes that its staff members' communications will be monitored under the challenged law.

93.    The challenged law undermines the ability of SEIU staff and leaders to gather information that is critical to their work. Some of the people from whom SEIU staff obtain information are labor activists who are persecuted by their own governments or by non-governmental groups. These individuals will not share information with SEIU if they believe that their identities cannot be kept confidential. Labor activists in Colombia, Zimbabwe, and Russia, for example, operate in extremely repressive environments, and they must often operate in secret. Labor activists who believe that their communications with SEIU could be acquired by the U.S. government (and perhaps turned over to their own governments) will be more cautious about the information they share and in some cases may decide that working with SEIU is simply too risky.

### Washington Office on Latin America

94.    The Washington Office on Latin America is a non-profit, non-governmental organization based in Washington, D.C. Founded in 1974, WOLA conducts research, education, and advocacy designed to foster human rights, democracy, and social justice in Latin America with a focus on the impact of U.S. foreign policy in the region. WOLA is regularly called upon for its research and analysis by policymakers, the media, and academics in the United States and Latin America. WOLA does direct advocacy with the U.S. and foreign governments pertaining to the impact of U.S. foreign policy on human rights and democracy in Latin America.

95.    Because of the nature of its staff members' communications and the identity and location of those with whom they communicate, WOLA reasonably believes

that its staff members' communications will be monitored under the challenged law. In

connection with its work relating to drug policy, youth gang violence, organized crime,

rights and development, and security policy, WOLA's staff routinely engage in email and

telephone communications with activists, policy makers, government representatives,

journalists, and academics outside the United States. Some of these communications

include "foreign intelligence information" as defined in the challenged law. For example,

WOLA's drug-policy program, which monitors the impact of U.S. international drug

control policy on democracy and human rights in Latin American countries including

Colombia and Mexico, sometimes requires WOLA staff to communicate with individuals

who have been accused by their own governments or by political opponents of being

guerrillas or terrorists, or of having links to such organizations. Some of WOLA's

communications with these individuals relate to drug control policy and the foreign

affairs of the United States.

      96.     The challenged law undermines the ability of WOLA to gather

information that is necessary to its work. For example, the challenged law will

undermine the ability of <u>Maureen Meyer</u>, WOLA's Associate for Mexico and Central

America, to gather information about human rights, democracy, and social justice in El

Salvador. Ms. Meyer's work requires her to communicate with human rights groups,

labor leaders, opposition figures, protest organizers, attorneys and other political actors in

El Salvador. Some of Ms. Meyer's communications are extremely sensitive because of

the high levels of political tension in the country. Likewise, some of the individuals she

works with have been accused of "terrorism" under El Salvador's anti-terror law. These

communications are sensitive because the individuals contacted by WOLA fear

persecution due to their political activities. Any risk that confidentiality will be compromised will discourage political activists from sharing information with WOLA, especially if there is a perceived risk that information obtained by the United States will be shared with the government of El Salvador. If WOLA cannot ensure the confidentiality of its communications, its education and advocacy work in El Salvador and in other countries where social protest has been criminalized will be compromised.

The challenged law will also undermine the ability of John Walsh, WOLA's Senior Associate for the Andes and Drug Policy, to gather information about human rights and democratic governance in Venezuela. WOLA's Venezuala program, which is intended to promote dialogue in a political environment that has become polarized, requires that WOLA be and be seen as independent from any government. WOLA has worked for more than thirty years to build the trust and confidence that it now enjoys. In an atmosphere of mutual hostility between the U.S. and Venezuelan governments, however, in which harsh rhetoric on both sides has aggravated an already-contentious political climate, the mere suspicion that information provided in confidence to WOLA staff will be accessed by the U.S. government will seriously affect WOLA's credibility and effectiveness. Even if WOLA makes clear its opposition to the unwarranted monitoring of its communications by the government, some individuals who would otherwise have worked with WOLA and shared information with WOLA will decline to do so because of the danger that their private communications will be intercepted.

### Attorneys

97.    Daniel N. Arshack, David Nevin, Scott McKay, and Sylvia Royce (collectively, "Attorneys") are attorneys based in the United States. They engage in

sensitive and privileged communications by telephone and email with individuals outside of the United States, including clients, their families, witnesses, journalists, human rights organizations, experts, investigators, and foreign government officials. These communications are vital to their effective representation of their clients. Some of the information that the Attorneys communicate by telephone and email is "foreign intelligence information" as defined in the challenged law.

98. Because of the nature of their communications and the identities and location of those with whom they communicate, the Attorneys reasonably believe that their communications will be monitored under the challenged law.

99. The Attorneys have an ethical obligation to protect the confidentiality of their clients' information, including information covered by the attorney-client privilege. However, the challenged law makes it nearly impossible to ensure that their international email and telephone communications are secure. The law requires the Attorneys to take burdensome and costly steps to gather information necessary for the effective representation of their clients in a manner that ensures those communications remain confidential. The law will require the attorneys to minimize the amount of sensitive or privileged information they communicate by telephone or email. Some of the Attorneys will travel abroad to obtain information they would otherwise have been able to obtain by telephone or email.

100. The challenged law also reduces the likelihood that clients, witnesses, sources, and experts will be willing to share information by telephone or email that is necessary to provide effective representation to their clients. The Attorneys believe that the real risk that their communications will be intercepted undermines their ability to

38

represent their clients and prejudices or will prejudice their clients in ongoing and anticipated legal proceedings.

