# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMNESTY INTERNATIONAL USA; GLOBAL FUND FOR WOMEN; GLOBAL RIGHTS; HUMAN RIGHTS WATCH; INTERNATIONAL CRIMINAL DEFENSE ATTORNEYS ASSOCIATION; THE NATION MAGAZINE; PEN AMERICAN CENTER; SERVICE EMPLOYEES INTERNATIONAL UNION; WASHINGTON OFFICE ON LATIN AMERICA; DANIEL N. ARSHACK; DAVID NEVIN; SCOTT MCKAY; and SYLVIA ROYCE, | **DECLARATION OF JAMEEL JAFFER** |
| Plaintiffs, | Case No. 08 Civ. 6259 (JGK) |
| v. | **ECF CASE** |
| JOHN M. McCONNELL, in his official capacity as Director of National Intelligence; LT. GEN. KEITH B. ALEXANDER, in his official capacity as Director of the National Security Agency and Chief of the Central Security Service; and MICHAEL B. MUKASEY, in his official capacity as Attorney General of the United States, | |
| Defendants. | |

## DECLARATION OF JAMEEL JAFFER

I, Jameel Jaffer, declare:

1.     I am a resident of Brooklyn, New York over the age of 18.  I have personal knowledge of the facts stated in this declaration.

2.     I am an attorney for the American Civil Liberties Union and counsel to plaintiffs in this action.  I submit this declaration in support of Plaintiffs' Motion for Summary Judgment.

3.      Attached hereto as **Exhibit A** is *Bush Lets U.S. Spy on Callers Without Courts*, New York Times, December 16, 2005.  The article reports that, in 2002, President George W. Bush secretly authorized the National Security Agency to inaugurate a program of warrantless surveillance inside the United States.

4.      Attached hereto as **Exhibit B** is a transcript of a radio address delivered by President George W. Bush on December 17, 2005, in which the President stated: "In the weeks following the terrorist attacks on our Nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to Al Qaida and related terrorist organizations."

5.      Attached hereto as **Exhibit C** is a transcript of a news conference held by President Bush on December 19, 2005, during which President Bush stated: "I've reauthorized this program more than 30 times since the September the 11th attacks . . . ."

6.      Attached hereto as **Exhibit D** is a transcript of a press briefing held by then-Attorney General Alberto Gonzales and then-Deputy Director of National Intelligence Michael Hayden on December 19, 2005, during which Attorney General Gonzales stated: "The President has authorized a program to engage in electronic surveillance of a particular kind, and this would be the intercepts of contents of communications where one of the – one party to the communication is outside the United States."  During the same press briefing, General Hayden stated that targeting determinations under the Program were "made by the operational work force at the National Security Agency using the information available to them at the time, and the standard that they apply – and it's a two-person standard that must be signed off by a

shift supervisor, and carefully recorded as to what created the operational imperative to cover any target, but particularly with regard to those inside the United States."

7.     Attached hereto as **Exhibit E** is a transcript of an address to the National Press Club delivered by General Hayden on January 23, 2006 in which General Hayden stated that, under the program authorized by the President, the NSA intercepted "calls . . . [the government has] a reasonable basis to believe involve al Qaeda or one of its affiliates."

8.     Attached hereto as **Exhibit F** is a letter sent from Attorney General Gonzales to Senators Patrick Leahy and Arlen Specter on January 17, 2007, in which Attorney General Gonzales wrote that the FISC had issued orders in January 2007 that authorized the Government to "target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization."

9.     Attached hereto as **Exhibit G** is a transcript of a an interview conducted by the *El Paso Times* with DNI Michael McConnell on August 22, 2007, in which DNI McConnell indicated that the January 2007 FISC orders subjected any electronic surveillance that was occurring as part of the Program to the approval of the Foreign Intelligence Surveillance Court.  In the same interview, DNI McConnell indicated that the FISC modified the January 2007 orders in the spring of 2007, reportedly narrowing the authority that the FISC had extended to the executive branch in January.

10.     Attached hereto as **Exhibit H** is *A Law Terrorism Outran: We Need a FISA for the 21st Century*, a *Washington Post* op-ed piece written by DNI McConnell and published on May 21, 2007, in which DNI McConnell states that, following the

FISC's modification of its January 2007 orders, he had appealed to Congress to amend FISA.

    I declare under penalty of perjury under the laws of the United States and of the State of New York that the foregoing is true and correct.

JAMEEL JAFFER

Executed at New York, New York, on September 11, 2008.

# Exhibit A



PRINTER-FRIENDLY FORMAT
SPONSORED BY



**December 16, 2005**

# Bush Lets U.S. Spy on Callers Without Courts

**By JAMES RISEN and ERIC LICHTBLAU**

### Correction Appended

WASHINGTON, Dec. 15 - Months after the Sept. 11 attacks, President Bush secretly authorized the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without the court-approved warrants ordinarily required for domestic spying, according to government officials.

Under a presidential order signed in 2002, the intelligence agency has monitored the international telephone calls and international e-mail messages of hundreds, perhaps thousands, of people inside the United States without warrants over the past three years in an effort to track possible "dirty numbers" linked to Al Qaeda, the officials said. The agency, they said, still seeks warrants to monitor entirely domestic communications.

The previously undisclosed decision to permit some eavesdropping inside the country without court approval was a major shift in American intelligence-gathering practices, particularly for the National Security Agency, whose mission is to spy on communications abroad. As a result, some officials familiar with the continuing operation have questioned whether the surveillance has stretched, if not crossed, constitutional limits on legal searches.

"This is really a sea change," said a former senior official who specializes in national security law. "It's almost a mainstay of this country that the N.S.A. only does foreign searches."

Nearly a dozen current and former officials, who were granted anonymity because of the classified nature of the program, discussed it with reporters for The New York Times because of their concerns about the operation's legality and oversight.

According to those officials and others, reservations about aspects of the program have also been expressed by Senator John D. Rockefeller IV, the West Virginia Democrat who is the vice chairman of the Senate Intelligence Committee, and a judge presiding over a secret court that oversees intelligence matters. Some of the questions about the agency's new powers led the administration to temporarily suspend the operation last year and impose more restrictions, the officials said.

The Bush administration views the operation as necessary so that the agency can move quickly to monitor communications that may disclose threats to the United States, the officials said. Defenders of the program say it has been a critical tool in helping disrupt terrorist plots and prevent attacks inside the United States.

Administration officials are confident that existing safeguards are sufficient to protect the privacy and civil liberties of Americans, the officials say. In some cases, they said, the Justice Department eventually seeks warrants if it wants to expand the eavesdropping to include communications confined within the United States. The officials said the administration had briefed Congressional leaders about the program and notified the judge in charge of the Foreign Intelligence Surveillance Court, the secret Washington court that deals with national security issues.

The White House asked The New York Times not to publish this article, arguing that it could jeopardize continuing investigations and alert would-be terrorists that they might be under scrutiny. After meeting with senior administration officials to hear their concerns, the newspaper delayed publication for a year to conduct additional reporting. Some information that administration officials argued could be useful to terrorists has been omitted.

## Dealing With a New Threat

While many details about the program remain secret, officials familiar with it say the N.S.A. eavesdrops without warrants on up to 500 people in the United States at any given time. The list changes as some names are added and others dropped, so the number monitored in this country may have reached into the thousands since the program began, several officials said. Overseas, about 5,000 to 7,000 people suspected of terrorist ties are monitored at one time, according to those officials.

Several officials said the eavesdropping program had helped uncover a plot by Iyman Faris, an Ohio trucker and naturalized citizen who pleaded guilty in 2003 to supporting Al Qaeda by planning to bring down the Brooklyn Bridge with blowtorches. What appeared to be another Qaeda plot, involving fertilizer bomb attacks on British pubs and train stations, was exposed last year in part through the program, the officials said. But they said most people targeted for N.S.A. monitoring have never been charged with a crime, including an Iranian-American doctor in the South who came under suspicion because of what one official described as dubious ties to Osama bin Laden.

The eavesdropping program grew out of concerns after the Sept. 11 attacks that the nation's intelligence agencies were not poised to deal effectively with the new threat of Al Qaeda and that they were handcuffed by legal and bureaucratic restrictions better suited to peacetime than war, according to officials. In response, President Bush significantly eased limits on American intelligence and law enforcement agencies and the military.

But some of the administration's antiterrorism initiatives have provoked an outcry from members of Congress, watchdog groups, immigrants and others who argue that the measures erode protections for civil liberties and intrude on Americans' privacy.

Opponents have challenged provisions of the USA Patriot Act, the focus of contentious debate on Capitol Hill this week, that expand domestic surveillance by giving the Federal Bureau of Investigation more power to collect information like library lending lists or Internet use. Military and F.B.I. officials have drawn criticism for monitoring what were largely peaceful antiwar protests. The Pentagon and the Department of Homeland Security were forced to retreat on plans to use public and private databases to hunt for possible terrorists. And last year, the Supreme Court rejected the administration's claim that those labeled "enemy combatants" were not entitled to judicial review of their open-ended detention.

Mr. Bush's executive order allowing some warrantless eavesdropping on those inside the United States - including American citizens, permanent legal residents, tourists and other foreigners - is based on classified legal opinions that assert that the president has broad powers to order such searches, derived in part from the September 2001 Congressional resolution authorizing him to wage war on Al Qaeda and other terrorist groups, according to the officials familiar with the N.S.A. operation.

The National Security Agency, which is based at Fort Meade, Md., is the nation's largest and most secretive intelligence agency, so intent on remaining out of public view that it has long been nicknamed "No Such Agency." It breaks codes and maintains listening posts around the world to eavesdrop on foreign governments, diplomats and trade negotiators as well as drug lords and terrorists. But the agency ordinarily operates under tight restrictions on any spying on Americans, even if they are overseas, or disseminating information about them.

What the agency calls a "special collection program" began soon after the Sept. 11 attacks, as it looked for new tools to attack terrorism. The program accelerated in early 2002 after the Central Intelligence Agency started capturing top Qaeda operatives overseas, including Abu Zubaydah, who was arrested in Pakistan in March 2002. The C.I.A. seized the terrorists' computers, cellphones and personal phone directories, said the officials familiar with the program. The N.S.A. surveillance was intended to exploit those numbers and addresses as quickly as possible, they said.

In addition to eavesdropping on those numbers and reading e-mail messages to and from the Qaeda figures, the N.S.A. began monitoring others linked to them, creating an expanding chain. While most of the numbers and addresses were overseas, hundreds were in the United States, the officials said.

Under the agency's longstanding rules, the N.S.A. can target for interception phone calls or e-mail messages on foreign soil, even if the recipients of those communications are in the United States. Usually, though, the government can only target phones and e-mail messages in the United States by first obtaining a court order from the Foreign Intelligence Surveillance Court, which holds its closed sessions at the Justice Department.

Traditionally, the F.B.I., not the N.S.A., seeks such warrants and conducts most domestic eavesdropping. Until the new program began, the N.S.A. typically limited its domestic surveillance to foreign embassies and missions in Washington, New York and other cities, and obtained court orders to do so.

Since 2002, the agency has been conducting some warrantless eavesdropping on people in the United States who are linked, even if indirectly, to suspected terrorists through the chain of phone numbers and e-mail addresses, according to several officials who know of the operation. Under the special program, the agency monitors their international communications, the officials said. The agency, for example, can target phone calls from someone in New York to someone in Afghanistan.

Warrants are still required for eavesdropping on entirely domestic-to-domestic communications, those officials say, meaning that calls from that New Yorker to someone in California could not be monitored without first going to the Federal Intelligence Surveillance Court.

## A White House Briefing

After the special program started, Congressional leaders from both political parties were brought to Vice President Dick Cheney's office in the White House. The leaders, who included the chairmen and ranking members of the Senate and House intelligence committees, learned of the N.S.A. operation from Mr. Cheney, Lt. Gen. Michael V. Hayden of the Air Force, who was then the agency's director and is now a full general and the principal deputy director of national intelligence, and George J. Tenet, then the director of the C.I.A., officials said.

It is not clear how much the members of Congress were told about the presidential order and the eavesdropping program. Some of them declined to comment about the matter, while others did not return phone calls.

Later briefings were held for members of Congress as they assumed leadership roles on the intelligence committees, officials familiar with the program said. After a 2003 briefing, Senator Rockefeller, the West Virginia Democrat who became vice chairman of the Senate Intelligence Committee that year, wrote a letter to Mr. Cheney expressing concerns about the program, officials knowledgeable about the letter said. It could not be determined if he received a reply. Mr. Rockefeller declined to comment. Aside from the Congressional leaders, only a small group of people, including several cabinet members and officials at the N.S.A., the C.I.A. and the Justice Department, know of the program.

Some officials familiar with it say they consider warrantless eavesdropping inside the United States to be unlawful and possibly unconstitutional, amounting to an improper search. One government official involved in the operation said he privately complained to a Congressional official about his doubts about the program's legality. But nothing came of his inquiry. "People just looked the other way because they didn't want to know what was going on," he said.

