UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMNESTY INTERNATIONAL USA; GLOBAL FUND FOR     :
WOMEN; GLOBAL RIGHTS; HUMAN RIGHTS WATCH; IN-     :
TERNATIONAL CRIMINAL DEFENCE ATTORNEYS ASSO-     :
CIATION; THE NATION MAGAZINE; PEN AMERICAN CEN-     :
TER; SERVICE EMPLOYEES INTERNATIONAL UNION;     :
WASHINGTON OFFICE ON LATIN AMERICA; DANIEL N.     :
ARSHACK; DAVID NEVIN; SCOTT MCKAY; and SYLVIA     :
ROYCE,     :
    :
                  Plaintiffs,     :
    :
             v.     :     08 Civ. 6259 (JKG)
    :
JOHN M. MCCONNELL, in his official capacity as Director of Na-     :     ECF CASE
tional Intelligence; LT. GEN. KEITH B. ALEXANDER, in his offi-     :
cial capacity as Director of the National Security Agency and Chief     :
of the Central Security Service; and MICHAEL B. MUKASEY, in     :
his official capacity as Attorney General of the United States,     :
    :
                 Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

GREGORY G. KATSAS
Assistant Attorney General

ANTHONY J. COPPOLINO
Special Litigation Counsel

PAUL FREEBORNE
Trial Attorney
U.S. Department of Justice

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

SERRIN TURNER
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel. No. (212) 637-2701
Fax No. (212) 637-2686
serrin.turner@usdoj.gov

Attorneys for Defendants

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iv

Preliminary Statement ............................................................................................. 1

Statutory Background ............................................................................................... 3

A.   The Foreign Intelligence Surveillance Act ...................................................... 3

B.   The Protect America Act and the FISA Amendments Act of 2008 ....................... 8

Argument .............................................................................................................. 17

Point I: Plaintiffs Lack Standing .............................................................................. 17

A.   Standing Requirements ................................................................................ 17

B.   Plaintiffs' Alleged Injuries ........................................................................... 19

C.   Plaintiffs Lack Article III Standing to Pursue Any of Their Claims
     Because Their Allegations of Injury Rest on Speculation and Conjecture ........... 21

D.   Plaintiffs Lack Standing For Additional Reasons Specifically
     Relating to Their Fourth Amendment and Separation of Powers Claims .............. 29

Point II: Plaintiffs' Challenge Fails on the Merits ...................................................... 32

A.   Section 1881a Does Not Violate the Fourth Amendment ................................... 33

     1.   Section 1881a Does Not Violate the Fourth Amendment's Warrant Clause ........ 34

          a.   The Warrant Clause Does Not Apply to Surveillance Targeted
               at Foreign Persons Abroad ............................................................ 34

          b.   The Warrant Clause Does Not Apply to Surveillance Conducted
               for Foreign Intelligence Purposes .................................................. 40

     2.   Section 1881a Reasonably Balances the Government's Foreign Intelligence
          Needs with the Privacy Interests of U.S. Persons ................................... 48

          a.   Section 1881a Serves Governmental Interests of the Highest Order ......... 48

          b.   Section 1881a Affects the Privacy Interests of U.S. Persons Only
               Indirectly and Reasonably Protects Those Interests by Requiring
               FISC-Approved Targeting and Minimization Procedures ...................... 49

          c.   Reasonableness Does Not Require Prior Judicial Approval
               Approximating a Warrant Requirement ............................................ 53

B.    Section 1881a Does Not Violate the First Amendment ........................................................ 57

C.    Section 1881a Does Not Violate Article III ......................................................................... 58

Conclusion ................................................................................................................................... 60

# TABLE OF AUTHORITIES

Cases

*ACLU v. NSA*, 493 F. 3d 644 (6th Cir. 2007) .......................................................... passim

*Alderman v. United States*, 394 U.S. 165 (1969) ................................................... 34

*Allen v.* Wright, 468 U.S. 737 (1984) ...................................................................... 35

*Baker v. Carr*, 369 U.S. 186 (1962) ........................................................................ 21

*Berger v. New York*, 388 U.S. 41 (1967) ................................................................ 39

*Bordell v. General Elec. Co.*, 922 F.2d 1057 (2d Cir. 1991) ................................... 27

*Buckley v. Valeo*, 424 U.S. 1 (1976) ....................................................................... 35

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979) ................................................. 50

*Cassidy v. Chertoff*, 471 F.3d 67 (2d Cir. 2006) ......................................... 46, 51, 53

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2001) .............................................. 46

*Cleveland v. United States*, 531 U.S. 12 (2000) ..................................................... 45

*Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610 (2008) .......................... 36

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006) ............................................ 21

*Dames & Moore v. Regan*, 453 U.S. 654 (1981) .................................................... 61

*Davis v. Village Park II Realty Co.*, 578 F.2d 461 (2d Cir.1978) ............................ 27

*Doe v. Gonzales*, 500 F. Supp. 2d 379 (S.D.N.Y. 2007) ....................................... 51

*Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1 (2004) .................................. 21

*Fifth Ave. Peace Parade Comm.* v. *Gray,* 480 F.2d 326 (2d Cir. 1973)................... 27

*Gaston v. Gavin,* 1998 WL 7217 (S.D.N.Y.) ........................................................... 31

*Goldstein v. United States*, 316 U.S. 114 (1942) ................................................... 34

*Gordon v. Warren Consolidated Bd. of Educ.*, 706 F.2d 778 (6th Cir. 1983) ........... 62

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................ 55

*Griffin v. Wisconsin*, 483 U.S. 868 (1987)................................................... 45, 46, 59

*Haig v. Agee*, 453 U.S. 280 (1981) ................................................................................ 53

*Halkin v. Helms,* 690 F.2d 977 (D.C. Cir. 1982) ......................................................... 27

*Hankard v. Town of Avon*, 126 F.3d 418 (2d Cir. 1997) ............................................. 27

*Horton v. California*, 496 U.S. 128 (1990) ................................................................... 43

*Illinois v. Lafayette*, 462 U.S. 640 (1983) .................................................................... 60

*In re Sealed Case*, 310 F.3d 717 (FISA Ct. Rev. 2002). ..................................... passim

*INS v. Chada*, 462 U.S. 919 (1983) ............................................................................... 35

*Jabara v. Kelley*, 476 F. Supp. 561 (E.D. Mich. 1979) ............................................... 62

*Katz v. United States*, 389 U.S. 347 (1967) .................................................................. 49

*Laird v. Tatum,* 408 U.S. 1 (1972) ........................................................................ passim

*Latino Officers Association v. Safir*, 170 F.3d 167 (2d Cir. 1999) ............................. 27

*Levin v. Harelston*, 966 F.2d 85 (2d Cir. 1992) ........................................................... 27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................ passim

*MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006) ......................................................... 46

*Maryland v. Garrison*, 480 U.S. 79 (1987) ................................................................. 59

*Mason v. Ward*, 1991 WL 143713 (S.D.N.Y. 1991) ................................................... 27

*Mazza v. Hendrick Hudson Central School*, 942 F. Supp. 187 (S.D. N.Y. 1996) ....... 27

*Mistretta v. United States*, 488 U.S. 361 (1989) .......................................................... 63

*Morrison v. Olson*, 487 U.S. 654, n. 16 (1988) ........................................................... 63

*Muick v. Glanayre Elecs.*, 280 F.3d 741 (7th Cir. 2002) ............................................. 54

*Nat'l Treas. Employees Union v. Von Raab*, 489 U.S. 656 (1989) ............................. 37

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ..................................................... 37, 46, 60

*Pasiewicz v. Lake Cty Forest Preserve Dist.*, 270 F.3d 520 (7th Cir. 2001) ............... 56

*Payton v. New York*, 445 U.S. 573 (1980) ................................................................... 61

*Phillips Petroleum Co. v. Shutts,* 472 U.S. 797 (1985) ............................................... 21

*Raines v. Byrd,* 521 U.S. 811 (1997) ................................................................ 20, 36

*Rakas v. Illinois*, 439 U.S. 128 (1978) .............................................................. 33, 34

*Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1977) ............. 62

*Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26 (1976) .......................................... 31

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) ..................................... 56

*U.S. v. Bankston,* 182 F.3d 296 (5th Cir. 1999), ................................................. 44

*United Presbyterian Church v. Reagan,* 738 F.2d 1375 (D.C. Cir. 1984) ............................ 28

*United States v. Ambrosio*, 898 F. Supp. 177 (S.D.N.Y. 1995) ..................................... 42

*United States v. Amerson*, 483 F.3d 73 (2d Cir. 2007) ............................................ 53

*United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000) ......................... 41, 43, 47, 48

*United States v. Brown*, 484 F.2d 418 (5th Cir. 1973) .......................................... 47, 52

*United States v. Buck*, 548 F.2d 871 (9th Cir. 1977) ............................................. 47

*United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974) ......................................... 47, 52

*United States v. Domme, Jr.*, 753 F.2d 950 (11th Cir. 1985) ...................................... 42

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984) ........................................ passim

*United States v. Edwards*, 498 F.2d 496 (2d Cir. 1974) ........................................... 45

*United States v. Figueroa*, 757 F.2d 466 (2d Cir. 1985) ....................................... 42, 56

*United States v. Kahn*, 415 U.S. 143 (1974) ..................................................... 42

*United States v. Marcy*, 777 F. Supp. 1400 (N.D. Ill. 1991) ..................................... 42

*United States v. Martin*, 599 F.2d 880 (9th Cir. 1979) .......................................... 42

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) .......................................... 46

*United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982), .................................. 64

*United States v. Miller*, 425 U.S. 435 (1976) ................................................... 54

*United States v. Pappas*, 298 F. Supp. 2d 250 (D. Conn. 2004) ................................... 42

*United States v. Posey*, 864 F.2d 1487 (9th Cir. 1989) .......................................... 41

*United States v. Redmon*, 138 F.3d 1109 (7th Cir. 1998) .............................................................. 60

*United States v. Rodriguez*, 606 F. Supp. 1363 (D. Mass.1985) ................................................. 42

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................................ 36

*United States v. Simons*, 206 F.3d 392 (4th Cir. 2000)................................................................ 54

*United States v. Tortorello*, 480 F.2d 764 (2d Cir. 1973) ............................................................ 42

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001)................................................... 42

*United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980)........................... 47, 49, 51, 52

*United States v. United States Dist. Court*, 444 F.2d 651 (6th Cir. 1971)...................................... 4

*United States v. United States District Court*, 407 U.S. 297 (1972)........................... 48, 49, 50, 52

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)................................................. 38, 42, 43

*United States v. Yonn*, 702 F.2d 1341 (11th Cir. 1983) ............................................................... 49

*USPS v. Gregory*, 534 U.S. 1 (2001) ........................................................................................... 41

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) ............................................................................ 20

*Vermont Right to Life Committee v. Sorrell* (2d Cir. 2000)........................................................ 30

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995)......................................................... 41, 45

*Warshak v. United States*, 490 F.3d 455 (6th Cir. 2007) ............................................................ 54

*Warth v. Seldin*, 422 U.S. 490 (1975) .......................................................................................... 21

*Wash. State Grange v. Wash. State Republican Party*, 1289 S. Ct. 1184 (2008) ......................... 36

*Whitmore v. Arkansas*, 495 U.S. 149 (1990). ....................................................................... 20, 24

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ............................................ 50, 61

*Zweibon v. Mitchell*, 516 F.2d 594 (D.C. Cir. 1975) (en banc) ................................................... 52

Statutes

FISA Amendments Act of 2008, Pub. L. No. 110-261 (2008)................................................ passim

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 *et seq.* ........................................... passim

Protect America Act ("PAA"), Pub. L. 110-55 (2007).................................................... 9

Legislative History

124 Cong. Rec. S6097, S6122 (Jun. 25, 2008) (statement of Sen. Chambliss)............................ 55

154 Cong Rec. S6097, S6119 (Jun. 25, 2008) (statement of Sen. Feinstein)........................ 17, 44

154 Cong. Rec. S6097, S6125 (Jun. 25, 2008) (statement of Sen. Hatch) .................................... 16

154 Cong. Rec. S6097, S6129 (Jun. 25, 2008) (statement of Sen. Rockefeller). ........................ 52

154 Cong. Rec. S6130 (Jun. 25, 2008) ...................................................................................... 17

*Electronic Surveillance within the United States for Foreign Intelligence*
    *Purposes: Hearings before the Subcomm. on Intel. and the Rights of Americans*
    *of the S. Select Comm. on Intel.*, 94th Cong., 2d Sess. (Jun. 29, 1976 *et seq.*). ........................ 7

*Foreign Intelligence Electronic Surveillance: Hearings before the Subcomm. on*
    *Legislation of the H. Permanent Select Comm. on Intel.*, 95th Cong.,
    2d Sess. (Jan. 10, 1978 *et seq.*).................................................................................... 8

*Foreign Intelligence Surveillance Act and Implementation of the Protect*
    *America Act: Hearing before the S. Comm. on the Judiciary*, 110th Cong.,
    1st Sess. (Sep. 25, 2007) (statement of DNI McConnell), *available at*
    http://www.dni.gov/testimonies_2.htm ............................................................ 43, 54

*Foreign Intelligence Surveillance Act of 1977: Hearings before the Subcomm.*
    *on Crim. Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong.,
    1st Sess. (Jun. 13, 1977 *et seq.*)................................................................................ 9

*Foreign Intelligence Surveillance Act: Hearing before the Subcomm. on Crim.*
    *Laws and Procedures of the S. Judiciary Comm.*, 94th Cong.,
    2d Sess. (Mar. 29, 1976 *et seq*) ............................................................................ 6, 7

*Foreign Intelligence Surveillance Act: Hearings before the Subcomm. on*
    *Courts, Civil Liberties, and the Admin. of Justice of the H. Comm. on*
    *the Judiciary*, 94th Cong., 2d Sess. (Apr. 12, 1976 *et seq.*)........................................ 7

*Foreign Intelligence Surveillance Act: Hearings before the Subcomm. on*
    *Intel. and the Rights of Americans of the S. Select Comm. on Intel.*,
    95th Cong., 2d Sess. (July 19, 1977 *et seq.*) ............................................................ 8

*Hearing before the S. Comm. on the Judiciary*, 109th Cong., 2d Sess. (Jul. 26, 2006) (statement of then-NSA Director General Michael V. Hayden), *available at* http://judiciary.senate.gov/hearings/testimony.cfm?id=698&wit_id=5604 ............................ 12

*Modernization of the Foreign Intelligence Surveillance Act: Hearing before the H. Permanent Select Comm. on Intel.*, 109th Cong., 2d Sess. (Jul. 19, 2006) ................... 10

*Modernization of the Foreign Intelligence Surveillance Act: Hearing before the S. Select Comm. on Intel.*, 110th Cong., 1st Sess. (May 1, 2007) .................... 11, 12, 13, 39

S. Rep. No. 95-604 (1977) ......................................................................................... 4, 9

S. Rep. No. 95-701 (1978) ............................................................................................. 8

*Warrantless Surveillance and The Foreign Intelligence Surveillance Act: Hearing before the H. Judiciary Comm. (Part II)*, 110th Cong., 1st Sess. (2007) ............................... 44

## PRELIMINARY STATEMENT

This case presents a facial challenge to recent amendments to the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. § 1801 *et seq.*, as set forth in the FISA Amendments Act of 2008, Pub. L. No. 110-261 (2008) ("FAA" or "Act"). The FAA was enacted by a substantial bipartisan majority of Congress in order to provide the Government with critically needed flexibility in conducting foreign intelligence surveillance directed at foreign persons overseas. The provision of the Act at issue authorizes *only* surveillance targeted at a foreign person abroad and *cannot* be used to target U.S. persons or any persons inside the United States. The statute enforces this important limitation by requiring prior judicial approval of the Government's targeting procedures before surveillance of foreign persons abroad may be commenced under the Act. Moreover, to the extent that such surveillance may incidentally collect the communications of U.S. persons communicating with an overseas target, the Act requires that the surveillance be conducted in accordance with judicially approved procedures designed to minimize any intrusion on U.S. persons' privacy interests.

