# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

AMNESTY INTERNATIONAL USA; GLOBAL FUND FOR WOMEN; GLOBAL RIGHTS; HUMAN RIGHTS WATCH; INTERNATIONAL CRIMINAL DEFENSE ATTORNEYS ASSOCIATION; THE NATION MAGAZINE; PEN AMERICAN CENTER; SERVICE EMPLOYEES INTERNATIONAL UNION; WASHINGTON OFFICE ON LATIN AMERICA; DANIEL N. ARSHACK; DAVID NEVIN; SCOTT MCKAY; and SYLVIA ROYCE,

   Plaintiffs,

     v.

JOHN M. McCONNELL, in his official capacity as Director of National Intelligence; LT. GEN. KEITH B. ALEXANDER, in his official capacity as Director of the National Security Agency and Chief of the Central Security Service; and MICHAEL B. MUKASEY, in his official capacity as Attorney General of the United States,

   Defendants.

---

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Case No. 08 Civ. 6259 (JGK)

**ECF CASE**

JAMEEL JAFFER
MELISSA GOODMAN
L. DANIELLE TULLY
LAURENCE M. SCHWARTZTOL
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2583
jjaffer@aclu.org

(additional counsel on following page)

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by
CHRISTOPHER DUNN
ARTHUR EISENBERG
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

CHARLES S. SIMS
THEODORE K. CHENG
MATTHEW J. MORRIS
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
(212) 969-3000

December 12, 2008

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.  PLAINTIFFS HAVE STANDING TO CHALLENGE THE FAA ........................ 2

    a.  Plaintiffs have satisfied the "injury in fact" requirement because they
    have demonstrated an "actual and well-founded fear" that their
    communications will be monitored under the FAA ...................................... 3

    b.  Plaintiffs have satisfied the "injury in fact" requirement because they
    have already suffered "specific present objective harm" as a result of
    the FAA ........................................................................................................ 8

    c.  Plaintiffs' injuries are traceable to the challenged Act and would be
    redressed by an injunction prohibiting the government from
    conducting surveillance under the Act ....................................................... 13

II. THE FAA VIOLATES THE FOURTH AMENDMENT ..................................... 15

    a.  The FAA violates the warrant requirement ............................................... 15

        i.  Neither *Verdugo-Urquidez* nor cases concerning "incidental
        overhears" renders the warrant requirement inapplicable to
        surveillance conducted under the FAA .......................................... 15

        ii.  There is no foreign intelligence exception to the warrant
        requirement sweeping enough to permit the warrantless
        surveillance authorized by the FAA .............................................. 20

    b.  The surveillance authorized by the FAA is unreasonable ......................... 24

III. PLAINTIFFS' FIRST AMENDMENT CLAIM IS NOT SUBSUMED
    WITHIN THEIR FOURTH AMENDMENT CLAIM ......................................... 30

IV. THE FAA VIOLATES ARTICLE III .................................................................. 32

V.  THE FAA MUST BE INVALIDATED ON ITS FACE ...................................... 34

CONCLUSION ............................................................................................................. 35

# TABLE OF AUTHORITIES

**Cases**

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822 (2002) ................................................................................................................ 7, 24

*Abel v. United States*, 362 U.S. 217 (1960) ................................................................ 22

*ACLU v. NSA*, 493 F.3d 644 (6th Cir. 2007) ...................................................... passim

*Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218 (2d Cir. 2008) ................................ 7

*Am. Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003)............................. 3, 4, 14

*Apter v. Richardson*, 510 F.2d 351 (7th Cir. 1975) ..................................................... 13

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979)......................... 3, 7

*Berger v. New York*, 388 U.S. 41 (1967) ...................................................... 25, 26, 34

*Bordell v. Gen. Elec. Co.*, 922 F.2d 1057 (2d Cir. 1991) ............................................. 10

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219 (2d Cir. 2006) ................. 6, 14

*Cassidy v. Chertoff*, 471 F.3d 67 (2d Cir. 2006)......................................................... 26

*Chandler v. Miller*, 520 U.S. 305 (1997)...................................................... 7, 20, 34

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ........................................................ 34

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).................................................. 21

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ....................................................... 7

*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332 (2006).................................................. 3

*Davis v. Vill. Park II Realty Co.*, 578 F.2d 461 (2d Cir. 1978) .................................... 10

*Doe v. Prosecutor, Marion County*, 566 F. Supp. 2d 862 (S.D. Ind. 2008) ................... 7

*Dombrowski v. Pfister*, 380 U.S. 479 (1965)............................................................... 4

*Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59 (1978) .......................... 3

*Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998)..................................................... 8

ii

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) ............................................................ 21, 22

*Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) ................................... 10

*Gaston v. Gavin*, 1998 WL 7217 (S.D.N.Y. 2003) ........................................................... 10

*Gaston v. Gavin*, 172 F.3d 37 (2d Cir. 1998) .................................................................. 10

*Giannullo v. City of New York*, 322 F.3d 139 (2d Cir. 2003) .......................................................... 2

*Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778 (6th Cir. 1983) ................................. 30, 31

*Griffin v. Wisconsin*, 483 U.S. 868 (1987) ............................................................................ 21, 30

*Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982) ..................................................................... 11, 12

*Halkin v. Helms*, 598 F.2d 1 (D.C. Cir. 1978) ........................................................................ 12

*Heldman v. Sobol*, 962 F.2d 148 (2d Cir. 1992) ...................................................................... 11

*Howard v. City of New York*, 302 F. Supp. 2d 256 (S.D.N.Y. 2004) ............................................ 2

*Illinois v. Lidster*, 540 U.S. 419 (2004) ......................................................................... 24, 26

*In re Sealed Case*, 310 F.3d 717 (FISA Ct. Rev. 2002) ........................................... 21, 26, 28, 29

*Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) ................................. 12

*INS v. Chadha*, 462 U.S. 919 (1983) ................................................................................. 3

*Jabara v. Kelley*, 476 F. Supp. 561 (E.D. Mich. 1979) .............................................................. 31

*Katz v. United States*, 389 U.S. 347 (1967) ......................................................................... 22

*Laird v. Tatum*, 408 U.S. 1 (1972) ............................................................................... 8, 9

*Lamont v. Woods*, 948 F.2d 825 (2d Cir. 1991) ................................................................... 16

*Larson v. Valente*, 456 U.S. 228 (1982) .............................................................................. 13

*Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135 (2d Cir. 2000) ........................... 34

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... 8, 15

*MacWade v. Kelly*, 460 F.3d 260 (2d Cir. 2006) ....................................................... 21, 24, 25

*Massachusetts v. EPA*, 127 S. Ct. 1438 (2007) .................................................................... 3, 8

*Mayfield v. United States*, 504 F. Supp. 2d 1023 (D. Or. 2007) .................................................. 21

*MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) ........................................................... 7

*Meese v. Keene*, 481 U.S. 465 (1987) ..................................................................................... 11, 12

*Miller v. French*, 530 U.S. 327 (2000) ............................................................................. 32, 32-33

*Mistretta v. United States*, 488 U.S. 361 (1989) ........................................................................ 34

*Morrison v. Olson*, 487 U.S. 654 (1988)……………………………………………………...34

*N.G. v. Connecticut*, 382 F.3d 225 (2d Cir. 2004) .................................................................... 24

*N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) ....................... 3

*New Jersey v. T.L.O.*, 469 U.S. 325 (1985) ......................................................................... 20, 30

*Nicholas v. Goord*, 430 F.3d 652 (2d Cir. 2005) ...................................................................... 21

*O'Connor v. Ortega*, 480 U.S. 709 (1987) ............................................................................... 21

*Ohio v. Kovacs*, 469 U.S. 274 (1985) ....................................................................................... 33

*Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984) ...................................................................... 11

*Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008)...................... 5, 6, 11, 14

*Palmieri v. Lynch*, 392 F.3d 73 (2d Cir. 2004) .................................................................... 21, 24

*Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975) ...................................................................... 11

*Payton v. New York*, 445 U.S. 573 (1980) ................................................................................ 34

*Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989).................................... 11, 15

*Reporters Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1977) ............. 31

*Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974)...................................... 3

*Sibron v. New York*, 392 U.S. 40 (1968)................................................................................... 35

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)......................................................... 14

*Skinner v. Labor Ry. Executives Ass'n*, 489 U.S. 602 (1989) ............................................. 7, 26, 27

*Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987) .......................................................... 11

*Socialist Workers Party v. Attorney Gen.*, 419 U.S. 1314 (1974) ................................. 9, 10, 12, 15

*Torres v. Puerto Rico*, 442 U.S. 465 (1979) ................................................................ 34

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) ............................ 11, 12

*United States v. Amerson*, 483 F.3d 73 (2d Cir. 2007) ................................................ 24, 27

*United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000) ..................................... 18, 24

*United States v. Brown*, 484 F.2d 418 (5th Cir. 1973) .................................................. 24

*United States v. Butenko*, 494 F.2d 593 (3d Cir. 1974) ................................................ 24

*United States v. Cardona-Sandoval*, 6 F.3d 15 (1st Cir. 1993) ..................................... 16

*United States v. Donovan*, 429 U.S. 413 (1977) .......................................................... 18

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984) ................................................... 32

