UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AMNESTY INTERNATIONAL USA; GLOBAL FUND FOR
WOMEN; GLOBAL RIGHTS; HUMAN RIGHTS WATCH; IN-
TERNATIONAL CRIMINAL DEFENCE ATTORNEYS ASSO-
CIATION; THE NATION MAGAZINE; PEN AMERICAN CEN-
TER; SERVICE EMPLOYEES INTERNATIONAL UNION;
WASHINGTON OFFICE ON LATIN AMERICA; DANIEL N.
ARSHACK; DAVID NEVIN; SCOTT MCKAY; and SYLVIA
ROYCE,

       Plaintiffs,

   v.

JOHN M. MCCONNELL, in his official capacity as Director of Na-
tional Intelligence; LT. GEN. KEITH B. ALEXANDER, in his offi-
cial capacity as Director of the National Security Agency and Chief
of the Central Security Service; and MICHAEL B. MUKASEY, in
his official capacity as Attorney General of the United States,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

08 Civ. 6259 (JGK)

ECF CASE


## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

GREGORY G. KATSAS
Assistant Attorney General

ANTHONY J. COPPOLINO
Special Litigation Counsel
Civil Division
U.S. Department of Justice

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York

SERRIN TURNER
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel. No. (212) 637-2701
Fax No. (212) 637-2686
serrin.turner@usdoj.gov

Attorneys for Defendants

## TABLE OF CONTENTS

Table of Authorities .................................................................................................................... iii

Preliminary Statement .............................................................................................................. 1

Argument .................................................................................................................................. 2

Point I: Plaintiffs Lack Standing ............................................................................................. 2

A.  Standing for Certain Pre-Enforcement Challenges is Inapposite Here .............................. 2

B.  Plaintiffs Have Not Satisfied Article III's "Injury-in-Fact" Requirement ........................ 6

Point II: Plaintiffs' Challenge Fails on the Merits ................................................................. 11

A.  Section 1881a Does Not Violate the Fourth Amendment .................................................. 11

    1.  Section 1881a Does Not Violate the Fourth Amendment's Warrant Clause ................ 11

        a.  The Warrant Clause Does Not Apply to Surveillance
            Targeted at Non-U.S. Persons Abroad ................................................................ 11

        b.  The Warrant Clause Also Is Inapplicable by Virtue
            of the Special Needs  Doctrine .............................................................................. 16

    2.  Section 1881a Satisfies the Fourth Amendment's Reasonableness Requirement ........ 18

B.  Plaintiffs Have No Basis to Assert a Separate Claim under the First Amendment ............. 22

C.  Section 1881a Does Not Violate Article III ...................................................................... 23

Conclusion .............................................................................................................................. 25

# TABLE OF AUTHORITIES

<u>Cases</u>

*ACLU v. NSA*, 493 F. 3d 644 (6th Cir. 2007) ....................................................................... passim

*American Booksellers Found. v. Dean*, 342 F.3d 96 (2d Cir. 2003) ............................................. 4

*Apter v. Richardson*, 510 F.2d 351 (7th Cir. 1975) ................................................................ 9

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979).......................................... 2, 3

*Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822 (2002) ...................................... 19

*Blodgett v. Campbell*, 508 U.S. 1301 (1993)................................................................. 8

*Bordell v. Gen. Elec. Co.*, 922 F.2d 1057 (2d Cir. 1991) ...................................................... 9

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219 (2d Cir. 2006) ......................... 4

*C. & S. Air Lines v. Waterman Corp.*, 333 U.S. 103 (1948)....................................................... 23

*City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).................................................................... 17

*Compare Paton v. La Prade*, 524 F.2d 862 (3d Cir. 1975) .......................................................... 9

*Davis v. Vill. Park II Realty Co.*, 578 F.2d 461 (2d Cir. 1978) ..................................................... 9

*Friends of the Earth v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167 (2000) .................................... 10

*Gaston v. Gavin*, 1998 WL 7217 (S.D.N.Y. 2003).......................................................................... 9

*Griffin v. Wisconsin*, 483 U.S. 868 (1987)................................................................. 16, 17, 22

*Hanna v. Plumer*, 380 U.S. 460 (1965) ...................................................................................... 24

*Hewitt v. Helms*, 482 U.S. 755 (1987) ....................................................................................... 23

*In re All Matters Submitted to Foreign Intelligence Surveillance Court*,
   218 F. Supp. 2d 611, (FISA Ct. 2002) ................................................................................. 21

*In re Sealed Case*, 310 F.3d 717 (FISA Ct. Rev. 2002) ............................................................... 17

*Joyner v. Mofford*, 706 F.2d 1523 (9th Cir. 1983)....................................................................... 8

*Katz v. United States*, 389 U.S. 347 (1967) ................................................................................ 12

*Laird v. Tatum*, 408 U.S. 1 (1972)........................................................................................ passim

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................... 5

*Meese v. Keene*, 481 U.S. 465 (1987)......................................................................... 8

*Michigan Dept. of State Police v. Sitz*, 496 U.S. 444 (1990)........................................ 17

*Mistretta v. United States*, 488 U.S. 361 (1989) ........................................................ 24

*Morrison v. Olson*, 487 U.S. 654 (1988) ..................................................................... 24

*N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8 (1st Cir. 1996) ........................ 2

*New Jersey v. T.L.O.*, 469 U.S. 337 (1985) ................................................................. 22

*Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir. 1984) ......................................................... 9

*Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008)....................... 3

*Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211 (1995)................................................. 24

*Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989)........................ 4, 8

*Reporters Committee for Freedom of the Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1977) ........ 22

*Socialist Workers Party v. Attorney General*, 419 U.S. 1314 (1974)............................ 7

*Steffel v. Thompson*, 415 U.S. 452 (1974), ................................................................. 4

*Tatum v. Laird*, 444 F.2d 947 (D.C. Cir. 1971) ........................................................ 2, 6

*United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) .................... 4

*United States v. Bin Laden*, 126 F. Supp. 2d 264 (S.D.N.Y. 2000)...................... 13, 14

*United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) ............................................. 22

*United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Africa)*,
    548 F.3d 276 (2d Cir. 2008)................................................................. 13, 17, 18

*United States v. Tortorello*, 480 F.2d 764 (2d Cir. 1973)............................................ 13

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)........................................... 11

*United States v. Yonn*, 702 F.2d 1341 (11th Cir. 1983) ............................................. 12

*Valley Forge Christian Coll. v. Americans United for Separation
    of Church & State, Inc.*, 454 U.S. 464 (1982) .......................................................... 5

*Vermont Right to Life Comm. v. Sorrell*, 221 F.3d 376 (2d Cir. 2000) ......................... 4

*Williams v. Price*, 25 F. Supp. 2d 623 (W.D. Pa. 1998) ................................................................ 9

*Yakus v. United States*, 321 U.S. 414 (1944) ............................................................................ 24

<u>Statutes</u>

18 U.S.C. § 2518(5) ........................................................................................................... 24

50 U.S.C. § 1801(f) ........................................................................................................... 16

50 U.S.C. § 1801(h) ...................................................................................................... 17, 22

50 U.S.C. § 1881a ....................................................................................................... passim

# PRELIMINARY STATEMENT

Plaintiffs' arguments from the start have rested on speculation and surmise; their reply brings more of the same.  On the issue of standing, plaintiffs claim to have a "well-founded fear" that they will be surveilled under § 1881a, yet they acknowledge they have no evidence the Government actually intends to monitor their communications.  Instead, plaintiffs contend that such evidence is unnecessary for standing, citing cases concerning pre-enforcement challenges to regulatory schemes.  But the regulatory schemes in the cases cited specifically restricted the conduct of the parties bringing suit.  No analogy is found here: § 1881a does not impose any regulatory requirements on plaintiffs.  Their alleged choice to avoid certain international communications due to the existence of the statute is instead *self*-imposed, reflecting nothing other than their own unsubstantiated suspicions about how the statute will be used.

