UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

AMNESTY INTERNATIONAL USA, et al.,

                    Plaintiffs,

    - against -                              08 Civ. 6259 (JGK)

                                             <u>OPINION AND ORDER</u>

JOHN MCCONNELL, et al.,

                    Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

     This is a facial challenge to the constitutionality of
Section 702 of the Foreign Intelligence Surveillance Act of 1978
("FISA"), 50 U.S.C. § 1881a, which was added to FISA by Section
101(a)(2) of the FISA Amendments Act of 2008 (the "FAA").  In
relevant part, the FAA amended FISA by creating a new framework
within which federal officials may seek approval from the
Foreign Intelligence Surveillance Court (the "FISC") to
authorize surveillance targeting non-United States persons
located outside the United States to acquire foreign
intelligence information.

     The plaintiffs are attorneys and organizations in the
United States whose work necessitates international
communications with people and organizations they believe to be
likely targets of surveillance under the FAA.  The defendants
are the Director of National Intelligence, the Director of the

National Security Agency and Chief of the Central Security Service, and the Attorney General of the United States.[1]

The plaintiffs fear that their international communications will be monitored under the FAA. They make no claim that their communications have yet been monitored, and they make no allegation or showing that the surveillance of their communications has been authorized or that the Government has sought approval for such surveillance. However, the plaintiffs assert that they have an "actual and well-founded fear" of surveillance under the FAA and claim already to have incurred significant costs in taking steps to protect their international communications from surveillance. The plaintiffs challenge the FAA as unconstitutional under the Fourth Amendment, the First Amendment, and Article III of the Constitution.

The Government contends as a threshold matter that the plaintiffs lack standing to challenge the FAA. The Government also contends that the lawsuit lacks merit in any event because the FAA is constitutional on its face.

The parties have filed cross-motions for summary judgment. For the reasons explained below, the plaintiffs have failed to show that they have standing to bring their facial challenge to the statute.

---

[1]    Attorney General Eric H. Holder, Jr., should be automatically substituted for former Attorney General Michael B. Mukasey as a defendant, and the caption of this case changed accordingly. See Fed. R. Civ. P. 25(d).

I

A

Prior to the passage of the FAA, FISA created a framework
for federal officials to apply for and obtain orders authorizing
electronic surveillance where a significant purpose of the
surveillance was to obtain foreign intelligence information.
See 50 U.S.C. § 1804; see also United States v. Duggan, 743 F.2d
59, 77 (2d Cir. 1984).[2]  FISA established the FISC, comprised of
judges appointed by the Chief Justice of the United States, with
jurisdiction to hear applications for and to grant orders
approving electronic surveillance "in aid of protecting the
United States against attack by foreign governments or
international terrorist groups."  United States v. Rahman, 861
F. Supp. 247, 249 (S.D.N.Y. 1994), aff'd, 189 F.3d 88 (2d Cir.
1999); see also 50 U.S.C. §§ 1801(e), 1803.

FISA required that each application for an order approving
electronic surveillance be made by a federal officer upon oath
or affirmation after approval by the Attorney General.  50
U.S.C. § 1804(a).  An application was required to set forth the

---

[2]    Prior to October 26, 2001, the date on which the Patriot Act became
effective, FISA required that obtaining foreign intelligence information be
"the purpose" of electronic surveillance, rather than "a significant
purpose."  See United States v. Sattar, No. 02 Cr. 395, 2003 WL 22137012, at
*3 & n.3 (S.D.N.Y. Sept. 15, 2003).

identity of the federal officer making the application; the identity, if known, of the target of the electronic surveillance; the facts upon which the applicant relied in concluding that the target of the electronic surveillance was a foreign power or an agent of a foreign power and that each of the facilities or places at which the surveillance was directed was being used, or was about to be used, by a foreign power or agent thereof; a statement of proposed minimization procedures; the type of information sought and the means by which surveillance would be effected; a statement concerning the previous applications sought; and a statement of the period of time for which the surveillance was required to be maintained. 50 U.S.C. § 1804(a)(1)-(9).

The application had to be approved by the Attorney General upon the Attorney General's finding that it satisfied the criteria and requirements of such an application.  50 U.S.C. § 1804(a).  The application had to include a certification from a high ranking executive officer employed in the area of national security or defense that the information sought was foreign intelligence information as defined by 50 U.S.C. § 1801(e).  50 U.S.C. § 1804(a)(6).  Foreign intelligence information included information relating to the ability of the United States to protect against international terrorism, and "information with

4

respect to a foreign power or foreign territory that relates to
. . . the conduct of the foreign affairs of the United States,"
among other things.  50 U.S.C. § 1801(e).  FISA required that
the certification include a statement that the information
sought could not reasonably be obtained by normal investigative
techniques and designating the type of foreign intelligence
information sought in accordance with § 1801(e).  50 U.S.C. §
1804(a)(6).  Finally, after the passage of the Patriot Act, the
executive officer was required to certify that "a significant
purpose of the surveillance is to obtain foreign intelligence
information."  50 U.S.C. § 1804(a)(6).

Prior to approving the requested electronic surveillance, a
FISC judge had to find that: (1) the application was made by a
federal officer and approved by the Attorney General; (2) there
was probable cause on the basis of the application to believe
that the target of the electronic surveillance was a foreign
power or agent of a foreign power, and that each of the
facilities or places at which the electronic surveillance was
directed was being used, or was about to be used, by a foreign
power or an agent of a foreign power; (3) the proposed
minimization procedures met the definition of minimization
procedures set forth in § 1801(h); and (4) the application

contained all statements and certifications required under §
1804.  50 U.S.C. § 1805(a).

Pursuant to FISA, a FISC judge who was satisfied that an
application met the statutory requirements was required to enter
an ex parte order approving the requested electronic
surveillance.  50 U.S.C. § 1805(a).  Such an order was required
to specify the identity of the target of the surveillance; the
location of each of the facilities or places at which the
surveillance would be directed; the type of information sought
and communications or activities to be subjected to the
surveillance; the means by which the surveillance would be
effected; and the period of time for which the surveillance was
approved; and to direct that the minimization procedures be
followed.  50 U.S.C. § 1805(c).

The FISA framework governed applications for orders
authorizing electronic surveillance to obtain foreign
intelligence information, including surveillance of
communications between persons located within the United States
("domestic communications") and surveillance of communications
between persons located within the United States and persons
located outside the United States ("international
communications").  FISA defined "electronic surveillance" to
include:

(1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes;

(2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States, but does not include the acquisition of those communications of computer trespassers that would be permissible under section 2511(2)(i) of Title 18;

(3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or

(4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

50 U.S.C. § 1801(f).  The FISA requirements thus applied to the surveillance of international wire communications (including telephone and email communications) provided that the surveillance occurred in the United States.  50 U.S.C. § 1801(f)(2).  The FISA requirements did not apply to the

7

surveillance of international radio communications, or to surveillance of international wire communications that did not take place in the United States,[3] unless such surveillance targeted a known United States person located in the United States.  See 50 U.S.C. §§ 1801(f)(1-2).[4]

B

The FAA was signed into law on July 10, 2008.  The FAA leaves much of the preexisting FISA framework intact.  However, new Section 702 of FISA, added by Section 101(a)(2) of the FAA and codified at 50 U.S.C. § 1881a, sets forth a new framework displacing the preexisting FISA framework where the Government seeks approval from the FISC to authorize surveillance targeting non-United States persons located outside the United States to acquire foreign intelligence information.  Under the FAA, "[n]otwithstanding any other provision of law, upon the issuance of an order in accordance with [50 U.S.C. § 1881a(i)(3)] or a determination under [50 U.S.C. § 1881a(c)(2)], the Attorney General and the Director of National Intelligence may authorize

---

[3]    The plaintiffs represent that at the time FISA was passed, approximately half of Americans' international communications were transmitted by radio or satellite, the monitoring of which Congress did not regulate.  The Government represents that the percentage was greater than half.

[4]    FISA defines "United States person" to mean a citizen of the United States or an alien lawfully admitted for permanent residence, in relevant part.  50 U.S.C. § 1801(i).

jointly, for a period of up to 1 year from the effective date of the authorization, the targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information."  50 U.S.C. § 1881a(a).

In order to authorize surveillance under the FAA, the Attorney General and the Director of National Intelligence must apply for and obtain an order authorizing such surveillance from the FISC.  50 U.S.C. §§ 1881a(a) & (i)(3).[5]  The application consists of providing a written certification and any supporting affidavit, under oath and under seal, to the FISC.  The certification must attest, among other things, that a significant purpose of the requested surveillance is to obtain foreign intelligence information; that the surveillance involves obtaining such information from or with the assistance of an electronic communications service provider; and that the surveillance complies with certain limitations set forth in § 1881a(b).  50 U.S.C. § 1881a(g)(2)(A)(v-vii).