101.    Attorney Daniel N. Arshack is a founding partner of the law firm Arshack, Hajek and Lehrman, PLLC located in New York City.  His practice includes the representation of civil litigants, individuals, and businesses not yet charged with crimes; criminal defendants; and witnesses in criminal cases domestically and in international criminal tribunals throughout the world.  As part of his legal practice, Mr. Arshack engages in frequent confidential international communications by both telephone and email with clients, their families, witnesses, journalists, human rights organizations, experts, investigators, and foreign government officials.  Some of the countries Mr. Arshack regularly calls and emails include Cambodia, France, Japan, Sierra Leone, Turkey, Uganda, Kenya, Liberia, Lebanon, Israel, Mexico, Argentina, Bolivia, Ecuador, and Saudi Arabia.  Because the challenged law increases the risk that his international communications will be monitored by the U.S. government, Mr. Arshack will be forced to gather some information in person that he would otherwise have been able to gather over the telephone or by email.

102.    Attorneys Scott McKay and David Nevin are partners at the law firm Nevin, Benjamin, McKay & Bartlett LLP located in Boise, Idaho.  As part of their criminal-defense practice, Mr. McKay and Mr. Nevin have represented and continue to represent individuals who have been accused by the federal government of terrorism-related crimes or who have been accused of having a link to terrorists or terrorist organizations.  For example, Mr. McKay and Mr. Nevin were defense counsel for Sami Al-Hussayen, an individual the government unsuccessfully prosecuted for providing

material support to terrorism. Mr. McKay and Mr. Nevin continue to represent Mr. Al-Hussayen in a civil suit arising from the September 11, 2001 terrorist attacks, in which Mr. Al-Hussayen has been named as a defendant. Their representation of Mr. Al-Hussayen has required and will continue to require them to communicate by telephone and email with witnesses, many of whom reside in Saudi Arabia, and with Mr. Al-Hussayen, who returned to Saudi Arabia following his acquittal. Mr. McKay and Mr. Nevin have also offered to represent Khalid Sheikh Mohammed, one of the five prisoners who have been charged with capital offenses before the military commissions at Guantánamo Bay. Mr. McKay and Mr. Nevin have met with Mr. Mohammed at Guantánamo Bay on several occasions since June 3, 2008. They have communicated about Mr. Mohammed's case, or will need to communicate in the future about his case, with journalists, human rights organizations, experts, investigators, witnesses and others, some of whom are located outside the United States. Some of their communications relate to terrorism, counterterrorism, and the foreign affairs of the United States. The challenged law will require Mr. McKay and Mr. Nevin to refrain from engaging in certain sensitive or privileged communications by telephone or email. It will also require them to gather certain information vital to the representation of their clients in person rather than by telephone or email.

103. Attorney <u>Sylvia Royce</u> is a former Assistant U.S. Attorney for the District of Colombia and the former Chief of International Prisoner Transfer at the U.S. Department of Justice. Ms. Royce's private practice includes the representation of individuals imprisoned in the United States who are seeking to be transferred to their home countries to serve out the remainder of their prison sentences. Ms. Royce also

represents Mohamedou Ould Slahi, a prisoner who is held at Guantánamo Bay as an

enemy combatant. In connection with her representation of Mr. Slahi, Ms. Royce

frequently communicates by email and telephone with co-counsel in France and

Mauritania. These communications include sensitive information relating to the litigation

of Mr. Slahi's habeas petition and Freedom of Information Act case. Ms. Royce also

frequently communicates with foreign journalists working for print media such as *Der

Spiegel* and the Toronto *Globe and Mail*, and with human rights organizations outside the

United States. These communications relate to, among other things, the detention center

at Guantánamo Bay, the policies of the U.S. government relating to the detention and

interrogation of enemy combatants, the connections or lack thereof between her client

and others held at Guantánamo, and the propriety or impropriety of government decisions

with respect to classification of national security information. Many of these

communications relate to terrorism, counterterrorism, and the foreign affairs of the

United States. The challenged law will require Ms. Royce to refrain from engaging in

certain sensitive or privileged communications by telephone or email. It will prevent her

from gathering some information that is critical to her representation of her clients.

## CAUSES OF ACTION

104.    The challenged law violates the Fourth Amendment because it

authorizes defendants to acquire the constitutionally protected communications of U.S.

citizens and residents without identifying the people to be surveilled; without specifying

the facilities, places, premises, or property to be monitored; without observing

meaningful limitations on the retention, analysis, and dissemination of acquired

information; without obtaining individualized warrants based on criminal or foreign

41

intelligence probable cause; and without making prior administrative determinations that the targets of surveillance are foreign agents or connected in any way, however tenuously, to terrorism.

105.    The challenged law violates the First Amendment by substantially burdening a broad range of lawful expressive activity without adequate justification and by authorizing defendants to acquire constitutionally protected communications without meaningful judicial oversight.

106.    The challenged law violates Article III by requiring the FISC to rule on questions that do not constitute cases or controversies.

107.    The challenged law violates the principle of separation of powers by allowing the government to continue surveillance activities even if the FISC has held those activities be illegal.

### PRAYER FOR RELIEF

WHEREFORE plaintiffs respectfully requests that the Court:

108.    Declare that section 702 of the FISA Amendments Act is unconstitutional under the First and Fourth Amendments, under Article III, and under the principle of separation of powers;

109.    Permanently enjoin defendants from conducting surveillance pursuant to the authority granted by section 702 of the FISA Amendments Act;

110.    Award Plaintiff fees and costs pursuant to 28 U.S.C. § 2412;

111.    Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

JAMEEL JAFFER (JJ-4653)
MELISSA GOODMAN (MG-7844)
L. DANIELLE TULLY (DT-0509)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by
CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

July 10, 2008