A senior government official recalled that he was taken aback when he first learned of the operation. "My first reaction was, 'We're doing what?' " he said. While he said he eventually felt that adequate safeguards were put in place, he added that questions about the program's legitimacy were understandable.

Some of those who object to the operation argue that is unnecessary. By getting warrants through the foreign intelligence court, the N.S.A. and F.B.I. could eavesdrop on people inside the United States who might be tied to terrorist groups without skirting longstanding rules, they say.

The standard of proof required to obtain a warrant from the Foreign Intelligence Surveillance Court is generally considered lower than that required for a criminal warrant - intelligence officials only have to show probable cause that someone may be "an agent of a foreign power," which includes international terrorist groups - and the secret court has turned down only a small number of requests over the years. In 2004, according to the Justice Department, 1,754 warrants were approved. And the Foreign Intelligence Surveillance Court can grant emergency approval for wiretaps within hours, officials say.

Administration officials counter that they sometimes need to move more urgently, the officials said. Those involved in the program also said that the N.S.A.'s eavesdroppers might need to start monitoring large batches of numbers all at once, and that it would be impractical to seek permission from the Foreign Intelligence Surveillance Court first, according to the officials.

The N.S.A. domestic spying operation has stirred such controversy among some national security

officials in part because of the agency's cautious culture and longstanding rules.

Widespread abuses - including eavesdropping on Vietnam War protesters and civil rights activists - by American intelligence agencies became public in the 1970's and led to passage of the Foreign Intelligence Surveillance Act, which imposed strict limits on intelligence gathering on American soil. Among other things, the law required search warrants, approved by the secret F.I.S.A. court, for wiretaps in national security cases. The agency, deeply scarred by the scandals, adopted additional rules that all but ended domestic spying on its part.

After the Sept. 11 attacks, though, the United States intelligence community was criticized for being too risk-averse. The National Security Agency was even cited by the independent 9/11 Commission for adhering to self-imposed rules that were stricter than those set by federal law.

## Concerns and Revisions

Several senior government officials say that when the special operation began, there were few controls on it and little formal oversight outside the N.S.A. The agency can choose its eavesdropping targets and does not have to seek approval from Justice Department or other Bush administration officials. Some agency officials wanted nothing to do with the program, apparently fearful of participating in an illegal operation, a former senior Bush administration official said. Before the 2004 election, the official said, some N.S.A. personnel worried that the program might come under scrutiny by Congressional or criminal investigators if Senator John Kerry, the Democratic nominee, was elected president.

In mid-2004, concerns about the program expressed by national security officials, government lawyers and a judge prompted the Bush administration to suspend elements of the program and revamp it.

For the first time, the Justice Department audited the N.S.A. program, several officials said. And to provide more guidance, the Justice Department and the agency expanded and refined a checklist to follow in deciding whether probable cause existed to start monitoring someone's communications, several officials said.

A complaint from Judge Colleen Kollar-Kotelly, the federal judge who oversees the Federal Intelligence Surveillance Court, helped spur the suspension, officials said. The judge questioned whether information obtained under the N.S.A. program was being improperly used as the basis for F.I.S.A. wiretap warrant requests from the Justice Department, according to senior government officials. While not knowing all the details of the exchange, several government lawyers said there appeared to be concerns that the Justice Department, by trying to shield the existence of the N.S.A. program, was in danger of misleading the court about the origins of the information cited to justify the warrants.

One official familiar with the episode said the judge insisted to Justice Department lawyers at one point that any material gathered under the special N.S.A. program not be used in seeking wiretap warrants from her court. Judge Kollar-Kotelly did not return calls for comment.

A related issue arose in a case in which the F.B.I. was monitoring the communications of a terrorist suspect under a F.I.S.A.-approved warrant, even though the National Security Agency was already conducting warrantless eavesdropping.

According to officials, F.B.I. surveillance of Mr. Faris, the Brooklyn Bridge plotter, was dropped for a short time because of technical problems. At the time, senior Justice Department officials worried what would happen if the N.S.A. picked up information that needed to be presented in court. The government would then either have to disclose the N.S.A. program or mislead a criminal court about how it had gotten the information.

Several national security officials say the powers granted the N.S.A. by President Bush go far beyond the expanded counterterrorism powers granted by Congress under the USA Patriot Act, which is up for renewal. The House on Wednesday approved a plan to reauthorize crucial parts of the law. But final passage has been delayed under the threat of a Senate filibuster because of concerns from both parties over possible intrusions on Americans' civil liberties and privacy.

Under the act, law enforcement and intelligence officials are still required to seek a F.I.S.A. warrant every time they want to eavesdrop within the United States. A recent agreement reached by Republican leaders and the Bush administration would modify the standard for F.B.I. wiretap warrants, requiring, for instance, a description of a specific target. Critics say the bar would remain too low to prevent abuses.

Bush administration officials argue that the civil liberties concerns are unfounded, and they say pointedly that the Patriot Act has not freed the N.S.A. to target Americans. "Nothing could be further from the truth," wrote John Yoo, a former official in the Justice Department's Office of Legal Counsel, and his co-author in a Wall Street Journal opinion article in December 2003. Mr. Yoo worked on a classified legal opinion on the N.S.A.'s domestic eavesdropping program.

At an April hearing on the Patriot Act renewal, Senator Barbara A. Mikulski, Democrat of Maryland, asked Attorney General Alberto R. Gonzales and Robert S. Mueller III, the director of the F.B.I., "Can the National Security Agency, the great electronic snooper, spy on the American people?"

"Generally," Mr. Mueller said, "I would say generally, they are not allowed to spy or to gather information on American citizens."

President Bush did not ask Congress to include provisions for the N.S.A. domestic surveillance program as part of the Patriot Act and has not sought any other laws to authorize the operation. Bush administration lawyers argued that such new laws were unnecessary, because they believed that the Congressional resolution on the campaign against terrorism provided ample authorization, officials said.

## The Legal Line Shifts

Seeking Congressional approval was also viewed as politically risky because the proposal would be certain to face intense opposition on civil liberties grounds. The administration also feared that by publicly disclosing the existence of the operation, its usefulness in tracking terrorists would end, officials said.

The legal opinions that support the N.S.A. operation remain classified, but they appear to have followed private discussions among senior administration lawyers and other officials about the need to pursue aggressive strategies that once may have been seen as crossing a legal line, according to senior officials who participated in the discussions.

For example, just days after the Sept. 11, 2001, attacks on New York and the Pentagon, Mr. Yoo, the Justice Department lawyer, wrote an internal memorandum that argued that the government might use "electronic surveillance techniques and equipment that are more powerful and sophisticated than those available to law enforcement agencies in order to intercept telephonic communications and observe the movement of persons but without obtaining warrants for such uses."

Mr. Yoo noted that while such actions could raise constitutional issues, in the face of devastating terrorist attacks "the government may be justified in taking measures which in less troubled conditions could be seen as infringements of individual liberties."

The next year, Justice Department lawyers disclosed their thinking on the issue of warrantless wiretaps in national security cases in a little-noticed brief in an unrelated court case. In that 2002 brief, the government said that "the Constitution vests in the President inherent authority to conduct warrantless intelligence surveillance (electronic or otherwise) of foreign powers or their agents, and Congress cannot by statute extinguish that constitutional authority."

Administration officials were also encouraged by a November 2002 appeals court decision in an unrelated matter. The decision by the Foreign Intelligence Surveillance Court of Review, which sided with the administration in dismantling a bureaucratic "wall" limiting cooperation between prosecutors and intelligence officers, cited "the president's inherent constitutional authority to conduct warrantless foreign intelligence surveillance."

But the same court suggested that national security interests should not be grounds "to jettison the Fourth Amendment requirements" protecting the rights of Americans against undue searches. The dividing line, the court acknowledged, "is a very difficult one to administer."

Barclay Walsh contributed research for this article.

**Correction:** Dec. 28, 2005, Wednesday:

Because of an editing error, a front-page article on Dec. 16 about a decision by President Bush to authorize the National Security Agency to eavesdrop on Americans and others inside the United States to search for evidence of terrorist activity without warrants ordinarily required for domestic spying misstated the name of the court that would normally issue those warrants. It is the Foreign - not Federal -Intelligence Surveillance Court.

Copyright 2005 The New York Times Company  Home  Privacy Policy  Search  Corrections  **XML**  Help  Contact Us  Work for Us  Site Map  Back to Top

Exhibit B

- ensure that departments and agencies promote a culture of information sharing by assigning personnel and dedicating resources to terrorism information sharing.

The guidelines build on the strong commitment that my Administration and the Congress have already made to strengthening information sharing, as evidenced by Executive Orders 13311 of July 27, 2003, and 13388 of October 25, 2005, section 892 of the Homeland Security Act of 2002, the USA PATRIOT Act, and sections 1011 and 1016 of the IRTPA. While much work has been done by executive departments and agencies, more is required to fully develop and implement the ISE.

To lead this national effort, I designated the Program Manager (PM) responsible for information sharing across the Federal Government, and directed that the PM and his office be part of the Office of the Director of National Intelligence (DNI), and that the DNI exercise authority, direction, and control over the PM and ensure that the PM carries out his responsibilities under section 1016 of IRTPA. I fully support the efforts of the PM and the Information Sharing Council to transform our current capabilities into the desired ISE, and I have directed all heads of executive departments and agencies to support the PM and the DNI to meet our stated objectives.

Creating the ISE is a difficult and complex task that will require a sustained effort and strong partnership with the Congress. I know that you share my commitment to achieve the goal of providing decision makers and the men and women on the front lines in the War on Terror with the best possible information to protect our Nation. I appreciate your support to date and look forward to working with you in the months ahead on this critical initiative.

**George W. Bush**

The White House,

December 16, 2005.

NOTE: An original was not available for verification of the content of this message.

## The President's Radio Address
*December 17, 2005*

Good morning. As President, I took an oath to defend the Constitution, and I have no greater responsibility than to protect our people, our freedom, and our way of life. On September the 11th, 2001, our freedom and way of life came under attack by brutal enemies who killed nearly 3,000 innocent Americans. We're fighting these enemies across the world. Yet in this first war of the 21st century, one of the most critical battlefronts is the homefront. And since September the 11th, we've been on the offensive against the terrorists plotting within our borders.

One of the first actions we took to protect America after our Nation was attacked was to ask Congress to pass the PATRIOT Act. The PATRIOT Act tore down the legal and bureaucratic wall that kept law enforcement and intelligence authorities from sharing vital information about terrorist threats. And the PATRIOT Act allowed Federal investigators to pursue terrorists with tools they already used against other criminals. Congress passed this law with a large, bipartisan majority, including a vote of 98–1 in the United States Senate.

Since then, America's law enforcement personnel have used this critical law to prosecute terrorist operatives and supporters and to break up terrorist cells in New York, Oregon, Virginia, California, Texas, and Ohio. The PATRIOT Act has accomplished exactly what it was designed to do: It has protected American liberty and saved American lives.

Yet key provisions of this law are set to expire in 2 weeks. The terrorist threat to our country will not expire in 2 weeks. The terrorists want to attack America again and inflict even greater damage than they did on September the 11th. Congress has a responsibility to ensure that law enforcement and intelligence officials have the tools they need to protect the American people.

The House of Representatives passed reauthorization of the PATRIOT Act. Yet a minority of Senators filibustered to block the renewal of the PATRIOT Act when it came up for a vote yesterday. That decision is irresponsible, and it endangers the lives of our

citizens. The Senators who are filibustering must stop their delaying tactics, and the Senate must vote to reauthorize the PATRIOT Act. In the war on terror, we cannot afford to be without this law for a single moment.

To fight the war on terror, I am using authority vested in me by Congress, including the Joint Authorization for Use of Military Force, which passed overwhelmingly in the first week after September the 11th. I'm also using constitutional authority vested in me as Commander in Chief.

In the weeks following the terrorist attacks on our Nation, I authorized the National Security Agency, consistent with U.S. law and the Constitution, to intercept the international communications of people with known links to Al Qaida and related terrorist organizations. Before we intercept these communications, the Government must have information that establishes a clear link to these terrorist networks.

This is a highly classified program that is crucial to our national security. Its purpose is to detect and prevent terrorist attacks against the United States, our friends, and allies. Yesterday the existence of this secret program was revealed in media reports, after being improperly provided to news organizations. As a result, our enemies have learned information they should not have, and the unauthorized disclosure of this effort damages our national security and puts our citizens at risk. Revealing classified information is illegal, alerts our enemies, and endangers our country.

As the 9/11 Commission pointed out, it was clear that terrorists inside the United States were communicating with terrorists abroad before the September the 11th attacks, and the commission criticized our Nation's inability to uncover links between terrorists here at home and terrorists abroad. Two of the terrorist hijackers who flew a jet into the Pentagon, Nawaf al Hamzi and Khalid al Mihdhar, communicated while they were in the United States to other members of Al Qaida who were overseas. But we didn't know they were here until it was too late.

The authorization I gave the National Security Agency after September the 11th helped address that problem in a way that is fully consistent with my constitutional responsibilities and authorities. The activities I have authorized make it more likely that killers like these 9/11 hijackers will be identified and located in time. And the activities conducted under this authorization have helped detect and prevent possible terrorist attacks in the United States and abroad.