Plaintiffs—attorneys and organizations based in the United States who claim to engage in international communications as part of their work—challenge the FAA as unconstitutional under the Fourth Amendment, the First Amendment, and Article III of the Constitution. Notwithstanding the express terms of the statute limiting its application to surveillance targeting foreign persons abroad and requiring the Government to minimize any incidental intrusion on U.S. persons, plaintiffs baldly allege that the FAA will be used by the Government for the "dragnet acquisition of *Americans'* international communications." Pls.' Br. 1. They envision the Government conducting "mass acquisitions," "with virtually no oversight," directed at "ostensible" foreign targets but in reality used to spy on U.S. persons. *Id.* at 2, 35. Plaintiffs further allege a "reasonable belief" that *their* international communications will be monitored under the Act, that

people overseas will refuse to communicate with them for fear of such surveillance, and that plaintiffs thereby will be hindered in carrying out their professional obligations. *Id.* at 11-14.

This Court should decline to indulge any of these speculative claims. At the outset, it should dismiss the case for lack of standing. Standing demands a showing of personal, concrete injury that is actual or immediate—not conjectural or hypothetical. Plaintiffs cannot make such a showing here. They do not even claim, let alone prove, that they actually are being or imminently will be surveilled under the Act. Instead, they claim that the mere threat of being surveilled inhibits their communications with persons overseas. The Supreme Court has specifically held that an alleged "chill" resulting from nothing more than the *existence* of a government surveillance program does not suffice to establish standing under Article III. *See Laird v. Tatum*, *infra*. Indeed, more recently—in a case brought by plaintiffs' own counsel—the Sixth Circuit rejected the very same standing argument plaintiffs advance here, finding that the argument rests on the mere "possibility" that the challenged surveillance would be applied to the plaintiffs, rather than a "probability or certainty" as required for standing. *See ACLU v. NSA*, *infra*. The case at bar should be dismissed for the same reason.

Even if plaintiffs could establish standing, their claims would fail on the merits. Plaintiffs' argument that the FAA violates the Fourth Amendment's warrant clause is wrong for two independent reasons. First, contrary to plaintiffs' repeated speculation that the provision of the statute at issue will be used to target U.S. persons for surveillance—speculation that is wholly out of place in a facial challenge—the provision authorizes only surveillance targeted at foreign persons outside the United States. Because such persons indisputably fall outside the Fourth Amendment's ambit, they may be lawfully surveilled without a warrant, notwithstanding that such surveillance may incidentally capture communications of U.S. persons. Second, there is a

well recognized exception to the Fourth Amendment's warrant clause for foreign intelligence-gathering, even where directed at persons inside the United States. That exception applies with even greater force to the outwardly directed surveillance authorized by the FAA.

Equally meritless is plaintiffs' alternative argument that, if the warrant clause does not apply, the FAA is still *per se* unreasonable under the Fourth Amendment because it fails to require prior judicial approval based on individualized suspicion and a particularity showing. This argument amounts to an improper attempt to impose a warrant requirement through the back door of a reasonableness analysis. Fourth Amendment reasonableness simply requires that the statute reasonably balance governmental needs against protected privacy interests. The FAA does so, as its targeting and minimization restrictions reasonably protect the privacy interests of U.S. persons to the extent that they are implicated by the Act.

Plaintiffs' remaining claims require little in the way of response. Their free-speech claim simply dresses up their Fourth Amendment claim in First Amendment clothing. Nor is there any substance to plaintiffs' claim that the FAA violates Article III.

Accordingly, the Court should grant summary judgment to defendants and dismiss plaintiffs' complaint in its entirety.

## STATUTORY BACKGROUND

A.    **The Foreign Intelligence Surveillance Act**

Since the earliest years of this country, the Government has relied on foreign intelligence collection to protect the nation. For the vast majority of that time and through the present day, much of this intelligence gathering has been conducted under the President's constitutional authority over national security and foreign affairs, with methods of surveillance evolving over time in light of developing technologies. Presidents have authorized warrantless wiretaps for

foreign intelligence purposes since at least 1940.  *See, e.g.*, *United States v. United States Dist. Court*, 444 F.2d 651, 669-71 (6th Cir. 1971) (reproducing as an appendix memoranda from Presidents Roosevelt, Truman, and Johnson).

FISA was enacted in 1978 "to regulate the use of electronic surveillance within the United States for foreign intelligence purposes."  *See* S. Rep. No. 95-604, at 7 (1977).  The statute was a response to congressional investigations into abuses of surveillance directed at specific American citizens and political organizations.  *Id.* at 7-8.  FISA was intended to provide a check against such abuses by placing certain types of foreign intelligence surveillance under the oversight of the Foreign Intelligence Surveillance Court ("FISC").

FISA's key provisions set forth a procedure by which the Government may undertake "electronic surveillance" under the statute by applying for an order from the FISC.  Three main requirements must be met for the FISC to approve the application.  First, the Government must establish probable cause to believe that the "target" of the surveillance is a "foreign power" or an "agent of a foreign power," and that the target is using, or is about to use, the "facility" to be surveilled (*e.g.*, a telephone number). 50 U.S.C. § 1805(a)(2).  Second, the application must include "minimization procedures" for the surveillance as defined by the statute.  *Id.* § 1805(a)(3).  These are specific procedures designed to minimize the acquisition and retention, and to prevent the dissemination, of information concerning U.S. persons that is unrelated to foreign-intelligence purposes.  *See id.* § 1801(h); *see also In re Sealed Case*, 310 F.3d 717, 730-31 (FISA Ct. Rev. 2002) (providing examples).  Third, the Attorney General must approve the application and a high-ranking intelligence official must certify, *inter alia*, that a significant purpose of the surveillance is to obtain foreign intelligence information.  *Id.* § 1805(a)(4); *see also id.* § 1804(a)(6)(B).

If, but only if, the surveillance target is a U.S. person, the basis for this certification is subject to review, for clear error. *Id.* § 1805(a)(4).[1]

When Congress enacted FISA, its focus was on foreign intelligence surveillance of persons within the United States. Contrary to the impression left by plaintiffs' brief, Congress did not generally intend the statute's regulatory framework to cover surveillance directed at persons outside the United States—even with respect to those persons' international communications with parties inside the United States. Thus, FISA's "electronic surveillance" definition, to which FISA's requirements are keyed, encompasses non-domestic communications only in limited circumstances. *See* 50 U.S.C. § 1801(f). In particular, while the definition includes international communications if intercepted by wire inside the United States, the definition excludes surveillance of international communications by radio, or by wire interception conducted outside U.S. borders—so long as the surveillance does not intentionally target a particular, known person inside the United States. *Id.* § 1801(f)(1)&(2).[2]

FISA's legislative history clarifies the practical significance of these technical distinctions: they were designed to carve out from the statute's reach most governmental surveillance of

---

[1] A "United States person" is defined by the statute to mean, as to natural persons, a citizen or permanent resident of the United States. 50 U.S.C. § 1801(j).

[2] Both of these prongs of the definition encompass communications to or from a person in the United States—thus including international as well as domestic communications—*if* acquired in a particular manner. Section 1801(f)(1) includes such "to/from" communications if intercepted by wire or radio, but only if the communications are acquired by "intentionally targeting" a "particular, known United States person who is in the United States." Section 1801(f)(2) includes to/from communications if intercepted by wire (*as opposed to* radio), but only if the wire interception is physically conducted within the United States. There are two other prongs of the definition, one of which covers the intentional acquisition of purely domestic radio communications, while the other covers the use of monitoring devices in the United States other than those involving wire or radio communications (*e.g.*, microphone bugging). *Id.* § 1801(f)(3)&(4).

international communications as that surveillance was commonly conducted at the time. Congress was told in the hearings leading to FISA's enactment that these surveillance operations generally did not rely on the modes of surveillance covered by the definition—including wire interceptions executed in the United States—and thus the operations would not be affected by FISA. As Attorney General Edward Levi testified: "the bill covers all wiretaps within the United States . . . regardless of the location of the sender or receiver," but "[b]ecause of the different nature of government operations to collect foreign intelligence by intercepting international communications . . . [those operations are] not addressed in this bill." *Foreign Intelligence Surveillance Act*: *Hearing before the Subcomm. on Crim. Laws and Procedures of the S. Judiciary Comm.*, 94th Cong., 2d Sess., at 11 (Mar. 29, 1976 *et seq.*) ("3/76 FISA Hrg.").[3] Congress heard similar testimony from other witnesses.[4]

Hence, Congress understood that the "electronic surveillance" definition would exclude certain foreign-intelligence monitoring of international communications traffic from FISA's

---

[3] Attorney General Levi subsequently elaborated: "The bill does not purport to cover interceptions of all international communications where, for example, the interception would be accomplished outside of the United States, or, to take another example, a radio transmission that does not have both the sender and all intended recipients within the United States." *Electronic Surveillance within the United States for Foreign Intelligence Purposes: Hearings before the Subcomm. on Intel. and the Rights of Americans of the S. Select Comm. on Intel.*, 94th Cong., 2d Sess., at 180-81 (Jun. 29, 1976 *et seq.*).

[4] *See, e.g.*, *Foreign Intelligence Surveillance Act*: *Hearings before the Subcomm. on Courts, Civil Liberties, and the Admin. of Justice of the H. Comm. on the Judiciary*, 94th Cong., 2d Sess. at 8 (Apr. 12, 1976 *et seq.*) (statement of former Justice Department official Philip Lacovara) ("[N]ot covered [under the bill] are international wire communications since it is relatively simple, I understand, to intercept these communications at a point outside the United States. Similarly, . . . . the bill would have no application whatsoever to international radio traffic, even of a private or commercial nature."); 3/76 FISA Hrg. at 31 (testimony of Morton Halperin) (stating that "if I am an American citizen [in the United States] and I make a phone call to London, and the Government picks it up on a transatlantic cable under the ocean, it is not covered," and "if it goes by microwave, or if it passes through Canada, . . . it would not be covered").

scope.  *See* 3/76 FISA Hrg. at 25 (testimony of Attorney General Levi) ("Congress knows that there is an important area here which is not covered by this legislation . . . .").  This conclusion is confirmed by the final report of the Senate Intelligence Committee, which flatly states that, based on the definition, "the legislation does not deal with international signals intelligence activities as currently engaged in by the National Security Agency."  S. Rep. No. 95-701, at 71 (1978).

To be sure, FISA's "electronic surveillance" definition includes surveillance of international communications where particular, known U.S. persons are targeted.  50 U.S.C. § 1801(f)(1); S. Rep. No. 95-701 at 33-34.  But Congress understood that this limitation would not prevent the international communications of U.S. persons from being incidentally intercepted by the Government—without FISA oversight—where such persons were *not* the targets of the surveillance.  *See Foreign Intelligence Surveillance Act: Hearings before the Subcomm. on Intel. and the Rights of Americans of the S. Select Comm. on Intel.*, 95th Cong., 2d Sess., at 148-178 (July 19, 1977 *et seq.*) (statement of David Watters) ("The key word is 'targeted,' not intercepted.'"); *Foreign Intelligence Electronic Surveillance: Hearings before the Subcomm. on Legislation of the H. Permanent Select Comm. on Intel.*, 95th Cong., 2d Sess., at 172 (Jan. 10, 1978 *et seq.*) (testimony of Sen. Kennedy) (stating that "targeted sweeps [aimed at particular, known U.S. persons in the United States] would be covered" by the legislation, but "nontargeted sweeps by the [National Security Agency]" would not be covered).[5]

---

[5] Likewise, Congress understood that this provision would not affect the Government's ability to intercept international communications when it was not "known" whose communications were being intercepted.  *See Foreign Intelligence Surveillance Act of 1977: Hearings before the Subcomm. on Crim. Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong., 1st Sess., at 5 (Jun. 13, 1977 *et seq.*) (statement of Attorney General Griffin Bell) ("The word 'known' . . . is necessary because radio communications are targeted which are known to originate from or be received in the United States, but the identity of the person involved [may be] totally unknown (continued…)

-7-

In short, Congress enacted FISA based on the understanding that it would not disrupt the surveillance practices through which the Government commonly monitored international communications at the time. Where the Government did not intentionally target a particular, known U.S. person in the United States, FISA allowed the Government to monitor international communications through radio surveillance, or wire surveillance of transoceanic cables offshore or on foreign soil, outside the statute's regulatory framework.[6]

**B.      The Protect America Act and the FISA Amendments Act of 2008**

In 2006, Congress began considering proposed amendments to FISA aimed at modernizing the statute in response to changes in communications technology since its original enactment. *See Modernization of the Foreign Intelligence Surveillance Act: Hearing before the H. Permanent Select Comm. on Intel.*, 109th Cong., 2d Sess. (Jul. 19, 2006). Congress took up the issue concurrently with an inquiry into the Terrorist Surveillance Program ("TSP")—a program authorized by the President after the terrorist attacks of September 11, 2001, which allowed the NSA to intercept communications into and out of the United States where the Government reasonably believed that a communicant included a member or agent of al Qaeda or an affiliated terrorist organization. S. Rep. No. 110-209 (2007), at 2-5. The President's confirmation of the TSP in 2005 led Congress to "inquire vigorously" into the program and to "carefully review[] the impact

---

and largely undiscoverable."); *see also id.* at 68 (testimony of Secretary of Defense Harold Brown) (explaining that "many of these channels of communication [monitored by the government] are used by a great many people" and so "[i]n many of these cases it cannot be said in advance who the individuals are").

[6] Although Congress noted when it enacted FISA that it would be "desirable to develop legislative controls" over these exempted forms of surveillance, S. Rep. No. 95-604, at 34, no such controls were included in FISA; nor were they developed in subsequent legislation, despite the fact that Congress has amended FISA on several occasions since its enactment.

of technological change on FISA collection to assess whether amendments to FISA should be enacted." *Id.* at 2. In the course of that review, the intelligence and judiciary committees of both houses of Congress held numerous public hearings, received many classified briefings, and solicited the views of "experts on national security law and civil liberties" on the issues at stake. *Id.* at 2-3.

These deliberations initially led to the passage in August 2007 of the Protect America Act ("PAA"), Pub. L. 110-55 (2007). Due to a sunset provision, the PAA expired approximately six months later in February 2008. Pursuant to further congressional deliberations, the PAA was subsequently refined and replaced by the FAA in July 2008.