*United States v. Ehrlichman*, 546 F.2d 910 (D.C. Cir. 1976) ........................................ 24

*United States v. Figueroa*, 757 F.2d 466 (2d Cir. 1985) .............................................. 28

*United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982) .................................... 32

*United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Africa)*, --- F.3d ---, 2008 WL 4964777 (2d Cir. Nov. 24, 2008) ................................ 17, 23, 29

*United States v. Rybicki*, 354 F.3d 124 (2d Cir. 2003) ................................................ 34

*United States v. SCRAP*, 412 U.S. 669 (1973) .......................................................... 11

*United States v. Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980) ................................. 23, 24

*United States v. U.S. Dist. Court for the E. Dist. Of Mich., S. Div. (Keith)*, 407 U.S. 297 (1972) ........................................................................................................ 25

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ........................................... 15, 16, 17

*United States v. Yannotti*, 399 F. Supp. 2d 268 (S.D.N.Y. 2005) ................................... 18

*Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646 (1995)................................................................ 26

*Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988)........................................................ 4

*Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376 (2d Cir. 2000).................................................... 4

*Williams v. Price*, 25 F. Supp. 2d 623 (W.D. Pa. 1998) ............................................................... 13

**Statutes**
50 U.S.C. § 1801................................................................................................................................ 17

50 U.S.C. 1881a……………………………………………………………………………..27, 34

**Other Authorities**
H.R. Rep. No. 95-1283 (1978)......................................................................................................... 17

James G. Connell, III & René L. Valladares, *Search and Seizure Protections for Undocumented Aliens:The Territoriality and Voluntary Presence Principles in Fourth Amendment Law*, 34 AM. CRIM. L. REV. 1293 (1997) ............................................................. 16

**INTRODUCTION**

It is useful to begin by describing the points on which the parties agree. While the government takes issue with some of plaintiffs' terminology, Gov't Br. 12 n.9, the parties are in agreement about the scope of the FAA and the kind of surveillance that it authorizes. The government does not dispute that the statute permits warrantless surveillance of telephone calls and e-mails. Gov't Br. 33. It does not dispute that the statute permits it to acquire the international communications of Americans without identifying to any court the people or facilities to be monitored and without demonstrating individualized suspicion – let alone probable cause – with respect to either the foreign "target" or the American on the other end of the phone. Gov't Br. 12-13. Nor does the government dispute that the FAA permits it to authorize dragnet surveillance programs *inside the United States*, any one of which may sweep up thousands of international communications and invade the privacy of thousands of people. Gov't Br. 9-11, 13-14 (comparing FAA authority to collect wire communications with authority to conduct dragnet surveillance of international radio communications).

The parties are also in agreement that, although the FAA permits surveillance that is "targeted" at foreign nationals abroad, the statute implicates the constitutional interests of U.S. citizens and residents. The government concedes that Americans have a constitutionally protected privacy interest in the content of their international telephone calls and e-mails, and that the FAA must be subject to scrutiny under the Fourth Amendment. Gov't Br. 33, 39, 49, 49 n.37.

From this juncture, however, the government veers far off course. Having conceded that Americans' constitutional interests are implicated by the FAA, the government contends that the statute's "targeting" and "minimization" provisions suffice to render the statute constitutional.

But these provisions do not render the Fourth Amendment's warrant clause inapplicable; nor can they render the statute reasonable. That the government asserts that its targets are foreign nationals overseas cannot supply a constitutionally adequate predicate for a statute that gives the government the authority to collect *Americans'* international communications en masse and that permits it to do so by conducting surveillance on U.S. soil. Moreover, minimization requirements have never been found to be sufficient in themselves to safeguard constitutional rights, and certainly they cannot be sufficient where, as here, they place no meaningful restrictions on the government's power to retain, analyze, and disseminate the communications it acquires. The government's contention that the FAA's targeting and minimization provisions are enough to render the statute constitutional is unmoored from the relevant case law and breathtaking in its implications. To accept it would, at least as far as Americans' international communications are concerned, leave the Fourth Amendment a dead letter.

Plaintiffs respectfully ask that the Court grant their motion for summary judgment and deny the government's cross-motion.[1]

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING TO CHALLENGE THE FAA.

The contention that plaintiffs lack standing to challenge the FAA because they cannot show that their communications will certainly be monitored under it, Gov't Br. 17, 26-27, or because their injuries are "indirect" rather than "direct," Gov't Br. 21, misunderstands both the relevant law and plaintiffs' allegations.

---

[1] Although the government has submitted a putative response to plaintiffs' Statement of Undisputed Facts, to the extent it denies facts asserted by plaintiffs its submission lacks any citation to potentially admissible evidence. As a result, the facts submitted by plaintiffs must be deemed admitted pursuant to Local Rule 56.1(b)-(d). *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Moreoever, the government has failed to submit a Statement of Undisputed Facts in support of its own motion for summary judgment, a failure that "is typically sufficient grounds to dismiss the motion." *Howard v. City of New York*, 302 F. Supp. 2d 256, 259 (S.D.N.Y. 2004) (Koeltl, J.).

Plaintiffs have demonstrated two distinct injuries, each of which is an "injury in fact" sufficient to support standing. First, plaintiffs have an "actual and well-founded fear" that their communications will be monitored under the challenged statute. Second, plaintiffs have already suffered concrete harm because of the challenged statute – the statute has compelled them to take costly and burdensome measures to protect the confidentiality of their telephone and e-mail communications, caused them to forgo some communications that are especially sensitive, and discouraged third parties from giving them information that is relevant and necessary to their work. In their sworn affidavits, plaintiffs have also shown that their injuries are traceable to the challenged statute and that the relief requested – principally, an injunction prohibiting the government from relying on the challenged statute – would redress their injuries.

Having satisfied the constitutional and prudential requirements, plaintiffs have standing to challenge the FAA.[2]

> a.   Plaintiffs have satisfied the "injury in fact" requirement because they have demonstrated an "actual and well-founded fear" that their communications will be monitored under the FAA.

A plaintiff satisfies the "injury in fact" requirement if she demonstrates "*a realistic danger* of sustaining direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (emphasis added); *see also Am. Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003); *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996). Where First Amendment rights are at stake, the

---

[2] The government's contention that plaintiffs must show standing separately for each plaintiff, Gov't Br. 20 n.14, is incorrect. *See, e.g.*, *Massachusetts v. EPA*, 127 S. Ct. 1438, 1453 (2007) ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."). Moreover, while it is true that a "plaintiff must demonstrate standing for each claim he seeks to press," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (cited at Gov't Br. 21), the government is wrong to suggest that plaintiffs must identify an injury of a different character for each of their claims, *INS v. Chadha*, 462 U.S. 919, 935-36 (1983); *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 78-79 (1978); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 225 n.15 (1974).

assessment of injury must be informed by the fact that "free expression [is] of transcendent value to all society, and not merely to those exercising their rights." *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965); *Am. Booksellers Found.*, 342 F.3d at 101; *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988). Because First Amendment rights are implicated here, Pl. Br. 44-48, the "injury in fact" requirement demands only that plaintiffs demonstrate an "actual and well-founded fear that the law will be enforced against them." *Am. Booksellers Found.*, 342 F.3d at 101 (internal quotation marks omitted); *Vt. Right to Life Comm. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). The "actual and well-founded fear" standard is a more lenient one than the "realistic danger" standard that applies where First Amendment rights are not implicated. *Am. Booksellers Found.*, 342 F.3d at 101.[3]

Plaintiffs have an actual and well-founded fear that their communications will be monitored under the FAA. First, there is no question that the FAA *authorizes* the government to monitor plaintiffs' international communications. Under the plain language of the law, the government can monitor *any* international communication; the only relevant limitations are (i) that the government's surveillance "targets" be non-U.S. persons outside the United States; and (ii) that the programmatic purpose of any particular surveillance program be to gather "foreign intelligence information." Pl. Br. 7-9. As plaintiffs have explained, however, and the government does not dispute, these requirements do not protect plaintiffs' international communications from interception. Pl. Br. 9-10; Gov't Br. 33 (conceding that Americans' international communications will be collected "incidentally" under the challenged law).

Second, plaintiffs' communications are *likely* to be collected under the challenged law. As plaintiffs have explained, some of the plaintiffs communicate by telephone and e-mail with

---

[3] While it is the more lenient standard that governs here, plaintiffs have satisfied even the more stringent one.

people whom the U.S. government believes or believed to be associated with terrorist organizations. Pl. Br. 11; Plaintiffs' Supplemental Statement of Undisputed Facts ("SSUF") 2B (McKay Decl. ¶¶3, 5-7, 11-12). Some of them communicate with political and human rights activists who oppose governments that are supported economically and militarily by the United States. Pl. Br. 11. Some of them communicate with people located in geographic areas that are a special focus of the U.S. government's counterterrorism or diplomatic efforts. Pl. Br. 11-12; SSUF 2C (Hedges Decl. ¶¶4, 7; McKay Decl. ¶¶5, 12). And all of the plaintiffs exchange information that constitutes foreign intelligence information within the meaning of the FAA. SSUF 2D (Hedges Decl. ¶7; McKay Decl. ¶¶5, 7, 12).