Likewise, on the merits, plaintiffs' challenge boils down to repeated conjecture that the statute will be used to spy on Americans, contrary to both its purpose and design.  No matter how many times plaintiffs say otherwise, § 1881a was not intended to provide, and in fact does not provide, any kind of unfettered authority for "dragnet" surveillance of American citizens.  To the contrary, in order to conduct surveillance under the statute, the Government must (1) have a significant foreign intelligence purpose, (2) target *only* persons reasonably believed to be non-U.S. persons overseas, (3) minimize any impact on the privacy of U.S. persons in communication with surveillance targets, and (4) submit to continuing oversight by the legislative and judicial branches designed to ensure that these restrictions function as intended.  The statute thus strikes a reasonable balance between the critical intelligence needs it serves and the privacy interests of Americans it indirectly affects.  The Fourth Amendment requires no more.

## ARGUMENT[1]

## POINT I: PLAINTIFFS LACK STANDING

Plaintiffs concede that their challenge to § 1881a is based solely on their "fear" of surveillance authorized by the provision. Pls.' Reply 3. They assert such fear is sufficient to establish standing for two related but distinct reasons. First, relying on principles set forth in *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979), plaintiffs contend that, on a pre-enforcement facial challenge, an "actual and well-founded fear that the law will be enforced against them" is sufficient for standing. Pls.' Reply 3-8. Second, plaintiffs contend that they have not merely alleged the kind of subjective "chill" injury rejected in *Laird v. Tatum*, 408 U.S. 1 (1972), but, instead, have presented evidence of objective, concrete injuries consisting of burdens that § 1881a allegedly places on their ability to communicate with individuals overseas. Pls.' Reply 8-15. Both theories of standing are wrong.

## A.  Standing for Certain Pre-Enforcement Challenges is Inapposite Here

Plaintiffs' first theory of standing is that they face "a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." Pls.' Reply 3 (citing *Babbitt*, 442 U.S. at 298). But the standing inquiry "is always case-specific," *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996), and plaintiffs repeatedly take this standing theory out of its specific context. Pre-enforcement standing has been found only where there is a

---

[1] We note at the outset that plaintiffs' contention that the Government's summary judgment motion should be dismissed because it is not accompanied by a Local Rule 56.1 statement, *see* Pls.' Reply 2 n.1, is meritless. A Rule 56.1 statement is required only where the moving party contends there are genuine issues of fact to be tried, which the Government does not contend here. As we have explained, plaintiffs' allegations of harm are insufficient on their face to establish standing, Gov't Br. 19 n.13, and plaintiffs' challenge to § 1881a is a facial one that turns strictly on the statute's text and legislative history rather than any issues of fact, *id.* at 32.

threat of imminent enforcement of a specific proscription that demonstrably applies to a plaintiff's actions. No such circumstances are presented by § 1881a.

In *Babbitt* itself, the plaintiffs (farm workers and their union) challenged provisions of a labor statute that allegedly operated to exclude them from participating in union elections and that criminalized "dishonest, untruthful, or deceptive" publicity campaigns—a requirement applicable to the union's boycott advertising. *Id.* at 299, 301-303. It was in this context—where the plaintiffs' First Amendment activities were "proscribed by a statute" and where "there exist[ed] a credible threat" of enforcement—that the Supreme Court found standing for a pre-enforcement challenge. *See id.* Notably, the Court in *Babbitt* rejected plaintiffs' standing to challenge a separate statutory provision, which, they complained, failed to require employers to grant unions access to facilities for communicating with employees. The Court held that the plaintiffs had not yet established that access would be denied and, thus, the alleged harm from the provision was conjectural. *See Babbitt*, 442 U.S. at 304. *Babbitt* thus shows that standing will not be found absent an actual proscription that imminently threatens a party's conduct.

Accordingly, *Babbitt* does not support plaintiffs' standing here. As plaintiffs concede, § 1881a merely *authorizes* the Government to conduct certain foreign intelligence surveillance directed at overseas targets. S*ee* Pls.' Reply 4. But the Act does not require surveillance of plaintiffs, nor does it otherwise proscribe or regulate plaintiffs' conduct. Thus, the critical factor on which standing was upheld in *Babbitt* is missing here.[2]

---

[2] The other pre-enforcement standing cases cited by plaintiffs are inapposite for the same reason, as each turns on the existence of a statutory provision that regulated or proscribed the plaintiff's conduct. For example, plaintiffs cite *Pacific Capital Bank, N.A. v. Connecticut*, 542 F.3d 341 (2d Cir. 2008), for the proposition that "[i]f a plaintiff's interpretation of a statute is 'reasonable enough' and under that interpretation the plaintiff may legitimately fear that it will face enforce-
(continued…)

Indeed, arguments based on the pre-enforcement standing doctrine, paralleling plaintiffs' argument here, were specifically rejected in cases cited in the Government's initial brief. In *United Presbyterian Church v. Reagan*, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.), which involved a challenge to an Executive Order authorizing certain surveillance activities, the plaintiffs alleged, as do plaintiffs here, that they were "more likely than the populace at large to be subjected" to the challenged surveillance. *See id.* at 1380. But, even accepting this claim as true, the court held that it still fell "far short of the 'genuine threat' required to support this theory of standing," *id.* (citing *Steffel v. Thompson*, 415 U.S. 452 (1974)). As it explained, the challenged Executive Order "does not direct intelligence-gathering activities against all persons who could conceivably come within its scope, but merely authorizes them." *Id.* Similarly, in *ACLU v. NSA*, 493 F. 3d 644 (6th Cir. 2007), involving a challenge to the Terrorist Surveillance Program, Judge Gibbons recognized that a "'genuine threat' of enforcement of a policy against a plaintiff who is demonstrably subject to that policy supports standing," *id.* at 689 n. 2 (citing *Steffel,* 415 U.S. at