---

[5]    The FAA provides an exception where the Attorney General and the Director of National Intelligence determine that exigent circumstances exist because, without immediate implementation of an authorization of surveillance, intelligence important to the national security of the United States may be lost or not timely acquired and time does not permit the issuance of an order pursuant to 50 U.S.C. § 1881a(i)(3) prior to the implementation of such authorization.  50 U.S.C. § 1881a(c)(2).  In the case of a determination of exigent circumstances pursuant to 50 U.S.C. § 1881a(c)(2), the Attorney General and the Director of National Intelligence must undertake as soon as practicable, but in no event later than 7 days after such determination is made, to fulfill the same requirements ordinarily imposed before an order authorizing surveillance under the FAA may be obtained from the FISC.  50 U.S.C. § 1881a(g)(1)(B).

9

Pursuant to the limitations set forth in § 1881a(b), the requested surveillance may not intentionally target any person known at the time of the surveillance to be located in the United States; any person reasonably believed to be located outside the United States if the purpose of such surveillance is to target a particular, known person reasonably believed to be in the United States; or any United States person reasonably believed to be located outside the United States. 50 U.S.C. § 1881a(b)(1-3). Moreover, the requested surveillance may not intentionally acquire communications known at the time of the surveillance to be domestic communications, 50 U.S.C. § 1881a(b)(4), although it may intentionally acquire international communications.[6] Section 1881a(b) also provides that the requested surveillance must be conducted in a manner consistent with the Fourth Amendment. 50 U.S.C. § 1881a(b)(5).

The certification must attest that guidelines have been adopted in accordance with 50 U.S.C. § 1881a(f) to ensure compliance with the limitations in § 1881a(b) and to ensure that an application for a court order is filed as required by § 1881a. 50 U.S.C. § 1881a(g)(2)(A)(iii). In addition, such guidelines must be provided to the congressional intelligence committee and the Committees on the Judiciary of the Senate and

_____

[6]    Insofar as the FAA regulates the surveillance of international radio communications to obtain foreign intelligence information, it establishes regulations where none existed under FISA.

the House of Representatives, as well as the FISC.  50 U.S.C. §
1881a(f)(2).  The certification must attest that such guidelines
are consistent with the Fourth Amendment.  50 U.S.C. §
1881a(g)(2)(A)(iv).

The certification must attest that the Government has
targeting and minimization procedures in place that have been
approved by the FISC or have been submitted to the FISC for
approval or will be submitted with the certification.  50 U.S.C.
§ 1881a(g)(2)(A)(i-ii).  The certification must also include the
actual procedures and attest that they comply with the Fourth
Amendment.  50 U.S.C. § 1881a(g)(2)(B) & (g)(2)(A)(iv).
"Targeting procedures" are procedures reasonably designed to
ensure that the requested surveillance is limited to targeting
persons reasonably believed to be located outside the United
States, and to prevent the intentional surveillance of
communications known to be domestic communications at the time
of the surveillance.  50 U.S.C. § 1881a(d)(1) & (g)(2)(A)(i).
"Minimization procedures" for purposes of electronic
surveillance under the FAA must meet the definition of
minimization procedures for purposes of electronic surveillance
under FISA.  Minimization procedures are:

> (1) specific procedures, which shall be adopted by the
> Attorney General, that are reasonably designed in
> light of the purpose and technique of the particular
> surveillance, to minimize the acquisition and

retention, and prohibit the dissemination, of
nonpublicly available information concerning
unconsenting United States persons consistent with the
need of the United States to obtain, produce, and
disseminate foreign intelligence information;

(2) procedures that require that nonpublicly available
information, which is not foreign intelligence
information, as defined in [50 U.S.C. § 1801(e)(1)],
shall not be disseminated in a manner that identifies
any United States person, without such person's
consent, unless such person's identity is necessary to
understand foreign intelligence information or assess
its importance; [and]

(3) notwithstanding paragraphs (1) and (2), procedures
that allow for the retention and dissemination of
information that is evidence of a crime which has
been, is being, or is about to be committed and that
is to be retained or disseminated for law enforcement
purposes[.]

50 U.S.C. § 1801(h).[7]

The certification required by the FAA must be supported, as

appropriate, by the affidavit of any appropriate official in the

area of national security who is appointed by the President, by

and with the advice and consent of the Senate, or who is the

head of an element of the intelligence community.  50 U.S.C. §

1881a(g)(2)(C).  The certification must include an effective

date for the authorization that is at least 30 days after the

---

[7]    Section 1801(h) includes a fourth requirement for minimization
procedures where surveillance is conducted pursuant to 50 U.S.C. § 1802(a).
Surveillance conducted under § 1802(a) is solely directed at communications
transmitted by means of communications used exclusively between or among
foreign powers, among other things, and may be authorized without a court
order if the requirements of that section are satisfied.  50 U.S.C. §
1802(a).  Surveillance conducted pursuant to the FAA is not subject to the
minimization requirement set forth in § 1801(h) that applies only to
surveillance conducted pursuant to § 1802(a).

submission of the certification to the FISC; or, if the acquisition has begun or the effective date is less than 30 days after the submission of the certification to the FISC, the date the acquisition began or the effective date of the acquisition. 50 U.S.C. § 1881a(g)(2)(D).

The FISC has jurisdiction to review a certification for electronic surveillance under the FAA, including the targeting and minimization procedures that were adopted by the Attorney General in consultation with the Director of National Intelligence. 50 U.S.C. § 1881a(i)(1)(A). The FAA provides that the FISC shall review the certification, the targeting procedures and the minimization procedures to ensure that they comply with all of the requirements discussed above. 50 U.S.C. § 1881a(i)(2). If the FISC finds that the certification contains all the required elements and the targeting and minimization procedures are in compliance with the statute and with the Fourth Amendment, it must issue an order granting the Government approval to authorize the requested surveillance. 50 U.S.C. § 1881a(i)(3)(A). The FISC must complete its review and issue an order with respect to an application for an order authorizing surveillance no more than 30 days after the date on which the certification and the targeting and minimization

procedures are submitted for approval.  50 U.S.C. § 1881a(i)(1)(B).

The FAA allows for the Government to appeal an order rejecting an application for a surveillance order to the FISA Court of Review.  The Court of Review must decide an appeal no more than 60 days from the date the appeal is filed.  The Government is permitted to continue any surveillance affected by a FISC order while an appeal to the Court of Review is pending, or while any rehearing of the FISC order by the FISC en banc is pending.  The Government may file a petition for a writ of certiorari with the Supreme Court for review of a decision of the Court of Review.  50 U.S.C. § 1881a(i)(4).

The FAA provides for a semiannual assessment of compliance with the targeting and minimization procedures adopted in accordance with 50 U.S.C. §§ 1881a(d) and (e) and the guidelines adopted in accordance with § 1881a(f).  The FAA provides that each assessment shall be made by the Attorney General and the Director of National Intelligence, and submitted to the FISC, the congressional intelligence committees, and the Committees on the Judiciary of the House of Representatives and the Senate.[8] 50 U.S.C. § 1881a(l).

---

[8]    The submission of semiannual assessments to the congressional committees, under this provision and all other provisions in the FAA, is subject to the Rules of the House of Representatives, the Standing Rules of

The FAA also provides that the Inspector General of the Department of Justice and the Inspector General of each element of the intelligence community authorized to acquire foreign intelligence information under § 1881a are authorized to review compliance with the targeting and minimization procedures adopted under §§ 1881a(d) and (e) and the guidelines adopted under § 1881a(f).  With respect to surveillance authorized under § 1881a, those officials are required to review the number of disseminated intelligence reports containing a reference to a United States person identity and the number of United States person identities subsequently disseminated by the element concerned in response to requests for identities that were not referred to by name or title in the original reporting.  They are also required to review the number of targets that were later determined to be located in the United States and, to the extent possible, whether communications of such targets were reviewed.  They must provide each such review to the Attorney General, the Director of National Intelligence, the congressional intelligence committees, and the Committees on the Judiciary of the House of Representatives and the Senate.  50 U.S.C. § 1881a(l)(2).

---

the Senate, and Senate Resolution 400 of the 94th Congress or any successor Senate resolution.  50 U.S.C. § 1881a(l)(B).

Finally, the FAA provides for the head of each element of the intelligence community conducting surveillance authorized under § 1881a to conduct an annual review to determine whether there is reason to believe that foreign intelligence information has been or will be obtained from the surveillance. The annual review is required to provide an accounting of the number of disseminated intelligence reports containing a reference to a United States person identity; an accounting of the number of United States person identities subsequently disseminated by that element in response to requests for identities that were not referred to by name or title in the original reporting; the number of targets that were later determined to be located in the United States and, to the extent possible, whether communications of such targets were reviewed; and a description of any procedures developed by the head of such element of the intelligence community and approved by the Director of National Intelligence to assess, in a manner consistent with national security, operational requirements and the privacy interests of United States persons, the extent to which the surveillance authorized under § 1881a acquires the communications of United States persons, and the results of any such assessment. 50 U.S.C. § 1881a(l)(3)(A). The purpose of the annual review is to evaluate the adequacy of the minimization procedures used and,

16

as appropriate, the application of the minimization procedures to a particular surveillance. 50 U.S.C. § 1881a(l)(3)(B). The annual reviews are to be provided to the FISC, the Attorney General, the Director of National Intelligence, the congressional intelligence committees, and the Committees on the Judiciary of the House of Representatives and the Senate. 50 U.S.C. § 1881a(l)(3)(C).[9]

In applying for an order from the FISC approving the authorization of surveillance under the FAA, the Government is not required to identify the specific facilities, places, premises, or property at which the surveillance will be directed or conducted. 50 U.S.C. § 1881g(4). The Government is also not required to identify the specific targets of the requested surveillance or to show probable cause that the prospective targets of the surveillance are foreign powers or agents thereof.