The activities I authorized are reviewed approximately every 45 days. Each review is based on a fresh intelligence assessment of terrorist threats to the continuity of our Government and the threat of catastrophic damage to our homeland. During each assessment, previous activities under the authorization are reviewed. The review includes approval by our Nation's top legal officials, including the Attorney General and the Counsel to the President. I have reauthorized this program more than 30 times since the September the 11th attacks, and I intend to do so for as long as our Nation faces a continuing threat from Al Qaida and related groups.

The NSA's activities under this authorization are thoroughly reviewed by the Justice Department and NSA's top legal officials, including NSA's General Counsel and Inspector General. Leaders in Congress have been briefed more than a dozen times on this authorization and the activities conducted under it. Intelligence officials involved in this activity also receive extensive training to ensure they perform their duties consistent with the letter and intent of the authorization.

This authorization is a vital tool in our war against the terrorists. It is critical to saving American lives. The American people expect me to do everything in my power under our laws and Constitution to protect them and their civil liberties. And that is exactly what I will continue to do, so long as I'm the President of the United States.

Thank you.

NOTE: The President spoke at 10:06 a.m. from the Roosevelt Room at the White House. In his address, he referred to the National Commission on Terrorist Attacks Upon the United States (9/11 Commission). The Office of the Press Secretary also released a Spanish language transcript of this address.

# Exhibit C

## The President's News Conference

*December 19, 2005*

**The President.** Welcome. Please be seated. Thanks.

Last night I addressed the Nation about our strategy for victory in Iraq and the historic elections that took place in the country last week. In a nation that once lived by the whims of a brutal dictator, the Iraqi people now enjoy constitutionally protected freedoms, and their leaders now derive their powers from the consent of the governed. Millions of Iraqis are looking forward to a future with hope and optimism.

The Iraqi people still face many challenges. This is the first time the Iraqis are forming a Government under their new Constitution. The Iraqi Constitution requires a two-thirds vote of the Parliament for certain top officials, so the formation of the new Government will take time as Iraqis work to build consensus. And once the new Iraqi Government assumes office, Iraq's new leaders will face many important decisions on issues such as security and reconstruction, economic reform, and national unity. The work ahead will require the patience of the Iraqi people and the patience and support of America and our coalition partners.

As I said last night, this election does not mean the end of violence, but it is the beginning of something new, a constitutional democracy at the heart of the Middle East. And we will keep working toward our goal of a democratic Iraq that can govern itself, sustain itself, and defend itself.

Our mission in Iraq is critical to victory in the global war on terror. After our country was attacked on September the 11th and nearly 3,000 lives were lost, I vowed to do everything within my power to bring justice to those who were responsible. I also pledged to the American people to do everything within my power to prevent this from happening again. What we quickly learned was that Al Qaida was not a conventional enemy. Some lived in our cities and communities and communicated from here in America to plot and plan with bin Laden's lieutenants in Afghanistan, Pakistan, and elsewhere. Then they boarded our airplanes and launched the worst attack on our country in our Nation's history.

This new threat required us to think and act differently. And as the 9/11 Commission pointed out, to prevent this from happening again, we need to connect the dots before the enemy attacks, not after. And we need to recognize that dealing with Al Qaida is not simply a matter of law enforcement; it requires defending the country against an enemy that declared war against the United States of America.

As President and Commander in Chief, I have the constitutional responsibility and the constitutional authority to protect our country. Article II of the Constitution gives me that responsibility and the authority necessary to fulfill it. And after September the 11th, the United States Congress also granted me additional authority to use military force against Al Qaida.

After September the 11th, one question my administration had to answer was how, using the authorities I have, how do we effectively detect enemies hiding in our midst and prevent them from striking us again? We know that a 2-minute phone conversation between somebody linked to Al Qaida here and an operative overseas could lead directly to the loss of thousands of lives. To save American lives, we must be able to act fast and to detect these conversations so we can prevent new attacks.

So, consistent with U.S. law and the Constitution, I authorized the interception of international communications of people with known links to Al Qaida and related terrorist organizations. This program is carefully reviewed approximately every 45 days to ensure it is being used properly. Leaders in the United States Congress have been briefed more than a dozen times on this program. And it has been effective in disrupting the enemy while safeguarding our civil liberties.

This program has targeted those with known links to Al Qaida. I've reauthorized this program more than 30 times since the September the 11th attacks, and I intend to do so for so long as our Nation is—for so long as the Nation faces the continuing threat of an enemy that wants to kill American citizens.

I said the other day that a mistake was trying to train a civilian defense force and an Iraqi Army at the same time but not giving the civilian defense force enough training and tools necessary to be able to battle a group of thugs and killers. And so we adjusted.

And the point I'm trying to make to the American people in this, as you said, candid dialog—I hope I've been candid all along, but in the candid dialog—is to say, we're constantly changing our tactics to meet the changing tactics of an enemy. And that's important for our citizens to understand.

Thank you. Kelly [Kelly Wallace, Cable News Network].

**Open Dialog on Wiretaps**

*Q.* Thank you, Mr. President. If you believe that present law needs to be faster, more agile, concerning the surveillance of conversations from someone in the United States to somewhere outside the country——

*The President.* Right.

*Q.* ——why, in the 4 years since 9/11, has your administration not sought to get changes in the law instead of bypassing it, as some of your critics have said?

*The President.* No, I appreciate that. First, I want to make clear to the people listening that this program is limited in nature to those that are known Al Qaida ties and/or affiliates. That's important. So it's a program that's limited, and you brought up something that I want to stress, and that is, is that these calls are not intercepted within the country. They are from outside the country to in the country or vice versa. So in other words, this is not a—if you're calling from Houston to L.A., that call is not monitored. And if there were any need to monitor, there would be a process to do that.

I think I've got the authority to move forward, Kelly. I mean, this is what it's—and the Attorney General was out briefing this morning and I—about why it's legal to make the decisions I'm making. I can fully understand why Members of Congress are expressing concerns about civil liberties. I know that. And it's—I share the same concerns. I want to make sure the American people understand, however, that we have an obligation

to protect you, and we're doing that and, at the same time, protecting your civil liberties.

Secondly, an open debate about law would say to the enemy, "Here's what we're going to do." And this is an enemy which adjusts. We monitor this program carefully. We have consulted with Members of the Congress over a dozen times. We are constantly reviewing the program. Those of us who review the program have a duty to uphold the laws of the United States, and we take that duty very seriously.

Let's see here—Martha [Martha Raddatz, ABC News]—working my way around the electronic media, here.

**Domestic Wiretaps**

*Q.* Thank you, Mr. President. You say you have an obligation to protect us. Then why not monitor those calls between Houston and L.A.? If the threat is so great, and you use the same logic, why not monitor those calls? Americans thought they weren't being spied on in calls overseas—why not within the country, if the threat is so great?

*The President.* We will, under current law, if we have to. We will monitor those calls. And that's why there is a FISA law. We will apply for the right to do so. And there's a difference—let me finish—there is a difference between detecting, so we can prevent, and monitoring. And it's important to know the distinction between the two.

*Q.* But preventing is one thing, and you said the FISA laws essentially don't work because of the speed in monitoring calls overseas.

*The President.* I said we use the FISA courts to monitor calls. It's a very important tool, and we do use it. I just want to make sure we've got all tools at our disposal. This is an enemy which is quick, and it's lethal. And sometimes we have to move very, very quickly. But if there is a need based upon evidence, we will take that evidence to a court in order to be able to monitor calls within the United States.

Who haven't I called on, let's see here. Suzanne [Suzanne Malveaux, Cable News Network].

Exhibit D




CLICK HERE TO PRINT

THE WHITE HOUSE
PRESIDENT
GEORGE W. BUSH

For Immediate Release
Office of the Press Secretary
December 19, 2005

## Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

James S. Brady Briefing Room

8:30 A.M. EST

MR. McCLELLAN: Good morning, everybody. I've got with me the Attorney General and General Hayden here this morning to brief you on the legal issues surrounding the NSA authorization and take whatever questions you have for them on that. The Attorney General will open with some comments and then they'll be glad to take your questions.

And with that, I'll turn it over to General Gonzales.

ATTORNEY GENERAL GONZALES: Thanks, Scott.

The President confirmed the existence of a highly classified program on Saturday. The program remains highly classified; there are many operational aspects of the program that have still not been disclosed and we want to protect that because those aspects of the program are very, very important to protect the national security of this country. So I'm only going to be talking about the legal underpinnings for what has been disclosed by the President.

The President has authorized a program to engage in electronic surveillance of a particular kind, and this would be the intercepts of contents of communications where one of the -- one party to the communication is outside the United States. And this is a very important point -- people are running around saying that the United States is somehow spying on American citizens calling their neighbors. Very, very important to understand that one party to the communication has to be outside the United States.

Another very important point to remember is that we have to have a reasonable basis to conclude that one party to the communication is a member of al Qaeda, affiliated with al Qaeda, or a member of an organization affiliated with al Qaeda, or working in support of al Qaeda. We view these authorities as authorities to confront the enemy in which the United States is at war with -- and that is al Qaeda and those who are supporting or affiliated with al Qaeda.

What we're trying to do is learn of communications, back and forth, from within the United States to overseas with members of al Qaeda. And that's what this program is about.

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 21 of 54

Now, in terms of legal authorities, the Foreign Intelligence Surveillance Act provides -- requires a court order before engaging in this kind of surveillance that I've just discussed and the President announced on Saturday, unless there is somehow -- there is -- unless otherwise authorized by statute or by Congress. That's what the law requires. Our position is, is that the authorization to use force, which was passed by the Congress in the days following September 11th, constitutes that other authorization, that other statute by Congress, to engage in this kind of signals intelligence.

Now, that -- one might argue, now, wait a minute, there's nothing in the authorization to use force that specifically mentions electronic surveillance. Let me take you back to a case that the Supreme Court reviewed this past -- in 2004, the Hamdi decision. As you remember, in that case, Mr. Hamdi was a U.S. citizen who was contesting his detention by the United States government. What he said was that there is a statute, he said, that specifically prohibits the detention of American citizens without permission, an act by Congress -- and he's right, 18 USC 4001a requires that the United States government cannot detain an American citizen except by an act of Congress.

We took the position -- the United States government took the position that Congress had authorized that detention in the authorization to use force, even though the authorization to use force never mentions the word "detention." And the Supreme Court, a plurality written by Justice O'Connor agreed. She said, it was clear and unmistakable that the Congress had authorized the detention of an American citizen captured on the battlefield as an enemy combatant for the remainder -- the duration of the hostilities. So even though the authorization to use force did not mention the word, "detention," she felt that detention of enemy soldiers captured on the battlefield was a fundamental incident of waging war, and therefore, had been authorized by Congress when they used the words, "authorize the President to use all necessary and appropriate force."

For the same reason, we believe signals intelligence is even more a fundamental incident of war, and we believe has been authorized by the Congress. And even though signals intelligence is not mentioned in the authorization to use force, we believe that the Court would apply the same reasoning to recognize the authorization by Congress to engage in this kind of electronic surveillance.

I might also add that we also believe the President has the inherent authority under the Constitution, as Commander-in-Chief, to engage in this kind of activity. Signals intelligence has been a fundamental aspect of waging war since the Civil War, where we intercepted telegraphs, obviously, during the world wars, as we intercepted telegrams in and out of the United States. Signals intelligence is very important for the United States government to know what the enemy is doing, to know what the enemy is about to do. It is a fundamental incident of war, as Justice O'Connor talked about in the Hamdi decision. We believe that -- and those two authorities exist to allow, permit the United States government to engage in this kind of surveillance.

The President, of course, is very concerned about the protection of civil liberties, and that's why we've got strict parameters, strict guidelines in place out at NSA to ensure that the program is operating in a way that is consistent with the President's directives. And, again, the authorization by the President is only to engage in surveillance of communications where one party is outside the United States, and where we have a reasonable basis to conclude that one of the parties of the communication is either a member of al Qaeda or affiliated with al Qaeda.

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 22 of 54

Mike, do you want to -- have anything to add?

GENERAL HAYDEN: I'd just add, in terms of what we do globally with regard to signals intelligence, which is a critical part of defending the nation, there are probably no communications more important to what it is we're trying to do to defend the nation; no communication is more important for that purpose than those communications that involve al Qaeda, and one end of which is inside the homeland, one end of which is inside the United States. Our purpose here is to detect and prevent attacks. And the program in this regard has been successful.

Q General, are you able to say how many Americans were caught in this surveillance?

ATTORNEY GENERAL GONZALES: I'm not -- I can't get into the specific numbers because that information remains classified. Again, this is not a situation where -- of domestic spying. To the extent that there is a moderate and heavy communication involving an American citizen, it would be a communication where the other end of the call is outside the United States and where we believe that either the American citizen or the person outside the United States is somehow affiliated with al Qaeda.

Q General, can you tell us why you don't choose to go to the FISA court?