The need for the legislation was laid out by the Director of National Intelligence ("DNI") and other Government officials in various appearances before Congress from 2006 to 2008. As the DNI explained at one such appearance, FISA needed to be amended because its definition of "electronic surveillance" is "tie[d] . . . to a snapshot of outdated technology." *Modernization of the Foreign Intelligence Surveillance Act: Hearing before the S. Select Comm. on Intel.*, 110th Cong., 1st Sess. (May 1, 2007) ("5/1/07 FISA Modernization Hrg."), at 19. Since the definition was crafted three decades ago, "[c]ommunications technology has evolved in ways that have had unforeseen consequences under [the statute]." *Id.*

Specifically, the DNI pointed to the definition's exclusion of international radio communications. That exclusion, as discussed above, was crafted to allow the Government to monitor international radio traffic outside FISA's confines. But, the DNI explained, whereas international communications were predominantly carried by radio when FISA was enacted, they are not today: "Communications that, in 1978, would have been transmitted via radio or satellite, are now transmitted principally by fiber optic cables"—and so qualify as wire communications un-

der FISA. *Id.* Thus, many international communications that would have been generally excluded from FISA regulation in 1978, when they were carried by radio, were now potentially included, due merely to a change in technology rather than any intentional decision by Congress. *Id.*[7]

Further, the DNI stated, with respect to the collection of wire communications, FISA's "electronic surveillance" definition "places a premium on the location of the collection": wire intercepts conducted inside the United States are covered, while those conducted outside the United States are not. 5/1/07 FISA Modernization Hrg. at 19; *see* 50 U.S.C. § 1801(f)(2). The DNI explained that technological advances had rendered this distinction outmoded as well: "Legislators in 1978 could not have been expected to predict an integrated global communications grid that makes geography an increasingly irrelevant factor. Today, a single communication can transit the world even if the two people communicating are only located a few miles apart." 5/1/07 FISA Modernization Hrg. at 19. In this environment, regulating communications differently based on the locus of collection significantly and arbitrarily limits the Government's intelligence-gathering capabilities. As the Director of the NSA elaborated in an earlier hearing:

> [As a communication travels the global communications network,] in that transit NSA may have multiple opportunities to intercept it as it moves and changes medium. As long as a communication is otherwise lawfully targeted, we should be indifferent to where the intercept is achieved. Signals intelligence is a difficult art and science, especially in today's telecommunication universe. Intercept of a particular communication . . . is always probabilistic, not deterministic. No coverage is guaranteed. We need to be able to use all the technological tools we have.

---

[7] *Compare* 50 U.S.C. § 1801(f)(2) (defining wire communication as "electronic surveillance" if, *inter alia*, one party is in the United States) *with* § 1801(f)(3) (defining radio communication as "electronic surveillance" only if sender and all intended recipients are in the United States).

*FISA for the 21st Century: Hearing before the S. Comm. on the Judiciary*, 109th Cong., 2d Sess. (Jul. 26, 2006) (statement of then-NSA Director General Michael V. Hayden), *available at* http://judiciary.senate.gov/hearings/testimony.cfm?id=698&wit_id=5604.

Thus, although FISA was originally crafted to accommodate the Government's monitoring of international communications as those operations were commonly conducted in 1978, now, in the modern communications age, facing the modern terrorist threat, the Government needed greater technological flexibility than the statute's terms allowed. As the DNI testified:

> In today's threat environment, FISA . . . is not agile enough to handle the community's and the country's intelligence needs. Enacted nearly 30 years ago, it has not kept pace with 21st century developments in communications technology. As a result, FISA frequently requires judicial authorization to collect the communications of non-U.S.—that is, foreign—persons located outside the United States. . . . This clogs FISA process with matters that have little to do with protecting civil liberties or privacy of persons in the United States. Modernizing FISA would greatly improve that process and relieve the massive amounts of analytic resources currently being used to craft FISA applications.

5/1/07 FISA Modernization Hrg. at 18.[8] The fix needed for this problem, as a Department of Justice official put it, was a "technology-neutral" framework for surveillance of foreign targets—focused not on "how a communication travels or where it is intercepted," but instead on "who is the subject of the surveillance, which really is the critical issue for civil liberties purposes." *Id.* at 46 (statement of Asst. Att'y Gen. Kenneth L. Wainstein).

---

[8] As Congress was told in response to inquiries about why the FISA process consumes such resources, applications for traditional FISC orders are often highly detailed and resemble "finished intelligence products," requiring substantial time and input from the "limited analysts and operators that are working these cases in real time." *Id.* at 70-71 (testimony of DNI Gen. Counsel Benjamin A. Powell); *see also id.* (testimony of Asst. Att'y Gen. Wainstein) (estimating that the average FISA application is 50 to 60 pages in length).

The FAA meets this need by establishing a new section of FISA entitled "Procedures for targeting certain persons outside the United States other than United States persons." *See* FAA § 101 (adding § 702 to FISA, *codified at* 50 U.S.C. § 1881a) (hereafter, "§ 1881a"). Section 1881a provides that, "[n]otwithstanding any other provision of law," the Attorney General and the DNI may authorize jointly, for up to one year, the "targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information." § 1881a(a). The provision does not define this authority by reference to any particular technology, other than to specify that acquisitions of communications under § 1881a (hereafter, "§ 1881a acquisitions")[9] must involve "the assistance of an electronic communication service provider." § 1881a(g)(2)(A)(vi). The statute expressly clarifies that § 1881a acquisitions "may not intentionally target any person known at the time of acquisition to be located in the United States," "may not intentionally target a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States," and "may not intentionally target a United States person reasonably believed to be located outside the United States." § 1881a(b).

Before the Attorney General and the DNI may authorize the targeting of foreign persons abroad under the statute, they must first obtain a FISC order approving the authorization. § 1881a(a)&(i)(3).[10] Three requirements must be met for the FISC to issue such an order—two

_____

[9] The phrase "§ 1881a acquisition" is used throughout this brief to refer to the acquisitions of communications authorized by § 1881a, which are the subject of this litigation. Plaintiffs' phrase – "mass acquisition" – is found nowhere in the statute and is merely plaintiffs' own speculative gloss on the nature of the acquisitions the statute authorizes.

[10] There are exceptions for exigent circumstances, as there are with traditional FISA orders. *Compare* § 1881(c)(2) *with id.* § 1805(e).

of which parallel traditional FISA requirements. First, the FISC must find that the Government has "targeting procedures" in place that are reasonably designed to ensure that any acquisition conducted under the authorization (a) is limited to targeting persons reasonably believed to be located outside the United States and (b) will not intentionally acquire purely domestic communications. § 1881a(i)(2)(B). Second, the FISC must find that the Government has minimization procedures in place for the acquisitions that meet FISA's requirements for such procedures. § 1881a(i)(2)(C); *see also* 50 U.S.C. §§ 1801(h), 1821(4). Third, the Attorney General and the DNI must jointly certify, *inter alia*, that a significant purpose of the acquisitions is to obtain foreign intelligence information. § 1881a(i)(2)(A); *see also* § 1881a(g)(2)(A)(v).[11]

The essential difference between these requirements and those needed for a traditional FISA order is that § 1881a does not require any probable cause showing addressed to individual surveillance targets. That difference reflects the fact that § 1881a acquisitions may only target non-U.S. persons who are outside the United States and thus outside the Fourth Amendment's reach. *See infra* Point II.A. Instead of a probable cause finding, § 1881a requires the FISC to find that the Government's targeting procedures are reasonably designed to ensure that only such persons will be targeted in any § 1881a acquisition. To the extent that a § 1881a acquisition results in the incidental collection of information concerning U.S. persons communicating with the target of the surveillance, § 1881a addresses that circumstance in the same fashion as the original

---

[11] Section 1881a does not provide for FISC review of the basis for this certification of foreign-intelligence purpose. In this respect, the statute does not meaningfully differ from traditional FISA requirements, which require such review only when the surveillance target is a U.S. person in the United States. *See* 50 U.S.C. § 1805(a)(4).

FISA: it requires the application of FISC-approved minimization procedures designed to prevent the unnecessary retention or dissemination of such information.

In authorizing surveillance targeted at non-U.S. persons abroad without a probable cause requirement, § 1881a does not, as plaintiffs charge "all but eviscerate" the original FISA framework, Pls.' Br. 1. To the contrary, as discussed, FISA has always permitted the Government to collect international communications by radio or by wiretap abroad without a traditional FISA order—indeed, without FISC oversight of any kind—so long as particular, known U.S. persons in the United States are not targeted. Section 1881a similarly does not require a traditional FISA order for the surveillance it authorizes, but at the same time, unlike the modes of surveillance carved out from the original FISA, § 1881a acquisitions *are* subject to significant FISC oversight. They may be conducted only pursuant to FISC-approved targeting and minimization procedures. In this respect, U.S. persons receive *greater* protection with respect to their international communications under § 1881a than they have ever had with respect to the international communications exempted from FISA's reach. *See* 154 Cong. Rec. S6097, S6125 (Jun. 25, 2008) (statement of Sen. Hatch) ("For the first time, the FISC will review and approve targeting procedures to ensure that authorized acquisitions are limited to persons outside of the United States. For the first time, the FISC will review and approve minimization techniques [for such acquisitions].").

Moreover, FISA's original carve-out of radio surveillance and wiretaps abroad left the Government free to use such modes of surveillance to target even *U.S. persons* if they were lo-

cated outside the United States—and to do so, again, wholly outside FISC oversight.[12]  By contrast, § 1881a acquisitions may not be targeted at any U.S. persons, whether inside or outside the United States.  Additional provisions of the FAA go further, entirely prohibiting the targeting of any U.S. person located outside the United States for foreign intelligence surveillance (where the person has a reasonable expectation of privacy and a warrant would be required if the acquisition were conducted in the United States for law enforcement purposes), unless the FISC has approved the surveillance based on a showing of probable cause to believe that the person is an agent of foreign power.  *See* § 1881c(a)(2); *see also id.* §§ 1881b, 1881c; 154 Cong Rec. S6097, S6119 (Jun. 25, 2008) (statement of Sen. Feinstein) ("This bill does more than Congress has ever done before to protect Americans' privacy regardless of where they are, anywhere in the world.").

Finally, the FAA imposes multiple forms of oversight with respect to the implementation of § 1881a, beyond the FISC's review of targeting and minimization procedures:  First, the statute requires the Attorney General, in consultation with the DNI, to adopt guidelines used to train intelligence personnel regarding the implementation of § 1881a's targeting restrictions, *see* § 1881a(f)(1), so as to "ensure that [§ 1881a] is not used for surveillance directed at persons within the United States or at United States persons."  154 Cong. Rec. S6130-31 (Jun. 25, 2008) (section-by-section explanation of the legislation).  These guidelines must be provided to Con-

---

[12] Although thus exempted from FISA, surveillance against U.S. persons abroad has been regulated by executive order since 1981.  Under Executive Order 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981), 1981 WL 76054, the Government may not conduct such surveillance using techniques that would require a warrant for law enforcement purposes, unless the "the Attorney General has determined in each case that there is probable cause to believe that the technique is directed against a foreign power or an agent of a foreign power."  *Id.* § 2.5.

gress and the FISC, § 1881a(f)(2), and must be adopted before any § 1881a acquisitions may be authorized under the statute, § 1881a(g)(2)(A)(iii).

Second, the FAA requires the Attorney General and the DNI to assess the Government's compliance with targeting and minimization procedures semi-annually and to submit the assessments to Congress as well as the FISC. § 1881a(l)(1). These assessments must include, *inter alia*: records of all proceedings before the FISC under § 1881a during the assessment period; any targeting and minimization procedures that have been implemented during the assessment period; and any incidents of noncompliance with these procedures by any element of the intelligence community. 50 U.S.C. § 1881f.

Third, the FAA requires the head of each element of the intelligence community conducting § 1881a acquisitions to report annually to the DNI, the Attorney General, Congress, and the FISC concerning their use of information obtained through the acquisitions. § 1881a(l)(3). These reviews must provide in particular: an assessment of the extent to which the acquisitions have collected the communications of U.S. persons; the number of disseminated intelligence reports stemming from these acquisitions that reference an identified U.S. person; the number of additional U.S.-person identities subsequently disseminated in response to requests prompted by these reports; and the number of targets of these acquisitions who were later determined to be located in the United States at the time of the acquisitions and whose communications were reviewed. § 1881a(l)(3)(A). The FAA authorizes the Inspector General of the Department of Justice and the Inspector General of each element of the intelligence community to acquire the information needed to conduct similar reviews. § 1881a(l)(2).

Finally, § 1881a allows any electronic communication service provider that is directed by the Government to cooperate in executing a § 1881a acquisition to challenge the lawfulness of

the directive in an adversarial proceeding before the FISC. § 1881a(h)(4). Providers are entitled

to appeal any adverse decision to the FISA Court of Review and, on writ of certiorari, to the Su-

preme Court. § 1881a(h)(6).

In sum, the FAA is hardly a grant of revolutionary and unchecked powers as plaintiffs

contend. To the extent that the FAA allows the international communications of U.S. persons to

be acquired by the Government as an incident to the surveillance of foreign targets abroad, with-

out a FISC order based on probable cause, the statute does not mark any fundamental shift in

U.S. persons' privacy rights. FISA's definition of "electronic surveillance" has always permitted

certain international communications to be collected outside traditional FISA requirements. The

FAA simply creates a technology-neutral framework for surveillance of international communi-

cations going forward. At the same time, the FAA builds in significant privacy protections for

U.S. persons, both inside and outside the United States, and imposes multiple layers of oversight

with respect to the implementation of those protections.

## ARGUMENT

## POINT I

## PLAINTIFFS LACK STANDING

Before the Court even reaches the constitutionality of the FAA, this case should be dis-

missed at the threshold for lack of standing. Plaintiffs do not allege that they have been subject

to surveillance under the Act. Rather, they merely allege a "reasonable belief" that they *may* be

subject to surveillance under the Act. As set forth below, the law is clear that such allegations

cannot support Article III standing.

## A.     Standing Requirements

The "judicial power . . . defined by Article III of the Constitution is not an unconditioned

authority to determine the constitutionality of legislative or executive acts" but, rather, is limited

to the resolution of "cases" and "controversies." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). An "essential and unchanging part" of that limitation is the doctrine of standing. *Lujan,* 504 U.S. at 560. "At an irreducible minimum, Article III requires the party who invokes the court's authority to show (1) that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that (2) the injury fairly can be traced to the challenged action, and (3) is likely to be redressed by a favorable decision." *Valley Forge*, 454 U.S. at 472 (internal citations omitted).

Most importantly here, constitutional standing requires an injury that is "concrete and particularized," and "actual or imminent," not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560; *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). A particularized injury is one that affects a plaintiff "in a personal and individual way." *Lujan*, 504 U.S. at 561 n.1; *see also Raines v. Byrd,* 521 U.S. 811, 819 (1997). Only a plaintiff so injured has "'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Beyond these constitutional requirements, a plaintiff must also satisfy certain prudential standing requirements, based on the principle that the judiciary should "avoid deciding questions of broad social import where no individual rights would be vindicated." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 804 (1985); *see also Warth*, 422 U.S. at 500. Prudential standing requires, *inter alia*, that a party "assert his own legal interests rather than those of third parties," *Shutts,* 472 U.S. at 804, and that a claim not be a "generalized grievance" shared in by all or a large class of citizens, *Warth,* 422 U.S. at 499. Prudential standing also addresses whether "the

constitutional or statutory provision on which [a plaintiff's] claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *See id.* at 499-500. Thus, the "source of the plaintiff's claim to relief" "assumes critical importance" with respect to prudential standing," *id.* at 498, 500, and a plaintiff must "demonstrate standing for *each claim* he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (emphasis added).