Notably, the risk that innocent, privileged, and constitutionally protected communications will be monitored under the FAA is far greater than it was under the NSA's warrantless wiretapping program. Under the latter program, the government monitored international communications only after concluding that one party to the communication was associated in some way with al-Qaeda. Pl. Br. 5-6. The FAA, by contrast, lacks an individualized suspicion requirement. Pl. Br. 9. The lead opinion in *ACLU v. NSA*, which concluded that plaintiffs lacked standing, was based in part on the premise that all of the communications that could be monitored under the NSA's warrantless wiretapping program could as easily be monitored under FISA. 493 F.3d 644, 671 (6th Cir. 2007) (Batchelder, J.). That is decidedly not the case here, because the FAA does not limit surveillance to suspected foreign agents.

Thus, plaintiffs have demonstrated an actual and well-founded fear that their communications will be monitored under the challenged law, which is sufficient to establish standing. *Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008) ("If a plaintiff's interpretation of a statute is 'reasonable enough' and under that interpretation the

plaintiff may legitimately fear that it will face enforcement of the statute, then the plaintiff has standing to challenge the statute.").

At various points, the government's brief suggests that plaintiffs cannot establish standing without demonstrating to a certainty that their communications have actually been monitored under the FAA. Gov't Br. 17, 26-27. To support this proposition – a proposition that at some junctures even the government seems to doubt, *see, e.g.*, Gov't Br. 27 n.20 – the government relies heavily on the Sixth Circuit's splintered decision in *ACLU v. NSA*. But to the extent that *ACLU v. NSA* held that plaintiffs could not establish standing without demonstrating that their communications would certainly be monitored, it erected hurdles to standing that have no basis at all in Article III or the Supreme Court's jurisprudence and that have been expressly rejected by the Second Circuit.[4] Again, Article III does not require plaintiffs to show that the harm they fear – here, the monitoring of their communications – has already occurred; it requires only that they show an "actual and well-founded fear" that the harm *will* occur. Thus, in *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006), the Second Circuit held that legal services organizations had standing to challenge restrictions on federal funding where the organizations reasonably feared that they would be denied funding if they contravened the regulations. Similarly, in *Pacific Capital*, 542 F.3d at 350, the Second Circuit held that banks had standing to challenge lending regulations where plaintiffs reasonably believed that the regulations would be applied to them.

In fact, where plaintiffs have established an actual and well founded fear of injury, both the Supreme Court and the Second Circuit have permitted challenges to statutes that have never

---

[4] In *ACLU v. NSA*, Judge Batchelder held that plaintiffs' inability to show that their own communications had been monitored was fatal to their Fourth Amendment claim, 493 F.3d 673-74; Judge Gibbons found that it was fatal to *all* of plaintiffs' claims, *id*. at 688.

been enforced at all against anyone.  *See, e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007); *Babbit*, 442 U.S. at 302 ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement . . . but does not have to await the consummation of threatened injury to obtain preventive relief."); *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 222 (2d Cir. 2008).

The government, quoting out of context a statement made by counsel in *ACLU v. NSA*, suggests that it would be "unprecedented" for this court to permit plaintiffs to pursue their Fourth Amendment claim without demonstrating that their communications have already been subject to surveillance.  Gov't Br. 31.  The government's argument seems to be that, with respect to Fourth Amendment claims in particular, a plaintiff must show a *certainty* of injury, not simply the "realistic risk" of injury that is sufficient to support standing in other contexts.  But in the Fourth Amendment context as in all others, a plaintiff need not await the consummation of her injury in order to bring suit.  *See, e.g.*, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822 (2002) (considering pre-enforcement challenge to drug-testing policy that applied to students involved in non-athletic activities); *Chandler v. Miller*, 520 U.S. 305 (1997) (considering pre-enforcement challenge to statute that required political candidates to certify that they had passed a urinalysis drug test); *Skinner v. Labor Ry. Executives Ass'n*, 489 U.S. 602 (1989) (without questioning standing, addressing the merits of labor organizations' pre-enforcement challenge to regulations that permitted drug and alcohol testing of railway employees); *Doe v. Prosecutor, Marion County*, 566 F. Supp. 2d 862 (S.D. Ind. 2008) (collecting cases).[5]

---

[5] Indeed, even cases that have found that plaintiffs *lacked* standing to challenge future Fourth Amendment injuries have made clear that such challenges are justiciable where the risk of injury is "real and immediate" or "imminent."  *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 110 (1983) (finding that plaintiff did not have standing to seek injunction against city's "choke hold" policy because plaintiff

Finally, the government errs in suggesting that plaintiffs lack standing because their injury is a "generalized grievance" common to a large class of people. Gov't Br. 18. As discussed above, plaintiffs are distinguishable in at least two important ways from the public at large. Because of the nature of their communications and the location and identities of the people with whom they communicate, plaintiffs' communications are particularly likely to be monitored under the challenged law. And because of the nature of plaintiffs' work, the burdens that the challenged law imposes on plaintiffs are particularly substantial. In any event, the Supreme Court has said repeatedly that a party who has suffered injury is not deprived of standing simply because others have been injured as well. *See, e.g.*, *Massachusetts v. EPA*, 127 S. Ct. at 1456; *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact.'"); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 581 (1992) (Kennedy, J., concurring).

Plaintiffs have satisfied the "injury in fact" requirement by demonstrating an "actual and well-founded fear" that their communications will be monitored under the challenged law.

> **b.** Plaintiffs have satisfied the "injury in fact" requirement because they have already suffered "specific present objective harm" as a result of the FAA.

Plaintiffs have established "injury in fact" for another reason: because they have already suffered concrete harm as a result of the challenged statute. As plaintiffs have explained, the FAA has compelled them to take costly and burdensome measures to protect the confidentiality of their international communications. Pl. Br. 14; SSUF 2H (Hedges Decl. ¶¶8-9; McKay Decl. ¶¶8, 10-11, 14). In some instances, the statute has compelled them to forgo certain particularly

---

who had been subjected to choke hold in the past could not demonstrate a "real and immediate threat" that police would subject him to a choke hold again); *Laird v. Tatum*, 408 U.S. 1, 16 (1972) ("there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual *or threatened* injury by reason of unlawful activities of the military would go unnoticed or unremedied" (emphasis added)).

sensitive communications altogether.  Pl. Br. 13-14; SSUF 2G (Hedges Decl. ¶¶8-9; McKay Decl. ¶¶8, 10).  Some of the plaintiffs are compelled to travel long distances, at considerable expense, to collect information in person that they would otherwise have been able to collect over the phone or by e-mail.  Pl. Br. 13-14; SSUF 2I (Hedges Decl. ¶9; McKay Decl. ¶10).  In some instances, third parties have refused to share information with plaintiffs because of the risk that the government may be monitoring their communications.  Pl. Br. 12-13.  As a result, the challenged statute has compromised plaintiffs' ability to locate witnesses, cultivate sources, gather information, communicate confidential information to their clients, and to engage in other legitimate and constitutionally protected communications.  Pl. Br. 12; SSUF 2F (Hedges Decl. ¶¶8-9; McKay Decl. ¶¶10-11, 13-14; Gillers Decl. ¶¶10, 12, 23).

The government argues that plaintiffs' injuries are "indirect" and amount only to the kind of "subjective chill" that the Supreme Court found insufficient to support standing in *Laird*.  Gov't Br. 27.  In *Laird*, however, the plaintiffs offered *no evidence at all* that they had suffered concrete harm because of the program they were challenging.  *See* 408 U.S. at 8 (noting that "it was the view of the district court that respondents . . . failed to allege any injury or any realistic threats to their rights growing out of the Army's challenged actions"); *id*. at 13 n.7 (stating that plaintiffs had "cast considerable doubt on whether they themselves [were] in fact suffering from any such chill").  *Laird* expressly distinguished allegations of "subjective chill," which it held were insufficient to support standing, from allegations of "specific present objective harm," which it indicated *would* be sufficient.  *Laird*, 408 U.S. at 13-14 (stating that "[a]llegations of a subjective 'chill' are not an adequate substitute *for a claim of specific present objective harm or a threat of specific future harm*" (emphasis added)).[6]

_____

[6] Two years after *Laird* was decided, Justice Marshall, writing as Circuit Judge, underscored the same distinction in *Socialist Workers Party v. Attorney General*, 419 U.S. 1314 (1974).  There, the Court

The government reads *Laird* exceedingly broadly to argue that the kinds of "indirect" or "collateral" injuries asserted by plaintiffs are insufficient as a matter of law to confer standing. Gov't Br. 21 (arguing that only "direct" injuries are sufficient to support standing). But *Laird* cannot fairly be read to have ruled out all claims based on indirect or collateral injuries, and certainly the Second Circuit has never read the case this way. *See, e.g.*, *Davis v. Vill. Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir. 1978) (stating that *Laird* "did not hold that chilling effect is not legally cognizable; rather, it held that the chilling effect alleged in that case was so remote and speculative that there was no justiciable case or controversy"); *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (interpreting *Laird* to mean only that a plaintiff must "proffer some objective evidence to substantiate his claim that the challenged conduct has deterred him from engaging in protected activity"); *see also Gaston v. Gavin*, 1998 WL 7217 (S.D.N.Y. 2003) (Koeltl, J.), *aff'd*, 172 F.3d 37 (2d Cir. 1998) (stating that "subjective chill" is insufficient to support standing but that plaintiff can establish "injury in fact" by showing that government conduct "discouraged him from exercising his First Amendment rights" and that he "suffered a concrete and demonstrable injury as a result").