---

ment of the statute, then the plaintiff has standing to challenge the statute." *See* Pls.' Reply 5-6 (quoting *Pacific Capital*, 542 F.3d at 350). But plaintiffs omit the critical factual context of this holding: *Pacific Capital* upheld pre-enforcement standing to challenge a statute that "by its exact wording" regulated the plaintiffs' business practices. 542 F.3d at 350-51. In the same vein, plaintiffs cite *Brooklyn Legal Services Corporation v. Legal Services Corporation*, 462 F.3d 219 (2d Cir. 2006), for the proposition that a "reasonable fear" of enforcement supports standing. But that case upheld an organization's standing to challenge a regulation that clearly applied to it and prohibited it from engaging in certain legal representation. *Id*. at 226-27. Plaintiffs' remaining cases are distinguishable on similar grounds. *See American Booksellers Found. v. Dean*, 342 F.3d 96, 98-100 (2d Cir. 2003) (upholding standing to challenge statute regulating dissemination of material deemed harmful to minors, where plaintiffs' websites contained sexually-related information allegedly within the proscriptions of the Act); *Vermont Right to Life Comm. v. Sorrell*, 221 F.3d 376, 379-84 (2d Cir. 2000) (upholding standing to challenge campaign finance restrictions that applied to plaintiff's advertisements and media expenditures); *N.H. Right to Life*, 99 F.3d at 11-18 (upholding standing in similar challenge to campaign spending limits).

475), but found that such a case differs from one in which a plaintiff "merely *fears* that he is subject to the policy that may be enforced, which cannot support standing." *Id.* (emphasis added).[3]

Plaintiffs' assertion that this reading of the law would require them to show a "certainty" of injury, *see* Pls.' Reply 6, 7, 11, is inapt. The applicable standard is simply the one the Supreme Court applied in *Laird* in rejecting standing claims based on a fear of surveillance. The Court there did no more than apply the "established principle" that "to invoke the judicial power to determine the validity of executive or legislative action [an individual] must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action." 408 U.S. at 13 (internal quotation marks omitted). That principle stems from Article III's general requirement of an injury that is "concrete and particularized," and "actual or imminent," not "conjectural" or "hypothetical." *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992). The point is that, in a pre-enforcement context, where a party is "demonstrably subject to a statutory requirement" that proscribes its conduct and a threat of enforcement is imminent, the dispute is sufficiently "definite and concrete." *See Babbit*, 442 U.S. at 298 (citations omitted). But where, as here and in *Laird, United Presbyterian*, and *ACLU*, plaintiffs challenge the existence of surveillance *authority* based merely on a *fear* that it might be applied to them, the alleged injury is purely hypothetical and insufficient for standing.

---

[3] Plaintiffs' contention that *United Presbyterian* and *ACLU* somehow conflict with Supreme Court standing jurisprudence, *see* Pls.' Reply 6, 11 is quite wrong. Both cases correctly distinguish Supreme Court precedent on pre-enforcement facial challenges in the precise context at issue here: a challenge to the mere authority to undertake surveillance. And both decisions are fully consistent with the Supreme Court's decision in *Laird*, which rejected standing based on an allegation that a surveillance program inhibited the plaintiffs' First Amendment activities.

**B.      Plaintiffs Have Not Satisfied Article III's "Injury-in-Fact" Requirement**

Plaintiffs separately seek to distinguish *Laird* and its progeny on the ground that they have allegedly demonstrated objective, concrete injuries by showing that § 1881a has "compelled" them to take burdensome measures to protect the confidentiality of their international communications. *See* Pls.' Reply 8-9. But plaintiffs' alleged injuries are no more than the self-imposed manifestation of their own speculative fears of being surveilled under the statute—a kind of alleged harm that *Laird* squarely precludes as a basis for standing.

Plaintiffs initially attempt to distinguish the facts in *Laird*, asserting that the *Laird* plaintiffs offered no evidence of harm or even that their speech was chilled at all. *See* Pls.' Reply 9. But the posture of the plaintiffs here is indistinguishable in all material respects. As in *Laird*, plaintiffs here complain of no specific action taken against them by the Government, *see Laird*, 408 U.S. at 9, instead basing their claim to standing on the "present inhibiting effect on their full expression and utilization of their First Amendment rights" caused by the existence of a surveillance system. *Id.* at 10. That plaintiffs have submitted declarations describing steps they have taken as a result of feeling inhibited by § 1881a does not distinguish the substance of their legal claim. *Laird* did not turn on the plaintiffs' failure to describe *how* they were inhibited, but on the fact that their claim of *being* inhibited rested on conjecture that they might be surveilled, which was deemed insufficient for standing.[4]

---

[4] Indeed, the *Laird* plaintiffs arguably had a stronger factual case for their claimed injuries, since some of them had shown that they actually had been surveilled in the past. *See Tatum v. Laird*, 444 F.2d 947, 956 (D.C. Cir. 1971) (the record shows that "most if not all the appellants and/or the organizations of which they are members have been the subject of Army surveillance reports and their names have appeared in Army records"), *rev'd*, 408 U.S. 1 (1972).

Plaintiffs' related assertion that they have not merely alleged a "subjective" chill but instead have shown "specific present objective harm," Pls.' Reply 8, is also meritless. Again, under *Laird*, such objective harm must result from action taken against a party by the Government—not from a party's own fear that action might be taken against them. Indeed, while claiming to satisfy *Laird's* "objective harm" standard, plaintiffs *reject* the reasoning on which it was based. The Court in *Laird* acknowledged that a chill injury may be justiciable where the challenged exercise of governmental power is "regulatory, proscriptive, or compulsory in nature," and the complainant is "either presently or prospectively subject to the regulations, proscriptions, or compulsions that he [is] challenging." *Id.* at 11 (citing cases). The Court contrasted such circumstances with allegations of "subjective chill" caused by the mere possibility of being subjected to surveillance. *Id.* at 13-14. Yet, according to plaintiffs, a regulatory, proscriptive, or compulsory act is not necessary to establish standing, *see* Pls.' Reply 12-13, and the "objective harm" *Laird* requires can be satisfied by plaintiffs' self-imposed reactions to the existence of surveillance authority. That is not remotely correct under *Laird* or any other case plaintiffs cite.