II

The plaintiffs move for summary judgment declaring the FAA unconstitutional, and the Government moves for summary judgment dismissing the plaintiffs' constitutional challenge. Summary

---

[9]    The FAA also provides a framework for directives to be issued by the Attorney General and the Director of National Intelligence to electronic communication service providers in order to carry out surveillance authorized under § 1881a, and for judicial review of such directives. See 50 U.S.C. § 1881a(h).

judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Roe v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008); New York State Motor Truck Ass'n v. Pataki, No. 03 Civ. 2386, 2004 WL 2937803, at *3 (S.D.N.Y. Dec. 17, 2004).

Although both parties have moved for summary judgment, the only factual submissions in the record are those made by the plaintiffs. In opposing the plaintiffs' motion for summary judgment, and in responding to the plaintiffs' Statement of Undisputed Facts pursuant to Local Rule 56.1 (the plaintiffs' "56.1 Statement" or "56.1 Stmt."), the Government makes no reference to any evidence except that submitted by the plaintiffs. Moreover, the Government submits no facts in support of its own motion for summary judgment. At oral argument, the Government clarified that it was accepting the factual submissions of the plaintiffs as true for purposes of these motions. (Tr. 48-49.) Of course, that does not imply the acceptance of any legal conclusions embedded in the plaintiffs' 56.1 statement. See, e.g., Alliance Sec. Products, Inc. v. Fleming Co., 471 F. Supp. 2d 452, 454 & n.8 (S.D.N.Y. 2007)

(legal arguments in Rule 56.1 Statement disregarded in determining whether there are genuine issues of material fact).[10]

Accordingly, the following facts are undisputed.[11]  The plaintiffs are attorneys and human rights, labor, legal, and media organizations whose work requires them to engage in sensitive and sometimes privileged telephone and email communications with colleagues, clients, journalistic sources, witnesses, experts, foreign governmental officials, and victims of human rights abuses located outside the United States. (Pl.'s 56.1 Stmt. ¶ 9(A).)  Some of the plaintiffs communicate by telephone and email with people the United States Government believes or believed to be associated with terrorist organizations.  (Pl.'s 56.1 Stmt. ¶ 9(B).)  Some of the plaintiffs communicate by telephone and email with political and

---

[10]    The plaintiffs argue in passing that the defendants should not be entitled to summary judgment because they failed to submit a 56.1 Statement in support of their motion for summary judgment.  However, the Court can dispense with the requirement of a 56.1 Statement, see Hadden v. Bureau of Prisons, No. 07 Civ. 8586, 2008 WL 5429823, at *5 (Dec. 22, 2008) (citing D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 109 n.2 (2d Cir. 2006)), and it would make no sense to require such a statement from the defendants in this case because they are prepared to accept the plaintiffs' allegedly undisputed facts, the conditional acceptance of which is in any event the consequence of failing to submit a 56.1 Statement.  Cf. Cosy Goose Hellas v. Cosy Goose U.S.A. Lt., 581 F. Supp. 2d 606, 616-17.

    Moreover, when the plaintiffs' standing has been challenged on a motion for summary judgment the plaintiffs must come forward with sufficient evidence to show that there is a genuine material issue as to their standing to warrant a trial.  See Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 53-54 (1976).  If the plaintiffs fail to meet this standard, then summary judgment should be granted dismissing their complaint.

[11]    The Court only recites those facts set forth by the plaintiffs that are material to the disposition of these motions.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

human rights activists who oppose governments that are supported economically or militarily by the United States Government. (Pl.'s 56.1 Stmt. ¶ 9(C).) Some of the plaintiffs communicate by telephone and email with people located in geographic areas that are a special focus of the United States Government's counterterrorism or diplomatic efforts. (Pl.'s 56.1 Stmt. ¶ 9(D).)

All of the plaintiffs exchange information that constitutes foreign intelligence information within the meaning of the FAA. (Pl.'s 56.1 Stmt. ¶ 9(E).) The plaintiffs believe that their communications will be monitored under the FAA, and that those communications will be retained, analyzed, and disseminated by the Government. (Pl.'s 56.1 Stmt. ¶ 9(F).) This belief has affected the way the plaintiffs do their jobs. (Pl.'s 56.1 Stmt. ¶ 9(G).) Namely, the plaintiffs feel constrained in locating witnesses, cultivating sources, gathering information, and communicating confidential information to their clients, among other things. (Pl.'s 56.1 Stmt. ¶ 9(H).) The plaintiffs have ceased engaging in certain conversations on the telephone and by email. (Pl.'s 56.1 Stmt. ¶ 9(I).) The attorney plaintiffs have an ethical obligation to avoid communicating confidential information about client matters over telephone, fax, or email if they have reason to believe that it is likely

20

to be intercepted by others.  (Pl.'s Supplemental 56.1 Stmt. ¶ 2(J).)

The plaintiffs have incurred costs in seeking to protect the confidentiality of sensitive and privileged communications. (Pl.'s 56.1 Stmt. ¶ 9(J).)  Some of the plaintiffs now travel long distances to meet personally with individuals instead of communicating with those individuals over telephone or email. (Pl.'s 56.1 Stmt. ¶ 9(K).)  On the whole, the plaintiffs' reaction to the FAA has affected their work more than their reaction to previous regulatory enactments providing frameworks for Government surveillance.  (Pl.'s 56.1 Stmt. ¶ 9(L).)


III

The plaintiffs argue that on its face, the FAA violates the Fourth Amendment, the First Amendment, and Article III of the Constitution.  The plaintiffs argue under the Fourth Amendment that the FAA fails to protect the privacy interest of Americans in the content of their telephone calls and emails.  They argue under the First Amendment that the FAA chills the constitutionally protected speech of Americans who fear that their telephone calls and emails will be subject to surveillance.  They argue under Article III that the process of judicial review set forth in the FAA violates the principle of

the separation of powers by allowing the FISC to issue orders
approving the authorization of surveillance in the absence of
any case or controversy and by allowing for the Government to
continue surveillance while an appeal to the FISC Court of
Review is pending.

In order to reach the merits of the plaintiffs'
constitutional arguments, the Court must first determine whether
the plaintiffs have standing to bring this action. See, e.g.,
Warth v. Seldin, 422 U.S. 490, 498 (1975) ("In essence the
question of standing is whether the litigant is entitled to have
the court decide the merits of the dispute or of particular
issues."); Ontario Public Service Employees Union Pension Trust
Fund v. Nortel Networks Corp., 369 F.3d 27, 34 (2d Cir. 2004)
("In order for our court to properly reach the merits of the
case . . . we must first find that the parties involved have met
the basic requirements of standing."); Local 851 of
International Brotherhood of Teamsters v. Thyssen Hill
Logistics, Inc., Nos. 95 Civ. 5179, 02 Civ. 6250, 2004 WL
2269703, at *5 (E.D.N.Y. Sept. 30, 2004) ("Standing is a
jurisdictional prerequisite; accordingly, the Court must
initially determine whether [the plaintiff] has standing to
invoke the jurisdiction of the federal courts to determine the

merits of the underlying disputes.") (internal citation and quotation marks omitted).

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992). To satisfy the irreducible constitutional minimum of Article III standing, a plaintiff must show that (1) it has suffered an actual or imminent injury in fact, that is concrete and particularized, and not conjectural or hypothetical; (2) there is a causal connection between the injury and the defendant's actions; and (3) it is likely that a favorable decision in the case will redress the injury. Id. at 560-61. "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561.

Because the judicial power of federal courts "exists only to redress or otherwise protect against injury to the complaining party," a federal court's jurisdiction "can be invoked only when the plaintiff . . . has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .'" Warth, 422 U.S. at 499 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973)). The plaintiff must show a particularized injury that affects the plaintiff in a personalized and individual way. Lujan, 504 U.S. at 560 n.1.

23

Only a plaintiff so injured has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth, 422 U.S. at 498-99 (quoting Baker v. Carr, 399 U.S. 186, 204 (1962)).

Apart from the irreducible constitutional minimum, the Supreme Court has also recognized other prudential limitations on the class of persons who may invoke the federal judicial power.  "[T]he Court has held that when the asserted grievance is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." Warth, 422 U.S. at 499.  The Court has also held that the plaintiff must generally assert the plaintiff's own rights, and cannot rest on the legal rights or interests of third parties.  Id.  This case turns on whether the plaintiffs have met the irreducible constitutional minimum of personal, particularized, concrete injury in fact without turning to the additional prudential aspects of standing.

The plaintiffs advance what they characterize as two independent bases for Article III standing to challenge the constitutionality of the FAA.  First, the plaintiffs argue that they have standing on the basis of their fear that their

24

communications will be monitored under the FAA because that fear
is "actual and well-founded."  Second, the plaintiffs argue that
they have standing on the basis of the costs they have incurred
in taking measures to protect the confidentiality of their
international communications, in light of their fear of
surveillance.  The Court addresses each proffered basis for
standing in turn.