ATTORNEY GENERAL GONZALES: Well, we continue to go to the FISA court and obtain orders. It is a very important tool that we continue to utilize. Our position is that we are not legally required to do, in this particular case, because the law requires that we -- FISA requires that we get a court order, unless authorized by a statute, and we believe that authorization has occurred.

The operators out at NSA tell me that we don't have the speed and the agility that we need, in all circumstances, to deal with this new kind of enemy. You have to remember that FISA was passed by the Congress in 1978. There have been tremendous advances in technology --

Q But it's been kind of retroactively, hasn't it?

ATTORNEY GENERAL GONZALES: -- since then. Pardon me?

Q It's been done retroactively before, hasn't it?

ATTORNEY GENERAL GONZALES: What do you mean, "retroactively"?

Q You just go ahead and then you apply for the FISA clearance, because it's damn near automatic.

ATTORNEY GENERAL GONZALES: If we -- but there are standards that have to be met, obviously, and you're right, there is a procedure where we -- an emergency procedure that allows us to make a decision to authorize -- to utilize FISA, and then we go to the court and get confirmation of that authority.

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK    Document 7-2    Filed 09/12/08    Page 23 of 54

But, again, FISA is very important in the war on terror, but it doesn't provide the speed and the agility that we need in all circumstances to deal with this new kind of threat.

Q But what -- go ahead.

GENERAL HAYDEN: Let me just add to the response to the last question. As the Attorney General says, FISA is very important, we make full use of FISA. But if you picture what FISA was designed to do, FISA is designed to handle the needs in the nation in two broad categories: there's a law enforcement aspect of it; and the other aspect is the continued collection of foreign intelligence. I don't think anyone could claim that FISA was envisaged as a tool to cover armed enemy combatants in preparation for attacks inside the United States. And that's what this authorization under the President is designed to help us do.

Q Have you identified armed enemy combatants, through this program, in the United States?

GENERAL HAYDEN: This program has been successful in detecting and preventing attacks inside the United States.

Q General Hayden, I know you're not going to talk about specifics about that, and you say it's been successful. But would it have been as successful -- can you unequivocally say that something has been stopped or there was an imminent attack or you got information through this that you could not have gotten through going to the court?

GENERAL HAYDEN: I can say unequivocally, all right, that we have got information through this program that would not otherwise have been available.

Q Through the court? Because of the speed that you got it?

GENERAL HAYDEN: Yes, because of the speed, because of the procedures, because of the processes and requirements set up in the FISA process, I can say unequivocally that we have used this program in lieu of that and this program has been successful.

Q But one of the things that concerns people is the slippery slope. If you said you absolutely need this program, you have to do it quickly -- then if you have someone you suspect being a member of al Qaeda, and they're in the United States, and there is a phone call between two people in the United States, why not use that, then, if it's so important? Why not go that route? Why not go further?

GENERAL HAYDEN: Across the board, there is a judgment that we all have to make -- and I made this speech a day or two after 9/11 to the NSA workforce -- I said, free peoples always have to judge where they want to be on that spectrum between security and liberty; that there will be great pressures on us after those attacks to move our national banner down in the direction of security. What I said to the NSA workforce is, our job is to keep Americans free by making Americans feel safe again. That's been the mission of the National Security Agency since the day after the attack, is when I talked -- two days after the attack is when I said that to the workforce.

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 24 of 54

There's always a balancing between security and liberty. We understand that this is a more -- I'll use the word "aggressive" program than would be traditionally available under FISA. It is also less intrusive. It deals only with international calls. It is generally for far shorter periods of time. And it is not designed to collect reams of intelligence, but to detect and warn and prevent about attacks. And, therefore, that's where we've decided to draw that balance between security and liberty.

Q Gentlemen, can you say when Congress was first briefed, who was included in that, and will there be a leaks investigation?

ATTORNEY GENERAL GONZALES: Well of course, we're not going to -- we don't talk about -- we try not to talk about investigations. As to whether or not there will be a leak investigation, as the President indicated, this is really hurting national security, this has really hurt our country, and we are concerned that a very valuable tool has been compromised. As to whether or not there will be a leak investigation, we'll just have to wait and see.

And your first question was?

Q When was Congress first briefed --

ATTORNEY GENERAL GONZALES: I'm not going to -- I'm not going to talk about -- I'll let others talk about when Congress was first briefed. What I can say is, as the President indicated on Saturday, there have been numerous briefings with certain key members of Congress. Obviously, some members have come out since the revelations on Saturday, saying that they hadn't been briefed. This is a very classified program. It is probably the most classified program that exists in the United States government, because the tools are so valuable, and therefore, decisions were made to brief only key members of Congress. We have begun the process now of reaching out to other members of Congress. I met last night, for example, with Chairman Specter and other members of Congress to talk about the legal aspects of this program.

And so we are engaged in a dialogue now to talk with Congress, but also -- but we're still mindful of the fact that still -- this is still a very highly classified program, and there are still limits about what we can say today, even to certain members of Congress.

Q General, what's really compromised by the public knowledge of this program? Don't you assume that the other side thinks we're listening to them? I mean, come on.

GENERAL HAYDEN: The fact that this program has been successful is proof to me that what you claim to be an assumption is certainly not universal. The more we discuss it, the more we put it in the face of those who would do us harm, the more they will respond to this and protect their communications and make it more difficult for us to defend the nation.

Q Mr. Attorney General --

Q -- became public, have you seen any evidence in a change in the tactics or --

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 25 of 54

ATTORNEY GENERAL GONZALES: We're not going to comment on that kind of operational aspect.

Q You say this has really hurt the American people. Is that based only on your feeling about it, or is there some empirical evidence to back that up, even if you can't --

ATTORNEY GENERAL GONZALES: I think the existence of this program, the confirmation of the -- I mean, the fact that this program exists, in my judgment, has compromised national security, as the President indicated on Saturday.

Q I'd like to ask you, what are the constitutional limits on this power that you see laid out in the statute and in your inherent constitutional war power? And what's to prevent you from just listening to everyone's conversation and trying to find the word "bomb," or something like that?

ATTORNEY GENERAL GONZALES: Well, that's a good question. This was a question that was raised in some of my discussions last night with members of Congress. The President has not authorized -- has not authorized blanket surveillance of communications here in the United States. He's been very clear about the kind of surveillance that we're going to engage in. And that surveillance is tied with our conflict with al Qaeda.

You know, we feel comfortable that this surveillance is consistent with requirements of the 4th Amendment. The touchstone of the 4th Amendment is reasonableness, and the Supreme Court has long held that there are exceptions to the warrant requirement in -- when special needs outside the law enforcement arena. And we think that that standard has been met here. When you're talking about communications involving al Qaeda, when you -- obviously there are significant privacy interests implicated here, but we think that those privacy interests have been addressed; when you think about the fact that this is an authorization that's ongoing, it's not a permanent authorization, it has to be reevaluated from time to time. There are additional safeguards that have been in place -- that have been imposed out at NSA, and we believe that it is a reasonable application of these authorities.

Q Mr. Attorney General, haven't you stretched --

Q -- adequate because of technological advances? Wouldn't you do the country a better service to address that issue and fix it, instead of doing a backdoor approach --

ATTORNEY GENERAL GONZALES: This is not a backdoor approach. We believe Congress has authorized this kind of surveillance. We have had discussions with Congress in the past -- certain members of Congress -- as to whether or not FISA could be amended to allow us to adequately deal with this kind of threat, and we were advised that that would be difficult, if not impossible.

Q If this is not backdoor, is this at least a judgment call? Can you see why other people would look at it and say, well, no, we don't see it that way?

ATTORNEY GENERAL GONZALES: I think some of the concern is because people had not been

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 26 of 54

briefed; they don't understand the specifics of the program, they don't understand the strict safeguards within the program. And I haven't had a discussion -- an opportunity to have a discussion with them about our legal analysis. So, obviously, we're in that process now. Part of the reason for this press brief today is to have you help us educate the American people and the American Congress about what we're doing and the legal basis for what we're doing.

Q Al, you talk about the successes and the critical intercepts of the program. Have there also been cases in which after listening in or intercepting, you realize you had the wrong guy and you listened to what you shouldn't have?

GENERAL HAYDEN: That's why I mentioned earlier that the program is less intrusive. It deals only with international calls. The time period in which we would conduct our work is much shorter, in general, overall, than it would be under FISA. And one of the true purposes of this is to be very agile, as you described.

If this particular line of logic, this reasoning that took us to this place proves to be inaccurate, we move off of it right away.

Q Are there cases in which --

GENERAL HAYDEN: Yes, of course.

Q Can you give us some idea of percentage, or how often you get it right and how often you get it wrong?

GENERAL HAYDEN: No, it would be very -- no, I cannot, without getting into the operational details. I'm sorry.

Q But there are cases where you wind up listening in where you realize you shouldn't have?

GENERAL HAYDEN: There are cases like we do with regard to the global SIGIN system -- you have reasons to go after particular activities, particular communications. There's a logic; there is a standard as to why you would go after that, not just in a legal sense, which is very powerful, but in a practical sense. We can't waste resources on targets that simply don't provide valuable information. And when we decide that is the case -- and in this program, the standards, in terms of re-evaluating whether or not this coverage is worthwhile at all, are measured in days and weeks.

Q Would someone in a case in which you got it wrong have a cause of action against the government?

ATTORNEY GENERAL GONZALES: That is something I'm not going to answer, Ken.

Q I wanted to ask you a question. Do you think the government has the right to break the law?

ATTORNEY GENERAL GONZALES: Absolutely not. I don't believe anyone is above the law.

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 27 of 54

Q You have stretched this resolution for war into giving you carte blanche to do anything you want to do.

ATTORNEY GENERAL GONZALES: Well, one might make that same argument in connection with detention of American citizens, which is far more intrusive than listening into a conversation. There may be some members of Congress who might say, we never --

Q That's your interpretation. That isn't Congress' interpretation.

ATTORNEY GENERAL GONZALES: Well, I'm just giving you the analysis --

Q You're never supposed to spy on Americans.

ATTORNEY GENERAL GONZALES: I'm just giving the analysis used by Justice O'Connor -- and she said clearly and unmistakenly the Congress authorized the President of the United States to detain an American citizen, even though the authorization to use force never mentions the word "detention" --

Q -- into wiretapping everybody and listening in on --

ATTORNEY GENERAL GONZALES: This is not about wiretapping everyone. This is a very concentrated, very limited program focused at gaining information about our enemy.

Q Now that the cat is out of the bag, so to speak, do you expect your legal analysis to be tested in the courts?

ATTORNEY GENERAL GONZALES: I'm not going to, you know, try to guess as to what's going to happen about that. We're going to continue to try to educate the American people and the American Congress about what we're doing and the basis -- why we believe that the President has the authority to engage in this kind of conduct.

Q Because there are some very smart legal minds who clearly think a law has been broken here.

ATTORNEY GENERAL GONZALES: Well, I think that they may be making or offering up those opinions or assumptions based on very limited information. They don't have all the information about the program. I think they probably don't have the information about our legal analysis.

Q Judge Gonzales, will you release then, for the reasons you're saying now, the declassified versions of the legal rationale for this from OLC? And if not, why not? To assure the American public that this was done with the legal authority that you state.

ATTORNEY GENERAL GONZALES: We're engaged now in a process of educating the American people, again, and educating the Congress. We'll make the appropriate evaluation at the appropriate time as to whether or not additional information needs to be provided to the Congress or the American

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 28 of 54

people.

Q You declassified OLC opinions before, after the torture -- why not do that here to show, yes, we went through a process?

ATTORNEY GENERAL GONZALES: I'm not confirming the existence of opinions or the non-existence of opinions. I've offered up today our legal analysis of the authorities of this President.

Q Sir, can you explain, please, the specific inadequacies in FISA that have prevented you from sort of going through the normal channels?

GENERAL HAYDEN: One, the whole key here is agility. And let me re-trace some grounds I tried to suggest earlier. FISA was built for persistence. FISA was built for long-term coverage against known agents of an enemy power. And the purpose involved in each of those -- in those cases was either for a long-term law enforcement purpose or a long-term intelligence purpose.

This program isn't for that. This is to detect and prevent. And here the key is not so much persistence as it is agility. It's a quicker trigger. It's a subtly softer trigger. And the intrusion into privacy -- the intrusion into privacy is significantly less. It's only international calls. The period of time in which we do this is, in most cases, far less than that which would be gained by getting a court order. And our purpose here, our sole purpose is to detect and prevent.

Again, I make the point, what we are talking about here are communications we have every reason to believe are al Qaeda communications, one end of which is in the United States. And I don't think any of us would want any inefficiencies in our coverage of those kinds of communications, above all. And that's what this program allows us to do -- it allows us to be as agile as operationally required to cover these targets.

Q But how does FISA --

GENERAL HAYDEN: FISA involves the process -- FISA involves marshaling arguments; FISA involves looping paperwork around, even in the case of emergency authorizations from the Attorney General. And beyond that, it's a little -- it's difficult for me to get into further discussions as to why this is more optimized under this process without, frankly, revealing too much about what it is we do and why and how we do it.