Standing requirements demand the "strictest adherence" when constitutional questions are presented and "when matters of great national significance are at stake." *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11 (2004). Plaintiffs here ask the Court to strike down an Act of Congress concerning a paramount public interest: the protection of national security through foreign intelligence surveillance. The Court cannot consider a matter of such sweeping constitutional implications unless plaintiffs clearly demonstrate they are suffering an imminent, direct, and personal injury. As explained below, they fail entirely to make any such showing.[13]

## B.    Plaintiffs' Alleged Injuries

Plaintiffs are attorneys and human-rights, labor, legal, and media organizations who allege that their work "requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, journalistic sources, witnesses, experts, foreign government officials, and victims of human rights abuses located outside the United States."

---

[13] Since the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, on summary judgment, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" establishing standing. *Id.* As explained below, plaintiffs' allegations are insufficient on their face to establish standing, and thus the affidavits they provide in support of these allegations fall short as well.

They all claim that, given "the scope of the challenged law," "the nature of their communications," and "the identities and geographic location" of the persons they communicate with, they "reasonably believe" that their communications will be "monitored" or "acquired, retained, analyzed, and disseminated" under the FAA. *See* Compl. ¶ 2, 44-45; Pls.' Br. 2, 11.

Plaintiffs specifically allege that they "communicate with people in countries and geographic regions that the [United States] is likely to target when conducting foreign intelligence surveillance of persons abroad, including regions that are the specific focus of the U.S. government's counterterrorism or diplomatic activities," and that some of these communications concern "foreign intelligence information" as FISA defines that term. *See* Compl. ¶¶ 47-48. "Because of the challenged law," plaintiffs claim they "will have to take burdensome and costly measures to minimize the chance that the confidentiality of their sensitive information will be compromised," including traveling long distances or in some circumstances foregoing particularly sensitive communications. *See id.* ¶¶ 48-49. As a result, plaintiffs claim, they "will be less able to gather information, represent their clients, and engage in domestic and international advocacy," because the FAA "reduces the likelihood" that their overseas contacts "will share sensitive information" with them. *Id.* ¶ 50. Accordingly, plaintiffs allege that the FAA "is inhibiting, and unless enjoined, will continue to inhibit" their constitutionally protected communications. *Id.* ¶ 51.[14]

---

[14] Each of the plaintiffs reiterates these cross-cutting allegations in the context of the particular mission and activity of that plaintiff. *See* Compl. ¶¶ 52-56 (Amnesty International); *id.* ¶¶ 57-61 (Global Fund for Women); *id.* ¶¶ 62-67 (Global Rights); *id.* ¶¶ 68-73 (Human Rights Watch); *id.* ¶¶ 74-77 (International Criminal Defence Attorneys Association); *id.* ¶¶ 78-83 *(The Nation* Magazine); *id.* ¶¶ 84-89 (PEN American Center); *id.* ¶¶ 90-93 (Service Employees International Union); *id.* ¶¶ 94-96 (Washington Office on Latin American ("WOLA")); *id.* ¶¶ 97-103 (plaintiff attorneys Arshack, Nevin, McKay, Royce). Only four of the plaintiffs present declarations in (continued…)

## C. Plaintiffs Lack Article III Standing to Pursue Any of Their Claims Because Their Allegations of Injury Rest on Speculation and Conjecture

In evaluating whether plaintiffs have Article III standing, it is first necessary to recognize what types of injury that plaintiffs are—and are not—alleging. Nowhere do plaintiffs allege, or attempt to show, that they actually have been subject to surveillance under the FAA. That is, plaintiffs do not allege a *direct* injury caused by any interception of their communications. Rather, plaintiffs allege that they "reasonably believe" it is "likely" they will be subject to surveillance based on their own "understanding" of how the Act operates and the "nature" of what they talk about with certain individuals overseas; and they allege that their professional activities have been harmed by actions plaintiffs aver that they have taken in fear of such surveillance, *viz.*, costly and burdensome travel in order to communicate securely. It should be plain that these allegations (and by the same token the evidence proffered by the plaintiffs to prove them) are not sufficient to support standing. Plaintiffs' allegations are riddled throughout with conjecture and speculation, which cannot form the basis of Article III standing. *See Lujan*, 504 U.S. at 560; *Whitmore*, 495 U.S. at 155; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

Plaintiffs first proffer their own "understanding" of how the Act operates—as permitting a "dragnet" surveillance on particular regions overseas. *See* Mariner Decl. ¶ 11; Walsh Decl. ¶ 3; Klein Decl. ¶ 5. They then note that they talk to people overseas on various topics—*e.g.*, human rights abuses, terrorism, drug interdiction policy in Latin America, and foreign labor poli-

---

support of their allegations of harm with their motion for summary judgment. *See* Mariner Decl. (Human Rights Watch); Walsh Decl. (WOLA); Klein Decl. (*The Nation*); Royce Decl. The other plaintiffs' failure to do so by itself requires the entry of summary judgment for defendants as against them. *See Lujan*, 504 U.S. at 561. Assuming these other plaintiffs were to present declarations attesting to the averments in the Complaint, however, their standing still would not be established for the reasons set forth herein.

cies—that they believe may constitute "foreign intelligence information" as defined by FISA[15] and, thus, engage in the kind of communications that may be subject to surveillance under the FAA. *See* Compl. ¶¶ 52-96; Mariner Decl. ¶¶ 4-9; Walsh Decl. ¶¶ 5-6, 8-11; Klein Decl. ¶¶ 3, 4, 6. Plaintiffs also speculate that the people with whom they communicate are of potential intelligence interest to the United States Government. *See* Walsh Decl. ¶ 5 (averring that the Government has a "motive" to intercept communications with individuals supportive of or hostile to the Chavez regime in Venezuela); *see also id* ¶ 11 (averring that Cubans opposed to U.S. embargo have greater fear of surveillance); *see* Royce Decl. ¶ 5 (averring that the Government has an interest in family of plaintiff's client); *see* Mariner Decl. ¶ 8 (averring that Government has targeted communicants in the past). Based on all the foregoing, plaintiffs allege that they face a "likelihood" or "risk" or "threat" of being subject to surveillance that "inhibits" or "hampers" their communications. *See* Mariner Decl. ¶¶ 8, 10, 11; Walsh Decl. ¶¶ 5, 10, 12; Klein Decl. ¶ 6; Royce Decl. ¶¶ 5, 7; *see also*, *e.g.*, Compl. ¶¶ 46, 50, 51, 56, 67, 82, 87, 96, 100. In sum, plaintiffs' allegations boil down to an assertion that they fear that their communications with persons abroad relating to U.S. foreign policy may be subject to surveillance under the Act, and that they are harmed by the steps they have decided to take to avoid that possibility.

Significantly, plaintiffs' alleged harms are based on their perception of how third parties overseas might react to the Act's potential impact on the confidentiality of their communications.

---

[15] *See* 50 U.S.C. § 1801(e) (defining "foreign intelligence information" to include, *inter alia*, information related to and, if concerning a United States person, necessary to, the ability of the United States to protect against an actual or potential attack, terrorism or sabotage by a foreign power or agents thereof, or clandestine intelligence activities of a foreign power or agent thereof, or information with respect to a foreign power or foreign territory that relates to and, if concerning a United States person, is necessary to, the national security of the United States or the conduct of the foreign affairs of the United States).

They assert that their overseas contacts will not share information "*if* they believe" it will be intercepted.   Mariner Decl. ¶ 10 (emphasis added); *see also* Walsh Decl. ¶¶ 11-12; Klein Decl. ¶¶ 8-9; Compl. ¶¶ 50, 56, 61, 67, 73, 82, 88, 93, 96.   Thus, plaintiffs' theory of harm rests not only on their own subjective fear, but also on the beliefs of people overseas whose communications may be inhibited if they even perceive that the Government may intercept them.[16]

The Supreme Court considered allegations similar to plaintiffs' in *Laird v. Tatum,* 408 U.S. 1 (1972), and rejected them as a basis for Article III standing.   The plaintiffs there challenged an Army surveillance program, which allegedly "exercise[d] a present inhibiting effect on their full expression and utilization of their First Amendment rights."   *Id.* at 10.   The Court framed the issue as "whether the jurisdiction of a federal court can be invoked by a complainant who alleges that the exercise of his First Amendment rights is chilled by the existence, without more, of a governmental investigative and data gathering activity."   *Id.*

The Court acknowledged prior cases finding that a constitutional violation may arise from the chilling effect of governmental regulation; but it explained that in none of those cases "did the chilling effect arise merely from the individual's knowledge that a government agency was engaged in certain activities."   *Id.* at 11.   Accordingly, the Court found that the plaintiffs lacked standing because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm[.]"   *Id.* at 13-14.   In the absence of a showing that the plaintiffs were chilled by "any specific action of the Army

---

[16] Plaintiffs do not actually offer the declarations of anyone located overseas, and their representations as to what such persons may have told them is inadmissible hearsay.   Moreover, plaintiffs' own testimony as to what such individuals may "believe" or "perceive" lacks any foundation.   But even assuming such averments about third-party statements or beliefs were admissible, they simply compound the conjectural basis for plaintiffs' standing.

*against them,*" *id.* at 3 (emphasis added), the Court refused to grant the plaintiffs what they effec-

tively sought through the litigation: "a broad-scale investigation, conducted by themselves as

private parties armed with the subpoena power of a federal district court and the power of cross-

examination, to probe into the Army's intelligence-gathering activities," with the district court

ultimately determining, in an advisory fashion, the appropriateness of those activities. *Id.* at

14.[17]

Other courts have followed *Laird* in similarly holding that plaintiffs cannot challenge

surveillance activities based merely on the fear that they will be selected for surveillance.[18]

Thus, in *Halkin v. Helms,* 690 F.2d 977 (D.C. Cir. 1982), various individuals and organizations

alleged that they were subject to unlawful surveillance by the NSA and CIA (and other agencies)

---

[17] *See also Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997) (rejecting standing under *Laird* based on chill injury for alleged threat of discipline against review board members where no evidence plaintiffs were directed to change findings or recommendations); *Bordell v. General Elec. Co*., 922 F.2d 1057, 1060-61 (2d Cir. 1991) (rejecting standing under *Laird* where employees of atomic power lab sought to challenge alleged chilling effect of policy against disclosure of sensitive information absent any evidence of immediate threat of application); *Fifth Ave. Peace Parade Comm.* v. *Gray,* 480 F.2d 326, 330-33 (2d Cir. 1973) (rejecting, under *Laird,* claim that anti-war demonstrators' free-speech rights were chilled by FBI investigation into the demonstration, given that plaintiffs could not show specific misuse of any information the FBI might have obtained about them).

[18] Where courts have held that standing was not foreclosed by *Laird*, the plaintiff was *in fact* the target of a Governmental action, investigation, or surveillance. *See*, *e.g.*, *Latino Officers Association v. Safir*, 170 F.3d 167, 170-71 (2d Cir. 1999) (NYPD policy had been applied to deny officer permission to speak publicly); *Levin v. Harelston*, 966 F.2d 85, 88-89 (2d Cir. 1992) (college had established committee to investigate professor's teaching ability); *Davis v. Village Park II Realty Co*., 578 F.2d 461, 462-63 (2d Cir.1978) (plaintiff was subject to eviction from public housing after advocacy in support of tenant association); *Mazza v. Hendrick Hudson Central School*, 942 F. Supp. 187, 190-93 (S.D. N.Y. 1996) (school district had sought and obtained an injunction against plaintiffs for speaking in support of school principal); *Mason v. Ward*, 1991 WL 143713, *2, 6-7 (S.D.N.Y. 1991) (community activists found to have standing under *Laird* to challenge alleged unlawful surveillance where NYPD had monitored and taped comments they made on talk radio program).

due to their opposition to the Vietnam War. They argued that Executive Orders authorizing intelligence surveillance programs rendered them "likely targets of surveillance," because they were "engaged in political activities [in] opposition to current United States foreign policies" and were "in contact with foreign organizations and individuals." 690 F.2d at 1002 n.89. The plaintiffs further alleged that they were "deterred" by the Executive Orders from "continuing such lawful activity." *Id.* The D.C. Circuit rejected the case on standing grounds, holding that it was "squarely controlled" by *Laird. Id.* at 1002.

A similar challenge was rejected in *United Presbyterian Church v. Reagan,* 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.). There, plaintiffs sought to enjoin implementation of Executive Orders authorizing surveillance activities overseas partly on the ground that the threat of surveillance was inhibiting their protected activities. *See id.* at 1377. The court held that *Laird* precluded this argument as a basis for standing, noting that cases employing the concept of a chilling effect "involve situations in which the plaintiff has unquestionably suffered some concrete harm (past or immediately threatened) apart from the 'chill' itself." *Id.* at 1378 (citations omitted). As the court elaborated, while a "'[c]hilling effect' [may be] cited as the *reason* why [a] governmental imposition is invalid" *on the merits*, it does not qualify under *Laird* "as the *harm* which entitles the plaintiff to challenge" the Government's action. *Id.* at 1378.

The court in *United Presbyterian* also found plaintiffs' fears of surveillance to be speculative. *See* 738 F.2d at 1380. The plaintiffs alleged that they were more likely than the populace at large to be subject to surveillance under the challenged Executive Order because they had been subjected to surveillance in the past and "their activities [were] such that they [were] especially likely to be targets"—citing, as an example of the latter point, their "considerable foreign

travel and contact with foreigners." *Id.*  But the court held:

> Even if it were conceded that these factors place the plaintiffs at greater risk than the public at large, that would still fall far short of the "genuine threat" required to support this theory of standing, . . . as opposed to mere "speculative" harm . . . .  It must be borne in mind that this order does not direct intelligence-gathering activities against all persons who could conceivably come within its scope, but merely authorizes them.

*Id.*

Most recently, in *ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007), concerning a challenge to the Terrorist Surveillance Program, the Sixth Circuit considered allegations of injury virtually identical to those at bar, and found them insufficient to establish standing.  The plaintiffs in *ACLU* included "journalists, academics, and lawyers who regularly communicate with individuals located overseas" who, the plaintiffs alleged, "are the types of people the NSA suspects of being al Qaeda terrorists, affiliates, or supporters, and are therefore likely to be monitored under the TSP."  *See id.* at 644 (Batchelder, J.).  On this basis, the *ACLU* plaintiffs alleged a "well founded belief" that their communications were being tapped.  *See id.*  As in this case, the main injury alleged by the *ACLU* plaintiffs was their "inability to communicate with their overseas contacts by telephone or email," resulting from "(1) their subjective belief that the NSA might be intercepting their communications, and (2) the ethical requirements governing such circumstances, as dictated by their respective professional organizations or affiliations."  *Id.* at 653-54.  And, again as in this case, the *ACLU* plaintiffs alleged that this injury "manifests itself in both a quantifiable way (as the added time and expense of traveling overseas) and a non-quantifiable way (as the incomplete or substandard performance of their professional responsibilities and obligations)."  *Id.* at 654.

Both judges in the majority in *ACLU* rejected plaintiffs' standing theory.[19]  The court found that the implicit "premise upon which the plaintiffs' entire theory is built" was a "possibility" that the *ACLU* plaintiffs sought to label a "'well founded belief' and . . . to treat as a probability or even a certainty."  *Id.* at 655.  That "possibility" was "that the NSA is presently intercepting, or will eventually intercept, communications to or from one or more of these particular plaintiffs, and that such interception would be detrimental to the plaintiffs' clients, sources, or overseas contacts."  *Id.* at 655.  But the court observed that "the alternative possibility remains that the NSA might not be intercepting, and might never actually intercept" any of the plaintiffs' communications.  *Id.* at 655-56.  The court thus held that plaintiffs' "anticipated harm is neither imminent nor concrete—it is hypothetical, conjectural, or speculative" and therefore "cannot satisfy the 'injury in fact' requirement of standing.  *Id.*; *see also id.* at 689-90 (Gibbons, J.).[20]

After that threshold analysis, the court went on to examine each of the *ACLU* plaintiffs' claims, *see id.* at 658 (Batchelder, J.), and concluded that plaintiffs' alleged First Amendment "chill" constituted a "self-imposed unwillingness to communicate" that cannot establish standing

---

[19]  Judges Batchelder and Gibbons, in concurring opinions, both held for similar reasons that plaintiffs lacked standing, each analyzing the issue separately.  Both opinions are cited below.