The Supreme Court has routinely held that plaintiffs who asserted injuries that were indirect or collateral had standing. In *Friends of the Earth v. Laidlaw Environmentaltl Services, Inc.*, 528 U.S. 167, 181-83 (2000), the Court found that environmental groups had standing to sue a polluter under the Clean Water Act because the environmental damage caused by the

---

of Appeals had vacated a district court's order enjoining the FBI from attending or monitoring an organization's national convention. Though Justice Marshall denied the petition to stay the appellate court's order, he first ruled that the controversy was justiciable because the plaintiffs' allegations about FBI surveillance were much more specific than those presented in *Laird*. For standing purposes, Justice Marshall held that it was sufficient that "the applicants have complained that the challenged investigative activity will have the concrete effects of dissuading some [Young Socialist Alliance] delegates from participating actively in the convention and leading to possible loss of employment for those who are identified as being in attendance." *Id*. at 1319.

defendant had deterred members of the plaintiff organizations from using and enjoying certain lands and rivers. In *Meese v. Keene*, 481 U.S. 465 (1987), the court found that a politician who wanted to screen foreign films that the government had labeled "political propaganda" had standing to challenge the government's labeling practice because he asserted that the practice discouraged him from showing the films, harmed his reputation in the community, and damaged his prospects for reelection. And in *United States v. SCRAP*, 412 U.S. 669, 688-90 (1973), the Court held that an environmental group had standing to challenge a government fee that would have decreased the use of recycled materials, which in turn would have impacted the environment impairing the members' use of forests and streams. In each of these cases, plaintiffs' standing was predicated on injuries that were collateral.

These cases are authority that "a plaintiff does not lack standing simply by virtue of the indirectness of his or her injury." *Heldman v. Sobol*, 962 F.2d 148, 156 (2d Cir. 1992); *see also Pacific Capital*, 542 F.3d 341, 350 (2d Cir. 2008) (stating that standing is not defeated by the existence of an "intermediate link" between the challenged conduct and the injury). Further evidence of the same proposition can be found in virtually every circuit. *See, e.g.*, *Presbyterian Church v. United States*, 870 F.2d 518, 521-22 (9th Cir. 1989); *Smith v. Meese*, 821 F.2d 1484, 1494 (11th Cir. 1987); *Ozonoff v. Berzak*, 744 F.2d 224, 228-30 (1st Cir. 1984) (Breyer, J.); *Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir. 1975).

The government's reliance on *Halkin v. Helms*, 690 F.2d 977 (D.C. Cir. 1982), and *United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984), is misplaced. To the extent that these cases required plaintiffs to show to a certainty that their communications were being monitored, they applied a standing rule that is inconsistent with case law from the Supreme

Court and Second Circuit.[7]  Moreover, in neither *Halkin* nor *United Presbyterian* did plaintiffs assert present ongoing concrete injuries relating to the surveillance authorities they were challenging.  And while plaintiffs in those cases alleged the possibility of future harm, the allegation was wholly speculative.  *Halkin*, 690 F.2d at 1002; *United Presbyterian*, 738 F.2d at 1378.  Indeed, in *Halkin*, the allegations were based on evidence of past surveillance under an entirely different program that had ceased a decade before.  *See Halkin*, 690 F.2d at 1002-03; *see also ACLU v. NSA*, 493 F.3d at 700 (Gilman., J., dissenting) (distinguishing *United Presbyterian*).

The argument that plaintiffs' challenge is non-justiciable because the FAA is not "regulatory, proscriptive, or compulsory" is also wrong.  As Justice Marshall explained in *Socialist Workers Party*, the *Laird* court's use of the phrase "regulatory, proscriptive, or compulsory" was meant to "distinguish[] earlier cases, not set[] out a rule for determining whether an action is justiciable or not."  419 U.S. at 1318.  Thus, in *Meese v. Keene*, the Supreme Court found that the plaintiff had standing to challenge the government's practice of labeling certain foreign films as "political propaganda" even though the government's labeling practice did not require the plaintiff to do anything.  481 U.S. at 473 (noting that challenged practice had "[no] direct effect on the exercise of [plaintiffs'] First Amendment rights"); *see also Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082 (10th Cir. 2006) (en banc) ("*Meese* demonstrates that, in some cases, First Amendment plaintiffs can assert standing based on a chilling effect on speech even where the plaintiff is not subject to criminal prosecution, civil liability, regulatory requirements, or other 'direct effect[s].'").  In keeping with *Socialist Workers Party* and *Meese*,

---

[7] The *Halkin* court's statement that plaintiffs needed to prove actual interception (as opposed to other concrete injuries or a well-founded threat of future surveillance) was made in the context of claims for damages; plaintiffs seek no damages here.  *Cf. Halkin*, 690 F.2d at 990, 998 n.78; *Halkin v. Helms*, 598 F.2d 1, 6 (D.C. Cir. 1978).

the lower courts have generally declined to read *Laird's* "regulatory, proscriptive, or compulsory" language as setting out a litmus test for justiciability. *See, e.g.*, *Apter v. Richardson*, 510 F.2d 351 (7th Cir. 1975); *Williams v. Price*, 25 F. Supp. 2d 623 (W.D. Pa. 1998). Even in *ACLU v. NSA*, only one judge of the three-judge panel took the position that the government takes here. *Compare ACLU v. NSA*, 493 F.3d at 664 (Batchelder, J.) with *id*. at 693 n.3 (Gibbons, J., concurring) and *id*. at 701 (Gilman, J., dissenting).

Plaintiffs have satisfied the "injury in fact" requirement because they have already suffered "specific present objective harm" as a result of the FAA.

> c. <u>Plaintiffs' injuries are traceable to the challenged Act and would be redressed by an injunction prohibiting the government from conducting surveillance under the Act</u>.

The government's "causation" and "redressability" arguments are intertwined: the government contends, principally, that plaintiffs have not satisfied these requirements because the government can conduct surveillance of plaintiffs' international communications by "any number of means," not just under the FAA. Gov't Br. 29. As a result, the government says, plaintiffs' injuries are neither traceable to the FAA nor redressable through the injunction they seek. The discrete injury complained of here, however, results from dragnet, warrantless surveillance conducted under the FAA. While other mechanisms of surveillance may impose their own burdens on constitutional rights, those burdens are different – and less onerous – than the ones imposed by the FAA. Pl. Br. 14; SSUF 2H, 2K (Hedges Decl. ¶¶6, 8-9; McKay Decl. ¶¶8, 10-11, 13-14; Gillers Decl. ¶21). In any event, plaintiffs are not required to show that the remedy they ask for will redress *all* of their injuries – nor even all of their injuries that are traceable to government surveillance. *Larson v. Valente*, 456 U.S. 228, 243 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will

relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury."); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

The contention that plaintiffs have failed to satisfy the causation requirement because their injuries are "self-imposed," Gov't Br. 27; *see also ACLU v. NSA*, 493 F.3d at 662 (Batchelder, J.), is also erroneous. As a factual matter, the measures that plaintiffs have taken in response to the FAA are not "self-imposed" in any reasonable sense of that phrase; plaintiffs have taken these measures because they are professionally obligated to do so. SSUF 2J (McKay Decl. ¶¶8-11, 14; Gillers Decl. ¶¶10-23). The government has not offered any factual basis to conclude that the actions that plaintiffs have taken in response to the challenged law are unreasonable, nor could it.

In any event, the government is incorrect as a matter of law to suggest that plaintiffs' independent action – even if properly characterized as "independent" – breaks the causal chain that Article III requires. The FAA presents plaintiffs with an unacceptable choice – a choice between (i) forgoing communications that they have a constitutional right to engage in or taking costly and burdensome measures to collect information in person that they would otherwise have collected by telephone or e-mail; and (ii) in possible violation of their professional obligations, exposing their sensitive and privileged communications to the likelihood of government monitoring. The Second Circuit has held that plaintiffs confronted with such a choice have standing. *See, e.g.*, *Pacific Capital*, 542 F.3d at 350-51; *Brooklyn Legal Servs.*, 462 F.3d at 227; *Am. Booksellers Found.*, 342 F.3d at 101.

Finally, the government contends that, to the extent that plaintiffs' injury results from the actions of third parties (e.g. the refusal of overseas contacts to share information with plaintiffs), "independent third-party action disrupts the causal connection between the challenged

surveillance and plaintiffs' alleged injury." Gov't Br. 28. This argument is ultimately irrelevant

because, as the government acknowledges, plaintiffs' injury results only in part from the actions

of third parties. In any case the actions of third parties are sufficient to satisfy the injury

requirement where those injuries are the direct result of the government action that is challenged.

*See, e.g.*, *Lujan*, 504 U.S. at 562 (stating that choices of third parties can supply injury where

those choices "have been or will be made in such a manner as to produce causation and permit

redressability of the injury"); *Socialist Workers Party*, 419 U.S. 1314; *Presbyterian Church*, 870

F.2d at 522.