On the contrary, authority applying *Laird* uniformly indicates that a "chill injury" is sufficient for standing only where some action has been taken or is imminently threatened by the Government—but not based on fear or speculation that governmental action might occur. For example, in *Socialist Workers Party v. Attorney General*, 419 U.S. 1314 (1974), the plaintiffs sought injunctive relief against the FBI where there was no apparent dispute that the "the FBI planned to monitor [their] national convention," set to begin the next day." *See id.* at 1315. In

these circumstances, Justice Marshall, writing as a circuit judge,[5] distinguished *Laird* in finding that the plaintiffs' allegations of chill injury (reflected in lost participation in the convention and the possible loss of employment from those attending) was sufficient for standing. Similarly, in *Presbyterian Church v. United States*, 870 F.2d 518 (9th Cir. 1989), the plaintiff was found to have standing to raise a First Amendment challenge after INS agents had in fact entered churches wearing "body bugs" and surreptitiously recorded church services. *See id.* at 520-23. Thus, in stark contrast to the plaintiffs' claims here, the alleged chill injury resulted from actual surveillance undertaken by the Government. Finally, in *Meese v. Keene*, 481 U.S. 465 (1987), the Supreme Court held that the plaintiff had standing to challenge a requirement that he label a foreign film he planned to exhibit as "propaganda." Once again, the alleged harm resulted from the imposition of a regulatory requirement that clearly applied to the plaintiff's action. *See ACLU*, 493 F.3d at 664 (distinguishing *Meese*). In contrast, plaintiffs in this case "are not regulated by [§ 1881a] in any way, nor are they directly ordered to do or refrain from doing anything." *Id.* Plaintiffs' alleged "objective harms" are instead based on their own conjectural fear that § 1881a might be applied to their communications, which is insufficient to establish standing.[6]

---

[5] The decision of a Justice writing in chambers has no precedential effect. *See Joyner v. Mofford*, 706 F.2d 1523, 1530 (9th Cir. 1983). Such decisions are issued under the authority of a single Justice to grant applications for interim relief—a circumscribed authority that does not permit resolution of the merits of a dispute. *See*, *e.g.*, *Blodgett v. Campbell*, 508 U.S. 1301, 1303-04 (1993) (O'Connor, J., in chambers).

[6] Plaintiffs' contention that their injuries are not "self-imposed" because they have ethical obligations to maintain privileged communications, *see* Pls.' Reply 14, misses the point: to have standing, the injury alleged must be caused by and traceable to action taken against a party by the Government. No matter how much a party believes it is obligated to take protective measures, fear of governmental action is not sufficient to establish standing in the absence of any applicable proscription on plaintiffs' conduct or imminent threat of Governmental action.

Other authority cited by plaintiffs likewise provides that a chill injury may be sufficient for standing under *Laird* only if based upon actual governmental conduct directed at an individual, rather than mere speculative fears of such action.[5]  Accordingly, plaintiffs' assertion that courts have not read *Laird* to require "regulatory, proscriptive or compulsory" governmental action to establish a sufficient chill injury, *see* Pls.' Reply 12-13, does not aid their argument, because, regardless of whether *Laird* is so limited, authority applying *Laird* nonetheless provides that a chill injury must in any event result from *some kind* of Governmental action taken against the plaintiff or imminently threatened, not speculation that such action might occur.  The question in *Laird* was "whether the jurisdiction of a federal court could be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data gathering activity" alleged to be broader than necessary to accomplish a valid governmental purpose.  *Laird*, 408 U.S. at 10.  As the court in *ACLU* put it, "the something 'more' required by *Laird* is not merely more subjective injury, but is the exercise of governmental power," and the foregoing cases "involve plaintiffs

---

[7] *Compare Paton v. La Prade*, 524 F.2d 862, 868 (3d Cir. 1975) (distinguishing *Laird* where student was actually investigated, not merely challenging system of investigation out of fear it might encompass her); *Ozonoff v. Berzak*, 744 F.2d 224, 229 (1st Cir. 1984) (Breyer, J.) (distinguishing *Laird* where requirement of loyalty oath applied to plaintiff and barred his employment application absent compliance); *Davis v. Vill. Park II Realty Co*., 578 F.2d 461, 463 (2d Cir. 1978) (distinguishing *Laird where* plaintiff faced an actual attempt to terminate her public housing lease allegedly in an effort to chill her First Amendment rights); *Apter v. Richardson*, 510 F.2d 351, 353-54 (7th Cir. 1975) (distinguishing *Laird* where plaintiff alleged denial of grant based in part on First Amendment activity); *Williams v. Price*, 25 F. Supp. 2d 623, 630-31 (W.D. Pa. 1998) (distinguishing *Laird* where prisoner challenged prison's refusal to provide meeting space to protect confidential communications with counsel) *with Gaston v. Gavin*, 1998 WL 7217 (S.D.N.Y. 2003) (Koeltl, J.), *aff'd*, 172 F.3d 37 (2d Cir. 1998) (following *Laird* where plaintiff failed to show the Government used, or threatened to use, "the coercive power of the government against the plaintiff to prevent publication of an article"); *Bordell v. Gen. Elec. Co.*, 922 F.2d 1057, 1061 (2d Cir. 1991) (following *Laird* where no action taken or threatened against plaintiff under policy limiting employees of nuclear lab from disclosing sensitive information).

who can show direct injury because the government did directly regulate, order, or constrain them." *ACLU*, 493 F.3d at 663 (Batchelder, J.); *see also id.* at 693 n. 3 (Gibbons, J.) (questioning whether a chill injury can be found under *Laird* solely where the challenged action is regulatory, proscriptive, or compulsory but nonetheless *rejecting* standing in the absence of any evidence the plaintiffs were subject to surveillance).

Finally, plaintiffs' reliance on *Friends of the Earth v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167 (2000), is also unfounded. *See ACLU*, 493 F.3d at 685-86, 689-91. Plaintiffs in *Laidlaw* were found to have standing to challenge the discharge of pollutants into a river near their homes because it "curtail[ed] their recreational use of that waterway and would subject them to other economic and aesthetic harms." *Laidlaw*, 528 U.S. at 184. The key issue was whether that conduct (discharging pollutants) reasonably supported the plaintiffs' claim of injury, but there was no speculation about whether the conduct had in fact occurred. "Unlike the plaintiffs in *Laidlaw*, the present plaintiffs have curtailed their communications despite the absence of any evidence that the government has intercepted their particular communications." *ACLU*, 493 F.3d at 686; *see also id.* at 689 (distinguishing the holding in *Laidlaw*, where plaintiffs had standing because they "were in fact subject to defendant's conduct," from the "much broader proposition" that standing may be shown merely by "*a reasonable fear of being subject to defendant's allegedly harmful conduct*") (emphasis in original).

In sum, this case is, in all relevant respects, indistinguishable from *Laird*, *United Presbyterian*, and *ACLU*. In particular, plaintiffs make no effort to establish their standing to bring the central Fourth Amendment claim at issue in this case by showing that they have been actually subject to any alleged unlawful search. *See Rakas v. Illinois*, 439 U.S. 128, 133-34 (Article III

requires a plaintiff raising a Fourth Amendment claim to demonstrate that they were personally subject to an unlawful search).[7] Plaintiffs' claims constitute no more than a generalized grievance against a policy decision by Congress that, contrary to plaintiffs' assertion, *see* Pls.' Reply 8, would indeed be shared by an array of individuals—journalists, policy researchers, issue advocates, and attorneys—who communicate with individuals overseas on a wide range of matters dealing with foreign policy and national security issues. Speculative fears that a surveillance policy may be applied to such communications does not give rise to a case or controversy within the meaning of Article III.