                                    A

     The plaintiffs argue that their fear of surveillance under
the FAA provides a basis for Article III standing to challenge
the constitutionality of that statute.  They seize upon case law
indicating that in the context of a pre-enforcement challenge to
a statute on First Amendment grounds, a plaintiff need only
demonstrate "'an actual and well-founded fear that the law will
be enforced against' it" to satisfy the injury-in-fact
requirement for Article III standing.  Vt. Right to Life Comm.,
Inc. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000) (quoting
Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 393
(1988)); see also Am. Booksellers Foundation v. Dean, 342 F.3d
96, 101 (2d Cir. 2003).[12]  The plaintiffs urge that their fear of

---

[12]    The Court of Appeals for the Second Circuit has indicated that the
standard of showing an "actual and well-founded fear" of enforcement is
"slightly" easier to satisfy than the standard of showing a "realistic
danger" of enforcement that applies to non-First Amendment pre-enforcement

surveillance is "actual and well-founded" because, according to
the plaintiffs, "the FAA <u>authorizes</u> the government to monitor
plaintiffs' international communications" and "plaintiffs'
communications are <u>likely</u> to be collected under the challenged
law" based on the nature of the communications and the identity
of the persons with whom the plaintiffs communicate.  (Pl.'s
Reply Br. 4.) (emphasis in original).

---

challenges to a statute.  <u>Am. Booksellers</u>, 342 F.3d at 101 (internal
quotation marks omitted).  The plaintiffs argue that the "actual and well-
founded fear" standard should apply to the determination of standing with
respect to all of their claims, rather than the First Amendment claim alone,
because the alleged conduct that is the source of the injuries asserted under
each constitutional claim – the potential enforcement of the statute –
implicates First Amendment rights.  The difference between the "actual and
well-founded fear" standard and the "realistic danger" standard has never
been explained, and it should be noted that there are some indications that
there is no meaningful difference between the two standards.  <u>See</u> <u>Brooklyn
Legal Servs. Corp. v. Legal Servs. Corp.</u>, 462 F.3d 219, 227 (2d Cir. 2006)
(finding standing for as-applied First Amendment challenge based on "actual
and well-founded fear" and "realistic danger"); <u>cf.</u> <u>Babbitt v. United Farm
Workers Nat'l Union</u>, 442 U.S. 289, 298 (1979) (invoking "realistic danger"
standard in First Amendment context).  In any event, any difference between
the "actual and well-founded fear" standard and the "realistic danger"
standard has no bearing on the outcome of this case, and the parties agree
that Article III standing should be assessed under a single standard with
respect to all of the plaintiffs' claims.  (Tr. 12, 54.)  Therefore, the
Court applies the "actual and well-founded fear" standard to all of the
challenges to the FAA.

    In addition, because the potential enforcement of the challenged
statute accounts for all of the injuries asserted under each constitutional
claim; the parties agree that Article III standing should be assessed under a
single standard with respect to all of the plaintiffs' claims; and separate
standing analyses for each constitutional claim would not affect the outcome
of this case, the Court does not undertake a separate standing analysis with
respect to each alleged constitutional violation.  <u>See</u> <u>Duke Power Co. v.
Carolina Envtl. Study Group, Inc.</u>, 438 U.S. 59, 78 (1978) (holding that
plaintiffs need not "demonstrate a connection between the injuries they claim
and the constitutional rights being asserted"); <u>United Presbyterian Church in
the United States of America v. Reagan</u>, 738 F.2d 1375 (D.C. Cir. 1984)
(Scalia, J.) (conducting collective standing analysis for First, Fourth, and
Fifth Amendment claims and separation of powers claims); <u>cf.</u> <u>Friends of the
Earth v. Laidlaw Envtl. Servs., Inc.</u>, 528 U.S. 167, 185 (2000) (standing must
be demonstrated separately for injunctive relief and civil penalties because
these are different forms of relief).

The Government argues that the plaintiffs' fear that their communications will be monitored under the FAA does not confer standing on the plaintiffs to challenge the constitutionality of that statute.  The Government contends that standing to make a pre-enforcement challenge to a statute may only be found "where there is a threat of imminent enforcement of a specific proscription that demonstrably applies to a plaintiff's actions" (Gov't Reply Br. 2-3), and that no such basis for a pre-enforcement challenge to the FAA exists here.

The plaintiffs have failed to establish standing to challenge the constitutionality of the FAA on the basis of their fear of surveillance.  The plaintiffs can only demonstrate an abstract fear that their communications will be monitored under the FAA.  The FAA creates a framework within which intervening federal officials may apply for approval from the FISC to authorize surveillance targeting non-United States persons located outside the United States to acquire foreign intelligence information.  The FAA sets forth the requirements that an application to obtain a surveillance order from the FISC must satisfy.  Contrary to the characterization of the statute in the plaintiffs' motion papers, the FAA itself does not authorize the surveillance of the plaintiffs' communications. Indeed, the FAA neither authorizes surveillance nor identifies

on its face a class of persons that includes the plaintiffs.
Rather the FAA authorizes specified federal officials to seek a
surveillance order from the FISC.  That order cannot target the
plaintiffs and whether an order will be sought that affects the
plaintiffs' rights, and whether such an order would be granted
by the FISC, is completely speculative.


                                1.

    Courts have explicitly rejected standing based on a fear of
surveillance in circumstances similar to those in this case.  In
United Presbyterian Church in the United States of America v.
Reagan, 738 F.2d 1375 (D.C. Cir. 1984) (Scalia, J.), the Court
of Appeals for the District of Columbia Circuit denied standing
to plaintiffs seeking to challenge the constitutionality of
Executive Order No. 12333 (the "Executive Order").  The
Executive Order created a framework within which intelligence
agencies could apply to the Attorney General for approval to
collect, retain or disseminate certain kinds of intelligence
information.  See Executive Order No. 12333 at ¶¶ 2.3, 2.5.  The
Executive Order set forth the kinds of information that could be
collected and established limitations on permissible collection
techniques, including electronic surveillance under certain
circumstances.  Executive Order No. 12333 at ¶¶ 2.3, 2.4, 2.5.

                                28

The plaintiffs were political and religious organizations that
the Court assumed were more likely than the public at large to
be subject to surveillance under the Executive Order.  See
United Presbyterian, 738 F.2d at 1380.  The Court rejected the
plaintiffs' attempt to rely upon the "threat" of surveillance
for standing to challenge the Executive Order, explaining that
"[t]he problem with [the plaintiffs'] attempt to rely upon this
sort of harm to establish standing in the present case is that
they have not adequately averred that any specific action is
threatened or even contemplated against them."  Id.  The Court
observed that "[t]o give these plaintiffs standing on the basis
of threatened injury would be to acknowledge, for example, that
all churches would have standing to challenge a statute which
provides that search warrants may be sought for church property
if there is reason to believe that felons have taken refuge
there.  That is not the law."  Id.

     The plaintiffs' attempt to rely upon their fear of
surveillance as a basis for standing in this case is not
materially distinguishable from the attempt that was rejected in
United Presbyterian.  As in United Presbyterian, the plaintiffs
in this case have not shown that any specific action is
threatened or even contemplated against them.  They have not
shown or alleged that the Government has sought or obtained

29

approval from the FISC to authorize surveillance of their communications.  They have not shown or alleged that surveillance of their communications has ever taken place under the challenged statute.  They only allege a fear, based on a perceived likelihood, that their communications will be surveilled.  But absent any showing that such surveillance has been conducted, authorized or even contemplated, the plaintiffs' fear is speculative.

Moreover, the alleged injury in this case is even more speculative than the injury asserted in United Presbyterian because the FAA requires a court to approve the application for surveillance, which includes making an independent judgment with respect to whether the guidelines proposed by the Executive Branch to circumscribe the requested surveillance comply with the Fourth Amendment.  The intervening role carved out for the Judicial Branch in the FAA makes the plaintiffs' assertion of standing on the basis of their fear of surveillance uniquely attenuated.

Arguments for standing similar to those asserted by the plaintiffs here were also rejected by the Court of Appeals for the Sixth Circuit in ACLU v. NSA, 493 F.3d 644 (6th Cir. 2007). ACLU involved a challenge to the constitutionality of the Terrorist Surveillance Program (the "TSP") conducted by the

30

National Security Agency (the "NSA").  The TSP entailed the
warrantless interception of telephone and email communications
with respect to which one party was located outside the United
States and the NSA had a reasonable basis to conclude that one
party was connected to al Qaeda.   See ACLU, 493 F.3d at 648.
The plaintiffs were journalists, academics and lawyers who
regularly communicated with individuals located overseas whom
they believed the NSA suspected of being connected to al Qaeda
and whom they believed the NSA would therefore be likely to
monitor under the TSP.   Id. at 648-49.   The ACLU decision was
fragmented into three opinions: a lead opinion, a concurrence,
and a dissent.   Both the lead opinion and the concurring opinion
rejected the plaintiffs' allegation that they had standing on
the basis of their fear of surveillance pursuant to the TSP.[13]

     The lead opinion rejected this basis for standing on the
rationale that "it would be unprecedented for this court to find
standing for plaintiffs to litigate a Fourth Amendment cause of
action without any evidence that the plaintiffs themselves have
been subjected to an illegal search or seizure."   Id. at 673-74
(Batchelder, J.).   The concurring opinion rejected standing on
the grounds that the plaintiffs had not shown that they were

---

[13]     The lead opinion only discussed this basis for standing in the context
of determining whether the plaintiffs had standing to bring Fourth Amendment
claims in connection with the TSP.   However, the lead opinion denied the
plaintiffs standing to bring any of their claims.