Q If FISA didn't work, why didn't you seek a new statute that allowed something like this legally?

ATTORNEY GENERAL GONZALES: That question was asked earlier. We've had discussions with members of Congress, certain members of Congress, about whether or not we could get an amendment to FISA, and we were advised that that was not likely to be -- that was not something we could likely get, certainly not without jeopardizing the existence of the program, and therefore, killing the program. And that -- and so a decision was made that because we felt that the authorities were there, that we should continue moving forward with this program.

Q And who determined that these targets were al Qaeda? Did you wiretap them?

GENERAL HAYDEN: The judgment is made by the operational work force at the National Security Agency using the information available to them at the time, and the standard that they apply -- and it's a two-person standard that must be signed off by a shift supervisor, and carefully recorded as to what created the operational imperative to cover any target, but particularly with regard to those inside the United States.

Q So a shift supervisor is now making decisions that a FISA judge would normally make? I just want to make sure I understand. Is that what you're saying?

GENERAL HAYDEN: What we're trying to do is to use the approach we have used globally against al Qaeda, the operational necessity to cover targets. And the reason I emphasize that this is done at the operational level is to remove any question in your mind that this is in any way politically influenced. This is done to chase those who would do harm to the United States.

Q Building on that, during --

Q Thank you, General. Roughly when did those conversations occur with members of Congress?

ATTORNEY GENERAL GONZALEZ: I'm not going to get into the specifics of when those conversations occurred, but they have occurred.

Q May I just ask you if they were recently or if they were when you began making these exceptions?

ATTORNEY GENERAL GONZALEZ: They weren't recently.

MR. McCLELLAN: The President indicated that those -- the weeks after September 11th.

Q What was the date, though, of the first executive order? Can you give us that?

GENERAL HAYDEN: If I could just, before you ask that question, just add -- these actions that I described taking place at the operational level -- and I believe that a very important point to be made -- have intense oversight by the NSA Inspector General, by the NSA General Counsel, and by officials of the Justice Department who routinely look into this process and verify that the standards set out by the President are being followed.

Q Can you absolutely assure us that all of the communications intercepted --

Q Have you said that you -- (inaudible) -- anything about this program with your international partners -- with the partners probably in the territories of which you intercept those communications?

ATTORNEY GENERAL GONZALEZ: I'm not aware of discussions with other countries, but that

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 30 of 54

doesn't mean that they haven't occurred. I simply have no personal knowledge of that.

Q Also, is it only al Qaeda, or maybe some other terrorist groups?

ATTORNEY GENERAL GONZALEZ: Again, with respect to what the President discussed on Saturday, this program -- it is tied to communications where we believe one of the parties is affiliated with al Qaeda or part of an organization or group that is supportive of al Qaeda.

Q Sir, during his confirmation hearings, it came out that now-Ambassador Bolton had sought and obtained NSA intercepts of conversations between American citizens and others. Who gets the information from this program; how do you guarantee that it doesn't get too widely spread inside the government, and used for other purposes?

Q And is it destroyed afterwards?

GENERAL HAYDEN: We report this information the way we report any other information collected by the National Security Agency. And the phrase you're talking about is called minimization of U.S. identities. The same minimalizationist standards apply across the board, including for this program. To make this very clear -- U.S. identities are minimized in all of NSA's activities, unless, of course, the U. S. identity is essential to understand the inherent intelligence value of the intelligence report. And that's the standard that's used.

Q General, when you discussed the emergency powers, you said, agility is critical here. And in the case of the emergency powers, as I understand it, you can go in, do whatever you need to do, and within 72 hours just report it after the fact. And as you say, these may not even last very long at all. What would be the difficulty in setting up a paperwork system in which the logs that you say you have the shift supervisors record are simply sent to a judge after the fact? If the judge says that this is not legitimate, by that time probably your intercept is over, wouldn't that be correct?

GENERAL HAYDEN: What you're talking about now are efficiencies. What you're asking me is, can we do this program as efficiently using the one avenue provided to us by the FISA Act, as opposed to the avenue provided to us by subsequent legislation and the President's authorization.

Our operational judgment, given the threat to the nation that the difference in the operational efficiencies between those two sets of authorities are such that we can provide greater protection for the nation operating under this authorization.

Q But while you're getting an additional efficiency, you're also operating outside of an existing law. If the law would allow you to stay within the law and be slightly less efficient, would that be --

ATTORNEY GENERAL GONZALEZ: I guess I disagree with that characterization. I think that this electronic surveillance is within the law, has been authorized. I mean, that is our position. We're only required to achieve a court order through FISA if we don't have authorization otherwise by the Congress, and we think that that has occurred in this particular case.

Press Briefing by Attorney General Alberto Gonzales and General Michael Hayden, Principal Deputy Director for National Intelligence

Case 1:08-cv-06259-JGK   Document 7-2   Filed 09/12/08   Page 31 of 54

Q Can you just give us one assurance before you go, General?

ATTORNEY GENERAL GONZALEZ: It depends on what it is. (Laughter.)

Q Can you assure us that all of these intercepts had an international component and that at no time were any of the intercepts purely domestic?

GENERAL HAYDEN: The authorization given to NSA by the President requires that one end of these communications has to be outside the United States. I can assure you, by the physics of the intercept, by how we actually conduct our activities, that one end of these communications are always outside the United States of America.

END 9:02 A.M. EST

---

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2005/12/20051219-1.html



Exhibit E

## Office of the
# Director of
# National Intelligence

About ODNI    National Intelligence Strategy    Intelligence Reform Act    Speeches    Releas

## REMARKS BY
## GENERAL MICHAEL V. HAYDEN

### PRINCIPAL DEPUTY DIRECTOR OF NATIONAL INTELLIGENCE
### AND
### FORMER DIRECTOR OF THE NATIONAL SECURITY AGENCY

### ADDRESS TO THE NATIONAL PRESS CLUB
### WHAT AMERICAN INTELLIGENCE & ESPECIALLY THE NSA HAVE BEEN DOING TO DEFEND THE NATION

### NATIONAL PRESS CLUB
### WASHINGTON, D.C.

### 10:00 A.M. EST
### MONDAY, JANUARY 23, 2006

MR. HILL: Good morning. My name is Keith Hill. I'm an editor/writer with the Bureau of National Affairs, Press Club governor and vice chair of the club's Newsmaker Committee, and I'll be today's moderator.

Today, we have General Michael Hayden, principal deputy director of National Intelligence with the Office of National Intelligence, who will talk about the recent controversy surrounding the National Security Agency's warrantless monitoring of communications of suspected al Qaeda terrorists.

General Hayden, who's been in this position since last April, is currently the highest ranking military intelligence officer in the armed services, and he also knows a little something about this controversy because in his previous life he was NSA director when the NSA monitoring program began in 2000 -- 2001, sorry.

So with that, I will turn the podium over to General Hayden.

GEN. HAYDEN: Keith, thanks. Good morning. I'm happy to be here to talk a bit about what American intelligence has been doing and especially what NSA has been doing to defend the nation.

Now, as Keith points out, I'm here today not only as Ambassador John Negroponte's deputy in the Office of the Director of National Intelligence, I'm also here as the former director of the National Security Agency, a post I took in March of 1999 and left only last spring.

Serious issues have been raised in recent weeks, and discussion of serious issues should be based on facts. There's a lot of information out there right now.

Some of it is, frankly, inaccurate. Much of it is just simply misunderstood. I'm here to tell the American people what NSA has been doing and why. And perhaps more importantly, what NSA has not been doing.

Now, admittedly, this is a little hard to do while protecting our country's intelligence sources and methods. And, frankly, people in my line of work generally don't like to talk about what they've done until it becomes a subject on the History Channel. But let me make one thing very clear. As challenging as this morning might be, this is the speech I want to give. I much prefer being here with you today telling you about the things we have done when there hasn't been an attack on the homeland. This is a far easier presentation to make than the ones I had to give four years ago telling audiences like you what we hadn't done in the days and months leading up to the tragic events of September 11th.

commonly refer to it as Signals Intelligence or SIGINT. SIGINT is a complex business, with operational and technological and legal imperatives often intersecting and overlapping. There's routinely some freedom of action -- within the law -- to adjust operations. After the attacks, I exercised some options I've always had that collectively better prepared us to defend the homeland.

Look, let me talk for a minute about this, okay? Because a big gap in the current understanding, a big gap in the current debate is what's standard? What is it that NSA does routinely? Where we set the threshold. Where we're directed to collect. That's what we're required to limit ourselves to -- inherent foreign intelligence value. Where we set that threshold, for example, in reports involving a U.S. person shapes how we do our job, shapes how we collect, shapes how we report. The American SIGINT system, in the normal course of foreign intelligence activities, inevitably captures this kind of information, information to, from or about what we call a U.S. person. And by the way, "U.S. person" routinely includes anyone in the United States, citizen or not.

So, for example, because they were in the United States -- and we did not know anything more -- Mohamed Atta and his fellow 18 hijackers would have been presumed to have been protected persons, U.S. persons, by NSA prior to 9/11.

Inherent foreign intelligence value is one of the metrics we must use. Let me repeat that: Inherent foreign intelligence value is one of the metrics we must use to ensure that we conform to the Fourth Amendment's reasonable standard when it comes to protecting the privacy of these kinds of people. If the U.S. person information isn't relevant, the data is suppressed. It's a technical term we use; we call it "minimized." The individual is not even mentioned. Or if he or she is, he or she is referred to as "U.S. Person Number One" or "U.S. Person Number Two." Now, inherent intelligence value. If the U.S. person is actually the named terrorist, well, that could be a different matter. The standard by which we decided that, the standard of what was relevant and valuable, and therefore, what was reasonable, would understandably change, I think, as smoke billowed from two American cities and a Pennsylvania farm field. And we acted accordingly.

To somewhat oversimplify this, this question of inherent intelligence value, just by way of illustration, to just use an example, we all had a different view of Zacarias Moussaoui's computer hard drive after the attacks than we did before.

Look, this is not unlike things that happened in other areas. Prior to September 11th, airline passengers were screened in one way. After September 11th, we changed how we screen passengers. In the same way, okay, although prior to September 11th certain communications weren't considered valuable intelligence, it became immediately clear after September 11th that intercepting and reporting these same communications were in fact critical to defending the homeland. Now let me make this point. These decisions were easily within my authorities as the director of NSA under and executive order; known as Executive Order 12333, that was signed in 1981, an executive order that has governed NSA for nearly a quarter century.

Now, let me summarize. In the days after 9/11, NSA was using its authorities and its judgment to appropriately respond to the most catastrophic attack on the homeland in the history of the nation. That shouldn't be a headline, but as near as I can tell, these actions on my part have created some of the noise in recent press coverage. Let me be clear on this point -- except that they involved NSA, these programs were not related -- these programs were not related -- to the authorization that the president has recently spoken about. Back then, September 2001, I asked to update the Congress on what NSA had been doing, and I briefed the entire House Intelligence Committee on the 1st of October on what we had done under our previously existing authorities.

Now, as another part of our adjustment, we also turned on the spigot of NSA reporting to FBI in, frankly, an unprecedented way. We found that we were giving them too much data in too raw form. We recognized it almost immediately, a question of weeks, and we made all of the appropriate adjustments. Now, this flow of data to the FBI has also become part of the current background noise, and despite reports in the press of thousands of tips a month, our reporting has not even approached that kind of pace. You know, I actually find this a little odd. After all the findings of the 9/11 commission and other bodies about the failure to share intelligence, I'm up here feeling like I have to explain pushing data to those who might be able to use it. And of course, it's the nature of intelligence that many tips lead nowhere, but you have to go down some blind alleys to find the tips that pay off.

Now, beyond the authorities that I exercised under the standing executive order, as the war on terror has moved forward, we have aggressively used FISA warrants. The act and the court have provided us with important tools, and we make full use of them. Published numbers show us using the court at record rates, and the results have been outstanding. But the revolution in telecommunications technology has extended the actual impact of the FISA regime far beyond what Congress could ever have anticipated in 1978. And I don't think that anyone can make the claim that the FISA statute is optimized to deal with or prevent a 9/11 or to deal with a lethal enemy who likely already had combatants inside the United States.

I testified in open session to the House Intel Committee in April of the year 2000. At the time, I created some looks of disbelief when I said that if Osama bin Laden crossed the bridge from Niagara Falls, Ontario to Niagara Falls, New York, there were provisions of U.S. law that would kick in, offer him protections and affect how NSA could now cover him. At

the time, I was just using this as some of sort of stark hypothetical; 17 months later, this is about life and death.

So now, we come to one additional piece of NSA authorities. These are the activities whose existence the president confirmed several weeks ago. That authorization was based on an intelligence community assessment of a serious and continuing threat to the homeland. The lawfulness of the actual authorization was reviewed by lawyers at the Department of Justice and the White House and was approved by the attorney general.

Now, you're looking at me up here, and I'm in a military uniform, and frankly, there's a certain sense of sufficiency here - - authorized by the president, duly ordered, its lawfulness attested to by the attorney general and its content briefed to the congressional leadership.