[20]  The court in *ACLU* noted that, while a plaintiff may in some circumstances establish standing before a defendant has acted, only a "genuine threat" of enforcement of a policy against a plaintiff who is demonstrably subject to that policy supports standing.  *See ACLU*, 493 F.3d at 688 n.1 (Gibbons, J.) (citing *Steffel v. Thompson*, 415 U.S. 452, 475, (1974)); *see also Vermont Right to Life Committee v. Sorrell*, 381-82 (2d Cir. 2000) (plaintiff seeking to bring pre-enforcement facial challenge may have standing where he can demonstrate that his conduct is proscribed by a statute and there exists a credible threat of prosecution); *see also Gaston v. Gavin,* 1998 WL 7217 (S.D.N.Y.) (Koeltl, J.), *aff'd,* 172 F.3d 37 (2d Cir. 1998) (to establish constitutional violation, allegations of a subjective chill are not the equivalent of an actual or threatened harm and a plaintiff "must show both that a government investigation discouraged him from exercising his First Amendment rights and that he suffered a concrete and demonstrable injury as a result").  Plaintiffs' speculation about the possibility of surveillance plainly fails to meet this standard.

under *Laird*, *see id.* at 659-673.  Moreover, to the extent the alleged "chill" was based on the independent action of some third party not before the court, the court noted that the plaintiffs would have the burden of showing that the third parties' choices "'have been or will be made in such a manner as to produce causation and permit redressability of injury.'"  *See id.* at 666-67 (quoting *Lujan,* 504 U.S. at 562).  The court observed that independent third-party action disrupts the causal connection between the challenged surveillance and plaintiffs' alleged injury.  *See id.* at 669-70 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-43 (1976)).[21]

The *ACLU* court also found a more fundamental defect in the plaintiffs' theory: the plaintiffs could not legitimately claim that their communications were chilled by the Government's alleged use of one form of surveillance (warrantless) to spy on them versus another (authorized by a warrant).  As the court observed:

> A wiretap is always "secret"—that is its very purpose—and because of this secrecy, neither the plaintiffs nor their overseas contacts would know, with or without a warrant, whether their communications were being tapped.  Therefore, the NSA's secret possession of a warrant would have no more effect on the subjective willingness or unwillingness of these parties to "freely engage in conversations and correspond via email" . . . than would the secret absence of that warrant.

*Id.* at 667.  Noting that the harms alleged by the plaintiffs "would arise whenever, and continue so long as, the plaintiffs believe their contacts to be the types of people likely to be monitored by the NSA," *id.* at 668-69, the court found that "[a]s a practical matter, the mere issuance of a warrant would not alleviate either the plaintiffs' or the contacts' fears of interception."  *Id.* at 673.  Thus, the specific possibility of *warrantless* wiretapping, on which plaintiffs' standing theory

---

[21]  Judge Batchelder also noted that the record in *ACLU* (as here) "contains no testimony, by affidavit or otherwise, from any of the overseas contacts themselves as to the cause of their refusal to communicate; it contains only the plaintiffs' self-serving assertions and affidavits."  *Id.* at 670.

rested, was insufficient to establish causation for their alleged injuries, and the relief they sought (enjoining such wiretapping) was insufficient to redress those injuries. *See id.* at 667-673.[22]

The *ACLU* court's standing analysis applies in its entirety to this case. The "chill" injury alleged by plaintiffs here is just as speculative and dependent on the independent action of third parties as the injury alleged in *ACLU*. Likewise, this injury is not fairly traceable to surveillance *in the form authorized by § 1881a*, nor would it be redressed by the relief sought (enjoining such surveillance). To the extent that plaintiffs fear that the Government has an interest in surveilling their communications with overseas contacts, the Government has any number of means available to undertake such surveillance—including surveillance conducted under § 1881a, but also surveillance pursuant to a traditional FISA order, or surveillance conducted outside the United States and thus not subject to the FISA at all. Moreover, plaintiffs' overseas contacts may be subject to surveillance by foreign governments in any event. Hence, surveillance under § 1881a is not the only manner in which plaintiffs' communications could be acquired, and plaintiffs therefore lack any basis to contend that their fear of surveillance results from the provision.

**D.  Plaintiffs Lack Standing For Additional Reasons Specifically Relating to Their Fourth Amendment and Separation of Powers Claims**

As noted above, litigants must not only meet the general requirements for Article III standing but must also show that they are entitled to relief under the particular statutory or con-

---

[22] As noted throughout the *ACLU* decision, the plaintiffs could not actually *prove* whether they were subject to surveillance due to the Government's assertion of the state secrets privilege as to that information as well as the operational details of the TSP. *See id.* at 650, 655, 673 n. 32, 675 n.33 (Batchelder, J.) & 692-93 (Gibbons, J.). The Government's privilege assertion was upheld by the district court and not challenged on appeal. *See id.* at 650-51, n.3 (Gibbons, J.). The Government has not asserted the state secrets privilege here because plaintiffs' allegations of harm fail to satisfy Article III requirements on their face. To the extent classified information concerning the operation of surveillance under the FAA did become an issue in this case or necessary to its resolution, the Government reserves the right to assert the privilege at such time.

stitutional right invoked.  Here, beyond the foregoing defects in their injury allegations, which cut across their various claims, there are additional reasons why plaintiffs cannot establish standing specifically as to their Fourth Amendment and separation of powers claims.

Fourth Amendment rights are "personal rights" that may not be asserted vicariously.  *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978); *see also ACLU*, 493 F.3d at 673.  In *Rakas*, the Court rejected the theory that a defendant could have standing to challenge a governmental action under the Fourth Amendment "without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that *particular* defendant."  439 U.S. at 133-34.  The Court "reaffirmed the principle that the rights assured by the Fourth Amendment are personal rights, which may be enforced [ ] only at the instance of one whose own protection was infringed by the search and seizure. . . ."  *Id.* at 138-39[23]; *see also Alderman v. United States*, 394 U.S. 165, 171-75 (1969) (only a person "aggrieved" by an unlawful search or seizure has standing to challenge a search as in violation of the Fourth Amendment); *Goldstein v. United States*, 316 U.S. 114, 121 (1942) (stating that "federal courts in numerous cases have denied standing to one not the victim of an unconstitutional search and seizure to object to the introduction of evidence of that which was seized").

Plaintiffs allege that the FAA violates their rights under the Fourth Amendment for a host of reasons, including that it authorizes surveillance in violation of the Fourth Amendment's warrant clause and reasonableness requirements.  *See* Pls.' Br. 15-43.  But such allegations would require plaintiffs to show that their own Fourth Amendment rights have been violated by a war-

---

[23]  The Court in *Rakas* decided the issue as a matter of the merits of a Fourth Amendment claim, rather than as a matter of standing, but noted that the "inquiry under either approach is the same" and involved "invariably intertwined concept[s]."  *See* 439 U.S. at 138-39.

rantless search that was unreasonable under the circumstances, and plaintiffs have not even alleged that *any* surveillance has actually occurred. Plaintiffs seek simply to have the court issue an advisory opinion as to the Fourth Amendment issues raised by the FAA without regard to whether there is an actual case or controversy regarding the plaintiffs in this case. In *ACLU*, plaintiffs conceded that "it would be unprecedented for this court to find standing for plaintiffs to litigate a Fourth Amendment cause of action without any evidence that the plaintiffs themselves have been subjected to an illegal search or seizure." *See id.* at 655 n. 11 & 673. It would be equally unprecedented to do so here, and wholly inconsistent with standing principles.

Plaintiffs also lack standing specifically as to their separation of powers claim. A plaintiff who raises a separation of powers claim must establish that he has been subject to the conduct alleged to violate this doctrine. *See INS v. Chada*, 462 U.S. 919, 936 (1983); *Buckley v. Valeo*, 424 U.S. 1, 117 (1976); *see also ACLU*, 493 F.3d at 674. Here, plaintiffs' alleged harms cannot be traced to the FAA provisions that they challenge on separation of powers grounds, which concern the nature of the FISC's role in approving targeting and minimization procedures. *See* Pls.' Br. 48-53. There is simply nothing about the court's *role* in approving targeting procedures that would cause plaintiffs' alleged injuries—which are alleged to result from the surveillance authority granted by § 1881a itself. Indeed, the FISC's approval of minimization procedures would actually serve to *protect* individuals such as the plaintiffs if they were subject to surveillance in an acquisition authorized under the provision. The fact that the approval of such procedures is not tied to an individual targeting order is an objection to the breadth of the surveil-

lance authority granted by § 1881a, and is not fairly traceable to the FISC's role in the process.[24]

Plaintiffs' separation of powers claim is thus purely a generalized policy grievance with no connection to their alleged personal injuries. *See Allen v.* Wright, 468 U.S. 737, 751 (1984) (generalized grievances as to policy must be addressed in the representative branches of government).

## POINT II

### PLAINTIFFS' CHALLENGE FAILS ON THE MERITS

Because plaintiffs lack standing as to any of their claims, the Court should not reach the merits of the case. However, in the event that the Court were to find that plaintiffs have standing, the Court should uphold § 1881a in all respects.

Given that plaintiffs challenge § 1881a on its face, "they bear a heavy burden of persuasion." *Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1621 (2008). "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications. *Wash. State Grange v. Wash. State Republican Party*, 1289 S. Ct. 1184, 1190 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). A court evaluating such a challenge therefore "must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Id.* Such restraint "'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy.'" *Id.* (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

---

[24] Nor can plaintiffs' alleged harms be traced to the fact that § 1881a allows an acquisition to continue pending appeal of an adverse determination by the FISC, *see* Pls.' Br. 51-53. It is purely speculative whether plaintiffs are being subjected to surveillance under such circumstances, and, in any event, judicial review of the matter would be ongoing if they were.

Plaintiffs have not met their burden here. The statute on its face does not violate the Fourth Amendment, First Amendment, or Article III of the Constitution. Accordingly, plaintiffs' challenge to the statute should be rejected in its entirety.

## A.  Section 1881a Does Not Violate the Fourth Amendment

The Fourth Amendment forbids "unreasonable searches and seizures" and further requires that any search warrant be supported by "probable cause." U.S. Const. amend. IV. "[A]lthough both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, . . . in certain limited circumstances neither is required." *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985) (internal quotation marks omitted). Indeed, "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion is an indispensable component of reasonableness in every circumstance." *Nat'l Treas. Employees Union v. Von Raab*, 489 U.S. 656, 665 (1989). Rather, the "underlying command of the Fourth Amendment is always that searches and seizures be reasonable," and "what is reasonable depends on the context within which a search takes place." *T.L.O.* at 337.

As explained below, § 1881a is reasonable in all respects. Because § 1881a acquisitions must be targeted exclusively at non-U.S. persons abroad, who lack Fourth Amendment rights, the only constitutionally protected privacy interests implicated by the statute are those of U.S. persons whose communications are collected as an incident to surveillance targeted at others. A warrant requirement is neither necessary nor appropriate to protect those interests. Indeed, the warrant requirement does not even apply to foreign-intelligence gathering as a general matter. The interests of U.S. persons are instead properly protected by the statute through its requirement of FISC-approved targeting and minimization procedures and multiple layers of congressional, judicial, and internal oversight.

1.      *Section 1881a Does Not Violate the Fourth Amendment's Warrant Clause*

a.      *The Warrant Clause Does Not Apply to Surveillance Targeted at Foreign Persons Abroad*

Plaintiffs' argument that § 1881a violates the warrant clause fails, first, for the simple reason that § 1881a acquisitions may target only non-U.S. persons located outside the United States—who lack Fourth Amendment rights altogether. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (holding that only persons who "have come within the territory of the United States and developed substantial connections" to the country have Fourth Amendment rights). Notwithstanding plaintiffs' charge that § 1881a "invests government officers with precisely the powers that the Fourth Amendment was meant to extinguish," Pls.' Br. 17, the Supreme Court specifically remarked in *Verdugo-Urquidez* that "[t]here is . . . no indication that the Fourth Amendment was understood by contemporaries of the Framers to apply to activities of the United States directed against aliens in foreign territory." *Id.* at 267. Because the Fourth Amendment does not protect such persons in the first instance, perforce it does not prevent the Government from subjecting them to surveillance without a warrant.

Plaintiffs are all U.S. persons and do not purport to bring claims on behalf of foreign persons abroad. Yet, they fail to grapple seriously with the fact that, as U.S. persons, they may not permissibly be targeted for surveillance under § 1881a. Instead, they insinuate throughout their brief that § 1881a can and will be used to target U.S. persons despite its terms. For example, they allege that, under § 1881a, the government can engage "in the wholesale collection of *Americans'* international communications" so long as "the government's *ostensible* targets are foreign citizens outside the United States." *Id.* at 28 (second emphasis added); *see also id.* at 2 (stating that "under the new law the executive branch could acquire *all* of the international com-

munications of U.S. citizens and residents *on the theory* that the surveillance is directed at collecting foreign intelligence information and targeted at people outside the United States") (second emphasis added).  Similarly, they allege that the Government could use § 1881a as a "roving commission to 'seize' any and all conversations" between Americans and persons abroad, *id.* at 33 (quoting *Berger v. New York*, 388 U.S. 41, 49 (1967)), by conducting "mass acquisitions" against "targets" encompassing entire geopolitical regions, *id.* at 27-28.  Plaintiffs go so far as to compare § 1881a acquisitions to "'general warrants and writs of assistance that English judges had employed *against the colonists*.'" Pls.' Br. 15 (emphasis added).

The thinly veiled premise of these assertions is that § 1881a will be used to "reverse target" persons in the United States—even though the statute expressly forbids such a practice. Section 1881a specifically provides that an acquisition authorized under the provision "may not intentionally target a person reasonably believed to be located outside the United States if the purpose of such acquisition is to target a particular, known person reasonably believed to be in the United States." § 1881a(b)(2).  In other words, the Government may not surveil "ostensible" targets abroad as a pretext for surveilling actual targets in the United States.  *See* S. Rep. 110-209 at 16; *see also* 5/1/07 FISA Modernization Hrg. at 20 (statement of DNI McConnell) ("[I]f the real target is in the United States, the intelligence community would and should be required to seek approval from the FISA Court in order undertake such electronic surveillance.").  Further, additional provisions of the FAA (which plaintiffs entirely ignore) categorically prohibit the targeting of U.S. persons for foreign intelligence purposes anywhere—even if located outside the United States—without an individualized FISC order based on probable cause, where there is a reasonable expectation of privacy and a warrant would be required for law enforcement purpos-

es.  § 1881c(a)(2).[25]

Nor is the Government left to self-regulate in this regard; for § 1881a provides that any acquisition under the statute must be conducted in accordance with targeting procedures *found by the FISC* to be reasonably designed to ensure that the acquisition "is limited to targeting persons reasonably believed to be located outside the United States."  § 1881a(i)(2)(B).  The Government must also develop guidelines, submitted to both the FISC and congressional oversight committees, to use in training intelligence personnel on how to comply with the statute's targeting restrictions.  § 1881(f).  And the statute provides for continuing oversight by the FISC, the judiciary and intelligence committees of both houses of Congress, and the inspectors general of the Department of Justice and each element of the intelligence community, of the Government's compliance with approved targeting procedures and its use of any information concerning U.S. persons collected through § 1881a acquisitions.  § 1881a(l).