## II. THE FAA VIOLATES THE FOURTH AMENDMENT.

### a. The FAA violates the warrant requirement.

#### i. Neither *Verdugo-Urquidez* nor cases concerning "incidental overhears" renders the warrant requirement inapplicable to surveillance conducted under the FAA.

The government does not dispute that the warrant requirement ordinarily protects

Americans against surveillance of their international communications, but it contends that the

warrant requirement evaporates where the "targets" of such surveillance are foreign nationals

overseas – even if the surveillance is conducted *inside* the United States, even if the surveillance

is implemented with the aid of U.S. telecommunications corporations, even if the surveillance

would collect the communications of hundreds or thousands of people, and even if the

surveillance is specifically intended to gather communications to which Americans are parties.

This is a truly radical proposition – one that would eviscerate privacy protections for Americans'

international communications – and none of the cases the government cites supports it.

The case on which the government principally relies, *United States v. Verdugo-Urquidez*,

494 U.S. 259 (1990), is wholly inapposite. *Verdugo* held that the warrant requirement was

inapplicable to the U.S. government's search of a Mexican citizen's home in Mexico. Critical to the court's analysis was that the surveillance (i) took place entirely outside the United States; and (ii) did not implicate the rights of U.S. persons inside the United States. *See Verdugo*, 494 U.S. at 264 (emphasizing that because Fourth Amendment violations occur at the time of the search, any potential constitutional violation "occurred solely in Mexico"); *id.* at 275 (emphasizing that "the place searched was located in Mexico"); *id.* at 278 (Kennedy, J., concurring) (stating that "[i]f the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply"); *id.* at 283 (Brennan, J., dissenting) (stating that "the majority implies that [Verdugo] would be protected by the Fourth Amendment if the place searched were in the United States").

*Verdugo* provides no support at all for holding the warrant requirement inapplicable to surveillance conducted on U.S. soil that implicates the privacy rights of U.S. persons. *See, e.g.*, *Lamont v. Woods*, 948 F.2d 825, 834 (2d Cir. 1991) (rejecting *Verdugo*'s relevance in Establishment Clause challenge because "[u]nlike the Fourth Amendment violation in *Verdugo* . . . any alleged Establishment Clause violations . . . would have occurred in the United States"); *id.* (distinguishing *Verdugo* because "the domestic interests in [the] case were far greater than those in *Verdugo*"); *see also United States v. Cardona-Sandoval*, 6 F.3d 15, 20 n.5 (1st Cir. 1993) (rejecting application of *Verdugo* to search of ship docked at Puerto Rico naval base in part because "the violation occurred within United States territory").[8]

---

[8] *See also* James G. Connell, III & René L. Valladares, *Search and Seizure Protections for Undocumented Aliens:The Territoriality and Voluntary Presence Principles in Fourth Amendment Law*, 34 Am. Crim. L. Rev. 1293, 1322 (1997) ("[W]hen U.S. agents act within the United States, the nexus between the action of the U.S. agents and the Constitution is supplied by the territory on which the action occurs. . . . Within the United States, the U.S. agents are bound by the Constitution because of where they act, not against whom they act.").

The Second Circuit's recent decision in *United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Africa)*, --- F.3d ---, 2008 WL 4964777 (2d Cir. Nov. 24, 2008), relied on the same rationale. In holding the warrant clause inapplicable to surveillance of a U.S. citizen in Kenya, the Court emphasized that the surveillance at issue had been conducted entirely overseas, and it reviewed the practical difficulties that would flow from applying the warrant clause in this context. *See Odeh*, 2008 WL 4964777 at *20-23 (noting differences between U.S. search rules and search rules in other countries, difficulty in obtaining warrants from foreign magistrates, uncertainty whether a U.S.-issued warrant would carry any authority abroad, absence of any existing mechanism to secure a extraterritorial search warrant from a U.S. court, and foreign policy questions that might arise). These same practical difficulties were a primary motivation for the *Verdugo* court's holding as well. *See Verdugo*, 494 U.S. at 274; *id.* at 278 (Kennedy, J., concurring); *id.* at 279 (Stevens, J., concurring in the judgment); *id.* at 297 (Blackmun, J., dissenting). Applying the warrant clause to the kind of surveillance at issue here, however – that is, to surveillance conducted *inside* the United States – presents none of these difficulties. Indeed, until the passage of the FAA, the FISA Court had been doing exactly this for thirty years. 50 U.S.C. § 1801(f)(2) (extending FISA to surveillance of international wire communications where surveillance conducted on U.S. soil).[9]

In addition to *Verdugo*, the government relies on cases in which courts have held that the government does not violate the Fourth Amendment by intercepting a person's communications "during an otherwise lawful surveillance." Gov't Br. 37-38, 38 n.26. All those cases, however, rested on the warrants that had been properly obtained, and the cases therefore stand for the

---

[9] *See also* H.R. Rep. No. 95-1283, at 51 (1978) ("an international telephone call can be the subject of electronic surveillance [covered by FISA] . . . if the acquisition of the content of the call takes place in the United States.").

proposition (irrelevant here) that where the government has a *valid, individualized, particularized, court-authorized warrant based on probable cause* to monitor one person or facility, the surveillance is lawful even if the communications of third parties are swept up incidentally in the course of that surveillance. These cases provide no support whatsoever for the proposition that the warrant requirement is inapplicable to dragnet surveillance that is "targeted" at people abroad but that sweeps up thousands or millions of Americans' communications without reference to individualized suspicion or probable cause and that is not predicated upon individualized court orders at all. To the contrary, while these cases do not squarely confront the question, they strongly suggest that warrantless monitoring would violate the rights not only of the target of the surveillance but also of those incidentally overheard. *See United States v. Donovan*, 429 U.S. 413, 436 n.15 (1977) (holding that warrant was not made unconstitutional by "failure to identify every individual who could be expected to be overheard" but that "complete absence of prior judicial authorization would make an intercept unlawful"); *United States v. Yannotti*, 399 F. Supp. 2d 268, 274 n.40 (S.D.N.Y. 2005) (finding incidental intercept lawful because government had obtained a valid warrant that "did not give the monitoring agents unfettered discretion to intercept any conversations whatsoever occurring over the target cell phone").

An even more fundamental problem with the government's argument is that the collection of Americans' international communications under the FAA by, say, vacuuming at a domestic telecommunications switch, cannot be reasonably characterized as "incidental" or a "mistake," Gov't Br. 49; the monitoring of Americans' communications is rather fully foreseeable and may even be the very purpose of the surveillance. *Cf. United States v. Bin Laden*, 126 F. Supp. 2d 264, 281 (S.D.N.Y. 2000) (holding that government surveillance of U.S.

citizen abroad was not incidental because it was foreseeable and not "unanticipated" that the citizens' communications would be overheard).  While the FAA prohibits the government from "targeting" U.S. persons "known at the time of acquisition to be located in the United States," 50 U.S.C. § 1881a(b)(1), it permits the government to conduct undifferentiated, dragnet surveillance of Americans' international communications, and indeed it allows the government to conduct such surveillance with the *intent* of intercepting Americans' international communications – again, so long as the government's "targets" are non-citizens outside the country.  Nothing in the Act forecloses the government from, for example, targeting Al-Jazeera's offices in Qatar in order to determine which Americans are in communication with that organization, or targeting individuals formerly held at Guantanamo in order to learn the content of their communications with American journalists and human rights researchers, or even targeting everyone in Mumbai to find out which Americans are calling that city and what they are talking about in those calls.

The government contends that plaintiffs' fear that Americans' communications will be monitored under the FAA is speculative, Gov't Br. 25-29, but in advocating for passage of the FAA, senior administration officials specifically sought the authority to monitor Americans' communications.  In opposing an amendment that would have required the government to obtain a FISA warrant before acquiring communications of U.S. residents, the administration stated that the amendment would "diminish our ability swiftly to monitor a communication from a terrorist overseas to a person in the United States."  *See* Letter from Attorney Gen. Michael Mukasey and Nat'l Intelligence Director John McConnell to Sen. Harry Reid (Feb. 5, 2008) at 3.  And in opposing another amendment that would have required the government to seek a traditional FISA warrant where a "significant purpose" of its surveillance was to acquire the communications of a specific person located in the United States, the administration explained

that the amendment would "mak[e] it more difficult to collect intelligence when a foreign terrorist overseas is calling into the United States – *which is precisely the communication we generally care most about*." *Id*. at 4 (emphasis added). Thus, it is inaccurate to describe Americans as "incidental" victims of surveillance conducted under the FAA, when one of the reasons the administration sought the new law – perhaps the *chief* reason – was that it wanted unfettered access to Americans' international communications.[10]

Neither *Verdugo* nor the "incidental overhear" cases render the warrant requirement inapplicable to the surveillance authorized by the FAA.

ii. <u>There is no foreign intelligence exception to the warrant requirement sweeping enough to permit the warrantless surveillance authorized by the FAA.</u>

The government argues that foreign intelligence-gathering presents a "special need" not subject to the Fourth Amendment's ordinary warrant requirements, and it contends that the surveillance authorized by the FAA falls within the scope of this exception. Gov't Br. 40-43. The government is mistaken.