**POINT II: PLAINTIFFS' CHALLENGE FAILS ON THE MERITS**

**A. Section 1881a Does Not Violate the Fourth Amendment**

  *1. Section 1881a Does Not Violate the Fourth Amendment's Warrant Clause*

    *a. The Warrant Clause Does Not Apply to Surveillance Targeted at Non-U.S. Persons Abroad*

As we have explained, surveillance under § 1881a does not violate the warrant clause because it is targeted at non-U.S. persons overseas, who lack Fourth Amendment rights, *see United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); and warrantless surveillance of such persons is not made unlawful merely because it may incidentally intercept the communications of U.S. persons. Gov't Br. 34-40. Plaintiffs fail to refute either premise of this argument.

---

[8] Plaintiffs' contention that they need not separately satisfy standing requirements for their Fourth Amendment claim, *see* Pls.' Reply 3, is wrong, as shown by *Rakas*. And a mere fear of surveillance is insufficient to establish standing for this claim. The pre-enforcement Fourth Amendment challenges plaintiffs cite are inapposite, as they each involved policies that directly applied to the plaintiffs in those cases and presently subjected them to an allegedly unlawful search. *See* Pls.' Reply 7 (citing pre-enforcement challenges to drug testing). Section 1881a simply does not impose any comparable requirement on the plaintiffs—indeed, they may *never* be subject to surveillance under the provision.

-11-

Plaintiffs try to distinguish *Verdugo* on the ground that the search there "took place entirely outside the United States," whereas § 1881a acquisitions are "conducted on U.S. soil"— apparently referencing the location of the *communications equipment* used in the acquisitions. Pls.' Reply 16. But *Verdugo* hardly turns on such a superficial distinction. The case broadly holds that the Fourth Amendment has no extraterritorial application to non-U.S. persons. *See* 494 U.S. at 266 (explaining that the Fourth Amendment was not intended to "restrain the actions of the Federal Government against aliens outside of the United States territory"). In *Verdugo* itself, the physical search at issue was extraterritorial because the place searched was outside the United States. In the surveillance context, where the focus is on "people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), the analogous fact pattern is surveillance targeting a *person* outside the United States. It should be obvious that the location of the surveillance equipment is of no constitutional significance, and plaintiffs fail to answer case law on this very point. *See* Gov't Br. 44 (citing *United States v. Yonn*, 702 F.2d 1341, 1347 (11th Cir. 1983)).[7]

Plaintiffs likewise misread *Verdugo* in arguing that it turns on the "practical difficulties" of requiring a warrant for extraterritorial searches (which, plaintiffs contend, would not apply to surveillance executed with equipment in the United States). Pls.' Reply 17. *Verdugo* does not merely hold that extending Fourth Amendment rights to aliens abroad would be difficult in practice. It holds that such persons lack Fourth Amendment rights in the first place, a conclusion rooted in "the text of the Fourth Amendment, its history, and [the Court's] cases discussing the

---

[9] Nor does plaintiffs' proposed distinction carry the historical significance they attribute to it. Contrary to plaintiffs' statement that all foreign intelligence surveillance "conducted *inside* the United States" has been regulated by FISA for the past thirty years, *see* Pls.' Reply 17, FISA has in fact never regulated *radio* surveillance of international communications, regardless of where the radio transmissions are physically intercepted. *See* Gov't Br. 4-8.

application of the Constitution to aliens and extraterritorially." 494 U.S. at 275. While Justice Kennedy's concurrence noted the practical difficulties of requiring a warrant for extraterritorial searches—"in addition to the other persuasive justifications stated by the Court" for its holding, *id.* at 278 (Kennedy, J., concurring)—they were not the basis for the majority opinion, which Justice Kennedy expressly joined, *id.* at 275.[8]

Given that *Verdugo* holds that non-U.S. persons abroad lack Fourth Amendment rights, the case directly implies that the Government may surveil such persons without a warrant, regardless of whence the surveillance is executed. Nor does this authority dissipate wherever the surveillance may "implicate the rights of U.S. persons inside the United States," Pls.' Reply 16. As long as the Government may lawfully target someone for surveillance, it necessarily has an incidental authority to intercept that person's communications with others—since "the government is often not in a position of omniscience regarding who or what a particular surveillance will record." *United States v. Bin Laden*, 126 F. Supp. 2d 264, 280 (S.D.N.Y. 2000); *accord United States v. Tortorello*, 480 F.2d 764, 775 (2d Cir. 1973).

The incidental interception rule does not, as plaintiffs contend, Pls.' Reply 17-18, pertain only to surveillance conducted pursuant to a warrant. To the extent that most of the cases applying the rule involve this fact pattern, it is only because they concerned domestic wiretaps for ordinary law enforcement purposes, for which a warrant was necessary from the outset. The rationale for the rule equally applies, however, to surveillance lawfully conducted without a war-

---

[10] Nor does *United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Africa)*, 548 F.3d 276 (2d Cir. 2008), support plaintiffs' reading of *Verdugo*. In *Odeh*, the issue was whether the warrant clause applies to *U.S. citizens* abroad. The Second Circuit held that it does not, relying in part on the practical difficulties of implementing the warrant requirement abroad noted in *Verdugo*. *See id.* at 288-89. The court specifically distinguished these considerations from *Verdugo*'s main holding that aliens searched abroad lack Fourth Amendment rights. *See id.* at 288.

rant—including surveillance of foreign targets abroad. *Bin Laden*, 126 F. Supp. 2d at 280-81 ("[I]ncidental interception of a person's conversations during an *otherwise lawful* surveillance is not violative of the Fourth Amendment.") (emphasis added).[9] Indeed, plaintiffs all but ignore Judge Sand's holding in *Bin Laden* that the incidental interception rule specifically applies to warrantless surveillance of foreign targets abroad, *see id.* at 281, and cite no cases to the contrary. Further, they make no attempt to explain why the "plain view" rule applicable to physical searches—which turns on lawful right of access rather than the existence of a warrant, *see* Gov't Br. 38 n.27—should have no analog in the electronic surveillance context.