"personally subject to" the warrantless surveillance policy.
Id. at 691 (Gibbons, J., concurring).  The concurring opinion
drew an implicit distinction between proof of being subject to
the surveillance policy and proof of having been subjected to
actual surveillance pursuant to that policy.  The former
consisted of "evidence as to whether, in the government's view,
there are reasonable grounds to believe that a party to the
[plaintiffs'] communications is affiliated with al Qaeda."  Id.
at 690 (Gibbons, J., concurring) (internal quotation marks
omitted).  It was the failure to present such evidence that was
fatal to the plaintiffs' assertion of standing.  Relying on
United Presbyterian, the concurring opinion distinguished cases
involving "[a] genuine threat of enforcement of a policy against
a plaintiff who is demonstrably subject to that policy," which
supports standing, from cases "in which a plaintiff cannot
establish that he is subject to the policy but merely fears that
he is subject to the policy that may be enforced, which cannot
support standing."  Id. at 689 n.2 (Gibbons, J., concurring).
The plaintiffs could not demonstrate a genuine threat of
surveillance because they could not show that they were subject
to the challenged surveillance policy – that they would be
targeted by the policy.  See id. at 691 (Gibbons, J.,
concurring) ("There is no relevant factual difference between

32

the United Presbyterian Church plaintiffs, whose activities the
D.C. Circuit conceded made them more likely to be subject to
surveillance, and the attorney-plaintiffs in this case, whose
representation of exactly the types of clients targeted by the
TSP makes them more likely to be targeted by the TSP." Id. at
691 (Gibbons, J., concurring) (internal citations omitted).

The plaintiffs in this case, like the plaintiffs in ACLU
and United Presbyterian, have not made any showing that they are
subject to the surveillance policy they seek to challenge.
Without showing that they are subject to the statute they seek
to challenge, the plaintiffs' fear that they will suffer harm
from that statute is speculative and hypothetical.

Indeed, the plaintiffs in this case are one step further
removed from the challenged surveillance policy than were the
plaintiffs in ACLU.  The plaintiffs in ACLU sought to challenge
an actual program of surveillance that had already been
authorized by the President.  See ACLU, 493 F.3d at 648 n.1.
The TSP was more than a framework within which federal officials
could apply for authorization to engage in surveillance.  The
NSA was already authorized to monitor communications with
respect to which one party was located outside the United States
and there was a reasonable basis to believe that one party was
connected to al Qaeda.  As the concurring opinion in ACLU

33

explained, the plaintiffs in that case could not show that they were subject to that authorization of surveillance because they could not show that their communications fell into the class of communications that the NSA was authorized to monitor.  By contrast, the FAA does not authorize surveillance but rather authorizes the FISC to do so pursuant to the procedures set forth in the statute.  Thus the standing argument by the plaintiffs in this case is more speculative and hypothetical than the standing argument rejected by the Court of Appeals for the Sixth Circuit in ACLU.  No case from within or outside the context of surveillance provides any basis to conclude that the speculative fear of harm asserted by the plaintiffs is sufficient to support standing for a pre-enforcement challenge to a statute.

2.

At oral argument the plaintiffs sought to minimize the persuasiveness of United Presbyterian and ACLU, which denied standing to plaintiffs who feared the surveillance of their communications, by pointing to "physical surveillance cases" where the Supreme Court reached the merits of challenges to laws or policies authorizing drug or alcohol testing for specific classes of persons, without requiring that the plaintiffs had

34

actually submitted to such testing before bringing such
challenges.  (Tr. 9 ("The cases I'm thinking of are cases like
Earls and Chandler and Skinner.").)  None of those physical
search cases identified by the plaintiffs undermines the
reasoning of the electronic surveillance cases or otherwise
provides any support for the plaintiffs' standing argument.  The
physical search cases concerned plaintiffs who were in a defined
class of persons subject to a challenged policy of drug or
alcohol testing and who faced a genuine threat of being tested
pursuant to that policy.  In Board of Education of Independent
School District Number 92 of Pottawatomie County v. Earls, 536
U.S. 822, 826 & n.1 (2002), the Supreme Court found that a
student plaintiff who participated in competitive
extracurricular activities at school had standing to challenge a
Board of Education policy requiring all students participating
in such activities to consent to drug testing.  It was
indisputable in Earls that the challenged policy required a
student who participated in such extracurricular activities,
such as the plaintiff, to take a drug test before participating
in the activity, and to submit to random drug testing while
participating in the activity at any time based on reasonable
suspicion.  Earls, 536 U.S. at 826.  Earls therefore has no
application to this case, where the plaintiffs are not required

35

to do anything or to submit to anything, and where there is no showing that the Government has authorized any action against the plaintiffs.  See also Chandler v. Miller, 520 U.S. 305, 308-09 (1997) (ruling on merits, without discussing standing, where plaintiff candidates for state offices challenged state law requiring candidates for such offices to certify that they had taken a urinalysis drug test within 30 days prior to qualifying for nomination and that the test results were negative).

Among the drug or alcohol testing cases, the plaintiffs place particular emphasis on Skinner v. Railway Labor Executives' Association, 489 U.S. 602, 611 (1989), in which the Supreme Court upheld on the merits regulations authorizing railroads to conduct drug and alcohol testing of railroad employees after certain accidents, in the event of certain rule violations, or where a supervisor had a reasonable suspicion based on personal observation that an employee was under the influence of alcohol.  Skinner provides little guidance for the standing analysis in this case because standing was not contested in that case.  It was not discussed by the Supreme Court, the issue was not briefed before the Court, and the appellate court decision contained no discussion of standing. See Ry. Labor Executives' Ass'n v. Burnley, 839 F.2d 575 (9th Cir. 1988).

36

To the extent that the Supreme Court implicitly determined that there was standing in Skinner as a necessary prerequisite to jurisdiction, nothing about that determination affects the standing analysis in this case. The regulations at issue in Skinner authorized drug or alcohol testing of a defined class of persons represented by the plaintiff labor organizations, namely railroad employees. The plaintiffs were plainly subject to the challenged policy. By contrast, the FAA neither authorizes surveillance nor identifies, on its face, a class of persons to which the plaintiffs belong, and there is no allegation or evidence of an order authorizing Government surveillance that would encompass the plaintiffs' communications. Thus the relation in which the railroad employees stood to the challenged policy in Skinner is wholly unlike the relation in which the plaintiffs in this case stand to the FAA.

3.

Thus the electronic surveillance cases undermine any claim of standing in this case, and the drug or alcohol testing cases on which the plaintiffs rely do not support the plaintiffs' claims of standing to challenge the FAA based on their fear of surveillance. However, the plaintiffs urge the Court to look beyond surveillance cases. (See Tr. 11 ("Surveillance is just

37

like any other context . . . . [I]t's a completely artificial
distinction between surveillance cases [and] other contexts.").)
The plaintiffs claim that their position is supported by cases
outside the surveillance context considering the issue of
standing to make a pre-enforcement challenge to a statute or
regulation.  They argue that under those cases they have shown
an "actual and well-founded fear of enforcement" of the FAA
against them that is sufficient for standing in this case.

The plaintiffs' reliance on non-surveillance cases
considering pre-enforcement challenges to statutes or
regulations is unavailing.  The standing analysis displayed in
those cases is fully consistent with the rejection of standing
in the electronic surveillance cases.  Indeed, the application
of the reasoning employed by the non-surveillance cases to this
case reinforces the plaintiffs' lack of standing to challenge
the FAA.  The non-surveillance cases cited by the plaintiffs
stand for the proposition that a plaintiff may challenge a
specific law or regulation before it is enforced against the
plaintiff if the plaintiff is subject to that law or regulation
and has a well-founded fear that it will be so enforced.  The
plaintiffs in this case have made no showing that they are
subject to any specific law or regulation that they seek to
challenge.  The FAA does not require that the plaintiffs do

38

anything or refrain from doing anything such that they might have a well-founded fear that the Government would take action against them for failing to abide by the statute.  Moreover, the FAA does not authorize surveillance of the plaintiffs' communications and the plaintiffs have made no showing that the Government has sought any such surveillance pursuant to the general framework set forth in the statute or that such surveillance has been authorized.  It is unnecessary to seek to define the outer limits of what it would take for the plaintiffs to be subject to the FAA such that they would have standing to challenge its constitutionality.  The plaintiffs' failure to show that they are subject to the FAA in any concrete way is sufficient to conclude that the plaintiffs lack standing to challenge the FAA.

Under the line of non-surveillance cases referred to by the plaintiffs, "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it."  Vt. Right to Life, 221 F.3d at 382 (internal quotation marks omitted).  The plaintiffs seek to couch their fear of surveillance under the FAA as an "actual and well-founded fear" that the FAA will be enforced against them.