But we all have personal responsibility, and in the end, NSA would have to implement this, and every operational decision the agency makes is made with the full involvement of its legal office. NSA professional career lawyers -- and the agency has a bunch of them -- have a well-deserved reputation. They're good, they know the law, and they don't let the agency take many close pitches.

And so even though I knew the program had been reviewed by the White House and by DOJ, by the Department of Justice, I asked the three most senior and experienced lawyers in NSA: Our enemy in the global war on terrorism doesn't divide the United States from the rest of the world, the global telecommunications system doesn't make that distinction either, our laws do and should; how did these activities square with these facts?

They reported back to me. They supported the lawfulness of this program. Supported, not acquiesced. This was very important to me. A veteran NSA lawyer, one of the three I asked, told me that a correspondent had suggested to him recently that all of the lawyers connected with this program have been very careful from the outset because they knew there would be a day of reckoning. The NSA lawyer replied to him that that had not been the case. NSA had been so careful, he said -- and I'm using his words now here -- NSA had been so careful because in this very focused, limited program, NSA had to ensure that it dealt with privacy interests in an appropriate manner.

In other words, our lawyers weren't careful out of fear; they were careful out of a heartfelt, principled view that NSA operations had to e consistent with bedrock legal protections.

In early October 2001, I gathered key members of the NSA workforce in our conference room and I introduced our new operational authority to them. With the historic culture of NSA being what it was and is, I had to do this personally. I told them what we were going to do and why. I also told them that we were going to carry out this program and not go one step further. NSA's legal and operational leadership then went into the details of this new task.

You know, the 9/11 commission criticized our ability to link things happening in the United States with things that were happening elsewhere. In that light, there are no communications more important to the safety of this country than those affiliated with al Qaeda with one end in the United States. The president's authorization allows us to track this kind of call more comprehensively and more efficiently. The trigger is quicker and a bit softer than it is for a FISA warrant, but the intrusion into privacy is also limited: only international calls and only those we have a reasonable basis to believe involve al Qaeda or one of its affiliates.

The purpose of all this is not to collect reams of intelligence, but to detect and prevent attacks. The intelligence community has neither the time, the resources nor the legal authority to read communications that aren't likely to protect us, and NSA has no interest in doing so. These are communications that we have reason to believe are al Qaeda communications, a judgment made by American intelligence professionals, not folks like me or political appointees, a judgment made by the American intelligence professionals most trained to understand al Qaeda tactics, al Qaeda communications and al Qaeda aims.

Their work is actively overseen by the most intense oversight regime in the history of the National Security Agency. The agency's conduct of this program is thoroughly reviewed by the NSA's general counsel and inspector general. The program has also been reviewed by the Department of Justice for compliance with the president's authorization. Oversight also includes an aggressive training program to ensure that all activities are consistent with the letter and the intent of the authorization and with the preservation of civil liberties.

Let me talk for a few minutes also about what this program is not. It is not a driftnet over Dearborn or Lackawanna or Freemont grabbing conversations that we then sort out by these alleged keyword searches or data-mining tools or other devices that so-called experts keep talking about.

This is targeted and focused. This is not about intercepting conversations between people in the United States. This is hot pursuit of communications entering or leaving America involving someone we believe is associated with al Qaeda. We bring to bear all the technology we can to ensure that this is so. And if there were ever an anomaly, and we

Thank you. I'll be happy to take your questions.

MR. HILL: We have microphones on either end of the room, so if you can go to a microphone, and then choose people from there.

All right, we will start with you.

QUESTION: Yes, Wayne Madsen, syndicated columnist. General, how do you explain the fact that there were several rare spectacles of whistleblowers coming forward at NSA, especially after 9/11, something that hasn't really happened in the past, who have complained about violations of FISA and United States Signals Intelligence Directive 18, which implements the law at the agency?

GEN. HAYDEN: I talked to the NSA staff on Friday. The NSA inspector general reports to me, as of last Friday, from the inception of this program through last Friday night, not a single employee of the National Security Agency has addressed a concern about this program to the NSA IG. I should also add that no member of the NSA workforce who has been asked to be included in this program has responded to that request with anything except enthusiasm. I don't know what you're talking about.

QUESTION: General Hayden, the FISA law says that the NSA can do intercepts as long as you go to the court within 72 hours to get a warrant.

I understood you to say that you are aggressively using FISA but selectively doing so. Why are you not able to go to FISA as the law requires in all cases? And if the law is outdated, why haven't you asked Congress to update it?

GEN. HAYDEN: Lots of questions contained there. Let me try them one at a time.

First of all, I need to get a statement of fact out here, all right? NSA cannot -- under the FISA statute, NSA cannot put someone on coverage and go ahead and play for 72 hours while it gets a note saying it was okay. All right? The attorney general is the one who approves emergency FISA coverage, and the attorney general's standard for approving FISA coverage is a body of evidence equal to that which he would present to the court. So it's not like you can throw it on for 72 hours.

I've talked in other circumstances -- I've talked this morning -- about how we've made very aggressive use of FISA. If you look at NSA reporting under this program -- you know, without giving you the X or Y axis on the graph -- NSA reporting under this program has been substantial but consistent. This is NSA counterterrorism reporting. Substantial but consistent. NSA reporting under FISA has gone like that. FISA has been a remarkably successful tool. We use it very aggressively.

In the instances where this program applies, FISA does not give us the operational effect that the authorities that the president has given us give us. Look. I can't -- and I understand it's going to be an incomplete answer, and I can't give you all the fine print as to why, but let me just kind of reverse the answer just a bit. If FISA worked just as well, why wouldn't I use FISA? To save typing? No. There is an operational impact here, and I have two paths in front of me, both of them lawful, one FISA, one the presidential -- the president's authorization. And we go down this path because our operational judgment is it is much more effective. So we do it for that reason. I think I've got -- I think I've covered all the ones you raised.

QUESTION: Quick follow-up. Are you saying that the sheer volume of warrantless eavesdropping has made FISA inoperative?

GEN. HAYDEN: No. I'm saying that the characteristics we need to do what this program's designed to do -- to detect and prevent -- make FISA a less useful tool. It's a wonderful tool, it's done wonderful things for the nation in terms of fighting the war on terror, but in this particular challenge, this particular aspect -- detect and prevent attacks -- what we're doing now is operationally more relevant, operationally more effective.

QUESTION: Sam Husseini from IPA Media. You just now spoke of, quote, "two paths," but of course the FISA statute itself says that it will be the exclusive means by which electronic surveillance may be pursued. Are you not, therefore, violating the law?

GEN. HAYDEN: That's probably a question I should deflect to the Department of Justice, but as I said in my comments, I have an order whose lawfulness has been attested to by the attorney general, an order whose lawfulness has been attested to by NSA lawyers who do this for a living. No, we're not violating the law.

QUESTION: You cited before the congressional powers of the president.

Are you -- are you asserting inherent so-called constitutional powers that a -- to use the term that came up in the Alito hearings -- "a unitary executive" has to violate the law when he deems fit?

GEN. HAYDEN: I'm not asserting anything. I'm asserting that NSA is doing its job.

QUESTION: General, first, thank you for your comments. And I think you somewhat answered this in your response, and this goes to the culture and just to the average American. Let me just say this -- that domestic spying and the faith communities are outraged. Churches in Iowa, churches in Nebraska, mosques across the board are just outraged by the fact that our country could be spying on us. You made a point that the young lady at State Penn shouldn't have to worry, but we're worried that our country has begun to spy on us. We understand the need for terrorism and the need to deal with that, but what assurances -- and how can you answer this question, what can make Americans feel safe? How can the faith community feel safe that their country is not spying on them for any reason?

GEN. HAYDEN: Reverend, thanks for the question, and I'm part of the faith community too. And I've laid it out as well I could in my remarks here as to how limited and focused this program is, what its purpose is, that its been productive. We are not out there -- and again, let me use a phrase I used in the comments -- this isn't a drift net out there where we're soaking up everyone's communications. We are going after very specific communications that our professional judgment tells us we have reason to believe are those associated with people who want to kill Americans. That's what we're doing.

And I realize the challenge the we have. I mentioned earlier the existential issue that NSA has well before this program, that it's got to be powerful if it's going to protect us, and it's also got to be secretive if it's going to protect us. And that creates a tremendous dilemma. I understand that.

I'm disappointed I guess that perhaps the default response for some is to assume the worst. I'm trying to communicate to you that the people who are doing this, okay, go shopping in Glen Burnie and their kids play soccer in Laurel, and they know the law. They know American privacy better than the average American, and they're dedicated to it. So I guess the message I'd ask you to take back to your communities is the same one I take back to mine. This is focused. It's targeted. It's very carefully done. You shouldn't worry.

QUESTION: Just know, General, that the faith communities will take that back, but the faith communities are scared. Where does this stop?

QUESTION: Justine Redman with CNN. How was national security harmed by The New York Times reporting on this program? Don't the bad guys already assume that they're being monitored anyway, and shouldn't Americans, you know, bear in mind that they might be at any time?

GEN. HAYDEN: You know, we've had this question asked several times. Public discussion of how we determine al Qaeda intentions, I just -- I can't see how that can do anything but harm the security of the nation. And I know people say, "Oh, they know they're being monitored." Well, you know, they don't always act like they know they're being monitored. But if you want to shove it in their face constantly, it's bound to have an impact.

And so to -- I understand, as the Reverend's? question just raised, you know, there are issues here that the American people are deeply concerned with. But constant revelations and speculation and connecting the dots in ways that I find unimaginable, and laying that out there for our enemy to see cannot help but diminish our ability to detect and prevent attacks.

QUESTION: My name is Travis Morales. And we've read numerous reports in the Times and other papers about massive spying by the NSA on millions of people, along with reports of rendition, torture, et cetera. And I attended Congressman Conyers' hearings on Friday where a gentleman came from South Florida talking about military intelligence went and infiltrated his Quaker peace group, and that this -- they later saw the documents detailing that.

And my question -- I guess I have two questions for you. One is, as a participant in a group called, "The World Can't Wait: Drive Out the Bush Regime," which is organizing for people to drown out Bush's lies during the State of the Union, and to gather on February 4th demanding that Bush step down, my question is this: Are you or the NSA -- and when I say you, I mean the NSA in its entirety -- is it intercepting our e-mail communications, listening to our telephone conversations, et cetera? Because as Bush has said, you're either against us or you're with us, and they have asserted that whatever the president wants to do in time of war, whether it's holding people without charges or writing memos justifying torture, they can do that.

MR. HILL: Okay, I have to cut you off here.

We have time for two more questions. And if you can keep them fairly brief, we'd appreciate it.

First you, then the gentleman in the red.

QUESTION: Yeah, but --

MR. HILL: I'm sorry.

QUESTION: The first question that I asked --

MR. HILL: Excuse me. I'm sorry --

QUESTION: -- about U.S. citizen abroad.

MR. HILL: All right. Go ahead.

GEN. HAYDEN: I'm sorry, I didn't -- I apologize, I didn't understand the question, the first question. I'm sorry.

QUESTION: Jim Bamford. Good seeing you here in the Press Club, General,

GEN. HAYDEN: Hey, Jim.

QUESTION: Hope we see more of you here.

Just to clarify sort of what's been said, from what I've heard you say today and an earlier press conference, the change from going around the FISA law was to -- one of them was to lower the standard from what they call for, which is basically probable cause to a reasonable basis; and then to take it away from a federal court judge, the FISA court judge, and hand it over to a shift supervisor at NSA. Is that what we're talking about here -- just for clarification?

GEN. HAYDEN: You got most of it right. The people who make the judgment, and the one you just referred to, there are only a handful of people at NSA who can make that decision. They're all senior executives, they are all counterterrorism and al Qaeda experts. So I -- even though I -- you're actually quoting me back, Jim, saying, "shift supervisor." To be more precise in what you just described, the person who makes that decision, a very small handful, senior executive. So in military terms, a senior colonel or general officer equivalent; and in professional terms, the people who know more about this than anyone else.

QUESTION: Well, no, that wasn't the real question. The question I was asking, though, was since you lowered the standard, doesn't that decrease the protections of the U.S. citizens? And number two, if you could give us some idea of the genesis of this. Did you come up with the idea? Did somebody in the White House come up with the idea? Where did the idea originate from?

Thank you.

GEN. HAYDEN: Let me just take the first one, Jim. And I'm not going to talk about the process by which the president arrived at his decision.

I think you've accurately described the criteria under which this operates, and I think I at least tried to accurately describe a changed circumstance, threat to the nation, and why this approach -- limited, focused -- has been effective.

MR. HILL: Final question.