Thus, plaintiffs have no basis to presume that the targeting limitations of § 1881a will be ignored or that the statute will otherwise be abused as a means of surveilling U.S. persons.  To the contrary, the Government is presumed to follow the law.  *USPS v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies.").  Likewise, plaintiffs cannot rely on sheer speculation that indiscriminate targeting procedures will be

---

[25] Not only is "reverse targeting" illegal under the FAA, but it would also be an unwieldy means of gathering intelligence about a U.S. person, since only the person's communications with a foreign target abroad could be intercepted.  *See Foreign Intelligence Surveillance Act and Implementation of the Protect America Act: Hearing before the S. Comm. on the Judiciary*, 110th Cong., 1st Sess. (Sep. 25, 2007) (statement of DNI McConnell), *available at* http://www.dni.gov/testimonies_2.htm ("9/25/07 DNI Statement"), at 13 ("[F]or operational reasons, the Intelligence Community has little incentive to engage in reverse targeting.  If a foreign intelligence target who poses a threat is located within the United States, then we would want to investigate that person more fully.  In this case, reverse targeting would be an ineffective technique . . . .").

used by the Government—let alone approved by the FISC—for § 1881a acquisitions. Having chosen to challenge § 1881a on its face, plaintiffs must do more than raise the hypothetical possibility that it could be implemented in an unconstitutional manner. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 660 (1995) ("[W]hen respondents choose, in effect, to challenge [a government search program] on its face, we will not assume the worst."); *United States v. Posey*, 864 F.2d 1487, 1491 (9th Cir. 1989) (rejecting litigant's attempt to challenge lawfulness of surveillance conducted under FISA on basis that "*some possible applications* of the FISA might violate the Fourth Amendment") (emphasis in original); *United States v. Duggan*, 743 F.2d 59, 71 (2d Cir. 1984) (same).

Rather, plaintiffs must presume that the statute will function as intended and that it will be used only to target non-U.S. persons abroad. Accordingly, plaintiffs may only claim to face the risk that their communications will be collected *incidentally* under § 1881a, in the course of surveillance targeted at non-U.S. persons abroad with whom they are in contact. That risk alone, however, does not trigger the Fourth Amendment's warrant requirement.

It is well settled that the "incidental interception of a person's conversations during an otherwise lawful surveillance is not violative of the Fourth Amendment." *United States v. Bin Laden*, 126 F. Supp. 2d 264, 280 (S.D.N.Y. 2000) (citing *United States v. Kahn*, 415 U.S. 143, 157 (1974) (interception of wife's communications incident to lawful wiretap targeting husband's communications did not violate the Fourth Amendment); *United States v. Figueroa*, 757 F.2d 466, 472-73 (2d Cir. 1985); *United States v. Tortorello*, 480 F.2d 764, 775 (2d Cir. 1973) (once relevant authority is established for surveilling one participant in a conversation, "the

statements of other participants may be intercepted if pertinent to the investigation").[26]  It is likewise well settled that warrantless surveillance of non-U.S. persons abroad is "otherwise lawful"—given that such persons lack Fourth Amendment rights under *Verdugo-Urquidez*.  Accordingly, it follows that warrantless surveillance of non-U.S. persons abroad is not rendered unlawful if the surveillance incidentally captures the communications of non-targeted persons in the United States.  *See Bin Laden*, 126 F. Supp. 2d at 281 (holding that "the combination of *Verdugo-Urquidez* and the incidental interception cases" implies that a U.S. person's communications may be collected as an incident to warrantless surveillance of an alien abroad, so long as the U.S. person is not a "known and contemplated" surveillance target).[27]

Plaintiffs' contrary position not only is unsupported by case law but would subject the Government to an impossible standard and call into question decades of foreign-intelligence gathering.  Prior to initiating surveillance of an overseas target, the Government cannot be expected to know the identity of everyone with whom the target will communicate; there is virtually always the *possibility* that a foreign target may communicate with a U.S. person.  *See* 9/25/07 DNI Statement at 12 ("[A]n analyst cannot know, in many cases, prior to requesting legal authority to

---

[26] *Accord, e.g.*, *United States v. Domme, Jr.*, 753 F.2d 950, 954 n.2 (11th Cir. 1985); *United States v. Martin*, 599 F.2d 880, 884-85 (9th Cir. 1979), *overruled on other grounds by United States v. DeBright*, 730 F.2d 1255 (9th Cir. 1984) (en banc); *United States v. Butenko*, 494 F.2d 593, 608 (3d Cir. 1974); *United States v. Pappas*, 298 F. Supp. 2d 250, 254 n.4 (D. Conn. 2004); *United States v. Trippe*, 171 F. Supp. 2d 230, 235 (S.D.N.Y. 2001); *United States v. Ambrosio*, 898 F. Supp. 177, 183-85 (S.D.N.Y. 1995); *United States v. Marcy*, 777 F. Supp. 1400, 1402 (N.D. Ill. 1991); *United States v. Rodriguez*, 606 F. Supp. 1363, 1370 (D. Mass.1985).

[27] Analogously, in the context of a warrantless physical search, an officer may sieze items within plain view, as long as a warrant is not required to gain access to the search area in the first place. *E.g., Horton v. California*, 496 U.S. 128, 135 (1990).  Thus, a warrantless physical search of a non-U.S. person's residence abroad—precisely the fact pattern upheld as constitutional in *Verdugo-Urquidez*—would not be rendered unconstitutional merely by the incidental discovery of communications with U.S. persons among the alien's papers.

target a particular foreign intelligence target abroad, with whom that person will communicate . . . . [and thus cannot know] that the communications that would be collected would be exclusively between persons located outside the United States."); *Bin Laden*, 126 F. Supp. 2d at 280 ("[T]he government is often not in a position of omniscience regarding who or what a particular surveillance will record . . . ."). Hence, requiring the Government to obtain a warrant based on the mere possibility of contact with U.S. persons would effectively mean that all surveillance of foreign targets abroad would presumptively require a warrant—even though the communications of such targets are "frequently . . . with another person located overseas." 9/25/07 DNI Statement at 7. Such a regime would create an unprecedented intrusion into the Government's surveillance of targets abroad and seriously degrade its ability to protect against foreign threats.[28]

None of this is to deny that U.S. persons may have constitutionally protected privacy interests in their communications where incidentally intercepted in a § 1881a acquisition. But where they do, those interests are protected under the statute *ex post*, through minimization procedures. *See see infra* at 51-53; *see also* 154 Cong. Rec. S6097, S6119 (Jun. 25, 2008) (statement of Sen. Feinstein) ("If an American's communication is incidentally caught up in electronic surveillance while the Government is targeting someone else, minimization protects that person's private information."). It makes no sense to require those interests also to be protected *ex ante*

---

[28] *See Warrantless Surveillance and The Foreign Intelligence Surveillance Act: Hearing before the H. Judiciary Comm. (Part II)*, 110th Cong., 1st Sess., at 8 (2007) (statement of Rep. Forbes) ("To require a court order for every instance in which a foreign target communicates with someone inside the United States is to require a court order for every foreign target, and requiring this would reverse 30 years of established intelligence gathering . . . . The intelligence community cannot possibly know ahead of time who these terrorists will talk to. It needs to have the flexibility to monitor calls that may occur between a foreign terrorist and a person inside the United States.").

through a warrant requirement, given the Government cannot know whether a particular § 1881a acquisition will implicate such interests until the surveillance actually takes place. *Cf. U.S. v. Bankston,* 182 F.3d 296, 308 (5th Cir. 1999), *rev'd in part on other grounds*, *Cleveland v. United States*, 531 U.S. 12 (2000) ("Requiring probable cause that [an incidentally intercepted] communication itself concerns criminal activity . . . . would require that agents be gifted with prescience and the ability to know in advance what direction the conversation will take.") (internal quotation marks omitted). For this reason alone, plaintiffs' argument that § 1881a violates the Fourth Amendment's warrant requirement fails.

> ### b. The Warrant Clause Does Not Apply to Surveillance Conducted for Foreign Intelligence Purposes

Although the Court need not reach the issue, a second and independent reason why § 1881a does not violate the warrant clause is that there is an exception to the warrant requirement for foreign intelligence-gathering—even where directed at persons *inside* the United States. *A fortiori*, that exception applies to the surveillance authorized by § 1881a, which is exclusively directed at persons outside the United States.

The Supreme Court has recognized exceptions to the Fourth Amendment's warrant requirement "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (internal citations omitted); *see also Vernonia Sch. Dist. 47J*, 515 U.S. at 653.[29] In evaluating

---

[29] This doctrine originated in the Second Circuit in *United States v. Edwards*, 498 F.2d 496 (2d Cir. 1974), which upheld warrantless searches of carry-on baggage at airports, based on the court's finding that the searches did not serve "as a general means for enforcing the criminal laws" but rather were intended to "prevent airplane hijacking" by "terrorists." *Id.* at 500-501. The "reasoning [in *Edwards*] came to be known as the 'special needs exception' roughly one decade later." *MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006).

whether the "special needs" doctrine applies, the Supreme Court has distinguished between searches designed to uncover evidence of "ordinary criminal wrongdoing" and those motivated "at [a] programmatic level" by other governmental objectives. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37-40, 48 (2001) (reviewing cases). Accordingly, the Supreme Court has permitted, *inter alia*, warrantless stops of motorists at roadblocks for the purpose of securing the border, *see United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), warrantless searches of the homes of probationers to ensure compliance with probation conditions, *see Griffin*, 483 U.S. at 872, and warrantless searches of public school students to enforce school rules, *see T.L.O.*, 469 U.S. at 340.[30]

Foreign intelligence-gathering clearly serves a purpose "beyond the normal need for law enforcement." *Griffin*, 483 U.S. at 873. As the FISA Court of Review has specifically held, the Government's "programmatic purpose" in obtaining foreign intelligence information is "to protect the nation against terrorist and espionage threats directed by foreign powers—'a special need' that fundamentally differs from 'ordinary crime control.'" *In re Sealed Case*, 310 F.3d at 717. The Second Circuit has reached similar holdings in the context of physical searches conducted for analogous purposes. *See Cassidy v. Chertoff*, 471 F.3d 67, 82 (2d Cir. 2006) (upholding warrantless searches of ferry passengers: "Preventing or deterring large-scale terrorist attacks

---

[30] Contrary to plaintiffs' representation that the "special needs" doctrine is "limited to contexts in which the search is minimally intrusive and the discretion of executive officers is strictly confined," Pls.' Br. 21 n.6, there is no such limitation on the doctrine. *Cf. MacWade*, 460 F.2d at 269 ("[T]he Supreme Court never has implied – much less actually held – that a reduced privacy expectation is a *sine qua non* of special needs analysis."). While considerations of intrusiveness and executive discretion may be relevant to the reasonableness of a government search program designed to serve a "special need," neither is relevant to whether the "special needs" doctrine applies at the threshold, as an exception to the warrant clause. *See id.* at 268-69 (addressing such factors under the rubric of "reasonableness," separately from the threshold question whether searches serve a "special need" distinct from ordinary law enforcement).

present problems that are distinct from standard law enforcement needs and indeed go well beyond them."); *MacWade*, 460 F.3d at 271 (upholding warrantless searches of subway passengers: "[P]reventing a terrorist from bombing the subways constitutes a special need that is distinct from ordinary *post hoc* criminal investigation.").

Equally clearly, "the imposition of a warrant requirement [would] be a disproportionate and perhaps even disabling burden" on the Government's ability to conduct foreign intelligence surveillance. *Bin Laden*, 126 F. Supp. 2d at 273. As the Fourth Circuit has explained, "attempts to counter foreign threats to the national security require utmost stealth, speed, and secrecy." *United States v. Truong Dinh Hung*, 629 F.2d 908, 913 (4th Cir. 1980) ("*Truong*"). Accordingly, "a warrant requirement would add a procedural hurdle that would reduce the flexibility of executive foreign intelligence initiatives, in some cases delay executive response to foreign intelligence threats, and increase the chance of leaks regarding sensitive executive operations." *Id.*

It is thus unsurprising that every court of appeals to decide the question has held that the Government is *not* required, under the Fourth Amendment, to obtain a judicial warrant before conducting a foreign intelligence search. *See In re Sealed Case*, 310 F.3d at 742; *Truong*, 629 F.2d at 912-13; *United States v. Buck*, 548 F.2d 871, 875 (9th Cir. 1977); *Butenko*, 494 F.2d at 605; *United States v. Brown*, 484 F.2d 418, 426 (5th Cir. 1973); *see also Duggan*, 743 F.2d at 72 (commenting on the broad agreement among the circuit courts).[31] Significantly, all of these cas-

---

[31] Although most of these cases were decided before the formal development of the "special needs" doctrine, they rest on the same concerns underpinning the doctrine. *See, e.g.*, *Truong*, 629 F.2d at 914 (rejecting warrant requirement in light of Government's special need for flexibility and agility in conducting foreign surveillance)*; Butenko*, 494 F.2d at 605 (rejecting warrant requirement because, unlike ordinary law enforcement, "foreign intelligence gathering is a clandestine and highly unstructured activity," and warrant requirement "would seriously fetter the Executive in the performance of his foreign affairs duties").

es concerned the collection of foreign intelligence information from persons *inside the United States*.  Thus, their holdings apply with even greater force to § 1881a acquisitions, which may only target persons reasonably believed to be *outside* the United States.  *See Bin Laden*, 126 F. Supp. 2d at 277.  This is not to suggest that these cases imply that U.S. persons inside the United States may be targeted for foreign intelligence surveillance in the same fashion that non-U.S. persons overseas may be targeted for surveillance under § 1881a—*i.e.*, without some form of individualized suspicion and related safeguards.  To the contrary, the demands of Fourth Amendment reasonableness differ depending on context.  But to the extent that the foregoing cases hold that the Fourth Amendment does not specifically require a *warrant* for foreign intelligence surveillance of persons inside the United States, then they clearly imply that the Fourth Amendment does not require a warrant for foreign intelligence surveillance directed at persons outside the United States either.

The Supreme Court's decision in *United States v. United States District Court*, 407 U.S. 297 (1972) ("*Keith*"), on which plaintiffs place great weight, *see* Pls.' Br. 21-26, is not to the contrary.  The Court held in *Keith* that *domestic* intelligence surveillance requires a warrant; but the Court took pains to emphasize that its holding was not intended to carry over to *foreign* intelligence surveillance.  407 U.S. at 308, 321-22 & n.20; *see also, e.g.*, *In re Sealed Case*, 310 F.3d at 737 (noting that *Keith* "explicitly declined to consider foreign intelligence surveillance").