The special needs doctrine is a narrow one. "Only in those exceptional circumstances in which special needs, beyond the need for normal law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers." *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring); *see also Chandler*, 520 U.S. at 309. Thus the courts have recognized government interests as "special needs" only where two things are true. First, the primary purpose of the government's surveillance must be something other than the gathering of evidence of crime.

---

[10] Although the administration's stated objections to the proposed amendments were focused on the need to monitor the communications of suspected terrorists, it bears emphasis that the FAA permits the government to monitor *any* international communication, because the Act lacks an individualized suspicion requirement and fails to require the government to identify the people or facilities to be monitored.

*Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (2001) (stating that special needs exception inapplicable where an "immediate objective of the searches [is] to generate evidence *for law enforcement purposes*") (emphasis in original); *City of Indianapolis v. Edmond*, 531 U.S. 32, 41-47 (2000); *O'Connor v. Ortega*, 480 U.S. 709, 721-22 (1987); *Nicholas v. Goord*, 430 F.3d 652, 667-69 (2d Cir. 2005); *MacWade v. Kelly*, 460 F.3d 260, 268 (2d Cir. 2006). Second, "'the usual warrant or probable-cause requirements'" must "somehow [have] been rendered impracticable." *Palmieri v. Lynch*, 392 F.3d 73, 79 (2d Cir. 2004) (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).

The special needs doctrine is inapplicable here because the FAA permits the government to engage in surveillance for the primary purpose of gathering evidence of criminal activity. Pl. Br. 41-43; *cf. Mayfield v. United States*, 504 F. Supp. 2d 1023, 1032 (D. Or. 2007) (the "significant purpose" standard "allows the government to obtain surveillance orders under FISA even if the government's primary purpose is to gather evidence of domestic criminal activity"); *In re Sealed Case*, 310 F.3d 717, 732 (FISA Ct. Rev. 2002). Moreover, the FAA's "significant purpose" requirement is a programmatic one; while the significant purpose of any particular surveillance program must be to gather foreign intelligence, nothing in the Act prevents the government from conducting individual acquisitions that are motivated entirely by the desire to collect evidence of criminal activity. Pl. Br. 42. Like the programs that the Supreme Court found unconstitutional in *Edmond* and *Ferguson*, the FAA purports to permit the government to evade the Fourth Amendment's central requirements – including the warrant requirement – in ordinary law enforcement investigations.

The government does not dispute that the FAA permits it to conduct surveillance even where its primary purpose is to gather evidence of crimes. Gov't Br. 44 n.32. It proposes,

however, that it should be permitted to rely on the special needs doctrine if its purpose is to gather evidence relating to "foreign intelligence crimes" rather than "ordinary crimes." But the Fourth Amendment does not permit such a distinction between crimes; indeed, its protections are perhaps most important when the crimes being investigated are most serious, because the investigation of the most serious crimes is likely to provide the greatest temptation for government abuse. The Supreme Court addressed this issue in *Abel v. United States*, 362 U.S. 217 (1960), which involved the prosecution of a KGB agent for espionage. The government argued for relaxed constitutional standards because the crime was especially serious, but the Court rejected the argument that a different Fourth Amendment standard should apply merely because of "the nature of the case, the fact that it was a prosecution for espionage." *Id*. at 219. The nature of the case, the Court held, could have "no bearing whatever" on the Fourth Amendment questions at issue. *Id*. at 219-20; *see also Katz v. United States*, 389 U.S. 347, 359 (1967) (Douglas, J., concurring) ("spies and saboteurs are as entitled to the protection of the Fourth Amendment as suspected gamblers"); *Ferguson*, 532 U.S. at 83-84 ("Because law enforcement involvement always serves some broader social purpose or objective . . . virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose.").

Application of the special needs doctrine here is also inappropriate because the government has not demonstrated that a warrant requirement would be impracticable. The government asserts that a warrant requirement would place a "disproportionate burden" on the government, pointing to the need for the "utmost stealth, speed, and secrecy" and the possibility of "leaks." Gov't Br. 42. But it is telling that the government cites a pre-FISA case in support of this proposition. As plaintiffs have explained, the nation's experience with FISA shows

definitively that a warrant requirement is not impracticable.  Pl. Br. 24-25.  The government's argument that the Supreme Court's reasoning in *Keith* does not apply to surveillance involving a "foreign nexus," Gov't Br. 44, is misguided for the same reason.  While the *Keith* Court did not decide the issue presented here, the nation's experience with FISA shows that the warrant requirement is decidedly *not* impracticable with respect to surveillance directed at foreign targets, at least where the surveillance itself is conducted inside the United States.  More fundamentally, the government misses the point by emphasizing that the FAA involves surveillance of foreign targets.  The FAA does not simply permit surveillance of foreign targets; it permits surveillance of Americans' communications *with* those targets.  The government's brief glosses over the FAA's far-reaching implications for Americans' constitutional rights.

The government relies on a number of cases that recognized a foreign intelligence exception to the warrant requirement, Gov't Br. 42, 47, but these cases do not help the government here.  First, neither the Supreme Court nor the Second Circuit has recognized a foreign intelligence exception.[11]  Second, all of the appeals courts that have recognized an exception did so before FISA was enacted, and accordingly before it became plain that requiring a warrant for foreign intelligence surveillance would not be impracticable.  Pl. Br. 24-25.  Third, *none* of the courts that have recognized a foreign intelligence exception have recognized an exception broad enough to sanction the dragnet, suspicionless surveillance permitted by the FAA.  To the extent that these courts discussed the scope of the exception, they limited it to circumstances in which the government's surveillance (i) was directed at an individual suspected of being a foreign agent, *United States v. Truong Dinh Hung*, 629 F.2d 908, 916 (4th Cir. 1980);

---

[11] The Second Circuit expressly declined to adopt a foreign intelligence exception to the warrant requirement in *Odeh*; its holding was based instead on the fact that the surveillance at issue had been conducted entirely overseas.  2008 WL 4964777 at *22.

*Bin Laden*, 126 F. Supp. 2d at 272 n.7; (ii) was conducted with the primary purpose of gathering foreign intelligence information, *see, e.g.*, *Truong*, 629 F.2d at 916; *United States v. Butenko*, 494 F.2d 593, 606 (3d Cir. 1974); *United States v. Brown*, 484 F.2d 418, 427 (5th Cir. 1973) (Goldberg, J., concurring); and (iii) had been specifically authorized, "for the particular case," by the President or Attorney General, *United States v. Ehrlichman*, 546 F.2d 910, 925 (D.C. Cir. 1976); *see also Truong*, 629 F.2d at 917; *Bin Laden*, 126 F. Supp. 2d at 277; *id.* at n.18. Accordingly, even if there is a foreign-intelligence exception to the warrant requirement, it is plainly not sweeping enough to encompass the surveillance authorized by the FAA.

      b.   The surveillance authorized by the FAA is unreasonable.

      Even if the Government could show that searches authorized by the FAA fit into the "closely guarded" special needs category, it would still need to show that statute is reasonable. "[T]he fact that the government has a 'special need' does not mean the search and seizure is 'automatically, or even presumptively' constitutional." *United States v. Amerson*, 483 F.3d 73, 83 (2d Cir. 2007) (quoting *Illinois v. Lidster*, 540 U.S. 419, 425 (2004)); *see also N.G. v. Connecticut*, 382 F.3d 225, 231 (2d Cir. 2004). Rather, after satisfying the "threshold requirement" of qualifying as a special need, the weight of the government's interest must be balanced against the nature of the privacy interest compromised by the search and the character of the intrusion. *MacWade*, 460 F.3d at 269.[12]

      The reasonableness analysis is informed first and foremost by the intrusiveness of the search. *See, e.g.*, *Lidster*, 540 U.S. at 427; *Earls*, 536 U.S. at 834; *Palmieri*, 392 F.3d at 84. The

---

[12] The parties agree that, even if the warrant exception is inapplicable, the FAA is constitutional only if it satisfies the Fourth Amendment's reasonableness requirement. Gov't Br. 48. Plaintiffs have already explained why the FAA does not satisfy this requirement, Pl. Br. 30-44, and there is no need to repeat these arguments here. In this brief, plaintiffs focus on the reasonableness analysis that the courts have applied in the context of special needs searches.

Second Circuit's analysis in *MacWade* is instructive. The court found that New York City's subway search program "minimally intrudes" upon subway riders' legitimate expectation of privacy, citing a combination of factors:

> (1) passengers receive notice of the searches and may decline to be searched so long as they leave the subway; (2) police search only those containers capable of concealing explosives, inspect eligible containers only to determine whether they contain explosives, inspect the containers visually unless it is necessary to manipulate their contents, and do not read printed or written material or request personal information; (3) a typical search lasts only for a matter of seconds; (4) uniformed personnel conduct the searches out in the open, which reduces the fear and stigma that removal to a hidden area can cause; and (5) police exercise no discretion in selecting whom to search, but rather employ a formula that ensures they do not arbitrarily exercise their authority.