Nor do plaintiffs fare any better in arguing that the incidental interception rule is inapplicable here because it is "fully foreseeable" that Americans' communications will be intercepted under § 1881a, Pls.' Reply 18-19. It is of course foreseeable *as a general matter* that § 1881a acquisitions may intercept such communications, given that there is virtually always a possibility that a foreign target will communicate with someone inside the United States. By the same token, in the incidental interception cases dealing with criminal wiretaps, it is foreseeable *as a general matter* that surveillance of a targeted suspect may intercept the communications of others as to whom the Government lacks probable cause. What makes such interceptions "incidental," however, is that the interceptees are not persons *particularly known* to the Government whom it *intended* to surveil *ex ante*. *See Bin Laden*, 126 F. Supp. 2d at 280 (interceptee is "incidental" if, at the outset of the surveillance, "either the identity or the actual involvement of the interceptee was unknown"). And that is the key point: any interception of Americans' commu-

---

[11] *See also United States v. Butenko*, 494 F.2d 593, 608 (3d Cir. 1974) (upholding constitutionality of warrantless surveillance for foreign intelligence purposes notwithstanding that "conversations . . . of American citizens[] will be overheard").

nications under § 1881a is necessarily incidental in *this* sense—because the statute expressly forbids the targeting of persons abroad if "the purpose . . . is to target a particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(b)(2).[10]

Given this central statutory prohibition, plaintiffs' repeated allegations that the Government will use § 1881a as a "dragnet" to scour international communications for specific Americans to spy on—for example, by "targeting everyone in Mumbai to find out which Americans are calling that city and what they are talking about in those calls," Pls.' Reply 19—are baseless. Selecting international communications to monitor based simply on the fact that an identified American is on the line would violate the statute's ban on reverse targeting. The statute could not be clearer that the intended "target" of a § 1881a acquisition must be a non-U.S. person abroad. 50 U.S.C. § 1881a(b); *see also* 5/1/07 FISA Modernization Hrg. at 47 (testimony of DNI McConnell) ("The key is 'target' and [a U.S. person] would not be a target of something we were attempting to do."). Particularly in a facial challenge, it must be presumed that the Government will comply with this requirement in good faith. *See* Gov't Br. 35-37.

Similarly misguided are plaintiffs' hypotheticals involving "American journalists and human rights researchers" in contact with "individuals formerly held at Guantanamo," and the

---

[12] Nor is this a novel dividing line. A similar line marks the bounds of the original FISA, which has never regulated the interception of international communications by radio or offshore wire if done without "intentionally targeting" a "particular, known United States person who is in the United States." 50 U.S.C. § 1801(f). Plaintiffs make no suggestion that FISA's allowance of such surveillance for the past thirty years—without regulation of any kind—has been unconstitutional, even though such surveillance poses the same risk of intercepting U.S. persons' communications as surveillance under § 1881a. *See Modernization of the Foreign Intelligence Surveillance Act: Hrg. before the S. Select Comm. on Intel.*, 110th Cong., 1st Sess. (May 1, 2007) ("5/1/07 FISA Modernization Hrg.") (testimony of DNI McConnell) ("[S]ince FISA was enacted in 1978, we've had this situation to deal with on a regular basis. . . . [I]f you're targeting something foreign, you could inadvertently intercept an American.").

like, Pls.' Reply 19.  Even assuming, hypothetically, that the latter were targeted under § 1881a, and that U.S. persons were identified in the course of the surveillance, minimization procedures would restrict the Government's ability to retain or disseminate those identities if not "necessary to understand foreign intelligence information or assess its importance."  50 U.S.C. § 1801(h)(2).  Further, the Government could not proceed to target those U.S. persons for separate surveillance—which it presumably would want to do if they were truly of interest—except by obtaining a traditional FISA order.  *See* Gov't Br. 35-36 & n.25.  Hence, not only are plaintiffs' hypotheticals utterly speculative—since they have no evidence the Government will surveil the postulated targets—but they ignore that the protections for U.S. persons that would apply even if it did.

In short, the fact that surveillance of foreign persons abroad may incidentally intercept communications with U.S. persons does not imply the necessity of a warrant regime—which would place an impossible burden on the Government, as we have explained, *see* Gov't Br. 38-39.  Instead, it merely implies a need for reasonable procedures to deal with that eventuality whenever it arises, which is precisely what the statute prescribes, *see infra* Point II.A.2.

> b.   *The Warrant Clause Also Is Inapplicable by Virtue of the Special Needs Doctrine*

Plaintiffs plow little new ground in responding to the Government's argument that § 1881a also is exempt from the warrant clause under the "special needs" doctrine, which applies to search programs serving needs "beyond normal law enforcement" that make a warrant requirement "impracticable."  *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987).

Plaintiffs persist in arguing that the special needs doctrine does not apply because, they say, a § 1881a acquisition may be conducted for the "primary purpose of gathering evidence of criminal activity" as opposed to foreign intelligence collection, Pls.' Reply 21.  It is remarkable,

however, that plaintiffs continue trying to breathe life into a distinction between the intelligence-gathering and evidence-gathering functions of foreign intelligence surveillance, when the viability of such a distinction has been discredited not only by the FISA Court of Review, *see* Gov't Br. 44 n.32, but also now by the Second Circuit, *see Odeh*, 548 F.3d at 291.  Given that the ultimate point of foreign intelligence surveillance is to enable the Government to *respond* to foreign threats, including potentially through criminal prosecution, the fact that the Government may conduct a § 1881a acquisition knowing that the intelligence gathered may later be used as criminal evidence is in no way inconsistent with a foreign intelligence purpose.  *Id.*

In any event, what matters under the special needs doctrine is the "programmatic" purpose of the statute, not the motivations that might lie behind a particular surveillance.  *See City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000); *In re Sealed Case*, 310 F.3d 717, 745 (FISA Ct. Rev. 2002).  And on that level, it is plain that § 1881a is addressed to external threats to the nation's security rather than the needs of "normal law enforcement."  *Griffin*, 483 U.S. at 873; *see also In re Sealed Case*, 310 F.3d at 746 (stating that it is "[t]he nature of the 'emergency'" or "threat" that "takes the matter out of the realm of ordinary crime control").  Plaintiffs' contention that it is somehow impermissible to distinguish between such threats and "ordinary crimes," Pls.' Br. 21-22, ignores case law specifically applying the special needs doctrine to search programs designed to detect terrorist plots, *see* Gov't Br. 41-42, and to other contexts where the need for prevention is paramount, *see, e.g.*, *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444 (1990) (upholding sobriety checkpoint aimed at removing drunk drivers from the road).

Finally, plaintiffs reprise their argument that "FISA shows" that a warrant requirement is practicable for foreign intelligence surveillance of non-U.S. persons abroad.  Pls.' Br. 22-23.  But

the Government has already explained that FISA was never originally intended to comprehensively regulate such surveillance, and that as such surveillance increasingly came within FISA's scope due to changes in technology, the resulting constraints on intelligence collection were indeed impracticable in the eyes of the intelligence community and Congress. Gov't Br. 3-11, 45-46. Plaintiffs do not so much as acknowledge this legislative history, let alone rebut it.[11]

   2.   *Section 1881a Satisfies the Fourth Amendment's Reasonableness Requirement*

Given the inapplicability of the warrant clause, § 1881a need only meet the Fourth Amendment's reasonableness requirement, which it does. Plaintiffs fail to show otherwise.