But the cases are clear that an actual and well-founded fear of enforcement depends upon a reasonable showing that the plaintiff is subject to the challenged law or regulation.  In the cases cited by the plaintiffs involving pre-enforcement challenges to non-surveillance statutes, the plaintiffs in those cases were subject to a challenged statute or regulation such that there would be consequences resulting from a failure to comply.  Courts reasonably have allowed challenges to such legal proscriptions without requiring the plaintiff to incur the penalties of non-compliance.  Cf. Babbitt v. United Farm Workers National Union, 442 U.S. 289, 302-03 (1979) (granting standing for pre-enforcement challenge to certain provisions of statute based on "realistic danger" of enforcement where plaintiffs intended to engage in conduct "arguably prohibited by the statute"); Pacific Capital Bank, N.A. v. Connecticut, 542 F.3d 341, 350 (2d Cir. 2008 (finding standing for pre-enforcement challenge by national bank to state statute limiting certain interest rates where plaintiff "reasonably interpreted [the statute's] limitation as, on its face, applying to [the plaintiff]"; Vt. Right to Life, 221 F.3d at 383 (finding standing for pre-enforcement challenge to statute proscribing range of activities relating to campaign finance disclosure and reporting requirements where plaintiff's interpretation of proscription to cover its activities was

40

"reasonable," and plaintiff's activities "could easily be construed" to fall within the statute's proscription); Nitke v. Gonzales, 413 F. Supp. 2d 262, 267 (S.D.N.Y. 2005) (per curiam) ("[T]o show that a fear [of enforcement] is well-founded, the plaintiff must show that it is reasonable.  A fear that a statute will be enforced against a plaintiff is reasonable if the plaintiff's interpretation of the statute to reach his or her conduct is itself reasonable.") (internal citation and quotation marks omitted).

Every non-surveillance pre-enforcement challenge case cited by the plaintiffs involved a law or regulation that could, at the very least, reasonably be interpreted on its face to apply to the plaintiffs in that case.  The plaintiffs in such cases faced the risks of non-compliance unless they received judicial relief from enforcement of the statute or regulation against them.  See, e.g., Am. Booksellers Ass'n, 484 U.S. at 392 (granting standing for pre-enforcement challenge to statute where "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution"); Am. Booksellers Foundation, 342 F.3d at 100-01 (finding standing for pre-enforcement challenge to state statute proscribing residents from distributing pornographic material

harmful to minors where statute "reach[ed] material posted on plaintiffs' websites"); New Hampshire Right to Life Political Action Committee v. Gardner, 99 F.3d 8, 14 (1st Cir. 1996) ("The record reveals that [the plaintiff] intends to engage in political expenditures of a type protected under the First Amendment, and New Hampshire's statutory scheme restricts [the plaintiff's] freedom to make those expenditures.") (internal citation omitted); see also Pac. Capital Bank, 542 F.3d at 350; Vt. Right to Life, 221 F.3d at 383.

The plaintiffs attempt to stretch the pre-enforcement cases to apply to their challenge to the FAA even though those cases do not arise in the context of electronic surveillance or surveillance of any kind, and even though the facts of those cases bear no resemblance to the standing issues raised in the context of the FAA. A fundamental tenet of standing is that a plaintiff must show that the plaintiff has suffered an actual or imminent injury in fact, that is concrete and particularized, and not conjectural or hypothetical. Lujan, 504 U.S. at 559. In each of the pre-enforcement cases, the plaintiff or plaintiffs could point to a specific statute that reasonably could be applied to them and which produced consequences if they failed to comply. That provided concrete and particularized injury.

42

In this case, the plaintiffs have not made a reasonable showing that they are subject to the challenged statute in any way. The FAA does not require the plaintiffs to do anything or refrain from doing anything, and does not authorize surveillance to which the plaintiffs will be subject. The statute cannot reasonably be interpreted on its face to apply to the plaintiffs, because it neither authorizes surveillance nor refers to a class of persons that on its face could reasonably be construed to include the plaintiffs. Moreover, there is no allegation or evidence that an order has been obtained pursuant to the statute authorizing the surveillance of communications that could reasonably be construed to include the plaintiffs' communications. Therefore the plaintiffs cannot establish standing on the basis of a well-founded fear of enforcement. The plaintiffs have failed to show that there is anything to enforce, because they have failed to show that they are subject to the statute. The plaintiffs' alleged fears of enforcement arising from the fact that surveillance orders of unknown scope may eventually be issued that may affect them bear no resemblance to the fears of enforcement of specific statutes or regulations that reasonably apply to complaining plaintiffs and that have been found sufficient for purposes of standing.

The Supreme Court's decision in Babbitt, relied upon by the plaintiffs, does not suggest otherwise.  In Babbitt, the plaintiffs, including a farmworkers' union (the "UFW"), challenged, in relevant part, five provisions of a farm labor statute passed in Arizona.  Babbitt, 442 U.S. at 292-93.  The Court emphasized that "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Id. at 298.  The Court held that the plaintiffs had standing to challenge three of the five provisions of the statute but not the remaining two.  The first challenged provision regulated the election of employee bargaining representatives, specifying certain procedures for such elections.  Id. at 292-94, 299.  The Court found that the plaintiffs had standing to challenge that provision, because "the UFW has in the past sought to represent Arizona farmworkers and has asserted in its complaint a desire to organize such workers and to represent them in collective bargaining."  Id. at 300.

The second challenged provision limited consumer publicity and violations of the statute were criminally punishable.  Id. at 301-02.  The Court found that the plaintiffs had standing to challenge that provision because they intended to engage in

consumer publicity and erroneous statements would be inevitable.
Id. at 302.

The third challenged provision was the criminal penalty
provision of the statute, which authorized the imposition of
criminal sanctions against any person violating any provision of
the statute.  Id. at 303.  The Court found that the plaintiffs
had standing to challenge the criminal penalty provision because
they intended to engage in conduct that may be proscribed by the
statute.  Id.

Standing for the plaintiffs in Babbitt lends no support to
the plaintiffs in this case.  In Babbitt the Supreme Court found
that the plaintiffs had standing to challenge provisions of a
statute that could be construed on their face to proscribe or
regulate conduct in which the plaintiffs wished to engage.  The
analysis in Babbitt cannot be superimposed onto this case.  The
plaintiffs in this case have not challenged a statute that
regulates or proscribes any conduct by them, as was the case in
Babbitt, or that otherwise applies to them.

To the extent the decision in Babbitt bears on the issue of
standing in this case, it is instructive for its rejection of
the plaintiffs' bid for standing to challenge one of the
remaining provisions of the statute.  That provision provided
that no employer was required to furnish certain information to

45

a labor organization to enable that organization to communicate
with employees of the employer, members of the labor
organization, its supporters, or adherents (the "access
provision"). Id. at 303-04. The UFW argued that it would seek
access to employers' property to communicate with farmworkers,
which the Court conceded it would do. Id. at 304. However, the
Court found the challenge to be non-justiciable because the
plaintiffs had not yet "assert[ed] an interest in seeking access
to particular facilities as well as a palpable basis for
believing that access will be refused." Id.; see also id.
("[I]t is conjectural to anticipate that access will be denied.
More importantly, [plaintiffs'] claim depends inextricably upon
the attributes of the situs involved.").

The plaintiffs' challenge to the FAA is similarly non-
justiciable. The plaintiffs seek to challenge the FAA without
any showing that the FISC has approved surveillance that could
encompass their communications. Thus the plaintiffs in this
case lack a "palpable basis for believing" that their
communications will be surveilled. In Babbitt it was
"impossible to know whether access will be denied to places
fitting [plaintiffs'] constitutional claim." Id. The
plaintiffs' claim depended upon the attributes of the situs to
which they sought access, and the plaintiffs had not asserted an

46

interest in gaining access to any particular situs.  Like the plaintiffs in Babbitt attempting to challenge the access provision, the plaintiffs in this case have only a hypothetical fear of being harmed by the statute that is insufficient to support standing.[14]

In sum, the plaintiffs' assertion of standing to challenge the FAA on the basis of their fear of surveillance finds no support in the cases that have analyzed standing to challenge electronic surveillance.  The plaintiffs' argument also finds no support in the cases relating to drug and alcohol testing or the pre-enforcement challenges to non-surveillance statutes and regulations on which the plaintiffs rely.  In none of those contexts do the cases provide any support for the proposition that a plaintiff may challenge a statute to which the plaintiff cannot reasonably be considered subject.  On its face the FAA does not regulate or proscribe the plaintiffs' conduct or authorize surveillance of a class of persons that includes the plaintiffs.  Moreover, the plaintiffs have neither alleged nor shown that the Government has sought or obtained an order from the FISC authorizing surveillance that could reasonably be construed to encompass their communications.  The plaintiffs'

---

[14]     In Babbitt the Supreme Court also denied the plaintiffs standing to challenge a compulsory arbitration provision in the statute.  The Court based its holding in part on the fact that the plaintiffs had "never contested the constitutionality of the arbitration clause."  Id. at 305.

alleged fear of surveillance is insufficient to provide them
with standing to challenge the FAA.