QUESTION: Jonathan Landay with Knight Ridder. I'd like to stay on the same issue, and that had to do with the standard by which you use to target your wiretaps. I'm no lawyer, but my understanding is that the Fourth Amendment of the Constitution specifies that you must have probable cause to be able to do a search that does not violate an American's right against unlawful searches and seizures. Do you use --

GEN. HAYDEN: No, actually -- the Fourth Amendment actually protects all of us against unreasonable search and

Exhibit F



# The Attorney General
Washington, D.C.

January 17, 2007

The Honorable Patrick Leahy
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C.  20510

The Honorable Arlen Specter
Ranking Minority Member
Committee of the Judiciary
United States Senate
Washington, D.C.  20510

Dear Chairman Leahy and Senator Specter:

I am writing to inform you that on January 10, 2007, a Judge of the Foreign Intelligence Surveillance Court issued orders authorizing the Government to target for collection international communications into or out of the United States where there is probable cause to believe that one of the communicants is a member or agent of al Qaeda or an associated terrorist organization. As a result of these orders, any electronic surveillance that was occurring as part of the Terrorist Surveillance Program will now be conducted subject to the approval of the Foreign Intelligence Surveillance Court.

In the spring of 2005—well before the first press account disclosing the existence of the Terrorist Surveillance Program—the Administration began exploring options for seeking such FISA Court approval. Any court authorization had to ensure that the Intelligence Community would have the speed and agility necessary to protect the Nation from al Qaeda—the very speed and agility that was offered by the Terrorist Surveillance Program. These orders are innovative, they are complex, and it took considerable time and work for the Government to develop the approach that was proposed to the Court and for the Judge on the FISC to consider and approve these orders.

The President is committed to using all lawful tools to protect our Nation from the terrorist threat, including making maximum use of the authorities provided by FISA and taking full advantage of developments in the law. Although, as we have previously explained, the Terrorist Surveillance Program fully complies with the law, the orders the Government has obtained will allow the necessary speed and agility while providing substantial advantages. Accordingly, under these circumstances, the President has

Letter to Chairman Leahy and Senator Specter
January 17, 2007
Page 2

determined not to reauthorize the Terrorist Surveillance Program when the current authorization expires.

The Intelligence Committees have been briefed on the highly classified details of these orders. In addition, I have directed Steve Bradbury, Acting Assistant Attorney General for the Office of Legal Counsel, and Ken Wainstein, Assistant Attorney General for National Security, to provide a classified briefing to you on the details of these orders.

Sincerely,

Alberto R. Gonzales
Attorney General

cc:     The Honorable John D. Rockefeller, IV
        The Honorable Christopher Bond
        The Honorable Sylvester Reyes
        The Honorable Peter Hoekstra
        The Honorable John Conyers, Jr.
        The Honorable Lamar S. Smith

Exhibit G

# elpasotimes.com

## Transcript: Debate on the foreign intelligence surveillance act

By Chris Roberts / ©El Paso Times

Article Launched: 08/22/2007 01:05:57 AM MDT

The following is the transcript of a question and answer session with National Intelligence Director Mike McConnell.

Question: How much has President Bush or members of his administration formed your response to the FISA debate?

Answer: Not at all. When I came back in, remember my previous assignment was director of the NSA, so this was an area I have known a little bit about. So I came back in. I was nominated the first week of January. The administration had made a decision to put the terrorist surveillance program into the FISA court. I think that happened the 7th of Jan. So as I come in the door and I'm prepping for the hearings, this sort of all happened. So the first thing I want to know is what's this program and what's the background and I was pretty surprised at what I learned. First off, the issue was the technology had changed and we had worked ourselves into a position that we were focusing on foreign terrorist communications, and this was a terrorist foreigner in a foreign country. The issue was international communications are on a wire so all of a sudden we were in a position because of the wording in the law that we had to have a warrant to do that. So the most important thing to capture is that it's a foreigner in a foreign country, required to get a warrant. Now if it were

wireless, we would not be required to get a warrant. Plus we were limited in what we were doing to terrorism only and the last time I checked we had a mission called foreign intelligence, which should be construed to mean anything of a foreign intelligence interest, North Korea, China, Russia, Syria, weapons of mass destruction proliferation, military development and it goes on and on and on. So when I engaged with the administration, I said we've gotten ourselves into a position here where we need to clarify, so the FISA issue had been debated and legislation had been passed in the house in 2006, did not pass the Senate. Two bills were introduced in the Senate, I don't know if it was co-sponsorship or two different bills, but Sen. (Dianne Feinstein, D-Calif.) had a bill and Sen. Specter had a bill and it may have been the same bill, I don't know, but the point is a lot of debate, a lot of dialogue. So, it was submitted to the FISA court and the first ruling in the FISA court was what we needed to do we could do with an approval process that was at a summary level and that was OK, we stayed in business and we're doing our mission. Well in the FISA process, you may or may not be aware ...

Q: When you say summary level, do you mean the FISA court?

A: The FISA court. The FISA court ruled presented the program to them and they said the program is what you say it is and it's appropriate and it's legitimate, it's not an issue and was had approval. But the FISA process has a renewal. It comes up every so many days and there are 11 FISA judges. So the second judge looked at the

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

elpasotimes.com

same data and said well wait a minute I interpret the law, which is the FISA law, differently. And it came down to, if it's on a wire and it's foreign in a foreign country, you have to have a warrant and so we found ourselves in a position of actually losing ground because it was the first review was less capability, we got a stay and that took us to the 31st of May. After the 31st of May we were in extremis because now we have significantly less capability. And meantime, the community, before I came back, had been working on a National Intelligence Estimate on terrorist threat to the homeland. And the key elements of the terrorist threat to the homeland, there were four key elements, a resilient determined adversary with senior leadership willing to die for the cause, requiring a place to train and develop, think of it as safe haven, they had discovered that in the border area between Pakistan and Afghanistan. Now the Pakistani government is pushing and pressing and attempting to do something about it, but by and large they have areas of safe haven. So leadership that can adapt, safe haven, intermediate leadership, these are think of them as trainers, facilitators, operational control guys. And the fourth part is recruits. They have them, they've taken them. This area is referred to as the FATA, federally administered tribal areas, they have the recruits and now the objective is to get them into the United States for mass casualties to conduct terrorist operations to achieve mass casualties. All of those four parts have been carried out except the fourth. They have em, but they haven't been successful. One of the major tools for us to keep them out is the FISA program, a significant tool and we're going

the wrong direction. So, for me it was extremis to start talking not only to the administration, but to members of the hill. So from June until the bill was passed, I think I talked to probably 260 members, senators and congressmen. We submitted the bill in April, had an open hearing 1 May, we had a closed hearing in May, I don't remember the exact date. Chairman (U.S. Rep. Silvestre Reyes, D-Texas) had two hearings and I had a chance to brief the judiciary committee in the house, the intelligence committee in the house and I just mentioned the Senate, did not brief the full judiciary committee in the Senate, but I did meet with Sen. (Patrick Leahy, D-Vt.) and Sen. (Arlen Specter, R-Pa.), and I did have an opportunity on the Senate side, they have a tradition there of every quarter they invite the director of national intelligence in to talk to them update them on topics of interest. And that happened in (June 27). Well what they wanted to hear about was Iraq and Afghanistan and for whatever reason, I'm giving them my review and they ask questions in the order in which they arrive in the room. The second question was on FISA, so it gave me an opportunity to, here I am worrying about this problem and I have 41 senators and I said several things. The current threat is increasing, I'm worried about it. Our capability is decreasing and let me explain the problem.

Q: Can't you get the warrant after the fact?

A: The issue is volume and time. Think about foreign intelligence. What it presented me with an opportunity is to make the case for something current, but what I was really also trying to put a

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.

FormatDynamics®

Print Powered By   Format Dynamics™

elpasotimes.com

strong emphasis on is the need to do foreign intelligence in any context. My argument was that the intelligence community should not be restricted when we are conducting foreign surveillance against a foreigner in a foreign country, just by dint of the fact that it happened to touch a wire. We haven't done that in wireless for years.

Q: So you end up with people tied up doing paperwork?

A: It takes about 200 man hours to do one telephone number. Think about it from the judges standpoint. Well, is this foreign intelligence? Well how do you know it's foreign intelligence? Well what does Abdul calling Mohammed mean, and how do I interpret that? So, it's a very complex process, so now, I've got people speaking Urdu and Farsi and, you know, whatever, Arabic, pull them off the line have them go through this process to justify what it is they know and why and so on. And now you've got to write it all up and it goes through the signature process, take it through (the Justice Department), and take it down to the FISA court. So all that process is about 200 man hours for one number. We're going backwards, we couldn't keep up. So the issue was ...

Q: How many calls? Thousands?

A: Don't want to go there. Just think, lots. Too many. Now the second part of the issue was under the president's program, the terrorist surveillance program, the private sector had assisted us. Because if you're going to get access

you've got to have a partner and they were being sued. Now if you play out the suits at the value they're claimed, it would bankrupt these companies. So my position was we have to provide liability protection to these private sector entities. So that was part of the request. So we went through that and we argued it. Some wanted to limit us to terrorism. My argument was, wait a minute, why would I want to limit it to terrorism. It may be that terrorists are achieving weapons of mass destruction, the only way I would know that is if I'm doing foreign intelligence by who might be providing a weapon of mass destruction.

Q: And this is still all foreign to foreign communication?

A: All foreign to foreign. So, in the final analysis, I was after three points, no warrant for a foreigner overseas, a foreign intelligence target located overseas, liability protection for the private sector and the third point was we must be required to have a warrant for surveillance against a U.S. person. And when I say U.S. person I want to make sure you capture what that means. That does not mean citizen. That means a foreigner, who is here, we still have to have a warrant because he's here. My view is that that's the right check and balances and it's the right protection for the country and lets us still do our mission for protection of the country. And we're trying to fend off foreign threats.

Q: So are you satisfied with it the way it is now?

A: I am. The issue that we did not address, which

Advertisement


A bright idea in online advertising.
PrinterStitial® ads by Format Dynamics.


FormatDynamics®

Print Powered By  FormatDynamics™

elpasotimes.com

has to be addressed is the liability protection for the private sector now is proscriptive, meaning going forward. We've got a retroactive problem. When I went through and briefed the various senators and congressmen, the issue was alright, look, we don't want to work that right now, it's too hard because we want to find out about some issues of the past. So what I recommended to the administration was, 'Let's take that off the table for now and take it up when Congress reconvenes in September.'

Q: With an eye toward the six-month review?

A: No, the retroactive liability protection has got to be addressed.

Q: And that's not in the current law?

A: It is not. Now people have said that I negotiated in bad faith, or I did not keep my word or whatever...

Q: That you had an agenda that you weren't honest about.

A: I'll give you the facts from my point of view. When I checked on board I had my discussion with the president. I'm an apolitical figure. I'm not a Republican, I'm not a Democrat. I have voted for both. My job is as a professional to try to do this job the best way I can in terms of, from the intelligence community, protect the nation. So I made my argument that we should have the ability to do surveillance the same way we've done it for the past 50 years and not be inhibited when it's a foreigner in a foreign country. The

president's guidance to me early in the process, was, 'You've got the experience. I trust your judgement. You make the right call. There's no pressure from anybody here to tell you how to do it. He did that early. He revisited with me in June. He did it again in July and he said it publicly on Friday before the bill was passed. We were at the FBI, it's an annual thing, we go to the FBI and do a homeland security kind of update. So he came out at noon and said, 'I'm requesting that Congress pass this bill. It's essential. Do it before you go on recess. I'm depending on Mike McConnell's recommendations. And that was the total sum and substance of the guidance and the involvement from the White House with regard to how I should make the call. Now, as we negotiated, we started with 66 pages, were trying to get everything cleaned up at once. When I reduced it to my three points, we went from 66 pages to 11. Now, this is a very, very complex bill. I had a team of 20 lawyers working. You can change a word in a paragraph and end up with some major catastrophe down in paragraph 27, subsection 2c, to shut yourself down, you'll be out of business. So when we send up our 11 pages, we had a lot of help in making sure we got it just right so it would come back and we'd say wait a minute we can't live with this or one of the lawyers would say, 'Wait we tried that, it won't work, here's the problem.' So we kept going back and forth, so we sent up a version like Monday, we sent up a version on Wednesday, we sent up a version on Thursday. The House leadership, or the Democratic leadership on Thursday took that bill and we talked about it. And my response was there are some things I can't live with in this bill and they

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



Print Powered By [rd] Format Dynamics™

http://www.elpasotimes.com/fdcp?1221161476985

## elpasotimes.com

said alright we're going to fix them. Now, here's the issue. I never then had a chance to read it for the fix because, again, it's so complex, if you change a word or phrase, or even a paragraph reference, you can cause unintended ...

Q: You have to make sure it's all consistent?

A: Right. So I can't agree to it until it's in writing and my 20 lawyers, who have been doing this for two years, can work through it. So in the final analysis, I was put in the position of making a call on something I hadn't read. So when it came down to crunch time, we got a copy and it had some of the offending language back in it. So I said, 'I can't support it.' And it played out in the House the way it played out in the House. Meantime on the Senate side, there were two versions being looked at. The Wednesday version and the Thursday version. And one side took one version and the other side took the other version. The Thursday version, we had some help, and I didn't get a chance to review it. So now, it's Friday night, the Senate's voting. They were having their debate and I still had not had a chance to review it. So, I walked over, I was up visiting some senators trying to explain some of the background. So I walked over to the chamber and as I walked into the office just off the chamber, it's the vice president's office, somebody gave me a copy. So I looked at the version and said, 'Can't do it. The same language was back in there.'