Plaintiffs' make a perfunctory argument that *Keith* by its terms applies to § 1881a acquisitions because the acquisitions are physically "effected inside the United States."  Pls.' Br. 23.  But this argument misunderstands the meaning of "domestic" intelligence surveillance.  Such surveillance is defined by the nature of the surveillance target, *see Keith*, 407 U.S. at 321 (de-

scribing such surveillance as concerning "domestic threats to national security"), not the location of the surveillance *mechanism*. Plaintiffs' attempt to find significance in the latter ignores "the fundamental tenet of modern fourth amendment jurisprudence": when it comes to the content of communications, "'the Fourth Amendment protects people, not places.'" *United States v. Yonn*, 702 F.2d 1341, 1347 (11th Cir. 1983) (quoting *Katz v. United States*, 389 U.S. 347, 351 (1967)). Hence, there is no "constitutional distinction which depends upon the location of the recording apparatus." *Id.*

Plaintiffs also argue that *Keith*'s various reasons for imposing a warrant requirement on domestic intelligence surveillance "apply with equal force to foreign intelligence surveillance"; but these arguments, too, are unpersuasive. Pls.' Br. 23. First, plaintiffs argue that foreign intelligence surveillance "presents the same risks" of "'indiscriminate wiretapping and bugging of law-abiding citizens'" that the *Keith* Court found to be entailed by domestic intelligence surveillance. *Id.* at 24 (quoting *Keith*, 407 U.S. at 321). This argument ignores, however, that foreign intelligence surveillance may only be directed at persons with some foreign nexus. Under § 1881a in particular, that nexus is doubly clear: § 1881a acquisitions can target only non-U.S. persons outside the United States and only if a significant purpose of the acquisitions is to obtain foreign intelligence information.[32]

---

[32] Plaintiffs argue that courts have permitted departures from the Fourth Amendment's warrant clause only where the Government's "primary" purpose is to collect foreign intelligence information. Pls.' Br. 41 (citing *Truong*, *supra*). However, as the FISA Court of Review has explained, this distinction, drawn by *Truong*, was "inherently unstable, unrealistic, and confusing." *In re Sealed Case*, 310 F.3d at 743. A surveillance with a foreign intelligence purpose often will have a corresponding criminal-law purpose—*e.g.*, the apprehension of terrorism suspects—and attempting to discern whether such purposes are primary or secondary to "intelligence" purposes is an artificial exercise. *See id.* For this reason, FISA was amended in 2001 to clarify that foreign intelligence collection need only be a "significant purpose"—rather than "the purpose"—of (continued…)

Thus, unlike the domestic intelligence surveillance at issue in *Keith*, § 1881a acquisitions project the Government's surveillance power outward, not inward—a fact that by itself attenuates any risk to U.S. persons' civil liberties and makes a warrant requirement inappropriate. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 645 (1952) (Jackson, J., concurring) (stating that Executive power is owed "the widest latitude . . . when turned against the outside world for the security of our society"). Moreover, *Keith* concerned surveillance conducted not only without a warrant but without independent oversight of any kind. By contrast, § 1881a acquisitions are authorized under a detailed scheme enacted by Congress that imposes multiple forms of independent oversight intended to protect against abuse. *See Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum . . . ."); *see also In re Sealed Case*, 310 F.3d at 741 n.25 (noting that FISA's congressional oversight provisions serve "as a check against Executive Branch abuses").

Plaintiffs also argue that "the country's experience with FISA shows that a warrant and probable cause requirement are workable" in the foreign intelligence context just as much as *Keith* found them to be workable in the domestic intelligence context. Pls.' Br. 21 n.6, 24-25. However, putting aside whether a traditional FISA order qualifies as a "warrant" within the

---

surveillance under the statute. *See id.* at 721-30. The FISA Court of Review construed the term "significant purpose" in *In re Sealed Case* to preclude the Government from having a primary purpose of prosecuting a person for "a non-foreign intelligence crime" or using the statute as a "device to investigate wholly unrelated ordinary crimes." 310 F.3d at 735-36. Congress used the same term in the FAA and is presumed to have incorporated this construction. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696-699 (1979). Given this limitation, the Government's primary purpose in conducting § 1881a acquisitions *cannot* be to gather evidence of ordinary crimes "wholly unrelated" to foreign intelligence. That is all that the "special needs" exception requires. *See Edmond*, 531 U.S. at 40 (exception turns on whether the programmatic purpose of a search goes beyond the investigation of "ordinary criminal wrongdoing").

meaning of the Fourth Amendment,[33] plaintiffs' argument ignores that FISA has never purported to require such an order for all forms of foreign intelligence surveillance; rather, it exempts broad categories of surveillance targeted at persons outside the United States. *See Truong*, 629 F.2d at 915 n.4 ("[FISA] does not contain a blanket warrant requirement; rather, it exempts certain categories of foreign intelligence surveillance."). Moreover, plaintiffs' argument ignores the very concerns recognized by Congress that led to the enactment of § 1881a, which was passed because surveillance of targets outside the United States had increasingly come to fall within FISA's reach due to changes in technology. That development led Congress to conclude, in accord with the views of the nation's top intelligence officials, that FISA "ha[d] increasingly become outdated and hindered our Nation's ability to collect intelligence on foreign targets in a timely manner." 154 Cong. Rec. S6097, S6129 (Jun. 25, 2008) (statement of Sen. Rockefeller). Thus, the judgment the *political branches* have drawn from experience is that requiring prior judicial approval based on probable cause is *not* workable for foreign intelligence surveillance of foreign targets abroad. It is that judgment—rather than the conjectural views of the plaintiffs—to which the Court should defer. *Doe v. Gonzales*, 500 F. Supp. 2d 379, 408 (S.D.N.Y. 2007) (noting the "well-settled doctrine that courts grant substantial deference to the political branches in national security matters") (internal quotation marks and citation omitted); *cf. Cassidy*, 471 F.3d at 84 (deferring to Government's threat assessment in applying "special needs" exception).[34]

---

[33] *See In re Sealed Case*, 310 F.3d at 741 (noting that the issue is unsettled); *see also Duggan*, 743 F.2d at 73 (noting that requirements for a FISC order "are less stringent than those precedent to the issuance of a warrant for a criminal investigation"); *Truong*, 629 F.2d at 915 n.4 (same).

[34] A constitutional warrant requirement on foreign intelligence surveillance would preclude the political branches from making precisely these sorts of calibrated adjustments in light of what experience shows to be practicable. *See Truong*, 629 F.2d at 915 n.4 (stating that the judicial imposition of a warrant requirement on foreign intelligence surveillance "would be particularly (continued…)

-46-

In short, there are important differences between domestic intelligence surveillance and foreign intelligence surveillance, which strongly counsel against extending *Keith*'s warrant requirement from the former to the latter. Indeed, all the courts to have decided whether foreign intelligence surveillance is subject to a warrant requirement have distinguished *Keith* in holding that it is not. *In re Sealed Case*, 310 F.3d at 744; *Truong*, 629 F.2d at 913; *Butenko*, 494 F.2d at 602 n.32; *Brown*, 484 F.2d at 425.[35] Plaintiffs have no persuasive argument for distinguishing these cases.[36]

---

[35] The plurality opinion relied upon by plaintiffs in *Zweibon v. Mitchell*, 516 F.2d 594, 614 (D.C. Cir. 1975) (en banc), *see* Pls.' Br. 25-26, merely "suggested the contrary in *dicta*, it did not decide the issue." *In re Sealed Case*, 310 F.3d at 742 n.26. Moreover, the *Zweibon* plurality specifically noted that the surveillance target at issue was a domestic organization and that their conclusion might be different if a foreign power was targeted. *See* 516 F.2d at 651.

[36] Plaintiffs make little effort to address these cases at all, other than a cursory remark that the cases are limited to contexts in which "(i) the government's surveillance was directed at a specific foreign agent or foreign power; (ii) the government's primary purpose was to gather foreign intelligence information; and (iii) and [*sic*] either the President or Attorney General personally approved the surveillance." Pls.' Br. 26 (citing, *inter alia*, *Truong*). None of these purported limitations withstand scrutiny. The first may have been appropriate in *Truong*, which concerned surveillance directed at a person within the United States; but nothing in *Truong* suggests that foreign intelligence surveillance directed at non-U.S. persons outside the United States, as § 1881a authorizes, must be directed at a specific foreign agent or foreign power. The second cited limitation is flawed for reasons addressed above, *see supra* n. 32. As to the third cited limitation, there is simply no reason why the personal approval of the President or Attorney General is relevant to applying the "special needs" exception to foreign intelligence surveillance. But even if it were, it would be met here, because surveillance under § 1881a may be commenced only pursuant to an authorization issued by the Attorney General and the DNI. *See* § 1881a(a)&(g).

2.    *Section 1881a Reasonably Balances the Government's Foreign Intelligence Needs with the Privacy Interests of U.S. Persons*

Given that no warrant requirement applies here, the only question is whether § 1881a is "reasonable" under the Fourth Amendment, insofar as it *indirectly* implicates the privacy rights of U.S. persons. The answer to that question is a resounding "yes."

The Fourth Amendment's reasonableness test requires "balancing [the individual's] Fourth Amendment interests against [a search's] promotion of legitimate governmental interests." *Vernonia Sch. Dist.*, 515 U.S. at 652-53. Particularly where a "special need" has been established, a court is "required to judge reasonableness and thus constitutionality on the basis of a context-specific inquiry" that evaluates the searches at issue "'in light of the special need and against the privacy interest advanced.'" *United States v. Amerson*, 483 F.3d 73, 83 (2d Cir. 2007) (quoting *Cassidy*, 471 F.3d at 75). As explained below, § 1881a strikes a reasonable balance between the governmental and privacy interests at stake here.

a.    *Section 1881a Serves Governmental Interests of the Highest Order*

Section 1881a provides the Government with an effective means of monitoring foreign targets located overseas—surveillance that is critical to providing an early warning system against foreign threats to national security. *See, e.g.*, 9/25/07 DNI Statement at 3. "[I]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (internal citations omitted). In particular, the danger posed by terrorism, to which § 1881a's enactment was principally directed, "may well involve the most serious threat our country faces." *In re Sealed Case*, 310 F.3d at 746.

Congress concluded that § 1881a was needed after a careful examination of the technical shortcomings of FISA. *See, e.g.*, 124 Cong. Rec. S6097, S6122 (Jun. 25, 2008) (statement of

Sen. Chambliss) ("[T]he [FAA] will fill the gaps identified by our intelligence officials and provide them with the tools and flexibility they need to collect intelligence from targets overseas."). As discussed, the shared judgment of the political branches regarding the necessity for the provision is owed deference by the courts. *See supra* at 46; *cf. Duggan*, 743 F.2d at 74 ("We find highly persuasive the conclusions of Congress and the executive branch, the two branches most often concerned with foreign intelligence and national security questions, that international terrorist organizations are legitimate and important targets for foreign intelligence surveillance.").

        b.        *Section 1881a Affects the Privacy Interests of U.S. Persons Only Indirectly and Reasonably Protects Those Interests by Requiring FISC-Approved Targeting and Minimization Procedures*

Because § 1881a acquisitions may target only foreign persons abroad, who lack Fourth Amendment protection, the only constitutionally protected privacy interests implicated by § 1881a acquisitions are those of U.S. persons whose communications are collected either due to a targeting mistake or as an incident to surveillance properly targeted at others.[37] Section 1881a provides reasonable protection with respect to both scenarios.

    <u>*Targeting Procedures.*</u>  Section 1881a protects against targeting mistakes by requiring prior FISC approval of the targeting procedures used in any § 1881a acquisition. Specifically,

---

[37] For at least some of the electronic communications subject to collection under § 1881a, there remains an open question whether even a U.S. person has a reasonable expectation of privacy that would trigger Fourth Amendment protection. For example, with respect to email or other stored communications, many courts have held that particular user policies or disclaimers may reduce or even eliminate any reasonable expectation of privacy of parties to such communications. *See United States v. Simons*, 206 F.3d 392, 398 (4th Cir. 2000); *Muick v. Glanayre Elecs.*, 280 F.3d 741, 743 (7th Cir. 2002); *see generally United States v. Miller*, 425 U.S. 435, 443 (1976). *But see Warshak v. United States*, 490 F.3d 455, 469-75 (6th Cir. 2007), *vacated and reh'g en banc granted by* 2007 U.S. App. LEXIS 23741 (Oct. 9, 2007). Nevertheless, we assume for purposes of this litigation that the incidental acquisition of communications of U.S. persons under § 1881a may implicate a reasonable expectation of privacy in some circumstances.

the FISC must find that the Government's targeting procedures are reasonably designed to ensure that an acquisition (1) "is limited to targeting persons reasonably believed to be outside the United States" and (2) will not capture any communication as to which all parties "are known at the time of the acquisition to be located in the United States." § 1881a(i)(2)(B). While plaintiffs complain that these procedures allow for surveillance in the face of uncertainty about the location of the parties to a communication, *see* Pls.' Br. 43-44, any contrary rule would place an unreasonable demand on intelligence operators—especially given that, due to the nature of modern communications (*e.g.*, email), it often is not possible to ascertain with certainty where the parties to a communication are located. Nothing in the Fourth Amendment forbids the Government from proceeding with a search in the face of such uncertainty. *See. e.g., Graham v. Connor*, 490 U.S. 386, 396-397 (1989) ("The calculus of reasonableness must embody allowance for . . . split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . .").[38]

Moreover, § 1881a further protects against error by building in oversight of the Government's *implementation* of targeting procedures. *See* § 1881a(l). Of particular significance, the head of each element of the intelligence community must report annually to the FISC concerning, *inter alia*, how many persons the element targeted under § 1881a (on the belief that they were located outside the United States) who were later determined to be located inside the United States. *See* § 1881a(l)(3)(A)(iii). In this way, the FISC can assess how often approved targeting procedures result in targeting mistakes and thereby develop a body of experience to guide future decisions on whether to continue approving similar targeting procedures.

---

[38] Indeed, similar uncertainty has long been countenanced by FISA, which was originally drafted to allow the Government to monitor international radio traffic so long as the surveillance targets were not particular, known U.S. persons inside the United States – notwithstanding that the Government might not "know" the identities of the persons surveilled. *See supra* n.5.

Thus, while there is always the possibility that persons in the United States may be mistakenly targeted under § 1881a, the statute includes reasonable safeguards against such mistakes, which is all that the Fourth Amendment requires. *E.g., Pasiewicz v. Lake Cty. Forest Preserve Dist.*, 270 F.3d 520, 525 (7th Cir. 2001) ("[T]he Fourth Amendment demands reasonableness, not perfection."). And in any event, the mere possibility of mistake is irrelevant in the context of a facial challenge. *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 632 n.10 (1989).

*Minimization Procedures.* As for the privacy interests of U.S. persons whose communications are incidentally intercepted in the course of a § 1881a acquisition, the statute reasonably protects those interests through its requirement of minimization procedures, which, as with targeting procedures, must be approved by the FISC. By definition, minimization procedures under FISA must be reasonably designed to minimize the acquisition and retention, and to prohibit the dissemination, of private information concerning U.S. persons, to the extent consistent with the Government's need to obtain, produce, and disseminate foreign intelligence information. 50 U.S.C. § 1801(h). In other words, such procedures by design aim to ensure that any intrusion on the privacy of U.S. persons is reasonably balanced against governmental intelligence needs.

Such minimization procedures have been held constitutionally sufficient to protect third-parties in the domestic law enforcement context. *See, e.g., Figueroa*, 757 F.2d at 471 ("Innocent parties are protected from unreasonable surveillance by the requirement contained in [Title III] that surveillance 'shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.'"). This conclusion applies fully—if not more forcefully—in the foreign intelligence context. *See, e.g., In re Sealed Case*, 310 F.3d at 740-41 (holding that FISA's requirement of minimization procedures supports statute's reasonableness).