460 F.3d at 273 (internal citations omitted).

No analogous factors weigh in favor of the government here. Americans whose communications are monitored under the FAA will never learn of it unless they are prosecuted based on FAA-derived evidence. The law allows the government to monitor Americans' most intimate conversations. The surveillance can go on for weeks, months – as long as a year. And executive branch officials enjoy completely unfettered discretion in deciding which international communications to monitor.

Some of these points warrant elaboration. First, as the Supreme Court has recognized, "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger v. New York*, 388 U.S. 41, 63 (1967). Moreover, surveillance justified by the imperatives of national security pose a unique threat to important First Amendment values, given the risk that it will target dissenting or unorthodox expression. *United States v. U.S. Dist. Court for the E. Dist. Of Mich., S. Div.* (*Keith*), 407 U.S. 297, 314 (1972). Unlike run-of-the-mill

special needs cases, in other words, the searches at issue here intrude on the most vital aspects of constitutionally protected privacy.[13]

Second, the FAA places virtually no limitations on executive discretion. As the Supreme Court has recognized, containing executive discretion takes on special urgency in the context of electronic surveillance. *See, e.g.*, *Berger*, 388 U.S. at 59 (striking down wiretapping statute that contained few particularity requirements and left "too much to the discretion of the officer executing the order"); *see also In re Sealed Case*, 310 F.3d at 738-40 (emphasizing factors limiting executive discretion in upholding amendments to FISA).[14] But in other contexts as well, the courts have insisted that special needs programs must cabin executive discretion within strict limits. *See, e.g.*, *Lidster*, 540 U.S. at 428 (noting the "systematic[]" search protocol used for traffic stops); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 650, 658 (1995) (finding limited intrusiveness in student drug testing program where officials had no discretion in selecting students for testing and results could not be used for law enforcement or disciplinary purposes); *Skinner*, 489 U.S. at 622 (noting the "minimal discretion vested in those charged with administering the program"); *Cassidy v. Chertoff*, 471 F.3d 67, 79 (2d Cir. 2006) (finding

---

[13] The intrusiveness of FAA surveillance is all the greater given the sheer volume and increasingly important nature of the information we now communicate daily across borders, whether personal, professional, commercial, or governmental. Although the government places great weight on purported technological shifts since 1978, Gov't Br. 5-8, it ignores that time has only amplified the *privacy* implications of unfettered governmental monitoring of international communications. The government also argues that in 1978, Congress intended to leave monitoring of international communications largely unregulated, implying that international communications were primarily carried by radio or satellite (which Congress essentially left unregulated) not cables or wires (which Congress did regulate, so long as the interception occurred in the United States). In fact, in the 1970s, the transmission of Americans' international communications was divided essentially evenly between satellite and transoceanic cable. *See* Bellovin Decl. ¶7-9.

[14] The government criticizes plaintiffs' supposedly "dogmatic" comparison of the FAA and Title III. Gov't Br. 55. Plaintiffs make this comparison, however, for exactly the same reasons that the FISA Court of Review compared FISA and Title III in *In re Sealed Case*: because Title III provides a useful measure of the safeguards that the Fourth Amendment requires. 310 F.3d at 737. While some deviation from the Title III framework might not undercut the reasonableness of a surveillance statute, wholesale abandonment of Title III's protective measures strongly suggests that the statute is unreasonable.

searches "minimally intrusive" because, *inter alia*, "Plaintiffs have not alleged that the government has given unbridled discretion to [government] employees to carry out searches in a discriminatory or arbitrary manner").

Placing concrete limitations on executive discretion represents a logical trade-off when carving an exception to the warrant requirement:  rather than interpose a neutral magistrate charged with ensuring a search's reasonableness, a valid "special need" program structurally restricts undue invasions into protected privacy.  As the Second Circuit has explained, the "lack of discretion removes a significant reason for warrants – to provide a check on the arbitrary use of government power."  *Amerson*, 483 F.3d at 82; *see also Skinner*, 489 U.S. at 622.  Conversely, when executive discretion is relatively unconstrained, a search program that is unbounded by individual suspicion or probable cause, much less a warrant requirement, cannot be reasonable.

Contrary to the government's argument, the statute's targeting and minimization provisions do not render the statute reasonable.  Gov't Br. 49-53.  The targeting provision contained in section 1881a(d) requires only that any surveillance be targeted at persons "reasonably believed to be located outside the United States" and that the government avoid intentionally acquiring communications "as to which the sender and *all intended recipients* are known at the time of the acquisition to be located in the United States."  50 U.S.C. § 1881a(d) (emphasis added).  But these provisions place no restrictions whatsoever on the government's ability to set up dragnet searches, including searches in which thousands of Americans' communications may foreseeably or intentionally be seized, reviewed, and stored.  While the government acknowledges that the relevant privacy interest belongs to U.S. persons whose communications are collected, Gov't Br. 49, the first premise of its reasonableness argument merely restates the FAA's basic requirement that the "target" of surveillance be reasonably

believed to be abroad. As discussed above, one of the principal purposes of the FAA was to give the executive branch unfettered access to communications between Americans and foreign nationals abroad. Restricting the government from intentionally acquiring purely domestic communications does nothing at all to address the privacy concerns raised by a statute that permits Americans' international communications to be acquired by the thousands.

The government also argues that the targeting procedures somehow bolster the statute's reasonableness by virtue of its reporting requirements. Gov't Br. 50. This amounts to an assertion that certain unconstitutional searches may, over time, create a stream of data for a secondary governmental actor, which may (or may not) exert its authority or influence to ensure the reasonableness of *future* searches of *different people*. Even on the government's terms, this putative safeguard only contributes to "a body of expertise" related to "targeting mistakes," *id.*; it does not even purport to limit the intrusion flowing from dragnet surveillance or other communications between targeted individuals and U.S. persons. Such contingent and conjectural mechanisms cannot serve to guarantee reasonableness; they are certainly no substitute for ordinary Fourth Amendment protections.

The minimization provision of § 1881a(e) also fails to render searches under the FAA reasonable. The government contends that minimization procedures have bolstered the constitutional status of FISA in the past. Gov't Br. 51-53. But no court has ever upheld FISA purely on the basis of minimization; rather, minimization has counted as one of many safeguards, including probable cause and individualized suspicion, that together demonstrate reasonableness.

Indeed, the government somewhat curiously relies on *United States v. Figueroa*, 757 F.2d 466, 471 (2d Cir. 1985), for the proposition that "minimization procedures have been held constitutionally sufficient to protect third-parties in the domestic law enforcement context."

Gov't Br. 51.  But *Figueroa* illustrates the fallacy in the government's assertion that a

minimization provision, on its own, could provide "constitutionally sufficient" protection.  In

upholding the facial validity of Title III, the court reasoned that the statute "circumscribes"

surveillance authority so that it "comports" with the constitutional requirements articulated in

*Berger* and *Katz* – *i.e.*, probable cause, particularized scope and duration, and judicial oversight,

*Figueroa*, 757 F.2d at 471-72, all of which the FAA jettisons.  Equally unpersuasive is the

government's reliance on *In re Sealed Case*.  Gov't Br. 51.  While the court did include

minimization as one of several factors supporting FISA's reasonableness, it did so in the context

of comparing FISA to Title III and concluding that they offer comparable safeguards, including

probable cause, particularity, and judicial oversight.  *In re Sealed Case*, 310 F.3d at 738-41.

Significantly, the government musters no serious defense of the FAA's requirement of

merely programmatic, as opposed to individualized, minimization procedures.  As explained in

plaintiffs' opening brief, compared to Title III and FISA, the FAA provides *less* stringent

minimization requirements (because there is no judicial supervision of minimization in particular

cases) while simultaneously giving the government significantly *more* expansive search authority

(by dispensing with probable cause and authorizing dragnet surveillance).  Pl. Br. 40-41.  Rather

than confront this problem directly, the government hinges its argument on the hypothetical

possibility that, under FISA, "[t]he Government may propose, and the FISC may approve, the

same standardized minimization procedures in every case."  Gov't Br. 52.  The obvious reply is

that, in such a hypothetical situation, the FISC also may *not* approve recycled procedures, and

that is the whole point: individualized minimization procedures allow the FISC to ensure

protocols suitable for protecting privacy interests in the context of specific surveillance orders.

*See Odeh*, 2008 WL 4964777 at *28-29; *In re Sealed Case*, 310 F.3d at 740 (noting that

reasonableness of minimization procedures "depends on the facts and circumstances of each case").

Finally, the government accuses plaintiffs of concocting a "back-door warrant requirement." Gov't Br. 53. But this argument misapprehends the nature of the reasonableness analysis, which is always anchored in the basic protections of the Fourth Amendment.