Plaintiffs' discussion of Fourth Amendment reasonableness errs right off the bat by stating that the "foremost" consideration in reasonableness analysis is "the intrusiveness of the search." Pls.' Reply 24. That is not the law. The Fourth Amendment simply requires that the intrusiveness of a search be reasonably balanced against the legitimate governmental interests it serves; there is no thumb on the privacy side of the scale. Even where there are compelling privacy interests at stake, they can be trumped by a governmental interest of greater magnitude. *See, e.g.*, *Odeh*, 548 F.3d at 295. And the magnitude of the competing governmental interest here could scarcely be greater. As the Government has explained, Congress passed § 1881a because it recognized that a robust capacity to identify and monitor overseas intelligence targets— including those in contact with persons in the United States—is essential to defend against the

---

[13] Plaintiffs only take issue with statements in the legislative history that international communications were transmitted predominantly by radio when FISA was enacted, as they assert that international communications were instead distributed "more-or-less equally" between radio and wire at the time. Pls.' Reply 26 n.13. The Court need not resolve this background dispute. The bottom line is that FISA was originally drafted to leave considerable room for warrantless surveillance of international communications by radio or wire interception offshore. Plaintiffs do not contest that these exceptions are reflected in the FISA's text and legislative history, or that their utility substantially diminished over time due to changes in technology.

threat of foreign terrorism.  Gov't Br. 8-11.[12]  In seeking to provide the intelligence community the tools it needs in this regard, Congress had to provide only reasonable—not maximal—protection to the privacy interests of affected U.S. persons.  *See Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 837 (2002) ("[T]his Court has repeatedly stated that reasonableness under the Fourth Amendment does not require employing the least intrusive means . . . .").

Section 1881a does afford such reasonable protection; plaintiffs' arguments to the contrary rest on repeated distortions of the statute.  The leading example is plaintiffs' argument that § 1881a vests the Government with "completely unfettered discretion in deciding which international communications to monitor," thus creating "the risk that [the Government] will target dissenting or unorthodox expression."  Pls.' Reply 25.  Lost in this rhetoric is any recognition that § 1881a obviously limits the Government's targeting discretion, in that it prohibits the Government from targeting U.S. persons.  As well, the statute builds in comprehensive oversight of the Government's compliance with this prohibition, by requiring FISC approval of the Government's targeting procedures and regular reporting to Congress and the FISC, regarding, *e.g.*, the extent to which U.S. persons' communications have been acquired under the statute and the number of intelligence reports stemming from § 1881a acquisitions referencing the identity of a U.S. person.  *See* 50 U.S.C. § 1881a(l)(3).  Thus, § 1881a can hardly be portrayed as declaring

---

[14] Indeed, Congress earlier found gaps in such surveillance to be partly responsible for the failure to prevent the September 11 attacks.  *See* Report of the Joint Inquiry into the Terrorist Attacks of September 11th, 2001, S. Rep. 107-351, H. Rep. 107-792 (2002), *available* at http://www.gpoaccess.gov/serialset/creports/pdf/fullreport_errata.pdf, at 36 (faulting an insufficient "focus[] on the importance of identifying and then ensuring coverage of communications between the United States and suspected terrorist-associated facilities abroad"); *id.* at 72 (finding that prior to September 11, 2001, "signals intelligence on counterterrorism was limited by [a] failure to address modern communications technology aggressively").

open season for the targeting of U.S. persons based on their political views, when it bars the Government from targeting U.S. persons for surveillance *for any reason at all*.

Equally unfounded is plaintiffs' worry that the Government will use § 1881a to monitor "Americans' most intimate conversations." Pls.' Reply 25. First, this claim again ignores that the targets of § 1881a acquisitions are aliens abroad, whose contacts with Americans are limited. Second, it ignores that surveillance under § 1881a must have a significant foreign intelligence purpose; the statute is not a license to conduct surveillance for its own sake. Third, and most fundamentally, plaintiffs' claim ignores the statute's requirement of minimization procedures. The very function of these procedures is to minimize the acquisition, retention, or dissemination of "intimate" or otherwise non-public information regarding U.S. persons unrelated to foreign intelligence. *See* 50 U.S.C. § 1801(h). Plaintiffs have no basis to presume that these procedures—which are subject to FISC approval and oversight—will be ineffective.

Plaintiffs argue that only if minimization procedures are combined with traditional warrant and probable cause requirements can they support a finding of reasonableness, Pls.' Reply 28-29. Yet this is simply an extension of their argument that a warrant and probable cause are required to surveil foreign persons abroad whenever there is a foreseeable possibility of incidentally intercepting communications with U.S. persons. As explained above, this argument is wrong. Once it is accepted that warrantless surveillance of foreign persons overseas is not rendered unlawful by the risk of such incidental interceptions, the only question remaining is how to protect the privacy interests of the incidental interceptees. And on that point, minimization procedures provide a reasonable, and hence constitutionally sufficient, solution. *Cf. Figueroa*, 757 F.2d at 473 (where wiretap order validly authorizes government agents to intercept calls of "oth-

ers as yet unknown," "[t]he agents are required only to make reasonable efforts to minimize their interceptions in light of all the relevant circumstances").

Plaintiffs also continue to fixate on the notion that § 1881a's minimization requirement is constitutionally deficient because it purportedly requires only "programmatic" rather than "individualized" minimization procedures. As an initial matter, plaintiffs have no evidence to show that minimization procedures *must* be "individualized" to be reasonable, *i.e.*, that there is no *possible* set of standardized procedures that meet constitutional muster—as they would have to show to succeed in challenging the statute's minimization provision on its face. Instead, their argument is wholly abstract and speculative, and ignores the use of standardized procedures in the traditional FISA context.[13] But in any event, if "individualization" is really as critical as plaintiffs believe, then the FISC could always make room for it in any minimization procedures the court approves (*e.g.*, through a catch-all provision requiring the use of "such additional procedures as may be necessary" to provide effective minimization in any given case). Nothing in the Constitution requires the statute itself to predetermine the issue.[14]

Finally, plaintiffs dispute the Government's charge that they are seeking to impose a back-door warrant requirement under the rubric of reasonableness, Pls.' Reply 30. That is precisely what they are seeking. Plaintiffs argue that reasonableness requires prior judicial approval based on some form of individualized suspicion—which is exactly what the Supreme Court has

---

[15] *See, e.g.*, *In re All Matters Submitted to Foreign Intelligence Surveillance Court*, 218 F. Supp. 2d 611, 615 (FISA Ct. 2002) (referring to "Standard Minimization Procedures for a U.S. Person Agent of a Foreign Power that are filed with the Court, which we continue to approve").

[16] Indeed, by comparison, Title III does not require a court to approve *any* specific minimization procedures prior to surveillance. Rather, it requires only that a wiretap order contain a provision stating that the surveillance "shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5).

said the Fourth Amendment cannot be construed to require where the warrant clause does not apply. *Griffin v. Wisconsin*, 483 U.S. 868 (1987). Plaintiffs respond that "reasonableness analysis . . . is always anchored in the basic protections of the Fourth Amendment," Pls.' Reply 30, but the only unchanging command of the Fourth Amendment is reasonableness itself. And reasonableness is not mechanically keyed to any one factor—even individualized suspicion—but rather turns on the context in which the search takes place. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 337 (1985); *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976). Given the context of § 1881a—involving foreign intelligence surveillance fundamentally directed at non-U.S. persons abroad—the warrant and probable cause requirements that plaintiffs seek to transplant from the domestic law enforcement context are wholly out of place.