                                B

     The plaintiffs purport not to rely solely upon their fear
of surveillance as a basis for standing to challenge the FAA.
They offer what they characterize as a second, independent basis
for standing: the costly and burdensome measures they have
undertaken, as a result of that fear, to ensure the
confidentiality of their international communications.  The
plaintiffs argue that such costs constitute "specific present
objective harm[s]" suffered as a result of the passage of the
FAA and therefore qualify as an injury in fact for purposes of
standing.  (Tr. 18.)  The Government counters that any costs
incurred by the plaintiffs have resulted not from the challenged
statute itself but from the alleged subjective chilling effect
the statute has had on the plaintiffs' communications.  The
Government urges that the assertion of standing on the basis of
a "subjective chill" of this kind is foreclosed by Supreme Court
precedent.

     The costs the plaintiffs have incurred in an effort to
protect the confidentiality of their international
communications fail to provide a basis for standing to challenge

                               48

the constitutionality of the FAA.  This second basis for standing is not truly independent of the first basis; the costs incurred by the plaintiffs flow directly from the plaintiffs' fear of surveillance.  To allow the plaintiffs to bring this action on the basis of such costs would essentially be to accept a repackaged version of the first failed basis for standing. The plaintiffs cannot manufacture a sufficient basis for standing from an insufficient one.

The plaintiffs argue that their fear of surveillance has chilled their normal exchange of international communications and thereby forced them to incur certain costs to protect the confidentiality of those communications by carrying them out through alternative means.  But because the plaintiffs have failed to show that they are subject to the FAA and that they face a threat of harm from its enforcement, the chilling of their speech that they attribute to the statute is actually the result of their purely subjective fear of surveillance.  The Supreme Court has held that a subjective chill of this kind is insufficient to support standing.  In Laird v. Tatum, 408 U.S. 1, 6 (1972), the Supreme Court considered a First Amendment challenge to an Army surveillance program that entailed "the collection of information about public activities that were thought to have at least some potential for civil disorder," and

49

the dissemination and storage of such information within the
Army.  The plaintiffs argued that they had standing to challenge
the program because the existence of the program chilled the
exercise of their First Amendment rights.  The Court rejected
the argument that a plaintiff "who alleges that the exercise of
his First Amendment rights is being chilled by the mere
existence, without more, of a governmental investigative and
data-gathering activity" has standing to invoke the jurisdiction
of a federal court.  Id. at 10.  Noting that the plaintiffs had
failed to connect the existence of the surveillance program to
their own speech, the Court held that "[a]llegations of a
subjective 'chill' are not an adequate substitute for a claim of
specific present objective harm or a threat of specific future
harm; the federal courts established pursuant to Article III of
the Constitution do not render advisory opinions."  Id. at 13-14
& n.7 (internal quotation marks omitted).  The Court
distinguished its prior cases finding standing to challenge
Government conduct that allegedly violated the First Amendment
by chilling protected speech, explaining that "in each of these
cases, the challenged exercise of governmental power was
regulatory, proscriptive, or compulsory in nature, and the
complainant was either presently or prospectively subject to the

regulations, proscriptions, or compulsions that he was challenging." Id. at 11.

Like the plaintiffs in Laird, the plaintiffs in this case allege that their communications are chilled by the sheer existence of the challenged policy without connecting the policy to their own speech. Therefore the analysis of the plaintiffs' second purported basis for standing in this case is controlled by Laird. In Laird "the chilling effect alleged . . . was so remote and speculative that there was no justiciable case or controversy and therefore the federal courts lacked jurisdiction under Article III of the Constitution." Davis v. Vill. Park II Realty Co., 578 F.2d 461, 463 (2d Cir. 1978) (finding standing for First Amendment claim alleging that threat of eviction, manifested in attempt by defendant management company to terminate tenant plaintiff's lease, chilled plaintiff's expressive activity in connection with tenants' association). The same is true in this case, where the plaintiffs have failed to make any showing that they are subject to the FAA.

The plaintiffs insist that the Supreme Court's distinction in Laird between the challenged policy in that case and challenged exercises of Government power in previous cases that were "regulatory, proscriptive, or compulsory in nature" was only a distinction and not a prospective rule that plaintiffs

51

may only challenge Government policies that are regulatory,
proscriptive, or compulsory.  See Socialist Workers Party v.
Attorney General of the United States, 419 U.S. 1314, 1318
(1974) (Marshall, J., sitting as Circuit Justice) ("In my view .
. . the Court [in Laird] was merely distinguishing earlier
cases, not setting out a rule for determining whether an action
is justiciable or not."); ACLU, 493 F.3d at 693 n.3 (Gibbons,
J., concurring) ("The language in Laird about regulation,
proscription, and compulsion to me seems merely descriptive of
the facts in prior cases in which the Supreme Court had found
standing."); but see ACLU, 493 F.3d at 661 (Batchelder, J.)
("[T]o allege a sufficient injury under the First Amendment, a
plaintiff must establish that he or she is regulated,
constrained, or compelled directly by the government's actions .
. . .").

        It is unnecessary to decide whether an argument for
standing based on a chill of expressive activity should be
limited to cases in which the plaintiff is complaining about a
statute or regulation that is "regulatory, proscriptive, or
compulsory in nature" or whether a plaintiff can allege such a
chill based on a statute or regulation to which the plaintiff is
otherwise subject.  The plaintiffs in this case have failed to
show that they are subject to the statute other than by

                                52

speculation and conjecture, which is insufficient for standing. The plaintiffs in this case have made no showing that they are subject to the statute they seek to challenge, and therefore have made no showing that they face a danger of being harmed as a result of the statute.  In the standing context the indirect harm of a chilling effect on speech may only be asserted in conjunction with a danger of direct harm from the challenged statute, because that danger is the source of the chill.  See Laird, 408 U.S. at 12-13 ("[G]overnmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights.  At the same time, however . . . to entitle a private individual to invoke the judicial power to determine the validity of executive or legislative action he must show that he has sustained, or is immediately in danger of sustaining, a direct injury as the result of that action.") (internal quotation marks and ellipsis omitted).  As the Supreme Court explained: "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." Id. at 13-14 (internal quotation marks omitted).

A plaintiff's claim that a Government policy chills the plaintiff's expressive activity is not an independent basis to challenge the policy.  The alleged chill must be grounded in a threat of harm from the policy to which the plaintiff can reasonably argue he is subject; otherwise the chill is plainly subjective.  Cf. Davis, 578 F.2d at 463 (chilling effect grounded in threat of eviction).  A chilling effect can only be a product of a threat of direct harm, not a "substitute" for such a threat.  Laird, 408 U.S. at 14.

The plaintiffs argue that the chilling effect the FAA has had on their speech cannot be considered subjective because they have incurred real, objective costs to avoid surveillance. Embedded in that argument is a misunderstanding of what was meant in Laird by the term "subjective."  In Laird the Supreme Court found that a plaintiff cannot establish standing by "alleg[ing] that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity . . . ." Id. at 10.  What made the chilling effect subjective in Laird was the plaintiffs' failure to show that they were subject to the challenged policy and faced a threat of harm from it.  The plaintiffs could only show that the surveillance policy existed. The plaintiffs' failure to substantiate the alleged chill with

proof that they really were subject to the information gathering
policy made their alleged chill "subjective."  See Ozonoff v.
Berzak, 744 F.2d 224, 229 (1st Cir. 1984) (Breyer, J.)
(interpreting phrase "without more" in Laird to mean that "[t]he
plaintiffs in Laird did not claim that the information gathering
activities were directed against them specifically or that the
gathered data could be directly used against them in any
foreseeable way").  All of the plaintiffs' alleged "objective"
expenditures are insufficient to establish standing because they
all arise from the plaintiffs' choices to incur expenditures and
costs that are not based on a sufficient showing that the
statute in question was directed at them.

    The Court of Appeals for the District of Columbia Circuit
relied upon Laird in rejecting the allegation of a chilling
effect as a basis for standing in United Presbyterian.  The
United Presbyterian Court denied standing to certain political
and religious organizations to challenge an Executive Order that
provided a framework for agencies within the intelligence
community to seek and obtain approval from the Attorney General
for certain kinds of surveillance.  One of the bases for
standing that was proffered by the plaintiffs and rejected by
the Court was the assertion that their expressive activities
were chilled by the fear that their communications would be

surveilled under the Executive Order.  See United Presbyterian,
738 F.2d at 1378.  In rejecting this basis for standing, the
Court explained that "[a]ll of the Supreme Court cases employing
the concept of the 'chilling effect' involve situations in which
the plaintiff has unquestionably suffered some concrete harm
(past or immediately threatened) apart from the 'chill' itself."
Id.  In United Presbyterian the plaintiffs could not point to
any such concrete harm because they could not show that "any
specific action [was] threatened or even contemplated against
them" with respect to the Executive Order.  Id. at 1380.