Q: What was it?

A: Just let me leave it, not too much detail, there

were things with regard to our authorities some language around minimization. So it put us in an untenable position. So then I had another version to take a look at, which was our Wednesday version, which basically was unchanged. So I said, well certainly, I'm going to support that Wednesday version. So that's what I said and the vote happened in the Senate and that was on Friday. So now it rolled to the House on Saturday. They took up the bill, they had a spirited debate, my name was invoked several times, not in a favorable light in some cases. (laughs) And they took a vote and it passed 226 to 182, I think. So it's law. The president signed it on Sunday and here we are.

Q: That's far from unanimous. There's obviously going to be more debate on this.

A: There are a couple of issues to just be sensitive to. There's a claim of reverse targeting. Now what that means is we would target somebody in a foreign country who is calling into the United States and our intent is to not go after the bad guy, but to listen to somebody in the United States. That's not legal, it's, it would be a breach of the Fourth Amendment. You can go to jail for that sort of thing. And If a foreign bad guy is calling into the United States, if there's a need to have a warrant, for the person in the United States, you just get a warrant. And so if a terrorist calls in and it's another terrorist, I think the American public would want us to do surveillance of that U.S. person in this case. So we would just get a warrant and do that. It's a manageable thing. On the U.S. persons side it's 100 or less. And then the foreign side, it's in the

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.

FormatDynamics®

Print Powered By  Format Dynamics™

elpasotimes.com

thousands. Now there's a sense that we're doing massive data mining. In fact, what we're doing is surgical. A telephone number is surgical. So, if you know what number, you can select it out. So that's, we've got a lot of territory to make up with people believing that we're doing things we're not doing.

Q: Even if it's perception, how do you deal with that? You have to do public relations, I assume.

A: Well, one of the things you do is you talk to reporters. And you give them the facts the best you can. Now part of this is a classified world. The fact we're doing it this way means that some Americans are going to die, because we do this mission unknown to the bad guys because they're using a process that we can exploit and the more we talk about it, the more they will go with an alternative means and when they go to an alternative means, remember what I said, a significant portion of what we do, this is not just threats against the United States, this is war in Afghanistan and Iraq.

Q. So you're saying that the reporting and the debate in Congress means that some Americans are going to die?

A. That's what I mean. Because we have made it so public. We used to do these things very differently, but for whatever reason, you know, it's a democratic process and sunshine's a good thing. We need to have the debate. The reason that the FISA law was passed in 1978 was an arrangement was worked out between the Congress and the administration, we did not

want to allow this community to conduct surveillance, electronic surveillance, of Americans for foreign intelligence unless you had a warrant, so that was required. So there was no warrant required for a foreign target in a foreign land. And so we are trying to get back to what was the intention of '78. Now because of the claim, counterclaim, mistrust, suspicion, the only way you could make any progress was to have this debate in an open way.

Q. So you don't think there was an alternative way to do this?

A. There may have been an alternative way, but we are where are ...

Q. A better way, I should say.

A. All of my briefs initially were very classified. But it became apparent that we were not going to be able to carry the day if we don't talk to more people.

Q. Some might say that's the price you pay for living in a free society. Do you think that this is necessary that these Americans die?

A. We could have gotten there a different way. We conducted intelligence since World War II and we've maintained a sensitivity as far as sources and methods. It's basically a sources and methods argument. If you don't protect sources and methods then those you target will choose alternative means, different paths. As it is today al-Qaida in Iraq is targeting Americans, specifically the coalition. There are activities

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By  [fd] FormatDynamics™

elpasotimes.com

supported by other nations to import electronic, or explosively formed projectiles, to do these roadside attacks and what we know about that is often out of very sensitive sources and methods. So the more public it is, then they take it away from us. So that's the tradeoff.

## DIVERSITY IN THE INTELLIGENCE COMMUNITY

Q: I wanted to ask you about the diversity question. This has major ramifications here, we have this center of excellence program that's recruiting high school kids, many of whom wouldn't qualify if first generation American citizens weren't allowed.

A: So you agree with me?

Q: It does sound like something that would benefit this area that would also allow you to get people from here who are bicultural and have an openness to seeing things ...

A: You're talking about Hispanics?

Q: Yes.

A: Hispanics are probably the most under-represented group if you think of America, what the ethic makeup of America, Hispanics are the most under-represented group in my community. Now, that said, and should increase that Hispanic population and programs like this will do that. That's why the outreach. But also we need, particularly with the current problem of terrorism, we need to have speakers of Urdu and Farsi and Arabic and people from those cultures

that understand the issues of tribes and clans and all the things that go with understanding that part of the world. Varying religions and so on. Because it is, it's almost impossible, I've had the chance to live in the Middle East for years, I've studied it for years, it's impossible to understand it without having some feel for the culture and so on. So while I'm all for increasing the diversity along the lines we talked about, I'm also very much in favor of first generation Americans from the countries that are causing issues and problems.

Q: What is the status of that program.

A: It is not in statue. It is not in policy. It has been habit. So we've stated, as a matter of policy, that we're not going to abide by those habits.

Q: And that's already the case?

A: Yes, and are we making progress? Not fast enough, but we will make progress over time.

Q: How do you measure that?

A: Very simple, you get to measure what are you and where are you trying go and are you making progress. I wrestled with this years ago when I was NSA ....

Q: You don't want quotas, though?

A: Quotas are forbidden so we set goals. My way of thinking about it is what is your end state? Now some would say that federal governments

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.



FormatDynamics®

Print Powered By    Format Dynamics™

elpasotimes.com

should look like America, whatever that is. OK, that sounded like a reasonable metric, so I said, 'Alright, what does America look like?' So I got a bunch of numbers. I said, 'Alright, what do we look like?' and it didn't match, and as I just told you, the one place where there's the greatest mismatch is Hispanic. It's much closer, as matter of fact, people would be surprised how close it is across, at least my community among the other minorities. Now, that said, numbers don't necessarily equal positioning in the organization. So that's another feature we have to work on, is placement of women and minorities in leadership positions.

Q: So, you're quantifying that as well?

A: Yes.

### TERRORIST ACTIVITY ON THE NATION'S SOUTHWEST BORDER

Q: There seems to be very little terrorist-related activity on the Southwest border, which is watched very closely because of the illegal immigration issue. Can you talk about why it's important to be alert here?

A: Let me go back to my NIE, those are unclassified key judgements, pull them down and look at them. You've got committed leadership. You've got a place to train. They've got trainers and they've got recruits. The key now is getting recruits in. So if the key is getting recruits in. So, if you're key is getting recruits in, how would you do that? And so, how would you do that?

Q: I'd go to the northern border where there's nobody watching.

A: And that's a path. Flying in is a path. Taking a ship in is a path. Coming up through the Mexican border is a path. Now are they doing it in great numbers, no. Because we're finding them and we're identifying them and we've got watch lists and we're keeping them at bay. There are numerous situations where people are alive today because we caught them (terrorists). And my point earlier, we catch them or we prevent them because we've got the sources and methods that lets us identify them and do something about it. And you know the more sources and methods are compromised, we have that problem.

Q: And in many cases we don't hear about them?

A: The vast majority you don't hear about. Remember, let me give you a way to think about this. If you've got an issue, you have three potential outcomes, only three. A diplomatic success, an operational success or an intelligence failure. Because all those diplomatic successes and operations successes where there's intelligence contribution, it's not an intelligence success. It's just part of the process. But if there's an intelligence failure ...

Q: Then you hear about it.

A: So, are terrorists coming across the Southwest border? Not in great numbers.

Q: There are some cases?

Advertisement


A bright idea in online advertising.
PrinterStitial® ads by Format Dynamics.


FormatDynamics®

Print Powered By [fd] FormatDynamics™

elpasotimes.com

A: There are some. And would they use it as a path, given it was available to them? In time they will.

Q: If they're successful at it, then they'll probably repeat it.

A: Sure. There were a significant number of Iraqis who came across last year. Smuggled across illegally.

Q: Where was that?

A: Across the Southwest border.

Q: Can you give me anymore detail?

A: I probably could if I had my notebook. It's significant numbers. I'll have somebody get it for you. I don't remember what it is. The point is it went from a number to (triple) in a single year, because they figured it out. Now some we caught, some we didn't. The ones that get in, what are they going to do? They're going to write home. So, it's not rocket science, word will move around. There's a program now in South America, where you can, once you're in South American countries, you can move around in South America and Central America without a visa. So you get a forged passport in Lebanon or where ever that gets you to South America. Now, no visa, you can move around, and with you're forged passport, as a citizen of whatever, you could come across that border. So, what I'm highlighting is that something ...

Q: Is this how it happened, the cases you're

talking about?

A: Yes.

Advertisement



A bright idea in online advertising.

PrinterStitial® ads by Format Dynamics.

FormatDynamics®

Print Powered By  Format Dynamics™

# Exhibit H

# washingtonpost.com

# A Law Terrorism Outran
We Need a FISA For the 21st Century

By Mike McConnell
Monday, May 21, 2007; A13


Advertisement

In 1978, the first cellular mobile phone system was still being tested, a personal computer's memory had just been expanded to 16 kilobytes and our greatest threat was the largest nation-state on Earth, the Soviet Union. That same year, the framework governing electronic surveillance of foreign powers and agents of foreign powers -- the Foreign Intelligence Surveillance Act (FISA) -- was signed into law.

Today, cellular phones are the size of credit cards, you would be hard-pressed to find a computer with memory less than 512 megabytes and our greatest threats are independent transnational terrorists and terror networks.

FISA was created to guard against domestic government abuse and to protect privacy while allowing for appropriate foreign intelligence collection. Technology and threats have changed, but the law remains essentially the same. If we are to improve our ability to protect the country by gathering foreign intelligence, this law must be updated to reflect changes in technology and the ways our adversaries communicate with one another.

Many Americans would be surprised at just what the current law requires. To state the facts plainly: In a significant number of cases, our intelligence agencies must obtain a court order to monitor the communications of foreigners suspected of terrorist activity who are physically located in foreign countries. We are in this situation because the law simply has not kept pace with technology.

The failure to update this law comes at an increasingly steep price. The congressional joint inquiry into the Sept. 11, 2001, attacks recognized that there were systemic problems with covering communications of potential terrorists.

As director of national intelligence, I see every day the results of FISA-authorized activity and its contribution to our efforts to protect America. This surveillance saves lives -- the lives of our children and grandchildren. I also see the flaws inherent in the current law.

Because the law has not been changed to reflect technological advancements, we are missing potentially valuable intelligence needed to protect America. We simply cannot predict how communications technology will change in the coming years, but these changes may widen the gap between the law and technology. We need to adopt that understanding into FISA -- a law that does not address today's global systems in today's terms.

In seeking to update the law, in response to bipartisan congressional requests, the intelligence community is keeping faith with the foundation of credibility and legitimacy in which the law was grounded. Just as Congress in 1978 could not have anticipated today's technology, we cannot know how technology will advance in the next 30 years. Our job is to make the country as safe as possible by providing the highest possible quality intelligence available. We should not tie the nation's security to a snapshot of outdated technology.

I am encouraged that in my discussions with members of Congress, and in congressional hearings on this subject over the past year, there is recognition of the need to improve our intelligence efforts and close critical gaps created by changes in technology. We will continue to collect intelligence under strong congressional, executive and judicial oversight mechanisms. Protecting our nation against terrorist attacks and safeguarding privacy protections and civil liberties is not an either/or proposition.

The first responsibility of intelligence is to achieve understanding and provide warning. As the head of the nation's intelligence community, it is my duty to encourage changes in policies, procedures and legislation to improve our ability to warn of terrorist attacks and other threats to our security. Bringing FISA into the 21st century is one such improvement that can and should be made now. The recommended changes will protect the civil and privacy rights of our citizens while enabling the U.S. intelligence community to provide a higher level of protection against terrorist attacks.

*The writer is director of national intelligence.*

View all comments that have been posted about this article.

---

**Post a Comment**

**View all comments** that have been posted about this article.

You must be logged in to leave a comment. Login | Register

Submit

Comments that include profanity or personal attacks or other inappropriate comments or material will be removed from the site. Additionally, entries that are unsigned or contain "signatures" by someone other than the actual author will be removed. Finally, we will take steps to block users who violate any of our posting standards, terms of use or privacy policies or any other policies governing this site. Please review the full rules governing commentaries and discussions. You are fully responsible for the content that you post.

© 2007 The Washington Post Company

**Ads by Google**

**1 Rule of a flat stomach:**
Cut down 9 lbs of stomach fat every 11 days by obeying this 1 tiny rule
FatLoss4Idiots.com

**Hugh Downs Reports:**
Artery Clearing Secret from Nobel Prize Winner
www.bottomlinesecrets.com

**Terrorism**
Briarcliffe College - Bethpage, NY Offers Criminal Justice Training.
CJ.bcbeth.com