Plaintiffs argue that § 1881a's minimization requirement somehow falls short compared to that found in the original FISA. *See* Pls.' Br. 9-10, 39-41. Yet this argument is puzzling, for the two requirements are virtually identical: both simply require that surveillance be conducted in accord with minimization procedures found by the FISC to conform to the statute's definition of such procedures. *Compare* 50 U.S.C. § 1805(a)(3) *with* § 1881a(i). Plaintiffs attempt to draw a contrast by arguing that, under § 1881a, "minimization is not individualized but programmatic; minimization procedures apply not to surveillance of specific targets but rather to surveillance programs, the specific targets of which may be known only to the executive branch." Pls.' Br. 39-40. But nothing in the original FISA requires different minimization procedures for different targets. The Government may propose, and the FISC may approve, the same standardized minimization procedures in every case. Along similar lines, although plaintiffs complain that § 1881a "does not prescribe specific minimization procedures" itself, *id.* at 9, neither does the original FISA. Indeed, such procedures cannot be specifically prescribed by statute given that they are classified. *See In re Sealed Case*, 310 F.3d at 728 n.16.

Plaintiffs' also allege that § 1881a differs from the original FISA by not giving the FISC "any authority to oversee the implementation" of minimization procedures, Pls.' Br. at 9-10; but this claim, too, is misinformed. Section 1881a's oversight provisions require regular reporting to the FISC concerning the Government's implementation of minimization procedures, including, *e.g.*, any incidents of non-compliance with these procedures. *See* § 1881a(l). Should such re-

porting reveal particular minimization procedures to be ineffective in any respect, the FISC has the authority to disapprove such procedures in future § 1881a proceedings.[39]

Accordingly, plaintiffs have no basis to challenge the reasonableness of § 1881a's minimization requirement.

### c. Reasonableness Does Not Require Prior Judicial Approval Approximating a Warrant Requirement

Rather than focusing on § 1881a's targeting and minimization requirements, plaintiffs take the position that § 1881a is unreasonable regardless of these requirements. On their view, it is *per se* unreasonable for the statute not to require a prior judicial order based on "individualized suspicion" and a particularized identification of the persons, facilities, and communications to be surveilled. Pls.' Br. 30-36. This argument boils down an attempt to impose a back-door warrant requirement on § 1881a, and should be rejected.

Prior judicial review based on a showing of individualized suspicion and a particularized description of the planned surveillance is simply an approximation of a warrant, which must be based on "probable cause" and must "particularly describ[e] the place to be searched and the per-

---

[39] Plaintiffs further complain that § 1881a does not require certain minimization procedures described in the last prong of FISA's definition of minimization procedures, 50 U.S.C. § 1801(h)(4), which generally prohibit the retention of any communications of U.S. persons. *See* Pls.' Br. 40-41. However, this prong of the definition does not apply to traditional FISA surveillance either. By its terms, it is restricted to surveillance conducted under a special provision of the FISA, § 1802, concerning surveillance of dedicated communication lines used exclusively by foreign powers (*e.g.*, foreign government hotlines). *See* § 1802(a)(1)(A). Plaintiffs contend that § 1881a should be governed by the same minimization standards as surveillance covered under this provision, but it is unclear why, given that the two provisions each have a fundamentally different surveillance focus. Surveillance under § 1802 is subject to the strict minimization standard set forth in § 1801(h)(4) because it is limited to surveillance of communication lines that pose "no substantial likelihood" of being used by U.S. persons, *see* § 1802(a)(1)(B). In contrast, § 1881a was enacted specifically to address surveillance of international communications to which U.S. persons may be party. Hence, the rationale behind § 1801(h)(4) does not apply.

sons or things to be seized." U.S. Const. amend. IV.  In essence, plaintiffs seek under the rubric

of reasonableness to require the Government to obtain judicial approval emulating a warrant,

even though the warrant requirement does not apply here, as explained above.  As the Supreme

Court has specifically held, this "is a combination that neither the text of the Constitution nor any

of our prior decisions permits." *Griffin*, 483 U.S. at 877.  Where the Government is not subject

to a warrant requirement, the Fourth Amendment may not be construed to require some other

form of prior judicial approval based on a lesser showing.  *Id.*  Yet such a requirement is precise-

ly what plaintiffs ask this Court to impose in arguing that reasonableness requires a "judicial . . .

determination of individualized suspicion" and the identification "to a court" of the persons,

places, and communications to be surveilled.  Pls.' Br. 31, 33.

While plaintiffs point to the fact that such requirements are contained in Title III and the

original FISA, they ignore the fundamental distinguishing feature of § 1881a: its targets are ex-

clusively foreign persons abroad, who lack Fourth Amendment protection.  That is not so with

either Title III or the original FISA, both of which focus on surveillance of persons inside the

United States.  Accordingly, these two statutes provide protections geared toward surveillance

*targets*, rather than mere accidental or incidental interceptees.  Most prominently, both statutes

require some form of probable cause before a person can be targeted for surveillance.  And they

contain particularity requirements that serve to ensure that surveillance is limited to those per-

sons or facilities as to which probable cause exists.[40]  It was entirely reasonable for Congress not

to import such protections into § 1881a, given that § 1881a's targets are not protected by the

---

[40] *See, e.g.*, *Maryland v. Garrison*, 480 U.S. 79, 84 (1987) (purpose of requiring particularity is to "limit[] the authorization to search to the specific areas and things for which there is probable cause to search").

Fourth Amendment at all, let alone its probable cause requirement, and given that the Government's intelligence-gathering capabilities would be harmed were such protections extended gratuitously.[41]

*In re Sealed Case* is not to the contrary. Plaintiffs cite the case for the proposition that "'the closer [the challenged] procedures are to Title III procedures, the lesser are [the] constitutional concerns.'" Pls.' Br. 31 (quoting *In re Sealed Case*, 310 F.3d at 737). But the issue in *In re Sealed Case* was the constitutionality of traditional FISA surveillance. Given FISA's focus on surveillance of persons inside the United States, and the resemblance of the statute to a traditional warrant regime, it made sense for the FISA Court of Review to compare it with Title III procedures in assessing reasonableness. *See* 310 F.3d at 737-42. By no means, though, did the FISA Court of Review hold that such procedures were authoritative—or even relevant—in every surveillance context. *Cf. id.* at 737 (acknowledging that Title III standards, while instructive, are not necessarily applicable even to *domestic*-intelligence surveillance). Plaintiffs' dogmatic approach fails to heed the basic precept that "what is reasonable depends on the context within which a search takes place." *T.L.O.* at 337; *see also United States v. Redmon*, 138 F.3d 1109, 1128 (7th Cir. 1998) ("No one factor can be a talismanic indicator of reasonableness.").

---

[41] Likewise, notwithstanding plaintiffs' argument to the contrary, Pls.' Br. 37-38, it was reasonable for Congress to allow § 1881a acquisition orders to be issued for a longer duration compared to traditional FISA orders or Title III warrants, in light of the more attenuated effect of § 1881a acquisitions on the privacy interests of U.S. persons. (Section 1881a acquisitions may be authorized for up to one year, while FISA orders and Title III warrants may last up to 120 or 30 days, respectively.) Nothing in the Fourth Amendment required Congress to limit § 1881a acquisitions to the shortest duration possible; its choice need only be reasonable. *See Illinois v. Lafayette*, 462 U.S. 640, 647 (1983) ("The reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of alternative 'less intrusive' means.").

Indeed, plaintiffs cannot cite a single case holding that prior judicial approval of any kind is a necessary element of reasonableness in the context of foreign intelligence surveillance targeted at non-U.S. persons outside the United States. Notably, such a holding would run contrary not just to § 1881a, but to the original FISA. As discussed above, when Congress enacted FISA in 1978, it was clearly aware that the statute would enable the Government to surveil foreign targets abroad without prior judicial approval—notwithstanding that such surveillance would result in the incidental interception of the communications of U.S. persons. Adoption of plaintiffs' position thus would imply that surveillance that FISA has allowed for decades, with the full knowledge of Congress, is unconstitutional. Courts are loathe to tread on an Executive power long acquiesced in by the Congress, especially in the national security context. *See, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981); *Payton v. New York*, 445 U.S. 573, 600 (1980) ("A longstanding, widespread practice is not immune from constitutional scrutiny. But neither is it to be lightly brushed aside."). The Court should reject plaintiffs' invitation to do so here.

\* \* \*

In sum, in enacting § 1881a, Congress and the Executive Branch acted in concert to develop a framework aimed at facilitating foreign-intelligence operations vital to the nation's security while protecting any constitutionally protected privacy interests indirectly implicated by those operations. That framework is entitled to the utmost constitutional respect by this Court. *See Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring). The safeguards built into the statute provide reasonable assurance that the surveillance it authorizes will target only foreign persons outside the United States and will be conducted in a way that minimally affects the privacy of U.S. persons. The Fourth Amendment requires no more.

**B.      Section 1881a Does Not Violate the First Amendment**

Plaintiffs' First Amendment claim is simply a repackaging of their Fourth Amendment claim and, accordingly, fails along with it.  The law is clear that the First Amendment provides no greater right against governmental investigatory intrusion than the Fourth Amendment.

"[S]urveillance consistent with Fourth Amendment protections . . . does not violate First Amendment rights, even though it may be directed at communicative or associative activities." *Gordon v. Warren Consolidated Bd. of Educ.*, 706 F.2d 778, 781 n.3 (6th Cir. 1983).  "To the extent individuals desire to exercise their First Amendment rights in private, free from possible good faith  . . . investigation, they must operate within the zone of privacy secured by the Fourth Amendment."  *Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1059 (D.C. Cir. 1977); *see also Jabara v. Kelley*, 476 F. Supp. 561, 572 (E.D. Mich. 1979), *vacated on other grounds*, 691 F.2d 272 (6th Cir. 1982) ("[T]he first amendment and the fourth amendment provide coextensive zones of privacy in the context of good faith criminal investigation.").  "The First Amendment does not guarantee 'journalists,' or other citizens, a special right to immunize themselves from good faith investigation simply because they may be engaged in gathering information."  *Reporters Comm.*, 503 F.2d at 1052.

Thus, as the Sixth Circuit recognized in *ACLU v. NSA*, *supra*, "to call a spade a spade, the plaintiffs have only one claim"—a Fourth Amendment claim.  493 F.3d at 657.  Plaintiffs cannot hide the defects in that claim underneath a First Amendment veneer.

## C. Section 1881a Does Not Violate Article III

Finally, plaintiffs argue that the FISC's role in reviewing targeting and minimization procedures under § 1881a violates Article III because such review does not occur "in an adversary context" or concern any particular "proposed interception," and thus does not present a "case or controversy" under Article III. Pls' Br. 48-51. This argument is wholly without merit.

As an initial matter, "Article III courts perform a variety of functions not necessarily or directly connected to adversarial proceedings in a trial or appellate court." *Mistretta v. United States*, 488 U.S. 361, 389 n.16 (1989); *see also Morrison v. Olson*, 487 U.S. 654, 679 n. 16 (1988). In particular, the courts have long participated in the oversight of government searches and surveillance by reviewing warrant and wiretap applications, notwithstanding that these proceedings are wholly *ex parte* and do not occur at the behest of an aggrieved party as ordinarily required for a "case or controversy" under Article III. *Mistretta*, 488 U.S. at 389 n.16; *see also, e.g., In re Sealed Case*, 310 F.3d at 732 n.19 ("In light of [*Morrison* and *Mistretta*], we do not think there is much left to an argument . . . that the statutory responsibilities of the FISA court are inconsistent with Article III case and controversy responsibilities of federal judges because of the secret, non-adversary process.").

Thus, by assigning the FISC an analogous oversight role, § 1881a does not vest the FISC with a power that is "incongruous" with the judicial function or that "more appropriately belong[s] to another Branch"—the central question in a separation of powers challenge under Article III. *Mistretta*, 488 U.S. at 664. Given the traditional role of Article III courts in approving searches and surveillance in particular circumstances, it is not only permissible but logical for Congress to task the courts with reviewing general procedures for searches or surveillance where that is the subject matter in need of oversight. *Cf. id.* at 665 (given judiciary's traditional role in

determining individual criminal sentences, separation of powers not violated by giving the judiciary a role in formulating general sentencing guidelines).  Moreover, the decision the FISC is called upon to render under § 1881a is not merely "advisory," any more than a decision on a traditional search or wiretap application is "advisory."  If the FISC disapproves the Government's proposed targeting or minimization procedures under § 1881a, that decision has immediate effect, as it bars the Government from proceeding with surveillance under the statute.

Nor is there anything to plaintiffs' argument that the "general" nature of the assessments required by § 1881a, Pls.' Br. 51, somehow lies beyond the judicial ken.  According to plaintiffs' own authority, all that matters is whether the questions presented to the FISC "are in a form such that a judge is capable of acting on them."  *United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982), *aff'd Duggan*, 743 F.2d 59 (2d Cir. 1984).  That standard is plainly met here: § 1881a simply requires the FISC to review specific targeting and minimization procedures to determine whether they comply with applicable statutory standards.  Courts make such "general assessments" all the time—*e.g.*, in adjudicating the facial reasonableness of a regulation.  Although traditional warrant or wiretap applications typically involve a more fact-specific form of review, that is because the Fourth Amendment or Title III requires particularity in those contexts—not because of anything in Article III.[42]

---

[42] Finally, plaintiffs assert that § 1881a violates the constitutional separation of powers by permitting the government to continue an acquisition pending its appeal of an adverse FISC decision.  Pls' Br. at 52 (citing § 1881a(i)(4)(B)).  The cited provision, however, merely provides for an automatic stay – which is hardly unprecedented in the law, *see, e.g.*, 11 U.S.C. §362 (filing of bankruptcy petition operates as automatic stay of pending actions against debtor); Fed. R. Civ. P. 62 (entitling a party appealing a valid final money judgment to automatic stay of the judgment upon posting a supersedeas bond), and is entirely consistent with the separation of powers, *see Miller v. French*, 530 U.S. 327, 346-49 (2000) (upholding automatic stay provision in Prison Litigation Reform Act as consistent with separation of powers).

## CONCLUSION

For the reasons above, plaintiffs' motion for summary judgment should be denied and

defendants' cross-motion for summary judgment should be granted.

Dated: New York, New York
        October 28, 2008

| GREGORY G. KATSAS | MICHAEL J. GARCIA |
| Assistant Attorney General | United States Attorney for the |
| CARL J. NICHOLS | Southern District of New York |

GREGORY G. KATSAS
Assistant Attorney General
CARL J. NICHOLS
Principal Deputy Associate Attorney General
Civil Division
United States Department of Justice

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

By:   /s/ Anthony J. Coppolino
      ANTHONY J. COPPOLINO
      Special Litigation Counsel
      Civil Division, Federal Programs Branch
      United States Department of Justice
      20 Massachusetts Avenue, Room 6102
      Washington, D.C. 20530
      Tel No. (202) 514-4782
      Fax No. (202) 616-8460
      tony.coppolino@usdoj.gov

      PAUL FREEBORNE
      Trial Attorney
      U.S. Department of Justice

By:   /s/ Serrin Turner
      SERRIN TURNER
      Assistant United States Attorney
      86 Chambers Street
      New York, New York 10007
      Tel. No. (212) 637-2701
      Fax No. (212) 637-2686
      serrin.turner@usdoj.gov

      Attorneys for Defendants