The congruence between privacy safeguards and the functioning of a warrant is especially well established in the special needs context. As Justice Blackmun explained in *T.L.O.*, 469 U.S. 325, the warrant requirement represents the Constitution's default balancing of governmental and privacy interests, which can be recalibrated only in narrow circumstances. It is therefore unsurprising that cases balancing those interests pay close attention to safeguards designed to serve the purposes normally served by the warrant requirement, namely, constraining arbitrary governmental intrusion into protected areas of privacy. The government points to *Griffin*, 483 U.S. at 877, but in *Griffin* the Court expressly acknowledged that, in cases where the warrant requirement is inapplicable, the Fourth Amendment may nonetheless "demand[] probable cause," *id.*

### III. PLAINTIFFS' FIRST AMENDMENT CLAIM IS NOT SUBSUMED WITHIN THEIR FOURTH AMENDMENT CLAIM.

The government dismisses the plaintiffs' First Amendment claim with the assertion that "[t]he law is clear that the First Amendment provides no greater right against governmental investigatory intrusion than the Fourth Amendment." Gov't Br. 57. The entirety of the support the government offers for this sweeping proposition consists of a footnote from a 1983 Sixth Circuit decision, a single-sentence quote from single-judge portion of a 1977 D.C. Circuit decision, and a quote from a 1979 decision from a district court in Michigan. Gov't Br. 57 (citing *Gordon v. Warren Consol. Bd. of Educ.*, 706 F.2d 778, 781 n.3 (6th Cir. 1983); *Reporters*

*Comm. for Freedom of the Press v. AT&T*, 593 F.2d 1030, 1059 (D.C. Cir. 1977); *Jabara v. Kelley*, 476 F. Supp. 561, 572 (E.D. Mich. 1979)).

None of these cases undermines, much less forecloses, plaintiffs' independent First Amendment claim. Starting with the D.C. Circuit opinion in *Reporters Committee*, the court's opinion was joined by only two judges (the panel's third member dissented), and the quote the government offers – "To the extent individuals desire to exercise their First Amendment rights in private, free from possible good faith . . . investigation, they must operate within the zone of privacy secured by the Fourth Amendment." – is from a portion of the majority opinion joined only by Judge Wilkey. *See* 593 F.2d at 1046 n.50. Moreover, the concurring judge wrote separately to emphasize that the First Amendment may well provide protections independent of the Fourth Amendment in the surveillance context:

> I do not join in Part IV(A)(1)(b) of Judge Wilkey's opinion because the decisional alternative there discussed is unnecessary to disposition of this appeal. *Moreover, the analysis appropriate for First Amendment issues concentrates on the burden inflicted on protected activities and the result may not always coincide with that attained by application of Fourth Amendment doctrine.*

*Id*. at 1071 n.4 (Robinson, J., concurring) (emphasis added). As for the footnote in the Sixth Circuit ruling in *Gordon*, it relies on the same single-judge analysis from *Reporters Committee* cited by the government, *see* 706 F.2d at 781 n.3 (citing *Reporters Committee*, 593 F.2d at 1058); moreover, its cursory discussion seems to bear only on those situations in which the government is engaged in a specific law-enforcement investigation, which is very different from the mass and undifferentiated surveillance the plaintiffs challenge. Likewise, the district court quote from *Jabara* upon which the government relies also is based on Judge Wilkey's *Reporters Committee* analysis, *see* 476 F. Supp. at 572, and, akin to *Gordon*, arose in the context of a dispute about surveillance of a specific target as part of a criminal investigation.

As is evident from the only citations the government musters, there is no persuasive or relevant authority to support its contention that broad government surveillance that substantially burdens expressive activity is immune from independent First Amendment scrutiny. Since the government has not otherwise responded to the plaintiffs' First Amendment analysis and the Supreme Court and Second Circuit cases upon which it is based, plaintiffs stand on the arguments they offered the Court in their opening brief.

## IV.     THE FAA VIOLATES ARTICLE III.

The government's response to plaintiffs' Article III argument, Gov't Br. 58-59, fails to grapple seriously with the fact that the FISC's role is limited to issuing advisory opinions about the government's programmatic procedures, with no concrete factual context relating to particular surveillance targets. Tellingly, the government's main argument rests on the premise that "courts have long participated in the oversight of government searches and surveillance by reviewing warrant and wiretap applications," Gov't Br. 58, which ignores the FAA's evisceration of the FISA regime. The particularized review and authorization required by FISA was critical to *United States v. Megahey*, 553 F. Supp. 1180 (E.D.N.Y. 1982), *aff'd sub nom. United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984), and to the Office of Legal Counsel defense of FISA. Pl. Br. 50-51. These authorities cannot save the FAA, a statute under which judges are asked not to sanction specific searches but to opine about the constitutionality and legality of sweeping surveillance programs, and which also provides that their opinions can be ignored for months.

Taking no issue with plaintiffs' description of the statutory scheme, the government contends that the express authorization to disregard judgments of Article III courts is permissible under *Miller v. French*, 530 U.S. 327 (2000), and supported by the provisions for automatic stays

in bankruptcy proceedings pursuant to 11 U.S.C. § 362 and following valid final monetary judgments under Federal Rule of Civil Procedure 62.

Those authorities do not support the government's position. *Miller* upheld the automatic stay provision of the Prison Litigation Reform Act because Congress had amended the underlying substantive legal standards, and "when Congress changes the law underlying a judgment awarding prospective relief, that relief is no longer enforceable to the extent it is inconsistent with the new law." 530 U.S. at 347. By contrast, the FAA authorizes the executive branch to disregard the decisions of Article III judges not because underlying legal rules have changed, but because Congress decided that, given a disagreement between the Justice Department and Article III judges, the judgments of the former should prevail. The government's reliance on the automatic stay provided in bankruptcy proceedings is equally unavailing, since 11 U.S.C. § 362 does not relieve parties of the obligation to comply with pre-existing regulatory or legal rules but merely facilitates bankruptcy proceedings by staying money judgments (or proceedings that could lead to them). *See, e.g.*, *Ohio v. Kovacs*, 469 U.S. 274, 283 n.11 (1985) ("The automatic stay provision does not apply to suits to enforce the regulatory statutes of the State . . . ."). Finally, Rule 62 is irrelevant for reasons too obvious to require extended discussion: the rule was proposed by the judiciary in its rule-making function, not legislated by Congress. Nothing cited by the government is authority for a law providing for judicial opinions but directing the executive branch that it may categorically disregard those opinions pending appeal.

Just as authorizing the FBI to engage pending appeal in the very searches for which a warrant is denied would violate not only the Fourth Amendment but also the separation of

powers and Article III, the FAA – which is indistinguishable from just such a law – violates the Constitution.

The government also relies heavily on cases concerning the constitutionality of nonadjudicatory functions. Gov't Br. 58. But *Mistretta v. United States*, 488 U.S. 361 (1989), or *Morrison v. Olson*, 487 U.S. 654 (1988), which concerned, respectively, whether courts may be given power to appoint members of the U.S. Sentencing Commission or special prosecutors, are inapposite to the validity of the FAA's putative scheme for "judicial review" or the government's application for mass acquisition orders. The FAA invests the FISC with advisory *adjudicative* functions, not nonadjudicative ones. *See* 50 U.S.C. § 1881a(i)(1)-(3); *see also id.* at §1881a(i)(4) (making FISC mass acquisition orders subject to further judicial review by appellate courts).

## V.     THE FAA MUST BE INVALIDATED ON ITS FACE.

Even assuming that the *Salerno* standard applies here, Gov't Br. 32, which is doubtful,[15] facial invalidation of the FAA is appropriate because the procedural deficiencies etched in the face of the statute render it unconstitutional in every application. *See, e.g.*, *Chandler*, 520 U.S. 305 (finding facially invalid a statute requiring candidates for state office to undergo warrantless and suspicion-less drug tests); *Payton v. New York*, 445 U.S. 573 (1980) (finding facially invalid a New York statute authorizing warrantless entry into homes); *Torres v. Puerto Rico*, 442 U.S. 465 (1979) (finding facially invalid a statute permitting warrantless and suspicionless searches of luggage); *Berger*, 388 U.S. at 58 (finding facially invalid an electronic surveillance statute that

---

[15] *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision in this Court, including *Salerno* itself."); *United States. v. Rybicki*, 354 F.3d 124, 130-33 (2d Cir. 2003) (en banc) (discussing debate over the application and continuing validity of *Salerno*). Notably, the courts have expressly declined to apply the *Salerno* standard in cases implicating First Amendment rights. *See, e.g.*, *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 145 n.10 (2d Cir. 2000) ("[i]t is not even clear that *Salerno*'s 'no set of circumstances' test articulates an exclusive standard for making facial challenges *outside* the First Amendment context" (emphasis in original)).

lacked "precise and discriminate" procedural requirements "carefully circumscribed so as to prevent unauthorized invasions of privacy"); *cf. Sibron v. New York*, 392 U.S. 40, 59-60 (1968) (stating that where "procedural safeguards written into a statute" are inadequate, every search conducted under it is invalid). The FAA is facially deficient because it lacks nearly all of the procedural safeguard that the Fourth Amendment demands.

## CONCLUSION

Plaintiffs respectfully ask that the Court grant their motion for summary judgment and deny the government's cross-motion.


Respectfully submitted,


/s/ Jameel Jaffer
JAMEEL JAFFER
MELISSA GOODMAN
L. DANIELLE TULLY
LAURENCE M. SCHWARTZTOL
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2583
jjaffer@aclu.org

NEW YORK CIVIL LIBERTIES UNION
FOUNDATION, by
CHRISTOPHER DUNN
ARTHUR EISENBERG
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300

CHARLES S. SIMS
THEODORE K. CHENG
MATTHEW J. MORRIS
Proskauer Rose LLP
1585 Broadway
New York, NY 10036
212-969-3000

December 12, 2008