**B.      Plaintiffs Have No Basis to Assert a Separate Claim under the First Amendment**

Plaintiffs' First Amendment argument merits little in the way of response. Plaintiffs complain that the Government has not sufficiently *dis*proved their theory that governmental investigation implicating expressive activity is subject to separate scrutiny under the First Amendment. Pls.' Reply 30-32. It is plaintiffs, however, who have failed to provide any competent support for their theory, which would be breathtaking in its implications. As Judge Wilkey persuasively explained in *Reporters Committee for Freedom of the Press v. AT&T*, 593 F.2d 1030 (D.C. Cir. 1977):

> Each time law enforcement officers place a suspect under physical surveillance or make inquiries and collect information on a suspect, they "implicate" First Amendment rights. Does this mean that before the police can take this fundamental investigative action there must be a hearing at which the particular utility of these acts is judicially balanced against the First Amendment "interests" they may affect? Each time the Government solicits information from an informant or places an undercover agent it "implicates" First Amendment rights. Does this mean that before such action is taken there must be a hearing at which the Government's "interest" in taking these actions is judicially balanced against the First Amendment activities "implicated"? And each time the police obtain a warrant

for . . . wiretaps or searches, First Amendment rights are "implicated." Does this mean that in addition to determining the probable cause required by the Fourth Amendment the issuing magistrate must also balance First Amendment interests? Of course, the practical consequence of such a regime would be the complete and absolute stultification of law enforcement.

*Id.* at 1059.[15]  The First Amendment cases cited in plaintiffs' initial brief all involve affirmative regulation of speech or alleged discrimination on the basis of speech.  *See* Pls.' Br. 46-48 & n.12. They provide no support for imposing a First Amendment "strict scrutiny" test on good-faith investigative activity simply because the information to be collected *comprises* speech.

## C.    Section 1881a Does Not Violate Article III

Lastly, plaintiffs make no progress in advancing their separation of powers claims.  Plaintiffs continue to argue that § 1881a requires the FISC to issue "advisory" opinions in violation of Article III because its review concerns "programmatic procedures" rather than "particular surveillance targets."  Pls.' Reply 32.  The argument is a complete *non sequitur*.  The breadth of the issue to be decided a court has nothing to do with whether its decision is "advisory."  Rather, to call a decision "advisory" means that it "has only the force of a recommendation," *C. & S. Air Lines v. Waterman Corp.*, 333 U.S. 103, 113 (1948), or otherwise fails to resolve "some dispute *which affects the behavior*" of a party before the court, *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (emphasis in original).  Section 1881a does not call for the FISC merely to "recommend" whether the Government's proposed targeting and minimization procedures are lawful.  It empowers the FISC to *decide* whether the Government may proceed with surveillance under the

---

[17] Although plaintiffs note that the other judge in the *Reporters Committee* majority found it unnecessary to join this portion of Judge Wilkey's opinion, plaintiffs neglect to mention that the other judge did join Judge Wilkey's core holding that "the First Amendment does not guarantee a journalist, or any other citizen, the freedom to collect information immune from good faith investigation by means which accord with Fourth and Fifth Amendment protections."  *Id.* at 1053.

procedures (and whether to *compel* the assistance of electronic communication service providers).  Thus, its decisions have immediate effect and are manifestly not "advisory."[16]

Nor is there any merit in plaintiffs' argument that § 1881a violates the separation of powers merely by providing for an automatic stay pending appeal of an adverse decision by the FISC.  Plaintiffs' attempts to distinguish other examples of automatic stay provisions, Pls.' Reply 34, are in vain.  It is well settled that Congress has broad authority over federal court jurisdiction and procedure, *see, e.g.*, *Hanna v. Plumer*, 380 U.S. 460, 472 (1965), including the authority to restrict the injunctive powers of the federal courts, *see Yakus v. United States*, 321 U.S. 414, 442 & n.8 (1944).  While Congress of course cannot set aside "the last word of the judicial department with regard to a particular case or controversy," "the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 227 (1995).  Thus, Congress is free to regulate the effect of an inferior court's decision while the final word of the judiciary is still under determination.

The Supreme Court's decision in *Yakus* is directly on point.  At issue there was a statute establishing procedures for judicial review of wartime price controls and vesting original jurisdiction in a special court.  321 U.S. at 428-29.  The statute restricted the court's injunctive powers in various ways, providing in particular for an automatic stay pending appeal of any perma-

---

[18] Plaintiffs also claim that § 1881a violates the separation of powers by assigning the FISC "advisory *adjudicative* functions," as opposed to "nonadjudicative" functions of the kind upheld in *Mistretta v. United States*, 488 U.S. 361 (1989) and *Morrison v. Olson*, 487 U.S. 654 (1988).  Pls.' Br. 34.  Plaintiffs leave it a mystery, however, why the assignment of "adjudicative" functions to the *judicial* branch constitutes a *greater* affront to the separation of powers than the assignment of "nonadjudicative" functions.  Moreover, plaintiffs fail to appreciate the significance of *Mistretta*, in which the Court upheld "the placement of the Sentencing Commission within the Judicial Branch," notwithstanding the Commission's power to engage in "rulemaking" on sentencing matters.  488 U.S. at 390-91.  FISC review under § 1881a is, by comparison, far less removed from ordinary Article III functions, making it an easier, not harder, case, than *Mistretta*.

nent injunction issued against the Government. *Id.* The Supreme Court found no separation of powers violation in this arrangement, given that it merely established a rule of judicial procedure in place of judicial discretion. *Id.* at 442 ("The legislative formulation of what would otherwise be a rule of judicial discretion is not . . . a usurpation of judicial functions."). The same is true of § 1881a's automatic stay provision. Hence, it is fully consistent with the separation of powers.

## CONCLUSION

For the reasons stated above and in defendants' initial brief, plaintiffs' motion for summary judgment should be denied and defendants' cross-motion for summary judgment should be granted.

Dated: New York, New York
      January 16, 2009

GREGORY G. KATSAS
Assistant Attorney General
Civil Division

By: _/s/ Anthony J. Coppolino_
ANTHONY J. COPPOLINO
Special Litigation Counsel
Civil Division, Federal Programs Branch
United States Department of Justice
20 Massachusetts Avenue, Room 6102
Washington, D.C. 20530
Tel No. (202) 514-4782
Fax No. (202) 616-8460
tony.coppolino@usdoj.gov

LEV L. DASSIN
Acting United States Attorney for the
Southern District of New York

By: _/s/ Serrin Turner_
SERRIN TURNER
Assistant United States Attorney
86 Chambers Street
New York, New York 10007
Tel. No. (212) 637-2701
Fax No. (212) 637-2686
serrin.turner@usdoj.gov

Attorneys for Defendants

-25-