    The same analysis applies in this case.  The plaintiffs
have not shown that any specific action is threatened or
contemplated against them because they have not shown that they
are subject to the FAA.  Therefore they have failed to allege a
concrete harm "apart from" the chilling effect on their
international communications, and the chilling effect is their
subjective fear of being surveilled which is insufficient in the
absence of evidence that they are subject to surveillance under
the statute.  Cf. ACLU, 493 F.3d at 688 (Gibbons, J.,
concurring) (rejecting assertion of standing based on chilling
effect together with assertion of standing based on "well-
founded fear" of surveillance because "[t]he disposition of all
of the plaintiffs' claims depends upon the single fact that the

plaintiffs have failed to provide evidence that they are personally subject to the [challenged surveillance program].").

The plaintiffs cite a number of cases allowing challenges to statutes or policies based on the chilling effect such statutes or policies had on a plaintiff's expressive conduct. But in each of those cases, the plaintiff was subject to the challenged policy and faced potential harm from the enforcement of the policy. In Meese v. Keene, 481 U.S. 465, 467 (1987), the plaintiff alleged that he was chilled from exhibiting three films because under the challenged statute they would be labeled "political propaganda," thereby injuring his reputation. Crucially, there was no question in Meese that the statute applied to the films the plaintiff wished to exhibit. See Meese, 481 U.S. at 467 n.1. That fact distinguishes Meese from this case. In holding that the plaintiff had standing in Meese, the Supreme Court emphasized that the plaintiff had shown that he faced a threat of harm from the statute if he chose to exhibit the films. See id. at 473 ("We find, however, that [the plaintiff] has alleged and demonstrated more than a 'subjective chill'; he establishes that the term 'political propaganda' threatens to cause him cognizable injury."). The Court explained that under Laird, if the plaintiff could not show that the label of "political propaganda" would be harmful to him, he

57

would not have standing to challenge the statute.  See id.  The
plaintiff plainly could not have shown that the label would be
harmful to him without showing that his films would be subject
to the label.  The finding that the plaintiff's films were
subject to the challenged statute was a predicate to the finding
of standing in Meese for which there is no corollary in this
case.

The plaintiffs fare no better in their reliance on Ozonoff.
In Ozonoff, the Court of Appeals for the First Circuit found
standing to challenge an Executive Order based on the chilling
effect it would exert on the plaintiff's expressive activity.
See Ozonoff, 744 F.2d at 228.  The Executive Order provided for
a loyalty check, conducted by the Executive Branch, of persons
who applied to work for the World Health Organization (the
"WHO").  See id. at 225.  The plaintiff in Ozonoff "would like
to work" for the WHO, and thus there was no question that he was
subject to the policy of loyalty checks and the potential harm
of being denied a job with the WHO on account of being found
disloyal if the policy were enforced.  Id.  The Court found
standing based on the plaintiff's assertion that he planned to
apply for a job with the WHO and the challenged policy chilled
his expressive conduct by discouraging activity that might be
considered disloyal.  See id. at 228-29.  The Court explained

58

that the relevant inquiry was "whether the Order reasonably leads [the plaintiff] to believe he must conform his conduct to its standards." Id. at 229-30.  In distinguishing the case from Laird, the Court made clear that the reasonableness of that belief depended on the plaintiff being subject to the challenged policy: "The plaintiffs in Laird did not claim that the information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way." Id. at 229 (emphasis in original).

The plaintiffs in this case have not shown that the challenged statute is directed against them.  The chilling effect in Ozonoff was the result of the plaintiff's fear of harm from the enforcement of a policy to which he was subject. Because that much has not been shown in this case, the alleged chill of the plaintiffs' speech in this case is not analogous to the chill of the plaintiff's speech in Ozonoff.  Cf. also Socialist Workers Party, 419 U.S. at 1315 (Marshall, J., sitting as Circuit Justice) (granting standing to challenge prospective surveillance of convention where plaintiffs "apparently learned that the FBI planned to monitor the . . . convention").

The plaintiffs claim to find support for their assertion of standing based on the chilling of their speech in Friends of the

Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528
U.S. 167 (2000).  In Laidlaw, the Supreme Court found that
environmental groups whose members, among other things, wished
to use and enjoy a river into which the defendant was dumping
pollutants, had standing to sue the defendant.[15]  See Laidlaw,
528 U.S. at 181-82.  The Court found that the plaintiffs had
demonstrated injury in fact based on the evidence that members
of the plaintiff environmental groups were deterred from using
the river by the defendant's pollution.  See id. at 183.  The
plaintiffs suggest that their own reluctance to engage in
international communications is analogous to the reluctance of
the Laidlaw plaintiffs to use the river.  They extrapolate from
that analogy that they have standing to challenge the FAA.

    The plaintiffs' reliance on Laidlaw is plainly misplaced.
Laidlaw did not concern an alleged chill of First Amendment
activity, making any comparison between the plaintiffs' second
purported basis for standing in this case and the plaintiffs'
basis for standing in Laidlaw strained at best.  In any event,
Laidlaw does not help the plaintiffs.  In Laidlaw the members of
the plaintiff organizations had allegedly ceased to use the
river because of the concrete harm caused by the defendant's

---

[15]    The plaintiffs in Laidlaw also included a person whose property value
was allegedly diminished by the pollution of the river and another who would
like to purchase a home near the river but did not intend to do so because of
the pollution.  See id. at 182.

discharge of pollutants into the river.  The discharge of
pollutants was already occurring and there was no question that
the plaintiffs were affected by the discharge because they
ceased to use the river as a result of the defendant's activity
that allegedly harmed the river in which they had an
environmental interest.  Cf. ACLU, 493 F.3d at 689 (Gibbons, J.,
concurring) ("[I]n Laidlaw, the plaintiff's [sic] fear of harm
from the defendant's undisputed conduct – conduct that would
also undisputably affect plaintiffs personally if they undertook
their desired activities – was sufficient to support standing.")
(emphasis in original)).[16]  In this case, the plaintiffs'
reluctance to engage in their desired speech is self-imposed
because their fear of surveillance under the FAA is an abstract
and hypothetical one, for all of the reasons explained above.
Thus the reasoning behind the finding of standing in Laidlaw
does not support the plaintiffs' standing argument in this case.

    The plaintiffs' reliance on United States v. SCRAP, 412
U.S. 669 (1973), fares no better.  Like Laidlaw, SCRAP did not
involve an alleged chill of First Amendment activity.  Indeed,
the analysis of standing in SCRAP did not concern any sort of
deterrence or discouragement of the plaintiffs' behavior.

---

[16]    Judge Gibbons explained: "I read Laidlaw to require that plaintiffs
demonstrate that they (1) are in fact subject to the defendant's conduct, in
the past or future, and (2) have at least a reasonable fear of harm from that
conduct." ACLU, 493 F.3d at 689 (Gibbons, J., concurring).

SCRAP concerned a challenge by environmental groups, among others, to a decision by the Interstate Commerce Commission (the "Commission") allowing railroads to collect a 2.5% percent surcharge on freight rates.  SCRAP, 412 U.S. at 678.  The plaintiff groups argued that the surcharge would harm them by making the use of recycled goods more expensive, thereby impacting forests and other natural environments that members of the plaintiff groups used and intended to use.  See id. at 684-85.  The Court acknowledged skepticism with respect to whether the plaintiffs would be able to prove that the surcharge would harm the areas of the environment in which the plaintiffs had an interest.  See id. at 688 (referring to chain of causation as "attenuated").  Nevertheless, the Court found standing because the plaintiffs' allegations, "if proved, would place them squarely among those persons injured in fact by the Commission's action[.]"  Id. at 690.  The standing issue in SCRAP arose on a motion to dismiss based on the pleadings, and therefore the Court's doubts as to whether the plaintiffs would be able to prove that the surcharge would cause them harm did not bear on the standing analysis.  See id. at 683-84.

It is difficult to understand how the plaintiffs can find any analogy between the standing analysis in SCRAP and their effort to allege standing in this case.  In SCRAP, the conduct

62

challenged by the plaintiffs was the Commission's authorization
of the railroads to collect a surcharge that the plaintiffs
alleged would injure them.  The collection of the surcharge had
already been authorized and the plaintiffs alleged facts that,
if true, would "place them squarely among those persons injured"
by the surcharge.  The plaintiffs' fear of surveillance under
the FAA in this case bears no relation to the plaintiffs' fear
of harm from the surcharge in SCRAP.  The plaintiffs in this
case have neither alleged nor shown that surveillance
encompassing their communications has been authorized or even
that such authorization has been sought by the Government.
Neither in SCRAP nor in any case cited by the plaintiffs has any
court found that a plaintiff had standing to bring a lawsuit in
circumstances remotely similar to these.

      For all of the reasons explained above, the plaintiffs'
second purported basis for standing cannot survive the failure
of the first.  Therefore the costs incurred by the plaintiffs in
seeking to protect their international communications from
surveillance under the FAA do not constitute a basis for
standing for the plaintiffs' constitutional challenge to that
statute.

CONCLUSION

For all of the foregoing reasons, the plaintiffs lack
Article III standing to bring this constitutional challenge to
the FAA. The plaintiffs' motion for summary judgment is **denied**.
The Government's motion for summary judgment is **granted**. The
Clerk is directed to close Docket Nos. 6 and 12 and to enter
judgment dismissing the complaint and closing this case.

SO ORDERED.

Dated: New York, New York
     August 20, 2009

John G. Koeltl
United States District Judge